TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

JOSEPH L. PARKHURST
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
(STATE BAR NUMBER 16692)
E-MAIL: CADOCKET@AZAG.GOV

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Bradley Schwartz | CIV 09–200–TUC–DCB (DTF) |
|     Petitioner, | |
|     -vs- | |
| Charles L. Ryan, et al., | ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS |
|     Respondents. | |

Respondents, pursuant to Rules 5 and 11 of the Rules Governing § 2254 Cases, and this Court's order of April 20, 2009, hereby answer the Petition for Writ of Habeas Corpus.  For the reasons set forth in the following Memorandum of Points and Authorities, Respondents respectfully request that the petition be denied and dismissed with prejudice.

DATED this 6th day of July, 2009.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL

S/JOSEPH L. PARKHURST
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR RESPONDENTS

## MEMORANDUM OF POINTS AND AUTHORITIES

Petitioner Bradley Alan Schwartz seeks 28 U.S.C. § 2254 habeas corpus relief from his 2006 state court conviction and life sentence for conspiracy to commit first degree murder.

## I.    FACTUAL AND PROCEDURAL BACKGROUND.

The victim, Dr. David Stidham, was murdered in Tucson, Arizona, on October 5, 2004.  In 2000, Schwartz owned a medical practice specializing in neuroophthalmic plastic surgery and pediatric ophthalmology.  (R.T. 3/30/06, p.m., at 56, 100–02.)  His practice had 12 employees, and his gross income was over $1 million in both 2001 and 2002.  (R.T. 3/22/06, at 79–80; R.T. 3/30/06, p.m., at 61, 101; R.T. 3/31/06, p.m., at 13, 60–61; R.T. 4/11/06, p.m., at 46–49.)  In 2001, Schwartz hired Stidham to help with the pediatric ophthamology practice.  (R.T. 3/22/06, at 79–80; R.T. 4/11/06, p.m., at 45, 48.)

Sometime in 2000 or 2001, Schwartz underwent neck surgeries and began abusing prescription painkillers.  (R.T. 3/22/06, at 52; R.T. 3/30/06, at 131.)  In October 2002, the State Medical Board suspended Schwartz' license to practice for abusing drugs and writing fake prescriptions.  (R.T. 3/31/06, a.m., at 17–18.)  At the same time, the United States Drug Enforcement Agency (DEA) withdrew Schwartz' license to prescribe class 2 and 3 drugs (addictive medications).  (*Id.* at 27.)  The State Medical Board also required Schwartz to seek treatment, and in October and November 2002 Schwartz went to Cottonwood rehabilitation center for 30 days.  (R.T. 3/21/06, at 27; R.T. 3/31/06, a.m., at 16.)  Thereafter, he checked into an in-patient treatment facility in Illinois where he remained until February 2003.  (R.T. 3/31/06, a.m., at 18.)  From February 2003 until the date of Stidham's murder—October 5, 2004—Schwartz was in a monitored aftercare program requiring him to submit to regular urine testing for drugs.  (*Id.* at 22.)

During his rehabilitation period, Schwartz fired Stidham for allegedly soliciting business for himself at Schwartz' office.  (R.T. 3/30/06, at 29–35.)

1   Stidham allegedly took some of Schwartz' patients and employees with him to his

2   new practice.  (R.T. 4/11/06, p.m., at 53.)

3        The State Medical Board reinstated Schwartz' license to practice in October

4   2003.  (R.T. 3/31/06, a.m., at 26.)  He reopened his practice and eventually had

5   four employees.  (R.T. 3/21/06, at 178–80; R.T. 4/11/06, p.m., at 53.)  At the time

6   of Stidham's murder, the DEA had not yet restored Schwartz' license to write

7   prescriptions for class 2 and 3 drugs.  (R.T. 3/31/06, a.m., at 29.)  Likewise,

8   hospitals and health care organizations had withdrawn Schwartz' privileges.  (*Id.* at

9   35–36, 45–46.)  At the time of Stidham's death, Schwartz had regained privileges

10  at only one hospital, Northwest Hospital in Tucson.  (R.T. 3/31/06, a.m., at 35; R.T.

11  4/11/06, p.m., at 55.)  His gross income in 2003 was $118,000; in 2004, $276,000.

12  (R.T. 3/31/06, p.m., at 62–63.)

13       Schwartz was beleaguered by debt.  (R.T. 3/21/06, at 179; R.T. 3/31/06,

14  p.m., at 69–70.)  In January 2004, Schwartz was ordered to pay approximately

15  $10,000 per month in alimony and child support.  (R.T. 3/24/06, p.m., at 17; R.T.

16  3/30/06, at 83–86.)  Schwartz borrowed $100,000 from associates.  (R.T. 3/21/06,

17  at 28–30, 184; R.T. 3/30/06, p.m., at 128.)  On October 4, 2004, the day before

18  Stidham was murdered, Schwartz sold his 2003 Toyota Camry for $15,500.  (R.T.

19  3/31/06, p.m., at 127.)

20  **Lourdes Lopez**

21       Lourdes Lopez was a deputy Pima County Attorney from 1999–2002.  (R.T.

22  3/21/06, at 158.)  Lopez met Bradley Schwartz in December 2000 when Lopez

23  brought her foster daughter to Dr. Schwartz' offices to get eye surgery.  (*Id.* at 161.)

24  Lopez and Schwartz became romantically involved and were later engaged in

25  January 2004.  (*Id.* at 162.)  They broke up in May 2004.  (*Id.* at 163.)  Lopez

26  described Schwartz' practice as doing very well prior to October 2002.  (R.T.

27  3/22/06, at 79–80.)  She remembered that Schwartz hired Stidham to help with the

28  pediatric patient load.  (*Id.*)  She said Stidham was an employee, not a partner, and

that the business belonged to Schwartz. (*Id.* at 81–82.)

Sometime in 2000 or 2001, Schwartz had surgery and began abusing prescription painkillers. (*Id.* at 52.) Twice he asked Lopez if he could use her name to write prescriptions for Vicodin. (*Id.* at 49.) Another time he used her name without asking her. (*Id.*) In September or October 2001 the DEA contacted Lopez about the fraudulent prescriptions. (*Id.* at 42.) She initially lied to the DEA agents to protect Schwartz. (R.T. 3/21/06, at 186; R.T. 3/22/06, at 47.) But later she contacted the U.S. Attorney to "clarify" her statement. (R.T. 3/21/06, at 186–88.) In August 2002, Lopez was forced to resign her position with the Pima County Attorney. (R.T. 3/21/06, at 193; R.T. 3/22/06, at 41.) When asked why she left the County Attorney's office, she testified, "Because I knew that I was going to be indicted." (R.T. 3/21/06, at 191.)

Stidham left Schwartz' practice in October 2002, around the time of Schwartz' drug rehabilitation,. (R.T. 3/21/06, at 164–65; R.T. 3/22/06, at 10, 83–84.) Lopez said Schwartz felt Stidham left him when Schwartz needed him most. (R.T. 3/22/06, at 13.) Between October 2002 and September 2003, he talked to Lopez about plans to humiliate Stidham, such as planting child pornography in Stidham's new office. (R.T. 3/21/06, at 166–70.) Schwartz also inquired about the criminal liability for possessing child pornography. (*Id.*) About Stidham, Schwartz repeatedly stated, "that fucking guy is going to die." (R.T. 3/22/06, at 11.) Schwartz told her he would have someone else do it and it would look like a carjacking or robbery outside Stidham's office. (*Id.* at 14, 31.) Lopez said this kind of conversation would recur every time a hospital or health plan chose not to reinstate Schwartz' privileges. (*Id.* at 12.) Schwartz asked Lopez about police procedures for gathering fingerprints and DNA evidence. (R.T. 3/21/06, at 169–71.) Lopez said she did not take him seriously. (R.T. 3/22/06, at 16.) Nevertheless, Lopez claimed that she told Paul Skitzki of the County Attorney's Office about these conversations between May and October 2004. (*Id.* at 105–06.)

1  The trial court precluded Skitzki's testimony at trial.   (Respondents Exhibit A,
2  Excerpts of Record on Appeal (hereafter "R.O.A.") item 617.)

3      Lourdes Lopez had been married to Danny Lopez from 1988 to 1995.  (R.T.
4  3/21/06, at 172.)  Schwartz knew Danny through Lourdes.  (*Id.* at 174.)  Sometime
5  in early 2004, Schwartz had contacted Danny to take care of someone.   (R.T.
6  3/17/06, p.m., at 36–38.)   According to Lourdes, Schwartz gave Danny Lopez
7  $5,000 in February 2004 ostensibly for Danny's new son, born December 2003.
8  (R.T. 3/21/06, at 177–78; R.T. 3/22/06, at 96.)   Danny Lopez was murdered in
9  Omaha, Nebraska, on March 10, 2004.   (R.T. 3/17/06, p.m., at 50.)   Among his
10 personal effects on the day he was murdered were Schwartz' business card and a
11 photocopy of a photograph of Stidham.  (*Id.*)  Around April or May 2004, Schwartz
12 told Carmen Fernandez that he had already paid Danny Lopez to get rid of
13 Stidham, but that Danny had been murdered before he could do it.  (R.T. 3/17/06,
14 a.m., at 28.)   After Stidham's death, Schwartz told Lilliana Bibb and Carmen
15 Fernandez that Lourdes Lopez' ex-husband Danny Lopez was supposed to have
16 been the hit man.  (R.T. 3/15/06, p.m., at 38–39; R.T. 3/17/06, a.m., at 28.)

17 **January to October 2004**

18      Aisha Henry met Schwartz in October 2002.  (R.T. 3/16/06, at 18.)  He told
19 Henry he had lost patients to Stidham.   (*Id.* at 20–22.)   She described him as
20 "obsessed with revenge."   (*Id.* at 22.)   Schwartz asked her to take her son to
21 Stidham's office and call the police with accusations that Stidham had fondled her
22 son.   (*Id.* at 24–25.)   When she refused, Schwartz asked Henry to make an
23 appointment with Stidham herself and report it to the police that Stidham touched
24 her.  (*Id.* at 26–27.)  Henry declined.  In early 2004, Schwartz told her that Danny
25 Lopez was going to take care of it.   (*Id.* at 28.)   In July 2004, Schwartz asked
26 Henry whether her husband could harm Stidham, crush Stidham's hands or throw
27 acid in Stidham's face.   (*Id.* at 30–33.)   He said her husband could wear scrubs.
28 (*Id.*)  He offered $1,500 up front and $1,500–2,000 afterward.  (*Id.*)  Henry took

1   the $1,500 but a few days later said they could not do it.  (*Id.* at 34–35.)

2       In January 2004, Rosalia Humo applied for a job in Schwartz' new office.

3   (R.T. 3/17/06, p.m., at 69–70.)  Schwartz told Humo that he had a big problem with

4   Stidham because Stidham had stolen patients and had publicized Schwartz' drug

5   problems.  (*Id.*)  Schwartz asked her to plant child pornography or illegal drugs in

6   Stidham's office so that it could be publicized the way Schwartz' misdeeds had

7   been.  (*Id.* at 69–70.)  Schwartz also told Humo that he wanted Stidham dead and

8   that he wanted it to look like a carjacking.  (*Id.* at 72–74.)  Humo said she did not

9   take him seriously.  (*Id.* at 76.)

10      Stephanie Nagel met Schwartz when they both were reporting to the federal

11  courthouse for urine testing.  (R.T. 3/16/06, at 67.)  She said Schwartz approached

12  her several times to help him find a person who could take care of someone he

13  used to work with.  (*Id.* at 70–72.)  Schwartz offered Nagel $500 to find someone.

14  (*Id.* at 73.)  He said the person could make it look like a robbery.  (*Id.* at 76.)

15  Nagel said she did not take him seriously.  (*Id.* at 109.)

16      Rachel Atkinson dated Schwartz in early 2004 after Schwartz saw her infant

17  son for treatment.  (R.T. 3/24/06, a.m., at 8–9.)  Schwartz filled her in about how

18  he lost his hospital privileges and how he hated Stidham for badmouthing him at

19  hospitals.  (*Id.* at 12–14.)  Schwartz told her he had someone staking out Stidham's

20  office and that he had had someone to take care of Stidham but the person had

21  died.  (*Id.* at 14–15.)  Schwartz asked Atkinson to take her son to Stidham for a

22  second opinion and then make accusations that Stidham had touched her

23  inappropriately.  (*Id.* at 15.)  She made an appointment but never went through

24  with it.  (*Id.* at 16.)

25      Carmen Fernandez dated Schwartz from April to August 2004.  (R.T.

26  3/17/06, a.m., at 10–12.)   Schwartz asked her and her co-worker whether they

27  knew of a person who could take care of Stidham for him.  (R.T. 3/17/06, a.m., at

28  10–12; R.T. 3/16/06, at 133.)  Schwartz gave Fernandez a photocopied picture of

1   Stidham with Stidham's home and business addresses, and the make, model, and

2   license plate number of Stidham's car.  (R.T. 3/24/06, p.m., at 6–7.)  He told her

3   Stidham had taken his patients and had embezzled money.  (R.T. 3/17/06, a.m., at

4   14.)  Fernandez said Schwartz was obsessed with Stidham.  (*Id.* at 15.)  Schwartz

5   took Fernandez to see the medical complex where Stidham practiced, and he

6   remarked that it was the perfect place to get rid of someone because it was

7   secluded and had no security cameras.  (*Id.* at 17–18.)  Fernandez said she did not

8   take these remarks seriously until one day she saw Schwartz in a rage because

9   Northwest Hospital had suspended his privileges.  (*Id.* at 19.)  He blamed Stidham.

10  (*Id.*)  This was in July 2004.  (*Id.*)

11  Lilliana Bibb dated Schwartz in July 2004.  (R.T. 3/15/06, p.m., at 26–28.)

12  Schwartz told her that Stidham stole his practice.  (*Id.* at 33.)  He said he wanted

13  Stidham hurt, his eyes poked out, or his fingers broken so Stidham could not

14  perform surgery.  (*Id.* at 32.)  Other times Schwartz told Bibb that he would be

15  happy if Stidham was 6 feet under.  (*Id.* at 32.)  He asked Bibb if she could find

16  him a hit man.  (*Id.* at 40–41.)  One night he took her to the medical complex at

17  First Avenue and River Road, where Stidham's office was located, and showed her

18  that there were no security cameras.  (*Id.*)  Schwartz said he wanted it to look like a

19  robbery.  (*Id.*)  Bibb warned him about DNA evidence, and Schwartz countered

20  that the murderer could wear something that covered him up.  (*Id.* at 51.)  Bibb led

21  him on about finding a hit man in order to get rent money out of Schwartz.  (*Id.* at

22  42–43.)  She said she did not take his threats seriously.  (*Id.* at 47.)

23  Lisa Goldberg dated Schwartz in August and September 2004.  (R.T.

24  3/15/06, a.m., at 8.)  During that time she recalled him blaming Stidham for ruining

25  his life.  (*Id.* at 30.)  Schwartz said he had had a neck injury and began self-

26  medicating and writing prescriptions for painkillers and had "got into trouble for

27  the way he was doing it."  (*Id.* at 29.)  While he was in rehab, he told Goldberg,

28  Stidham took his patients, telling them Schwartz took drugs.  (*Id.* at 29.)  Goldberg

1    said Schwartz expressed anger toward Stidham every time she saw him and

2    insinuated he wanted Stidham dead.  (*Id.* at 30–31, 60.)  Schwartz told her that he

3    knew a drug lord who told him it could be done for $10,000.  (*Id.*)  Schwartz had

4    told a patient essentially the same story about the drug lord's offer.  (R.T. 3/16/06,

5    at 123–24.)  Goldberg said she did not take it seriously.  (R.T. 3/15/06, a.m., at 60.)

6        In September 2004, Ronald Bruce Bigger had sustained an eye injury in a

7    fight.  (R.T. 3/30/06, at 112; R.T. 3/31/06, p.m., at 22.)  Tucson Medical Center

8    referred him to Schwartz for treatment on September 8, 2004.  (R.T. 3/30/06, at

9    112; R.T. 3/31/06, p.m., at 22; R.T. 4/11/06, p.m., at 61–62.)  Schwartz once met

10   with Bigger at Schwartz' office on a weekend when the office was closed.  (R.T.

11   4/19/06, p.m., at 77.)

12   **October 5, 2004**

13       Lisa Goldberg had stopped at Schwartz' office at about 4:00 or 4:30 p.m., on

14   October 5, 2004.  (R.T. 3/15/06, a.m., at 8; R.T. 3/15/06, p.m., at 13.)  She testified

15   that she was introduced to Bigger at Schwartz' office at that time.  (R.T. 3/15/06,

16   a.m., at 11.)  Employees said Bigger was at the office for about 2 hours in the

17   afternoon of October 5, 2004.  (R.T. 3/30/06, p.m., at 63, 67; R.T. 3/31/06, p.m., at

18   33–34.)  Bigger had not had an appointment, and he used the telephone to call a

19   cab.  (R.T. 3/30/06, at 67; R.T. 3/31/06, p.m., at 23, 33–34.)  He asked if he could

20   put his bicycle in the back.  (R.T. 3/31/06, at 33–34.)  At around 5:30, Goldberg

21   went with Schwartz to Schwartz' apartment.  (R.T. 3/15/06, a.m., at 12.)  Schwartz

22   went to a rehab meeting and returned to his apartment around 7:00 p.m.  (*Id.* at 13.)

23   Goldberg and Schwartz then went to a Thai restaurant at about 7:30 or 8:00.  (*Id.* at

24   13–14.)

25       David Stidham's ophthamology practice occupied the office at # 4727 North

26   First Avenue, in a medical complex near First Avenue and River Road.  (R.T.

27   3/10/06, a.m., at 52.)  On Tuesday, October 5, 2004, sometime around 5:00 or 5:20

28   p.m., one of Stidham's employees went to Stidham's Lexus parked outside the

1   office to retrieve the doctor's wallet.  (R.T. 3/7/06, p.m., at 24–25.)  She left for the
2   day at 5:30 p.m., while Stidham was still there.  (*Id.*)

3       The employees at the doctor's office at # 4737 N. First Avenue were just
4   closing the office at 5:25 p.m., October 5, 2004, when a man dressed in dark blue
5   or black scrubs, as one employee described them, walked into the office to get a
6   drink of water.  (R.T. 3/9/06, at 11–13.)  He said "hola" to the office staff.  (*Id.*)  He
7   was in the office 20–30 seconds and left.  (*Id.*)  The employee described him as
8   Mexican or Hispanic, 5 feet 6 or 7 inches, with light olive skin and short black hair.
9   (*Id.* at 13, 21.)  When the employee left work at 5:30, she saw the man sitting on
10   the curb in front of # 4733.  (*Id.* at 14–15, 18.)  She was unable to pick the
11   individual from a photo lineup 3 months later.  (*Id.* at 21.)

12       Another employee at the complex saw a man in light blue scrubs hanging
13   around # 4733 sometime after 6:00 p.m., on October 5, 2004.  (R.T. 3/10/06, p.m.,
14   at 14, 19.)  She described the man in scrubs as tall and skinny with bushy black
15   hair.  (*Id.* at 17.)  She said at trial that the man did not look like the photograph of
16   Bigger.  (*Id.* at 18.)

17       On October 5, 2004, Stidham conducted a seminar on ophthamology at his
18   office at # 4727, beginning at 6:00 p.m.  (R.T. 3/8/06, a.m., at 13.)  Several
19   residents in ophthamology attended.  (R.T. 3/8/06, a.m., at 13; R.T. 3/10/06, a.m.,
20   at 27–28; R.T. 4/12/06, p.m., at 19.)  Stidham ordered pizza.  (R.T. 3/8/06, a.m., at
21   15; R.T. 4/12/06, p.m., at 26.) The lecture concluded at 7:00 p.m., and the attendees
22   left the office and the medical complex by about 7:15 p.m.  (R.T. 3/8/06, a.m., at
23   16; R.T. 3/10/06, a.m., at 32; R.T. 4/12/06, p.m., at 25.)  It was dark when the
24   attendees left.  (R.T. 3/8/06, a.m., at 16; R.T. 3/10/06, a.m., at 32.)  Stidham was
25   the only person left at the office after everyone else left.  (R.T. 3/8/06, a.m., at 18.)

26       Jason Lee arrived at Stidham's lecture at 5:50 p.m. and briefly spoke to a
27   man in light blue scrubs who was sitting on a curb in front of # 4731.  (R.T.
28   3/10/06, a.m., at 27–28.)  The man in scrubs directed Lee to Dr. Stidham's office

1   and mentioned that pizza had been delivered.  (*Id.* at 30–31.)  Lee described the

2   man in scrubs as Caucasian, a little taller than average, with a medium build and

3   brown hair.  (*Id.* at 33–34, 36.)  Lee did not get a good look at the man's face and

4   was unable to pick him from a photo lineup.  (*Id.* at 33–34, 37–38, 42.)

5       Parham Morgan also attended the lecture and also noticed a man wearing

6   blue scrubs sitting on a curb in the parking lot.  (R.T. 4/12/06, p.m., at 21–23.)

7   Morgan asked the man directions to Stidham's office and the man pointed him in

8   the direction and said that Stidham had ordered pizza.  (*Id.* at 21, 23–24.)

9       Of the 11 employees or occupants of the medical complex who testified at

10  trial, none had a male employee who wore scrubs on October 5, 2004, at around

11  5:25 to 6:00 p.m., when the man in blue scrubs had been seen hanging around the

12  parking lot.  (R.T. 3/10/06, a.m., at 59; R.T. 3/10/06, p.m., at 8, 9, 12, 23, 26, 29,

13  42, 44; R.T. 3/24/06, at 52; R.T. 3/28/06, a.m., at 12–13.)

14      Stidham's office was equipped with a security system.  (R.T. 3/7/06, p.m., at

15  40.)  On October 5, 2004, the system had been turned off at 7:21 a.m., indicating

16  the time the office opened in the morning, and the security system had been turned

17  on again at 7:26 p.m., indicating when Stidham had closed the office that evening.

18  (*Id.* at 42.)

19      At approximately 10:30 p.m., on October 5, 2004, a massage therapist

20  whose practice occupied # 4741 N. First Avenue returned to the medical complex

21  with her fiancee to retrieve her engagement ring from her office.  (R.T. 3/7/06,

22  p.m., at 12.)  The couple discovered Stidham's dead body lying face-up in the

23  parking lot.  (*Id.* at 13–15.)  They called 911, and the Pima County Sheriff's

24  Department (PCSD) responded within 3–5 minutes.  (*Id.* at 15.)  The massage

25  therapist said that she saw no one hanging around the parking lot when she left

26  work at around 7:00 p.m. that evening.  (*Id.* at 17.)

27      The first responder, PCSD Deputy Jeff Craven, arrived between 10:30 and

28  11:00 p.m., touched Stidham's body, and determined it had no pulse.  (R.T. 3/8/06,

1   p.m., at 73–74.)  Paramedics arrived next and confirmed Stidham was dead.  (*Id.* at

2   75.)  A "trail of blood spatter" led to his body.  (*Id.* at 10.)  PCSD investigators

3   found Stidham's wallet on his person containing his driver's license, $61 in cash,

4   and credit cards.   (R.T. 3/8/06, a.m., at 42; R.T. 3/8/06, p.m., at 19.)   The

5   registration to his 1992 Lexus was on the pavement near his body.  (R.T. 3/8/06,

6   a.m., at 42.)  The police also found a Dominos pizza box in the dumpster with a

7   label showing the delivery address of 4727 N. First Avenue, together with time and

8   date of delivery.  (R.T. 3/8/06, a.m., at 54, 56; R.T. 3/8/06, p.m., at 19.)

9       At around 6:00 p.m., on October 5, 2004, a man in light blue scrubs came

10   into the Quicksmart convenience store at River and First Avenue.  (R.T. 3/14/06, at

11   30–33, 45.)  Jennifer Dainty was working alone at the Quicksmart and identified

12   the man as Bigger in a photo lineup shown to her on October 13, 2004.  (R.T.

13   3/14/06, at 50–51; R.T. 3/17/06, p.m., at 103.)  Dainty described him as clean

14   shaven, about 5 feet 7 inches, average weight, with short brown hair, darker skin

15   tone, and a slight accent.  (R.T. 3/14/06, at 34–35.)  Dainty said Bigger was

16   "bouncy" and "hyperactive."  (*Id.* at 39.)  He told Dainty that he was at a meeting

17   where they had served pizza, but he did not like pizza so he was looking for

18   something to eat.  (*Id.* at 40.)  Dainty said Bigger left the store and came back to

19   use the telephone three or four times over a period of 30–45 minutes.  (*Id.* at 44–

20   45.)  Bigger was the only person to use the store's telephone in that time frame.

21   (*Id.* at 48.)  Ten minutes after Bigger left the store, the store's telephone rang.  (*Id.*

22   at 46–48.)  Dainty answered, and a man on the other end said he had received a

23   telephone call from that number a few minutes before.  (*Id.*)  Phone company

24   records showed that a call originating from Schwartz' cell phone was placed to the

25   Quicksmart phone number at 6:58 p.m., on October 5, 2004.  (R.T. 3/24/06, p.m.,

26   at 108.)

27       Phone company records also showed that at 7:46 p.m., October 5, 2004,

28   Schwartz received a call on his cell phone from the telephone in the Denny's

1   restaurant on Speedway near Dodge.  (*Id.* at 112.)  A waitress at the Denny's

2   testified that she remembered a man in scrubs coming into the restaurant sometime

3   before November 2004.  (R.T. 3/30/06, at 15–16.)  She could not remember the

4   date.  (*Id.* at 16, 18, 24.)  She said the man in scrubs talked to her and asked for a

5   number for a cab.  (*Id.* at 17–19.)  She gave him a card for Allstate cab company.

6   (*Id.*)  She said the man was at the restaurant for 1 to 1½ hours.  (*Id.*)

7          In the early evening of October 5, 2004, a cab driver with Allstate taxi was

8   flagged down by a man in front of the Bunny Ranch on Speedway, across the street

9   from Denny's restaurant.  (R.T. 3/14/06, at 89; R.T. 3/29/06, p.m., at 79.)  It was

10  dark out.  (R.T. 3/14/06, at 103.)  The cab driver said the man had long legs and

11  looked like a transient.  (*Id.* at 92–93.)  The man wanted a ride to an Asian

12  restaurant near Campbell and Grant.  (*Id.* at 90–91.)  En route, the man asked to

13  use the cab driver's cell phone.  (*Id.* at 90.)  Phone  company records showed that

14  at 8:19 p.m., October 5, 2004, Schwartz received a call on his cell phone

15  originating from the cab driver's cell phone number.  (R.T. 3/24/06, p.m., at 112.)

16  When the cab reached the destination, the taxi driver said the man jumped out and

17  another man came out of the establishment and paid the fare.  (R.T. 3/14/06, at 92.)

18  The man who paid the cab fare was Schwartz.  (R.T. 3/15/06, a.m., at 15.)

19          Lisa Goldberg recalled that she and Schwartz went to a Thai restaurant at

20  about 7:30 or 8:00.  (R.T. 3/15/06, a.m., at 13–14.)  Schwartz had received three

21  cell phone calls and told Goldberg that a friend from rehab was going to join them.

22  (*Id.* at 14–15.)  When the cab pulled up to the restaurant, Schwartz went outside to

23  pay for it.  (*Id.*)  He returned to the restaurant with Bigger, who appeared very

24  agitated.  (*Id.* at 16.)  Goldberg said this was around 8:45 p.m.  (R.T. 3/15/06, p.m.,

25  at 12.)  Bigger wore casual clothes and ordered a beer.  (R.T. 3/15/06, a.m., at 16–

26  17.)  Schwartz asked Bigger how the scrubs worked out.  (*Id.* at 18.)  On October

27  18, 2004, Goldberg picked Bigger out of a photo lineup.  (R.T. 3/15/06, a.m., at 26;

28  R.T. 3/17/06, p.m., at 103.)  Megan Loveres waited tables at Karuna's Thai

1    restaurant on October 5, 2004, near Campbell and Grant and remembered Schwartz
2    and Goldberg coming in around 7:00 or 7:30 p.m.  (R.T. 3/15/06, p.m., at 72.)  She
3    recalled Bigger showing up later and acting nervous and flustered. (*Id.* at 75–79.)
4    She identified Bigger in a photo lineup 10 days later.  (R.T. 3/15/06, p.m., at 81–
5    83; R.T. 3/17/06, p.m., at 104.)  She said the three left together before 8:30.  (R.T.
6    3/15/06, p.m., at 83.)

7         Goldberg said that she, Bigger, and Schwartz left the restaurant in Schwartz'
8    Escalade.  (R.T. 3/15/06, a.m., at 18.)   First, they went to Schwartz' office to
9    retrieve Bigger's bicycle. (*Id.* at 18–19.)  Next, they drove to three different hotels
10   where Schwartz tried booking a room for Bigger.  (*Id.* at 20–21.)   Surveillance
11   video from the Sheraton Hotel on Grant Road showed Schwartz and Bigger in the
12   hotel lobby at 9:19 and 9:20 p.m., October 5, 2004.  (R.T. 3/28/06, a.m., at 22–26.)
13   Bigger was wearing cargo shorts.  (*Id.*)   At the third hotel, the Residence Inn,
14   Schwartz booked Bigger a room at 10:52 p.m.  (R.T. 3/15/06, p.m., at 108.)  The
15   desk clerk picked Bigger out of a photo lineup two weeks later.  (R.T. 3/15/06,
16   p.m., at 104; R.T. 3/17/06, p.m., at 103.)   Goldberg and Schwartz returned to
17   Schwartz' apartment where they remained the rest on the night.  (R.T. 3/15/06,
18   a.m., at 22.)  Hotel and phone company records showed that calls originating from
19   Bigger's hotel room at the Residence Inn were placed to Schwartz' cell phone
20   numbers several times before Bigger checked out the next day.  (R.T. 3/15/06,
21   p.m., at 108–09; R.T. 3/24/06, p.m., at 113–14.)

22   **October 6 to October 15, 2004**

23        On October 6, 2004, Schwartz withdrew $10,000 in denominations of 100s
24   and 50s from his business account at the Bank of Tucson.  (R.T. 3/21/06, at 97.)  A
25   day or so later, a couple of Bigger's associates saw Bigger flashing around a thick
26   envelope of cash, all 100s and 50s.  (*Id.* at 46–48, 71.)  He gave his associates $350
27   to $400 of it.  (*Id.* at 47, 73.)  Bigger appeared nervous and jittery.  (*Id.* at 46, 70.)

28        The day after Stidham's murder, October 6, 2004, Lisa Goldberg had dinner

1    with Schwartz.  (R.T. 3/15/06, a.m., at 28–29.)  Schwartz did not mention that

2    Stidham had died.  (*Id.*)  Two days later, Schwartz told Goldberg that Stidham had

3    been murdered.  (*Id.* at 33.)  She felt Schwartz had done it, but Schwartz claimed

4    he had not.  (*Id.*)  Schwartz told Goldberg that she was his "alibi" since she had

5    been with him the evening of the murder.  (*Id.*)  The jury heard expert testimony

6    explaining that contract killings usually involve manipulating evidence to misdirect

7    any investigation, including setting up an alibi.  (R.T. 3/9/06, at 99–110.)

8        Carmen Fernandez called Schwartz the day after Stidham's murder.  (R.T.

9    3/17/06, a.m., at 26.)  Schwartz denied involvement in the murder but warned

10   Fernandez not to talk with the police.  (*Id.* at 26–27.)  He implied that he knew her

11   family was involved in illegal activities.  (*Id.* at 28.)  He told her, "if he went down

12   [her] family was going down too."  (*Id.*)

13       Schwartz also spoke with Rosalia Humo after Stidham's murder and told her

14   he did not do it.  (R.T. 3/17/06, p.m., at 79.)  Nevertheless, Schwartz told Humo

15   that Stidham "got what was coming to him."  (*Id.*)

16       When Rachel Atkinson called Schwartz after getting news of Stidham's

17   death, Schwartz told her that he believed his bank accounts might be investigated

18   and that he had to account for $10,000.  (R.T. 3/24/06, a.m., at 23–27.)

19   Accordingly, if anybody asked her, she was to say that he had given her $2,500 for

20   bills, which was false.  (*Id.*)

21       On October 7, 2004, Lilliana Bibb was the first civilian to come forward

22   with information about Stidham's death.  (R.T. 3/29/06, p.m., at 99; R.T. 4/12/06,

23   p.m., at 49.)  Lisa Goldberg was next to contact PCSD on October 8, 2004.  (R.T.

24   4/12/06, p.m., at 50–51.)  On October 13, 2004, she identified Bigger in a photo

25   lineup.  (*Id.* at 58.)  A PCSD detective contacted Goldberg and asked her to wear a

26   wire when she next saw Schwartz.  (R.T. 3/15/06, a.m., at 28–29.)  She refused and

27   instead warned Schwartz that the PCSD was questioning her.  (*Id.*)  She later

28   entered an immunity agreement with the State.  (*Id.* at 37.)  On October 15, 2004,

1    at 9:30 p.m., the PCSD arrested Schwartz at his residence.  (R.T. 4/18/06, p.m., at

2    82.)  A female companion was present, and Schwartz went peacefully.  (*Id.*)  The

3    PCSD searched Schwartz' office on October 16, 2004, and found a note pad

4    containing the name and phone number of Bigger's mother.  (R.T. 3/24/06, p.m., at

5    116.)

6    **The Autopsy**

7          Dr. David Winston with the Pima County Medical Examiner arrived at the

8    crime scene at about 3:45 a.m. and examined the body at 4:00 or 4:15 a.m.,

9    October 6, 2004.  (R.T. 3/8/06, p.m., at 57; R.T. 3/14/06, at 144, 185.)  He

10   observed six stab wounds in Stidham's chest which he determined to be the cause

11   of death.  (R.T. 3/14/06, at 118, 180.)  In addition, Stidham had suffered a head

12   fracture attributable to hitting his head on the pavement.  (*Id.* at 120–23.)  Winston

13   noted no defensive wounds.  (*Id.* at 141.)

14         Winston testified that rigor mortis was partially fixed at the time of his first

15   examination, leading him to conclude that less than 12 hours had passed since

16   Stidham's death.  (R.T. 3/14/06, at 158.)  Winston testified that livor mortis, the

17   settling of the blood after death, was still "blanchable" over Stidham's posterior

18   except areas in direct contact with the ground.  (*Id.* at 164.)  Winston explained that

19   livor mortis sets in when the skin does not blanche anymore when pressure is

20   applied.  (*Id.* at 161.)  This, he stated, occurs after about 12 hours have passed

21   since death, leading him to conclude again that Stidham died less than 12 hours

22   earlier.  (*Id.* at 164.)  Winston said that blood loss could have slowed livor mortis in

23   Stidham's case.  (*Id.* at 163.)  He acknowledged differences in opinion as to the

24   time livor mortis fixes, but he said that he held with the community of medical

25   examiners who believe blanchability goes away after about 12 hours.  (*Id.* at 189.)

26   Winston performed the autopsy at 8:30 a.m., October 6, 2004, but said that his

27   observations as to livor and rigor mortis were from his initial examination of the

28   body at about 4:15 a.m.  (*Id.* at 185–88.)  He would later correct this last statement

1    when recalled by the defense.  (R.T. 4/11/06, p.m., at 96.)

2        Dr. Philip Keene, the chief medical examiner for Maricopa and Yavapai

3    Counties, offered his opinion that the time of death was 4–7 hours prior to Dr.

4    Winston's first observation of the body, making the time of death approximately

5    9:00 p.m. to midnight, October 5, 2004.  (R.T. 4/11/06, p.m., at 20–21.)   Keene

6    based his opinion on his belief that livor mortis fixes in about 6–8 hours, marking

7    his difference with Winston who believes livor mortis fixes in 12 hours.  (*Id.* at 22–

8    23.)   Keene acknowledged differences of opinion among pathologists as to how

9    soon livor mortis fixes.  (*Id.* at 37.)  Keene did not examine the body.  (*Id.* at 23.)

10       The defense later called Winston in its case, and Winston changed his

11   testimony.  (*Id.* at 96.)  Where he had previously stated that livor mortis had not

12   fixed at the time of his first observation at the scene—approximately 4:15 a.m.—

13   he now stated that that testimony was in error, that his notation "NF" ("not fixed")

14   in his notes referred to his observations made at 8:30 a.m., the time he performed

15   the autopsy.  (*Id.* at 96, 101.)  Winston stated that it did not change his opinion that

16   Stidham's death occurred between 7:30 p.m. (around the time Stidham was last

17   seen) and 10:30 p.m. (when Stidham's body was discovered).  (*Id.* at 97, 102.)  He

18   reiterated the general rule that livor mortis fixes in 12 hours, plus or minus 2 hours

19   depending on the amount of blood in the body and the temperature.  (*Id.* at 103.)

20   He stated that with less blood in the body, livor mortis takes longer to appear.  (*Id.*

21   at 104.)  And he said for the first time that Stidham's body had been refrigerated

22   for about 3 hours prior to the autopsy.  (*Id.* at 109.)

23   **The Lexus**

24       Stidham's white 1992 Lexus was parked outside his office sometime around

25   5:00 or 5:20 p.m., October 5, 2004, when Stidham's employee went outside to

26   retrieve the doctor's wallet from the Lexus.  (R.T. 3/7/06, p.m., at 25.)   Stidham's

27   Lexus was not among the cars in the medical complex parking lot when PCSD

28   later secured the scene.  (R.T. 3/8/06, a.m., at 37; R.O.A. item 90, Exhibit 3.)

1    At 9:45 p.m., on October 6, 2004, a PCSD deputy found Stidham's Lexus

2 parked in space # 18 of the parking lot of the Bellevue Apartments at 3710 East

3 Bellevue Street near Dodge and Speedway.  (R.T. 3/8/06, p.m., at 25–26, 85.)  The

4 key was in the ignition, and the doors were locked.  (*Id.* at 28.)  Deputies surveilled

5 the Lexus overnight but no one came for it.  (*Id.* at 26, 86, 90.)  Investigators

6 processed the exterior at around 10:00 a.m., on October 7 and towed it to the

7 Sheriff's impound where they processed the car's interior on October 7 and 11,

8 2004.  (*Id.* at 27–31.)

9    Blood spatter in the interior driver's side door led investigators to believe

10 that the attack on Stidham took place while the driver's door was open.  (R.T.

11 3/8/06, p.m., at 43.)  The State introduced expert testimony describing a "blitz"

12 attack common in carjack cases where the attack leaves few if any defensive

13 wounds on the victim.  (R.T. 3/9/06, at 54–63.)  After examining photographs of

14 blood spatter on the Lexus and at the crime scene, the expert opined that the attack

15 in this case took between 30 and 90 seconds.  (*Id.* at 134.)

16    Investigators test drove several routes from the medical complex at River

17 and First Avenue to the location where the Lexus was found on Bellevue, trying to

18 approximate driving conditions existing on the night of the murder by conducting

19 the test drives on Tuesday, October 4, 2005, at 7:30 p.m.  (R.T. 3/29/06, p.m., at

20 108–09.)  They were able to drive the routes in 13 to 16 minutes.  (*Id.* at 67–68,

21 108–09.)  Investigators also walked a variety of routes from the location of the

22 Lexus in parking space # 18 of the Bellevue Apartments to the Denny's restaurant

23 on Speedway.  (*Id.* at 115.)  They found this short distance could be covered on

24 foot in 1 minute 26–30 seconds.  (R.T 3/29/06, p.m., at 115; R.T. 4/12/06, p.m.,

25 Vinson Reporting, at 60.)

26   **DNA Evidence**

27    PCSD processed the interior of Stidham's Lexus, and on October 11, 2004,

28 took a swab of the radio knob, labeled in evidence as LX-39.  (R.T. 3/8/06, p.m., at

1   100–01.)  PCSD also took a buccal swab from Bigger on October 18, 2004.  (R.T.

2   3/17/06, p.m., at 101.)

3        Curtis Reinbold, a Department of Public Safety (DPS) serologist, conducted

4   Short Tandem Repeat (STR) testing on LX-39 and the known DNA samples from

5   Bigger and Stidham and found that LX-39 contained a mixture of the DNA of both

6   individuals.  (R.T. 3/28/06, a.m., at 46–47; R.T. 3/28/06, p.m., at 10–11.)  Reinbold

7   testified that for STR analysis, a match is declared if a known sample and an

8   unknown sample are the same at all 14 loci.  (R.T. 3/28/06, a.m., at 60–61.)  He

9   said Stidham's sample matched LX-39 on all 14 loci.  (R.T. 3/28/06, p.m., at 13.)

10        He said a partial profile occurs when the known and unknown samples

11   match at less than 14 loci.  (R.T. 3/28/06, a.m., at 62.)  He testified that the

12   threshold level for reliable STR results used to be 150 Relative Florescent Units

13   (RFU), but with improved technology, the level now accepted in the forensic

14   community is 100 RFU.  (*Id.* at 69–70.)  Using the 150 RFU threshold, Reinbold

15   found that Bigger's DNA matched LX-39 at three loci.  (R.T. 3/28/06, p.m., at 13.)

16   Using the 100 RFU threshold, Reinbold found that Bigger's DNA matched LX-39

17   at four loci.  (*Id.* at 14.)  At none of the remaining loci using either 150 or 100 RFU

18   could Reinbold exclude Bigger.  (*Id.*)  Reinbold testified that he could not conclude

19   that LX-39 contained Bigger's DNA, but he could not exclude Bigger as the minor

20   contributor.  (*Id.* at 14–15.)

21        Because one locus in STR data is strictly the subject's gender, that locus is

22   eliminated for purposes of determining random statistical probabilities in the

23   general population.  (*Id.* at 16.)  The State called Dr. Bruce Budowle of the FBI

24   crime lab to offer his random statistical probability analysis.[1]  (R.T. 4/20/06, p.m.,

25   at 10–11.)  Budowle testified that at the 150 RFU level, the random statistical

26   ―――――――――――――――――

27   [1] Reinbold offered his own random probability results (R.T. 3/28/06, p.m., at 16–

28   18), but the State called Budowle to correct Reinbold's statistics.

1  probability of a person matching two loci of the sample in LX-39 was 1 in 2,900
2  Hispanics, 1 in 870 African-Americans, and 1 in 4,400 Caucasians.  (R.T. 4/20/06,
3  p.m., at 18.)  At the 100 RFU level, he said the random statistical probability of a
4  person matching three loci of the sample in LX-39 was 1 in 6,300 Southeast
5  Hispanics, 1 in 8,900 Southwest Hispanics, 1 in 6,800 African-Americans, and 1 in
6  13,000 Caucasians.  (*Id.*)  Budowle said he could not exclude Bigger from LX-39.
7  (*Id.*)

8        Lorraine Heath, another DPS criminalist, conducted Y-chromosome STR, or
9  Y-STR, which has 16 loci.  (R.T. 3/28/06, p.m., at 101, 104.)  She found that
10  Stidham's DNA matched all 16 loci on LX-39, making him the major contributor
11  in the mixture, and Bigger matched nine of the 16 loci, making him the minor
12  contributor.  (R.T. 3/28/06, p.m., at 104–06.)  Bigger could not be excluded on five
13  other loci where the major and minor contributions were identical.  (*Id.*)  Results at
14  the remaining two loci were inconclusive.  (*Id.*)  Heath could not conclude to a
15  scientific certainty that LX-39 contained Bigger's DNA.  (*Id.* at 106–07.)  Heath
16  explained this was principally because Y-STR is a new process, and the statistical
17  database for Y-STR profiles is small.  (*Id.* at 108–17.)  Bigger's profile did not
18  match any of the 3,561 profiles on record, therefore, Heath employed the "counting
19  method," generally accepted in the scientific community, to determine that the
20  random statistical probability of a male matching nine loci of the sample in LX-39
21  was 1 in 202 Hispanics, 1 in 333 African-Americans, and 1 in 431 Caucasians.  (*Id.*
22  at 116–18.)  Over objection, the trial court allowed Heath to testify that her
23  confidence that Bigger was the minor component in LX-39 increased when her
24  review of Reinbold's results showed agreement with her own results.  (R.T.
25  3/29/06, p.m., at 8–10.)

26        Brian Wraxall of the Serological Research Institute in California reviewed
27  Reinbold's and Heath's work.  (R.T. 4/4/06, at 111, 126.)  He agreed with their
28  conclusions that Stidham was the major contributor on LX-39 and Bigger was the

1   minor contributor.  (*Id.* at 156.)  Wraxall questioned Reinbold's conclusion that

2   Bigger was a full match on three loci, asserting that results vary if the analyst

3   assumes slightly different values and drop out at each loci.  (R.T. 4/4/06, at 162–

4   75.)  "It's all interpretation," he stated, particularly where the minor donor is

5   masked by the major donor.  (*Id.* at 171.)  Wraxall declined to say Reinbold was

6   wrong.  (*Id.*)  But he did suggest that as interpretations of a minor contribution

7   differ, so changes the random statistical probability.  (*Id.* at 177–84.)

8        With respect to Y-STR, Wraxall said he would eliminate six of the nine loci

9   Heath matched with Bigger, and that his finding would increase the probability of a

10  random match in the general population.  (*Id.* at 193–95.)  He criticized Heath for

11  picking out data that inculpates Bigger while ignoring data that excludes Bigger.

12  (R.T. 4/12/06, p.m., at 34–37.)  Thus, he offered his opinion that the DPS analysis

13  was biased.  (*Id.*)  Ultimately, Wraxall said his independent review of the data did

14  not exclude Bigger from LX-39.  (*Id.* at 38–39.)

15       Thus, all four DNA experts who testified at Schwartz' trial said that Bigger

16  could not be excluded from LX-39, the sample of material swabbed from the radio

17  knob of Stidham's Lexus on October 11, 2004.  (R.T. 3/28/06, p.m., at 14–15; R.T.

18  3/28/06, p.m., at 104–06; R.T. 4/12/06, p.m., at 38–39; R.T. 4/20/06, p.m., at 18.)

19  **II.    PROCEDURAL BACKGROUND.**

20       On October 25, 2004, the State indicted Schwartz and Bigger on one count

21  of first degree murder of David Stidham and one count of conspiracy to commit

22  first degree murder of David Stidham.  (Pet. Exh. 1.)  The defendants were tried

23  separately, and after a 2-month trial, a jury found Schwartz guilty of conspiracy to

24  commit first degree murder.  (R.T. 5/2/06, at 12.)  The jury hung on the first degree

25  murder charge, the trial court declared a mistrial as to that count and dismissed it

26  without prejudice.  (R.T. 5/2/06, at 8–9, 16; R.T. 5/30/06, at 6.)  The court imposed

27  a life sentence without the possibility of parole for 25 years.  (R.T. 5/30/06, at 17.)

28

Schwartz timely appealed, raising 11 claims of trial error:

1.  The trial court abused its discretion by precluding third-party culpability evidence concerning Dennis Walsh;

2.  The trial court erred in refusing his motions for mistrial for multiple acts of allegedly intentional prosecutorial misconduct;

3.  The testimony by Lorraine Heath, the State's DNA expert, warranted a mistrial;

4.  Jason Lee and Jennifer Dainty testified to inadmissible hearsay in violation of Schwartz' confrontation rights;

5.  The court erred in precluding impeachment of Lourdes Lopez with testimony from Paul Skitzki and DEA agent Dave Wickey;

6.  The trial court abused its discretion by precluding third-party culpability evidence concerning Daphne Stidham and limiting cross-examination about her conduct on the night of the murder;

7.  The court improperly precluded him from presenting character evidence showing his competence as a physician and his ability to sustain a successful practice;

8.  The trial court abused its discretion by denying funds to appoint a telephone polling expert to evaluate the effect of pretrial publicity;

9.  The trial court should have granted his motion for change of venue;

10. The trial court should have sequestered the jury;

11. A motion for judgment of acquittal under Rule 20(a) of the Arizona Rules of Criminal Procedure should be submitted to the jury to decide.

(Resp. Exh. B.)

On March 31, 2008, the Arizona Court of appeals issued a memorandum decision affirming the trial court.   (Pet. Exh. 2.)   Schwartz filed a petition for

21

review in the Arizona Supreme Court presenting 5 claims for review:

1.    The trial court abused its discretion by precluding third-party culpability evidence concerning Dennis Walsh;

2.    The trial court erred in refusing his motions for mistrial for multiple acts of allegedly intentional prosecutorial misconduct;

3.    Jason Lee and Jennifer Dainty testified to inadmissible hearsay in violation of Schwartz' confrontation rights;

4.    The court erred in precluding impeachment of Lourdes Lopez with testimony from Paul Skitzki and DEA agent Dave Wickey;

5.    A motion for judgment of acquittal under Rule 20(a) of the Arizona Rules of Criminal Procedure should be submitted to the jury to decide.

(Resp. Exh. C.)  The Arizona Supreme Court denied review on October 29, 2008. (Pet. Exh. 3.)  Schwartz did not opt to petition for post-conviction relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.

**III.    TIMELINESS UNDER AEDPA.**

Schwartz, through counsel, timely filed his § 2254 petition on April 9, 2008. *See* 28 U.S.C. § 2244(d)(1)(A) and (d)(2).

**IV.    EXHAUSTION/PRECLUSION.**

Two of Schwartz' six federal habeas claims are precluded by operation of state court procedural default for failure to exhaust state court remedies by fairly presenting the state court with the federal law claim he now asserts.  These claims will be discussed in the Argument section of this Answer.

Before a state prisoner advances his claim in a federal habeas petition, he must exhaust the claim in the state courts "by invoking one complete round of the State's established review process."  *O'Sullivan v. Boerckel*, 526 US. 838, 845 (1999).  State exhaustion requires a prisoner to "'fairly present' his claims in each appropriate state court (including a state supreme court with powers of

1   discretionary review), thereby alerting that court to the federal nature of the claim."

2   *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

3          Federal habeas relief is not available for alleged violations of state law.

4   *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  At a minimum, "fair presentation"

5   requires the prisoner to tell the state court that he is making a federal claim by

6   labeling it such, by referring to provisions of the United States Constitution, or by

7   citing case law that might have alerted the state court to the alleged federal nature

8   of the claim.  *See Baldwin*, 541 U.S. at 33.  "It is not enough that all the facts

9   necessary to support the federal claim were before the state courts, or that a

10  somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 6

11  (1982).

12         If the prisoner fails to fairly present his federal claim in the state court in a

13  procedurally appropriate manner, the claim is "procedurally defaulted" and barred

14  from federal habeas review.  *See*, *e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 802–05

15  (1991); *White v. Lewis*, 874 F.2d 599, 602–03 (9th Cir. 1989); *Tacho v. Martinez*,

16  862 F.2d 1376, 1378 (9th Cir. 1988).  There are two categories of procedural

17  default.  The first consists of instances in which a state court expressly applied a

18  procedural bar to the prisoner's claim when the prisoner attempted to raise the

19  claim in state court.  *See, e.g., Nunnemaker*, 501 U.S. at 802–05; *Martinez-*

20  *Villareal v. Lewis*, 80 F.3d 1301, 1305–06 (9th Cir. 1996).  The second category,

21  known as "technical exhaustion," *Coleman v. Thompson*, 501 U.S. 722, 732

22  (1991), describes instances in which the prisoner never presented his claim in state

23  court, and returning to present that claim would be futile under the state court's

24  procedural rules.  *Teague v. Lane*, 489 U.S. 288, 297–99 (1989); *Reed v. Ross*, 468

25  U.S. 1, 10–11 (1984); *Engle v. Isaac*, 456 U.S. 107, 125 (1982) (federal statutory

26  requirement that habeas applicants exhaust remedies available in courts of state

27  refers only to remedies still available at time of federal petition); 28 U.S.C.

28  § 2254(b).

1    Grounds 5 and 6 of Schwartz' federal petition are technically exhausted.

2  Although he presented state law grounds for relief to the Arizona Court of Appeals

3  in his opening brief, he never asserted a *federal* law basis for claiming trial court

4  error regarding these issues.  As explained in the Argument section, these claims

5  are technically exhausted and procedurally defaulted.

6    A procedurally defaulted claim is not cognizable on habeas review unless the

7  petitioner shows valid cause for the default and actual prejudice from the claimed

8  constitutional violation, or that the habeas court's failure to consider the claim will

9  result in a miscarriage of justice.  *Coleman*, 501 U.S. at 749–50; *Wainwright v.*

10  *Sykes*, 433 U.S. 72, 86–91 (1977).  To show cause, a petitioner must show that

11  "some objective factor external to the defense impeded counsel's efforts to comply

12  with the state procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  If

13  cause is not shown, this Court need not evaluate prejudice.  *Id.*  To show prejudice,

14  the petitioner must show "not merely that the errors at his trial created a possibility

15  of prejudice, but that they worked to his actual and substantial disadvantage,

16  infecting his entire trial with error of constitutional dimensions." *United States v.*

17  *Frady*, 456 U.S. 152, 170 (1982).  Finally, a showing of a "fundamental

18  miscarriage of justice" (or "actual innocence") is "not itself a constitutional claim,

19  but instead a gateway through which a habeas petitioner must pass to have his

20  otherwise barred constitutional claim considered on the merits."  *Schlup v. Delo*,

21  513 U.S. 298, 315 (1995); *see Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  To

22  invoke this exception, the petitioner must show that newly-discovered evidence

23  exists that makes it "more likely than not that no reasonable juror would have

24  convicted him."  *Schlup*, 513 U.S. at 329 (quotes omitted).

25    As a general rule, a habeas petition should be dismissed if state remedies

26  have not been exhausted with respect to every claim in the petition.  *Rose v. Lundy*,

27  455 U.S. 509 (1982); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Obremski v.*

28  *Maas*, 915 F.2d 418, 421 (9th Cir. 1990).  However, dismissal for exhaustion

purposes should not occur here.  There remain no available state remedies for Schwartz' precluded claims, so it would be purposeless to send him back to state court.  *See Clark v. Ricketts*, 958 F.2d 851, 856–57 (9th Cir. 1991) (habeas court should not put the state through the "mechanical burden" and "senseless task" of *Rose v. Lundy* dismissal and return to state court if the unexhausted claims clearly cannot prevail there).  Dismissal for failure to exhaust is appropriate only if the prisoner has a currently available state remedy at the time of the federal habeas petition.  *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989).  This is not such a case because, absent narrow exceptions inapplicable here, no state remedy is available for Schwartz' unexhausted claims.  He has exercised his mandatory direct appeal and his option to seek discretionary Arizona Supreme Court review of his appeal.  His option to pursue post-conviction relief has expired.  *See* Ariz. R. Crim. P. 32.2(a) (precluding claims raisable in a previous post-conviction petition or previously addressed on direct appeal) and Rule 32.4(a) (allowing 90 days to file a post-conviction petition).  Under these circumstances, where no state remedy remains, this Court should adjudicate the petition rather than dismiss it.  *Id.*  Schwartz' unexhausted claims should be regarded as "technically exhausted" due to the lack of any available state remedy, and thus, absent a showing of cause and prejudice, must be held precluded due to state court procedural default.

Finally, Schwartz failed to present the Arizona Supreme Court with the claims he now makes in grounds four and five of the federal petition.  His petition for review to the state supreme court omitted his claims of improper limitation of cross-examination and preclusion of character evidence.  (Resp. Exh. C.) Respondents take the position that these claims were not "fairly presented" to the state court as that term of art is used by the Supreme Court.  *See Baldwin*, 541 U.S. at 29 (prisoner must "'fairly present' his claims in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.").  Respondents acknowledge

1    the Ninth Circuit's holding in *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999),

2    that in cases where neither a life sentence nor the death penalty has been imposed,

3    discretionary review by the Arizona Supreme Court is "unavailable" for purposes

4    of exhaustion—in effect, obviating the state court of last resort for purposes of

5    exhausting state court remedies.  196 F.3d at 1010.  In this case, however, Schwartz

6    received a life sentence, so *Swoopes* does not except him from presenting his

7    habeas claims to the Arizona Supreme Court.

8         Moreover, Respondents believe that *Swoopes* was wrongly decided.  *See*

9    U.S. Supreme Court Rule 13.1 (providing that the Supreme Court takes certiorari

10   from "a state court of last resort"); 28 U.S.C. § 1257 (certiorari jurisdiction limited

11   to "the highest court of a State in which a decision could be had"); *Flynt v. Ohio*,

12   451 U.S. 619, 620 (1981) ("Court's jurisdiction to review a state court decision is

13   generally limited to a final judgment rendered by the highest court of the State in

14   which decision may be had").  The Arizona Supreme Court has powers of

15   discretionary review over all non-capital criminal appeals.  *See* A.R.S. §§ 12–2102,

16   12–2103; Ariz. R. Crim. P. 31.19(a, c).  Review by the Arizona Supreme Court is

17   part of the direct appeal process, whether review is accepted or denied.  *State v.*

18   *Ikirt*, 770 P.2d 1159, 1163 (Ariz. 1987) (Holohan, J., Supp. Op. (1989)); *see also*

19   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (where state law provides a

20   "right to raise" claims for discretionary review by the state's highest court,

21   prisoners are required to do so before presenting those claims to a federal court);

22   *see also Akins v. Kenney*, 410 F.3d 451, 454 (8th Cir. 2005) (finding petition for

23   review in state supreme court to be part of the ordinary process of appeal where

24   "the mandate may not issue until the time for filing such a petition has lapsed.");

25   Ariz. R. Crim. P. 31.23(a)(1) (providing that mandate will not issue until time for

26   filing a petition for review has expired).  Accordingly, grounds four and five of the

27   § 2254 petition should be dismissed as unexhausted.

28

# V.    ARGUMENT.

This Court is prohibited from issuing the writ of habeas corpus unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth by the Supreme Court or if the state court arrives at a result different from Supreme Court precedent on materially indistinguishable facts. *Id.* at 405–06. The "unreasonable application" clause of § 2254(d)(1) requires the state court decision to be more than incorrect or erroneous; the state court's application of federal law must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003), citing *Williams v. Taylor*, 529 U.S. at 409–12.

## A. Prosecutorial Misconduct.

Alleging multiple acts of intentional prosecutorial misconduct, Schwartz contends the trial court erred in refusing his motions for mistrial. (Petition at 17–36.) In assessing a habeas claim alleging prosecutorial misconduct, the relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Moreover, the appropriate standard for habeas review is "the narrow one of due process, and not the broad exercise of supervisory power that [the state appellate court] would possess in regard to [its] own trial court." *Id.* at 642. Improper argument does not, per se, violate a defendant's constitutional rights. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

When Schwartz made the same claims on direct appeal, the Arizona Court of Appeals found no merit in any of the allegations of prosecutorial misconduct. (Pet. Exh. 2 at 9–26.) The state court's determination of these claims was neither contrary to, nor unreasonably applied, federal law.

27

**1. Reference to mug shot.**

On cross-examination, Jason Lee testified that the detective showed him a photograph of Bigger, but Lee told the detective that the man in scrubs he had seen was not the one depicted in the photograph.  (R.T 3/10/06, a.m., at 37–38.)  On redirect, Lee said the photograph was of the entire body of the person and the face.  (*Id.* at 43.)  The prosecutor then asked, "As to Mr. Bigger, was it not just a mug shot — ."  (*Id.*)  The trial court sustained Schwartz' objection.  (*Id.*)  Schwartz did not ask for a mistrial or any other remedial action.

The prosecutor's question was not misconduct and does not warrant reversal.  Although the introduction into evidence of mug shots or the mention of the fact that the police had photos of the suspect taken sometime before the crime can be error when it infers a prior arrest, *see United States v. Carillo*, 20 F.3d 617, 620 (5th Cir. 1994), that is not the situation here.  The prosecutor characterized the nature of the photograph to draw a distinction between a photograph of a person's entire body, as Lee had viewed, as opposed to a tight shot of a person's face, like a "mug shot."  The question did not imply that Bigger had priors.  In any event, the court sustained the objection and later instructed the jurors that "[i]f the court sustained an objection to a question, you must disregard it and any answer given." (R.T. 4/25/06, at 14.)  The court issued a similar instruction at the beginning of trial.  (R.T. 3/3/06, at 14.)  Jurors are presumed to follow instructions, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and Schwartz offers no information suggesting they did not in this instance.

**2. References to federal courthouse.**

Stephanie Nagel testified that she ran into Schwartz from time to time when they were both at the federal courthouse to drop urine.  (R.T. 3/16/06, at 67.)  The court called a bench conference to remind the prosecutor of its previous ruling precluding any evidence of federal charges against Schwartz.  (*Id.*)  At the bench conference, Schwartz did not object to Nagel's reference to the federal courthouse.

28

1    (*Id.*)   In her ensuing direct testimony, Nagel referred to her visits to the federal
2    courthouse several more times, explaining that they were part of her pretrial release
3    conditions on a federal charge.   Schwartz did not object to any of this testimony
4    but at the conclusion of Nagel's direct testimony moved for a mistrial.   (R.T.
5    3/16/06, at 86.)

6          No misconduct occurred.   The court denied a mistrial because Schwartz did
7    not object at the bench conference, nor did he object one time throughout Nagel's
8    testimony.   (*Id.* at 90–91.)   He let the references to the federal courthouse go
9    unchecked, so the State could assume that testimony referring only to the federal
10   courthouse was unobjectionable.   Moreover, nowhere in Nagel's testimony did any
11   information come out about Schwartz' federal charge.   Nagel characterized their
12   contacts as "social" and "flirtatious."   (*Id.* at 68–69.)   Nagel never testified why
13   Schwartz had to drop urine at the federal courthouse.   As the Arizona Court of
14   Appeals found, even if this evidence was improper, it was no more prejudicial than
15   properly admitted evidence of Schwartz' numerous legal problems at the time.
16   (Pet. Exh. 2 at 14–15.)   Nagel's testimony, which did not even draw a
17   contemporaneous objection, did not warrant a mistrial after twelve days of
18   testimony in this case.

19         **3. Reference to a second doctor.**

20         Carmen Fernandez testified that Schwartz had told her he wanted to find
21   someone to take care of Stidham.   (R.T. 3/17/06, a.m., at 12.)   The prosecutor
22   asked, "He also tell you about another doctor he wanted to be taken care of?"   (*Id.*)
23   She answered, "Yes."   (*Id.*)   Schwartz objected on relevance grounds and moved
24   for a mistrial.   (*Id.* at 12–13.)   The prosecutor explained that he wanted to elicit the
25   difference between the threats to the two doctors:   "One he wanted killed, one he
26   wanted harmed."   (*Id.* at 13.)   The court sustained the objection and struck the
27   testimony, instructing the jurors "to disregard the answer to the last question.   It is
28   not evidence in this case."   (*Id.*)

1   No misconduct occurred, and striking the testimony was an appropriate
2   remedy. The question did not elicit matters precluded by any previous ruling, and
3   the prosecutor had a reason for asking it. Four other witnesses at trial testified that
4   Schwartz had either asked them personally to find someone to injure Stidham.
5   Three more witnesses testified that Schwartz said he intended to find someone to
6   injure Stidham. Thus, the evidence that Schwartz mentioned injuring a second
7   victim would not reasonably have affected the verdict. In addition, the court
8   admonished the jury and struck the evidence from the record. Schwartz does not
9   explain how these actions were inadequate. *See Bayramoglu v. Estelle*, 806 F.2d
10  880, 888 (9th Cir. 1986) ("A timely instruction from the judge usually cures the
11  prejudicial impact of evidence unless it is highly prejudicial or the instruction is
12  clearly inadequate.")

13        **4. Palm pilot data.**

14        Computer analyst Jefford Englander testified that he had searched Schwartz'
15  palm pilot address book, a document containing 31 pages of data, and the only
16  entry that included the car model and license plate number was the entry for
17  Stidham. (R.T. 3/17/06, p.m., at 122–26.) Schwartz objected that the address book
18  had not been disclosed and filed a written motion to strike Exhibit 27 together with
19  a motion for mistrial. (R.T. 3/17/06, p.m., at 131–33; R.T. 3/23/06, at 60.) The
20  court found that the State had disclosed a computer disk containing the file without
21  specifically stating which files it intended to introduce at trial. (R.T. 3/23/06, at
22  61.) The court denied the motion for mistrial but struck Exhibit 27 and
23  Englander's testimony regarding the address book entry. (*Id.* at 63.) The court
24  instructed the jurors that Exhibit 27 was stricken, that they were to disregard the
25  palm pilot data and any testimony from Englander about it, and that "[i]t is not
26  evidence in this case." (R.T. 3/24/06, p.m., at 3.)

27        No misconduct occurred, and striking the exhibit and testimony, rather than
28  declaring a mistrial, was the appropriate remedy. Contrary to Schwartz' claim in

1  his § 2254 petition (pp. 25–26), the prosecution did not try to surprise him at trial

2  with this evidence.  The State had disclosed the data gathered from Schwartz' palm

3  pilot by sending the defense a computer disk.  (R.T. 3/23/06, at 61.)  Included were

4  instructions on how to open the files on the disk.  (*Id.*)  The defense never opened

5  the files on the disk.  (*Id.*)  Nevertheless, the court found that this disclosure was

6  not specific enough to put Schwartz on notice about the address book data.  (*Id.*)

7  To remedy this situation, the court denied the State this evidence and told the jurors

8  to disregard it.

9       While Schwartz claims that the damage had already been done, he does not

10  explain the damage this stricken evidence caused or why only a mistrial could

11  vindicate his right to a fair trial.  The jurors knew from other properly admitted

12  evidence that Schwartz had given Carmen Fernandez the make, model, and license

13  plate number of Stidham's car in connection with hiring a hit man.  (R.T. 3/24/06,

14  p.m., at 6–7.)  Schwartz did not object to Fernandez' testimony.  The jurors could

15  infer from this other evidence that Schwartz not only had Stidham's car

16  information but why he had it.   To the extent the state court determined the

17  disclosure was inadequate in this instance, the prosecutor did not commit

18  intentional misconduct, and the judge took appropriate action by striking the

19  evidence and instructing the jurors to disregard it.

20       **5. Reference to "indictment."**

21       On direct examination, the prosecutor asked Lourdes Lopez why she had left

22  the County Attorney's office, and Lopez testified, "Because I knew that I was

23  going to be indicted."  (R.T. 3/21/06, at 191.)  Schwartz moved for a mistrial based

24  on an alleged violation of the trial court's December 2, 2005, order (R.O.A. item

25  364) precluding evidence that Schwartz had been indicted on federal charges.

26  (R.T. 3/21/06, at 197–205.)  Schwartz argued that the State had failed to caution

27  Lopez not to talk about the issue of the federal indictment while testifying.  (*Id.*)

28       The trial court found no misconduct and denied the motion for mistrial.

1  (R.O.A. item 541.)   The court stated that its December 2, 2005, order did not

2  preclude mention of Lopez' indictment.  (R.O.A. item 541.)  Therefore, the court

3  found that "there has been no violation of the Court's order," and "[f]urther, the

4  response of Ms. Lopez was not one that the State sought to elicit, but was the result

5  of non-leading questions."  (*Id.*)

6        Moreover, in denying the motion for mistrial, the court stated:

7            In this case, Ms. Lopez testified that she believed that she was
             going to be indicted.  No evidence has been introduced that she
8            or the defendant were indicted nor has there been any evidence
             presented to the jury concerning the outcome of the federal
9            case.

10 (R.O.A. item 541.)   Without any evidence of misconduct, and without the

11 introduction of improper evidence, Schwartz was not entitled to a mistrial.

12    **6. Reference to combined DNA analysis.**

13       After a *Frye*[2] hearing, the trial court found that random probabilities

14 calculated by combining STR and Y-STR statistics was not accepted in the

15 scientific community.   Accordingly, the court precluded Lorraine Heath from

16 testifying about the random probability resulting from combining the STR and Y-

17 STR analyses.  (R.O.A. item 554.)   During her direct testimony, the prosecutor

18 asked Heath her opinion on Bigger's contribution to LX-39, and Heath responded

19 by saying:  "Having looked at both my own data and Mr. Reinbold's data, I feel

20 that there is very strong evidence that—."  (R.T. 3/28/06, p.m., at 119.)  Schwartz

21 objected and moved for a mistrial.  (*Id.*)

22       The court held a hearing on the motion, and Heath averred (1) that the

23 prosecutor had advised her that she could not testify about any kind of combined

24 results; (2) that she had received a copy of the judge's *Frye* ruling; (3) that she had

25 no intention of discussing combined probability statistics; and (4) that she always

26

27 _____

28 [2] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

1   looks at any other reports generated in a case to check her own conclusions in the

2   event that her data is contrary to prior reported results.  (*Id.* at 125–29.)  The court

3   reviewed the statements Heath had made in her prior two defense interviews and

4   found "ample discussion by Ms. Heath, in her interview of February 10th [2006],

5   regarding her confidence level while looking at both Mr. Reinbold's results and the

6   results in her case."  (R.T. 3/29/06, a.m., at 23–24.)  The court found that Heath's

7   testimony did not go outside the court's *Frye* ruling precluding combined statistics,

8   and it did not go outside what was disclosed to the defense.  (*Id.* at 26.)

9   Accordingly, the court denied the motion for mistrial.  (*Id.* at 23.)

10      The record does not support the inference of misconduct with respect to

11   Heath's testimony.  The prosecutor had advised Heath not to discuss combined

12   statistical analysis and provided her with a copy of the court's *Frye* ruling.  Heath

13   did not discuss and never intended to discuss combined statistics.  And the

14   prosecutor's question to her did not call for an opinion based on combined

15   analysis.  Nevertheless, the federal petition claims that Heath's opinion that "very

16   strong evidence" suggested Bigger contributed to the mixed profile on LX-39 was

17   based on Heath's combined statistical calculations.  (Pet. at 28–29.)  But Heath

18   never said at trial that her confidence was based on her combined statistical

19   calculations, the trial court never precluded the opinion Heath gave, and in any

20   event Heath's opinion conformed to her statements in her pre-trial interviews.

21      **7. Winston's undisclosed change in testimony.**

22      After autopsist David Winston had testified for the State, the defense called

23   him in its own case, and Winston changed his previous testimony, saying now that

24   his notation that livor mortis had not fixed referred to his observations made at

25   8:30 a.m., the time he performed the autopsy, rather than the time he first examined

26   Stidham's body at 4:15 a.m.  (R.T. 4/11/06, p.m., at 96, 101.)   Schwartz objected

27   and moved for a mistrial.  (*Id.* at 112–14.)

28      At the hearing on the motion, Winston said he first realized his error the day

before testifying the second time and that he had mentioned it to the prosecutor for the first time during a break immediately prior to his testimony.  (*Id.* at 125, 129–30.)  Winston said that the defense had not interviewed him since he had originally testified almost a month earlier.  (*Id.* at 130.)  The prosecutor said she was under the impression that Winston's error was precisely the reason the defense had recalled him, thus, she averred, she did not immediately inform defense counsel because she believed the defense already knew Winston would change his testimony.  (*Id.* at 121–22.)

The trial court admonished the State but denied the motion for mistrial, finding (1) the State received the information 20 minutes before Winston took the stand; (2) the court accepted the prosecutor's explanation that she thought it was known to the defense; and (3) Schwartz suffered no prejudice because Winston had not changed his opinion as to the time of death and because the defense used Winston's error effectively to impeach him.  (*Id.* at 132.)

Although the defense was obviously surprised by Winston's testimony on recall, the prosecutor was just as surprised when she learned it just 20 minutes before.   In view of Dr. Keene's testimony, the prosecutor was reasonable to conclude that the defense knew Winston would admit his error.  Keene had just testified that normally notations in the autopsy report indicate observations from the autopsy, not from the initial on-scene examination.  (R.T. 4/11/06, p.m., at 24.) Keene's testimony appeared to set up recalling Winston so he could admit his error. It was reasonable to assume that Winston's error was the reason the defense had called him.  Any perceived misconduct by the prosecutor was not intentional.

In any event, there is no showing of prejudice.  Winston did not change his earlier conclusion that Stidham had died sometime after 4:00 p.m. on October 5, 2004.  The time of death was the material issue, not the time Wilson had noted livor mortis.  Moreover, the defense reaped a strategic windfall.  As the prosecutor stated it, "Dr. Winston now looks like a boob and one who is perhaps not candid

1  with the Court." (*Id.* at 123.) A mistrial was not warranted.

2  **8. Cumulative error.**

3  The prosecutor's actions in this case did not constitute misconduct and

4  certainly not the kind of misconduct that permeates the entire trial and has been

5  found by courts to pose a double jeopardy bar to retrial. *See Oregon v. Kennedy*,

6  456 U.S. 667, 675–76 (1982); *Pool v. Superior Court*, 677 P.2d 261, 272 (Ariz.

7  1984). In *Pool*, the court set forth two conditions for reversible misconduct:

8  [S]uch conduct is not merely the result of legal error,
9  negligence, mistake, or insignificant impropriety, but, taken as a
   whole, amounts to intentional conduct which the prosecutor
10  knows to be improper and prejudicial, and which he pursues for
    any improper purpose with indifference to a significant
11  resulting danger of mistrial or reversal; and

12  [T]he conduct causes prejudice to the defendant which cannot
   be cured by means short of a mistrial.

13

14  677 P.2d at 271–72 (footnote omitted). The holding in *Pool* is not contrary to

15  federal law. In *Kennedy*, the Supreme Court stated in a plurality opinion that

16  "circumstances under which such a defendant may invoke the bar of double

17  jeopardy in a second effort to try him are limited to those cases in which the

18  conduct giving rise to the successful motion for a mistrial was intended to provoke

19  the defendant into moving for a mistrial." 456 U.S. at 679. Justices Brennan and

20  Marshall noted in their concurrence that "nothing in the holding of the Court today

21  prevents the state courts, on remand, from concluding that respondent's retrial

22  would violate the provision of the [state] Constitution that prohibits double

23  jeopardy . . . as that provision has been interpreted by the state courts." *Id.*

24  (Brennan, J., concurring). In *Pool*, the Arizona Supreme Court elected to adopt a

25  standard for the double jeopardy clause of the state constitution that included the

26  federal standard, but also afforded additional protection for the defendant. While

27  *Kennedy* holds that jeopardy attaches only when the prosecutor intends to provoke

28

1   the defendant to move for a mistrial, *Pool* provides constitutional protection to the

2   defendant when the prosecutor intentionally engages in conduct that he "knows to

3   be improper and prejudicial, and which he pursues for any improper purpose with

4   indifference to a significant resulting danger of mistrial or reversal." *Pool*, 677

5   P.2d at 271–72.

6        In reviewing Schwartz' claim, the Arizona Court of Appeals applied the *Pool*

7   standard, a standard that is not only complimentary to federal law, but was also

8   more favorable to Schwartz than application of federal law would have been.

9   Thus, the Arizona Court of Appeals' decision did not involve an unreasonable

10  application of federal law.

11       The enumerated instances raised in the petition were either entirely proper

12  conduct, or at worst "the result of legal error, negligence, mistake or insignificant

13  impropriety" not amounting to "intentional conduct which the prosecutor knows to

14  be improper and prejudicial."  In no instance did the prosecutor engage in conduct

15  which the prosecutor knew to be improper and prejudicial.  In six of the seven

16  instances cited in the petition, the trial court either found no impropriety at all or

17  struck the challenged evidence based on relevance or lack of timely disclosure.  In

18  the single instance where the court admonished the prosecutor (for failure to

19  disclose Winston's change of testimony), it was for an "insignificant impropriety";

20  the prosecutor simply erred in assuming the defense knew what its own witness

21  was going to say.  The trial judge was in the best position to assess the prosecutor's

22  motives, and the trial judge found the prosecutor's explanation credible.  While it

23  caused some surprise to the defense, it caused no real prejudice because Winston

24  did not change his opinion about the time of death.  Moreover, each of these

25  incidents involved completely unrelated issues.  There was no theme of intentional

26  misconduct designed to upset the defendant's case as happened in *Pool*.

27       Because there was no prosecutorial misconduct or trial error, there can be no

28  reversible cumulative error.  *See United States v. Martinez-Martinez*, 369 F.3d

1  1076, 1090 (9th Cir. 2004) ("[T]he 'cumulative error' analysis is inapposite

2  [where] .... [the] Defendant has failed to demonstrate any erroneous decisions by

3  the trial court.").  Even assuming some *de minimis* prosecutorial judgment errors,

4  viewing the cumulative effect of any such errors in the context of the entire trial, it

5  was "[un]likely to have affected the jury's discharge of its duty to judge the

6  evidence fairly."  *United States v. Sullivan*, 522 F.3d 967, 982 (9th Cir. 2008)

7  (internal quotation marks and citation omitted).  Ground one of the petition should

8  be denied.

9      **B**. **Hearsay**.

10      Schwartz contends that Jason Lee and Jennifer Dainty testified to

11  inadmissible hearsay in violation of his confrontation rights.  (Pet. at 35–42.)

12  Federal habeas corpus does not ordinarily lie to review questions about the

13  admissibility of evidence.  *McGuire*, 502 U.S. at 67–68.  It is not the province of a

14  federal habeas court to reexamine state court determinations on state law questions.

15  *Id*.  Federal courts may not interfere with a state evidentiary ruling but only

16  consider whether the evidence is so prejudicial that its admission or exclusion

17  violated due process and the right to a fair trial.  *See id*.  Alleged violations of the

18  Sixth Amendment's Confrontation Clause are reviewed *de novo*. *Lilly v. Virginia*,

19  527 U.S. 116, 136–37 (1999).

20      Here, the declarant's (Bigger's) remarks about pizza being delivered were

21  not offered for the truth of the matter asserted and did not violate the rule against

22  hearsay or the Confrontation Clause.

23      Schwartz objected to hearsay when Lee testified that the man in scrubs

24  pointed out Stidham's office at the medical complex and told Lee that pizza had

25  been delivered there.  (R.T. 3/10/06, a.m., at 31.)  Dainty testified that the man in

26  scrubs who entered her convenience store on October 5, 2004, told her he was at a

27  meeting where they had served pizza but that he did not like pizza.  (R.T. 3/14/06,

28  at 40.)  Schwartz had previously filed a motion in limine seeking preclusion of any

1  hearsay Dainty might attest to. (R.O.A. item 484.) Schwartz did not object when
2  Parham Morgan testified that the man wearing blue scrubs in the parking lot told
3  him that Stidham had ordered pizza. (R.T. 4/12/06, p.m., at 21–24.)

4      The trial court admitted the statements because they were not offered to
5  prove pizza was delivered or that the declarant did not like pizza, but were offered
6  instead because they tended to show that the man who made the statement in the
7  convenience store was the same person who spoke with Lee at the medical
8  complex. (R.O.A. item 516; R.T. 3/10/06, a.m., at 30.) The Arizona Court of
9  Appeals agreed with the trial court (Pet. Exh. 2 at 27), and this decision concerning
10 the admissibility of evidence did not amount to a deprivation of due process.

11     Neither statement was hearsay because neither the statement made to Lee
12 nor the statement made to Dainty was "offered in evidence to prove the truth of the
13 matter asserted." Ariz. R. Evid. 801(c). No one cares whether pizza was served at
14 Stidham's seminar or whether Bigger liked pizza or not. The statements in
15 question were offered to show that the declarant made similar remarks to two
16 different people. As the state court of appeals said, "Arizona courts have
17 repeatedly held that the rule against hearsay is not violated when evidence is
18 admitted solely for the purpose of proving that certain words were spoken,
19 regardless of their truth. *See, e.g., State v. Nightwine*, 137 Ariz. 499, 503, 671 P.2d
20 1289, 1293 (App. 1983)." (Pet. Exh. 2 at 28.) *See United States v. Hathaway*, 798
21 F.2d 902, 905 (6th Cir. 1986) ("[W]hen a statement is offered to prove neither the
22 truth nor falsity, there is no need to assess the credibility of the declarant. The
23 significance lies entirely in the fact that the words were spoken.").

24     The § 2254 petition implies that hearsay may not be offered to prove
25 identity, citing *United States v. Jamerson*, 35 F.3d 572 (9th Cir. 1994)

26

27

28

1   (unpublished)[3] and *State v. Romanosky*, 782 P.2d 693 (Ariz. 1989).   But the

2   statements in *Jamerson* and *Romanosky* involved out-of-court identifications

3   which were offered by the State for the truth of the matters asserted.   The

4   statements in question in the present case were not identifications made by the

5   declarant which were then offered for the truth of the matter asserted, so the

6   remarks were not hearsay.  Rule 801(c).

7        Schwartz alleges that Lee's and Dainty's testimony violated the Sixth

8   Amendment Confrontation Clause.   In *Crawford v. Washington*, 541 U.S. 36

9   (2004), the Supreme Court held that where "testimonial" statements are at issue,

10  the Sixth Amendment mandates a right of confrontation.   541 U.S. at 68–69.   No

11  confrontation issue arose here because the declarant's statements to Lee and Dainty

12  were not "testimonial" in any sense contemplated by the Supreme Court.   The

13  Supreme Court in *Crawford*, rather than specifically defining "testimonial,"

14  provided examples that constitute the "core class of 'testimonial' statements."   541

15  U.S. at 51. Among these are "pretrial statements that declarants would reasonably

16  expect to be used prosecutorially."   *Id.*   The Court further clarified the meaning of

17  "testimonial" in *Davis v. Washington*, 547 U.S. 813, 822 (2006), where the Court

18  said that a statement is testimonial if the declarant was acting as a witness "to

19  establish or prove past events potentially relevant to later criminal prosecution."

20       In Schwartz' case, the declarant simply was not acting as a witness.  He was

21  not testifying to facts relevant to a criminal prosecution, so he could not reasonably

22  expect his remarks to Lee and Dainty to be used prosecutorially.  What he said to

23  them was not "a weaker substitute for live testimony" at trial.  *Davis*, 547 U.S. at

24  828, quoting *United States v. Inadi*, 475 U.S. 387, 394 (1986).

25       Furthermore, the Confrontation Clause "does not bar the use of testimonial

26  —————————————————

27  [3] Unpublished decisions are not precedent and may not normally be cited as such.
28  U.S. Ct. of App. 9th Cir. Rule 36-3(a) and (c).

1   statements for purposes other than establishing the truth of the matter asserted."
2   *Crawford*, 541 U.S. at 59 n.9.  Here, the Arizona Court of Appeals found that the
3   statements about pizza were "casual or offhand remarks," not testimonial
4   statements made in expectation of trial.  (Pet. Exh. at 29.)  This view of the facts
5   was not unreasonable.  The declarant's statements to Lee and Dainty were not
6   offered for their truth.  The admission of these statement violated neither the
7   hearsay rules nor the Confrontation Clause.  Schwartz cannot show a violation of
8   due process justifying issuance of the writ.

9       **C. Impeachment.**

10      Schwartz contends that the court erred in precluding impeachment of
11  Lourdes Lopez with testimony from Paul Skitzki and DEA agent Dave Wickey.
12  (Pet. at 42–46.)   The right of cross-examination is included in the right of an
13  accused in a criminal case to confront witnesses.  *Pointer v. Texas*, 380 U.S. 400,
14  404 (1965). A defendant's right to present evidence is not absolute because the
15  defendant must comply with established rules of evidence and procedure.  *Taylor v.*
16  *Illinois*, 484 U.S. 400, 410–11 (1988).   Thus, the accused does not have an
17  unfettered right to offer evidence that is incompetent, privileged, or otherwise
18  inadmissable under standard rules of evidence.  *Id.*   Trial judges retain wide
19  latitude to impose reasonable limitations based upon concerns about, among other
20  things, harassment, prejudice, confusion of issues, witness safety, or interrogation
21  that is repetitive or only marginally relevant.  *Delaware v. Van Arsdall*, 475 U.S.
22  673, 679 (1986).  Finally, the Federal Rules of Evidence are not constitutionally
23  based.  *Dowling v. United States*, 493 U.S. 342, 352–53 (1990).  Therefore, cases
24  under the rules of evidence are not constitutionally mandated and cannot dictate a
25  constitutional result.  *Id.*

26      At trial, Schwartz asked Lopez on cross-examination whether she had ever
27  mentioned any of his conversations about Stidham to anyone else, and she said she
28  had related them to Paul Skitzki of the Pima County Attorney's Office.   (R.T.

1    3/22/06, at 105–06.)   The State sought preclusion of Skitzki on grounds of

2    collateral impeachment.  (R.O.A. item 562.)  In addition, Lopez testified on direct

3    examination that the DEA contacted her in September 2001 and she initially lied to

4    the agents to protect Schwartz.  (R.T. 3/21/06, at 186.)  On cross-examination,

5    Schwartz asked her whether she knew what the DEA agents wanted when they first

6    contacted her by telephone, and Lopez said she did not know but assumed it was

7    about a drug case she was prosecuting for the County Attorney's Office.  (R.T.

8    3/22/06, at 46.)  Schwartz then unsuccessfully sought to introduce the DEA report

9    to contradict Lopez, and later sought to call Agent Wickey of the DEA to impeach

10   Lopez.  (R.O.A. item 590.)

11       The court precluded both Skitzki and Wickey because their testimony

12   constituted improper use of extrinsic evidence to impeach Lopez on a collateral

13   matter and was not admissible under Rule 608(b) of the Arizona Rules of

14   Evidence.  (R.T. 4/12/06, p.m., Vinson Reporting, at 11.) The Arizona Court of

15   Appeals agreed.  (Pet. Exh. 2 at 30–32.)

16       The state court decision was constitutional.   Arizona Rule of Evidence

17   608(b) is the same as its federal counterpart.  *State v. Cook*, 726 P.2d 621, 622

18   (Ariz. App. 1986) ); *cf. Hernandez v. State*, 52 P.3d 765, 767 (Ariz. 2002) ("In

19   interpreting Arizona's evidentiary rules, we look to federal law when our rule is

20   identical to the corresponding federal rule.").

21       It is well settled that when impeaching a witness regarding an inconsistent

22   fact collateral to the trial issues, the impeaching party is bound by the witness'

23   answer and cannot produce extrinsic evidence to contradict the witness.  *United*

24   *States v. Higa*, 55 F.3d 448, 451–52 (9th Cir. 1995); *see* Ariz. R. Evid. 608(b)

25   (attacks on witness' credibility based on specific instance of conduct, other than

26   conviction of crime, may not be proved by extrinsic evidence); *State v. Hill*, 848

27   P.2d 1375, 1387 (Ariz. 1993).  Evidence is collateral if it could not properly be

28   offered for any purpose independent of the contradiction.  *State v. McGuire*, 555

1  P.2d 330, 331 (Ariz. 1976).

2      In this case, Skitzki's testimony would have been relevant only to contradict
3  Lopez' testimony regarding whether she told anyone else about Schwartz' threats
4  towards Stidham.  Thus, the court properly excluded the collateral testimony.

5      Schwartz claims that the State's motion to preclude Skitzki was in bad faith
6  because Skitzki had been disclosed prior to trial.   But Lopez first referred to
7  Skitzki  in  cross-examination.    Prior  to  that  testimony,  the  State  had  no
8  foreknowledge that Schwartz intended to use Skitzki's testimony improperly under
9  Rule 608(b).  The Arizona Court of Appeals even implied that Schwartz "hoped to
10  elicit  testimony  about  Skitzki  for  the  sole  purpose  of  later  challenging  Lopez's
11  general credibility by introducing extrinsic evidence to impeach her on that point."
12  (Pet. Exh. 2 at 32.)  The State's motion to preclude was not filed in bad faith.

13      Schwartz also asserts that Skitzki's testimony was admissible to "prove up"
14  Lopez'  prior  inconsistent  statement.   She  had  testified  that  she  told  Skitzki  of
15  Schwartz'  threats  prior  to  the  murder;  the  defense  proffered  that  according  to
16  Skitzki, Lopez told him after the murder.   (R.T. 4/12/06, a.m., at 22.)   But the
17  whole purpose of this "prove up" was to contradict Lopez on a collateral matter.
18  To  call  Skitzki  purportedly  to  offer  a  prior  inconsistent  statement  would  have
19  entailed a whole mini-trial on Skitzki's credibility and motive to lie in the face of
20  the dismissal action pending against him at the time following the murder.   The
21  evidence was extrinsic and collateral to Schwartz' guilt or innocence.

22      As to Wickey's proposed testimony, Lopez already admitted lying to DEA
23  agents about Schwartz' prescription fraud.  Wickey's testimony about whether she
24  knew why the DEA called her was extrinsic evidence on a collateral matter, the
25  sole purpose of which was to contradict Lopez' testimony.  Rule 608(b).

26      Schwartz  also  contends  that  Rule  608(b)  cannot  be  used  to  preclude  a
27  witness.   (Pet. at 44.)   That proposition is meritless in view of *Hill* where the
28  Arizona Supreme Court upheld the preclusion of a witness under Rule 608(b).  848

1   P.2d  at 1387–88.  Ground three of the petition must be denied.

2       **D. Limiting Cross-Examination.**

3       Schwartz posits a Sixth Amendment claim based on limiting cross-

4   examination of PCSD deputies about Daphne Stidham's conduct on the night of

5   her husband's murder.  (Pet. at 46–47.)  Schwartz did not make this argument in the

6   trial court; accordingly, the Arizona Court of Appeals reviewed the same claim on

7   appeal for fundamental error, finding none.  (Pet. Exh. 2 at 36–37; citing *State v.*

8   *Henderson*, 115 P.3d 601, 607 (Ariz. 2005)).

9       The Confrontation Clause of the Sixth Amendment guarantees the right of a

10  criminal defendant "to be confronted with the witnesses against him."  U.S. Const.

11  amend. VI.  The Supreme Court has held that "[t]he main and essential purpose of

12  confrontation is to secure for the opponent the opportunity of cross-examination."

13  *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting 5 J. Wigmore, Evidence §

14  1395, p. 123 (3d ed. 1940)).  Nevertheless, "trial judges retain wide latitude insofar

15  as the Confrontation Clause is concerned to impose reasonable limits on such

16  cross-examination based on concerns about, among other things, harassment,

17  prejudice, confusion of the issues, the witness' safety, or interrogation that is

18  repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.

19      As early as December 2004, Schwartz had informed the State of his

20  intention to pursue evidence of Daphne Stidham's possible culpability in the

21  murder of her husband based on her alleged bizarre behavior when deputies

22  contacted her on the night of the murder.  (R.O.A. item 444.)  This alleged bizarre

23  behavior included immediately asking the deputies whether her husband had been

24  shot (before they had informed her of anything to do with the incident), having

25  what appeared to the deputies to be a Will and related documents lying open in the

26  bedroom, and information suggesting a recent increase in insurance coverage on

27  Dr. Stidham.  (*Id.*)  In April 2005 Schwartz requested the prosecutor to provide him

28  with any information as to whether Dr. Stidham was having an extramarital affair,

1   whether Mrs. Stidham suspected her husband of such, and whether insurance

2   policies existed concerning Dr. Stidham.  (R.O.A. item 444, Exh. A.)

3       The trial court denied Schwartz' discovery request stating:   "Defendant

4   Schwartz, in this case, sets forth no specific defense which has any cognizable

5   basis for examination of Daphne Stidham, or to require her to provide the

6   requested information.  The request for discovery appears to be nothing more than

7   a fishing expedition."   (R.O.A. item 247.)   The Arizona Court of Appeals also

8   found that Schwartz had failed to meet Rule 401's threshold relevance requirement

9   and found that the evidence would not have created a reasonable doubt about

10  Schwartz' guilt.  (Pet. Exh. 2 at 36.)

11      The state court decision was reasonable.  Federal Rules of Evidence 401 and

12  402 require that evidence must be relevant to be admitted at trial.  Even relevant

13  evidence is subjected to the Rule 403 weighing analysis between relevance on the

14  one hand and prejudice or confusion on the other.  In *United States v. Larson*, 495

15  F.3d 1094 (9th Cir. 2007), the Ninth Circuit identified three factors it would

16  consider in determining whether a defendant's Confrontation Clause right was

17  violated through limited cross-examination:  "(1) [whether] the excluded evidence

18  was relevant; (2) [whether] there were other legitimate interests outweighing the

19  defendant's interest in presenting the evidence; and (3) [whether] the exclusion of

20  evidence left the jury with sufficient information to assess the credibility of the

21  witness."  *Id.* at 1103 (quoting *United States v. Beardslee*, 197 F.3d 378, 383 (9th

22  Cir. 1999) (brackets in *Larson*)).

23      First, Daphne Stidham did not testify at Schwartz' trial.   Generally,

24  "exposure of a witness' motivation in testifying is a proper and important function

25  of the constitutionally protected right of cross-examination."  *Davis*, 415 U.S. at

26  316–17 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).  Because Mrs.

27  Stidham was not a witness at trial, her motive to testify was not at issue, and

28  nothing she said to the deputies on the night of the murder even remotely

1   incriminated Schwartz, so the limitation on cross-examination did not deny
2   Schwartz any right to confront her.

3          Second, and more to the point, any such evidence was irrelevant. Schwartz
4   failed to produce any evidence that connected Daphne Stidham to the murder of
5   her husband. No evidence placed Mrs. Stidham at or near the scene of the crime
6   on October 5, 2004. The PCSD deputies' reports of their contact with Daphne
7   Stidham on the night of the murder did not raise the specter of her culpability.
8   Deputies entered the Stidham residence on a welfare check. (R.O.A. item 90, Exh.
9   1–4.) Mrs. Stidham was asleep. Upon waking to find deputies in her bedroom, her
10  first question was "Is my husband okay?" (*Id.*) The deputies did not immediately
11  inform her of her husband's death. She then asked whether her husband had been
12  shot. (*Id.*) She also wondered whether he had had a heart attack. (*Id.*) When the
13  deputies told her of her husband's murder, she said, "I don't know why the cruel
14  things happen to the nicest people." (*Id.*) She was very upset at first but regained
15  her composure in a short time. (*Id.*)

16         Mrs. Stidham's reactions which the deputies found peculiar—failing to look
17  to see if her husband was beside her in bed, asking whether he had been shot
18  before deputies disclosed their mission, and regaining her composure in a brief
19  time span—were all explained later to the detectives' satisfaction. (R.O.A. item
20  444, p. 8.) None of these reactions was inculpatory. The "Will" turned out to be
21  an estate planning letter from the Stidhams' attorney. (*Id.*) No information from
22  any witness suggested an extramarital affair. The information Schwartz sought to
23  introduce via cross-examination of the deputies had no tendency to create a
24  reasonable doubt about Schwartz' own guilt and therefore was irrelevant under
25  Rules 401 and 402. The prejudice inherent in this information far outweighed any
26  probative value it *might* have had. Rule 403. Limiting cross-examination on
27  irrelevant matters did not deny Schwartz his right to present a defense. This Court
28  should deny relief on ground four of the petition.

1          **E. Preclusion of Character Evidence.**

2          Schwartz contends that the court improperly precluded him from presenting

3   character evidence showing his competence as a physician and his ability to sustain

4   a successful practice.  (Pet. at 47–50.)  It is not the province of a federal habeas

5   court to reexamine state court determinations on state law questions.  *McGuire*,

6   502 U.S. at 67–68.  Federal courts may not interfere with a state evidentiary ruling

7   but only consider whether the evidence is so prejudicial that its admission or

8   exclusion violated due process and the right to a fair trial.  *Id.*

9          Nowhere in his state court briefs or petition for review did Schwartz raise

10  this as an issue of federal law.  He is procedurally defaulted from advancing this

11  unexhausted federal claim unless he shows valid cause for the default and actual

12  prejudice from the claimed constitutional violation, or that the habeas court's

13  failure to consider the claim will result in a miscarriage of justice.  *Coleman*, 501

14  U.S. at 749–50.  Gonzales fails to show cause for his procedurally defaulted claim.

15  He had sufficient opportunity in his direct appeal and petition for review before the

16  state supreme court to properly raise a federal law issue related to the preclusion of

17  character evidence, but he failed to do so, therefore he cannot establish cause for

18  the default other than himself.  If cause is not shown, this Court need not evaluate

19  prejudice.  *Murray*, 477 U.S. at 488.

20         Even if he had shown cause, Schwartz cannot show prejudice.  The Arizona

21  Court of Appeals rejected the same claim, finding the proposed character evidence

22  irrelevant and cumulative.  (Pet. Exh. 2 at 38–39.)  Rule 402 of the Federal Rules

23  of Evidence declares that "[a]ll relevant evidence is admissible, except as

24  otherwise provided by the Constitution of the United States, by Act of Congress,

25  by these rules, or by other rules prescribed by the Supreme Court pursuant to

26  statutory authority."  Rule 401 defines relevant evidence as "evidence having any

27  tendency to make the existence of any fact that is of consequence to the

28  determination of the action more probable or less probable than it would be

without the evidence."    Rule 404, which separately deals with "character" evidence, and its subsection 404(b), which covers evidence of other crimes, wrongs, or acts, is a qualification of the general rule of the admissibility of all relevant evidence, and renders inadmissible evidence of a person's general character if used to show propensity or proclivity.  Rule 404(b) covers not just other crimes or wrongs, but also explicitly other "acts"—if the other acts are "relevant in such a way as to avoid being nothing more than character or propensity evidence."  *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007). In *Curtin*, the Ninth Circuit advised:

> Character evidence is of slight probative value and may be very prejudicial.  It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.

*Id.* at 944 (citation omitted).

Here, the proposed character evidence was irrelevant.  Schwartz sought evidence of his medical abilities to rebut the inference that he conspired to kill Stidham because Stidham had stolen patients and left him unable to carry on with a successful practice. (R.O.A. item 429.)  Schwartz' competency as a physician was never in question, nor would his competence negate an element of the charge. Indeed, the State conceded Schwartz was a competent doctor with the necessary skills to practice his specialty and attract patients.  (R.O.A. item 478, p. 3.)

Moreover, the evidence he sought was cumulative of other evidence already admitted.  A former patient testified at trial that Schwartz had saved her right eye and that she had every confidence in him as a doctor.  (R.T. 3/16/06, at 120.) Another witness testified that Schwartz had removed a tumor from her son's eye saving his life.  (R.T. 3/24/06, a.m., at 8.)  She said she was very pleased with Schwartz' medical services.  (*Id.*)  A physician friend of his testified that he lent Schwartz a large amount of money because he had confidence in Schwartz as a

1   competent doctor and in Schwartz' ability to make money to repay the debt.  (R.T.

2   3/21/06, at 31–32.)

3       Evidence also showed that prior to October 2002 Schwartz had run a busy

4   and prosperous practice grossing in excess of $1 million per year.  (R.T. 3/22/06, at

5   79–80; R.T. 3/30/06, p.m., at 61, 101; R.T. 3/31/06, p.m., at 13, 60–61; R.T.

6   4/11/06, p.m., at 46–49.)  And while his practice was closed for about a year, trial

7   testimony established that the trend of his newly reopened practice was positive.

8   (R.T. 3/30/06, p.m., at 61; R.T. 3/31/06, p.m., at 69–70.)  Moreover, Schwartz'

9   medical assistant testified that Schwartz was the only practitioner in Tucson who

10  combined neuroophthamology, pediatric ophthamology, and cosmetic eye surgery.

11  (R.T. 4/11/06, p.m., at 58.)  At the time of Stidham's death, Schwartz was

12  expanding his business to include cosmetology and Botox face lifts.  (R.T. 3/30/06,

13  p.m., at 107; R.T. 4/11/06, p.m., at 59.)

14      Evidence of Schwartz' medical skill was irrelevant.  But to the extent that

15  his medical skills and business acumen were possibly relevant to any defense

16  theory of the case, jurors could readily infer from the evidence already presented

17  that Schwartz excelled at his specialty and knew how to make money.  The court

18  should exclude evidence, including relevant evidence, if it is a "needless

19  presentation of cumulative evidence."  Fed. R. Evid. 403.  Ground five of the

20  petition is procedurally defaulted and meritless in any event.

21      **F. Third-Party culpability evidence.**

22      Schwartz contends that the state trial court erred in precluding third-party

23  culpability evidence regarding Dennis Wayne Walsh.    (Pet. at 50–56.)

24  Fundamental standards of relevancy, subject to the discretion of the court, require

25  the admission of testimony which tends to prove that a person other than the

26  defendant committed the crime charged.  *See Chambers v. Mississippi*, 410 U.S.

27  284, 302 (1973).  The defendant's right to present evidence, however, is not

28  absolute.  "In the exercise of this right, the accused, as is required of the State,

48

1  must comply with established rules of procedure and evidence designed to assure
2  both fairness and reliability in the ascertainment of guilt and innocence." *Id.*

3      Nowhere in the state court did Schwartz raise this as an issue of federal law.
4  *See Baldwin*, 541 U.S. at 33.   Moreover, Schwartz fails to show cause for his
5  procedurally defaulted claim.   *Coleman*, 501 U.S. at 749–50.   He had sufficient
6  opportunity in his direct appeal and petition for review before the state court to
7  properly raise a federal law issue related to the preclusion of third-party evidence,
8  but he failed to do so, therefore he cannot establish cause for the default.

9      Even if he had shown cause, Schwartz cannot show prejudice.   In Arizona,
10 the standard for admissibility of third-party culpability evidence is found in Rules
11 401, 402, and 403 of the Arizona Rules of Evidence.   *State v. Gibson*, 44 P.3d 1001,
12 1003 (Ariz. 2002).   Any such evidence must first be relevant, then it is subjected to
13 the normal Rule 403 weighing analysis between relevance on the one hand and
14 prejudice or confusion on the other.   *Id.*   Arizona Rules of Evidence 401 and 403
15 are identical to the federal rules, and Arizona Rule 402 is based on Federal Rule
16 402.   Federal Rule of Evidence 403 provides:   "Although relevant, evidence may
17 be excluded if its probative value is substantially outweighed by the danger of
18 unfair prejudice, confusion of the issues, or misleading the jury, or by
19 consideration of undue delay, waste of time, or needless presentation of cumulative
20 evidence."   The trial court should exclude the evidence if it offers only a possible
21 ground of suspicion against another.   *State v. Prion*, 52 P.3d 189, 193 (Ariz. 2002).

22     As early as February 2005, Schwartz had informed the State of his intention
23 to present evidence of Walsh's robberies and carjackings committed in Tucson in
24 October and December 2004.   (R.O.A. item 489, Exh. A.)   The State filed a motion
25 in limine to preclude this evidence.   (R.O.A. item 489.)   On March 1, 2006, the
26 trial court precluded evidence of Walsh's robberies but admitted evidence of
27 Walsh's two carjackings, committed on October 15 and 28, 2004.   (R.O.A. item
28 517.)   The court also allowed the defense to present evidence of Walsh's alleged

1   statements to others relevant to his possible guilt in the Stidham case.  (*Id.*)

2   Schwartz declined to present a third-party culpability defense as to Walsh.  (R.O.A.

3   item 617.)  The Arizona Court of Appeals rejected Schwartz' claim that this partial

4   preclusion deprived him of his defense.  (Pet. Exh. 2 at 8–9.)

5        The state court decisions did not deprive Schwartz of his right to a defense.

6   No evidence connected Walsh to the murder of Stidham.  No evidence placed

7   Walsh at or near the scene of the crime on October 5, 2004.  Walsh's DNA was

8   excluded from the crime scene and from the Lexus.  (R.O.A. item 489, Exh. D.)

9   Walsh denied committing the murder and denied taking the Lexus.  (*Id.* at p. 4.)

10       At trial, the defense proffered a list of 18 crimes Walsh admitted committing

11  in October and December 2004.  Sixteen of these incidents involved robberies of

12  convenience store clerks during regular business hours.  (R.O.A. item 489, Exh.

13  C.)  During eight of these robberies Walsh displayed a handgun; in four other

14  robberies he showed no weapon but implied he was armed; and in the remaining

15  four instances he neither displayed nor implied a weapon.  (*Id.*)  On only one

16  occasion did Walsh display a knife.  (*Id.*)  Unlike the Stidham murder, Walsh's

17  robberies all involved retail businesses during business hours.  All involved taking

18  cash or cigarettes, whereas Stidham's wallet with cash and credit cards was found

19  on his person.  Walsh was never seen wearing scrubs and never even attempted to

20  disguise himself or otherwise elude detection.  The most telling detail is that Walsh

21  injured no one during these robberies.   None of these robberies bore any

22  resemblance to the murder of Stidham.  The only incidents bearing any similarity

23  to the Stidham case were Walsh's two carjackings where no one was hurt, and the

24  defense was allowed to present evidence of these carjackings.

25       Even though the § 2254 petition cites *Walters v. McCormick*, 122 F.3d 1172

26  (9th Cir. 1997), that case supports the rulings of the state court in Schwartz' case.

27  122 F.3d at 1177 ("Evidence of third-party culpability is not admissible [unless it

28  is] coupled with substantial evidence tending to directly connect that person with

the actual commission of the offense.") (citation and ellipsis omitted; brackets in *Walters*).

In addition, evidence of Walsh's robberies was improper character evidence under Rule 404(b) of the Arizona Rules of Evidence.[4]   The evidence painted Walsh as a bad character while having no tendency to connect Walsh with the murder of Stidham.   In addition to being irrelevant, any minimal probative value of Walsh's robberies was substantially outweighed by confusion of the issues.   *See* Rule 403. The evidence, if admitted, would have dragged before the tribunal the facts concerning numerous non-injurious petty stickups committed by a person who had no demonstrable connection to the Stidham crime scene or to the type of violent crime committed in Stidham's murder.

Nor was Schwartz denied a third-party culpability defense.   Besides evidence of Walsh's two carjackings, the court permitted evidence of any statements Walsh had allegedly made supporting a possible connection to the Stidham case.   The defense had originally proffered that Walsh had confessed to the murder of Stidham in a conversation allegedly overheard by Walsh's cell mate. (R.O.A. item 489, Exhibit A.)   The defense also offered that two other individuals allegedly had information that Walsh had been involved in carjacking.   (*Id.*) Although the trial court allowed the defense to present this evidence, these witnesses did not appear at Schwartz' trial, having apparently recanted, refused to testify, or disappeared.

Without some evidence tending to connect Walsh to the crime scene, evidence of Walsh's convenience store robberies bears no relation to Stidham's murder.   This evidence does not satisfy the requirements for third-party culpability evidence under the rules of evidence.   This claim was not properly exhausted, and,

_____

[4] The State argued preclusion of Walsh's crimes on the basis of Rule 404(b), and the trial court ruled in part based on Rule 404(b).   (R.O.A. items 489, 517.)

1  in any event, this Court should deny ground six of the petition on its merits.

2

3

4  **VI.   CONCLUSION.**

5       Based on the foregoing authorities and arguments, Respondents respectfully

6  request that the Petition for Writ of Habeas Corpus be denied and dismissed with

7  prejudice.

8       RESPECTFULLY SUBMITTED this 6th day of July, 2009.

9                                              TERRY GODDARD
10                                             ATTORNEY GENERAL

11                                             s/JOSEPH L. PARKHURST
12                                             ASSISTANT ATTORNEY GENERAL
                                               CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
13
                                               ATTORNEYS FOR RESPONDENTS
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I hereby certify that on July 6, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

BRICK P. STORTS, III
BARTON & STORTS, P.C.
271 N. Stone Ave.
Tucson, Arizona  85701

Attorney for Petitioner

s/JOSEPH L. PARKHURST

CRM06–0863
53497

1

2

**LIST OF EXHIBITS**

3   Exhibit A.   Excerpts of Record on Appeal ("R.O.A." item 90, 247, 364, 429, 444,

4                478, 489, 516, 517, 541, 554, 562, 590, 617.)

5   Exhibit B.   Opening Brief, Reply Brief

6   Exhibit C.   Petition for Review

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## LIST OF TRANSCRIPTS

2

3    Reporter's Transcript ("R.T.") 3/7/06, p.m.

4    R.T. 3/8/06, a.m.

5    R.T. 3/8/06, p.m.

6    R.T. 3/9/06

7    R.T. 3/10/06, a.m.

8    R.T. 3/10/06, p.m.

9    R.T. 3/14/06

10   R.T. 3/15/06, a.m.

11   R.T. 3/15/06, p.m.

12   R.T. 3/16/06

13   R.T. 3/17/06, a.m.

14   R.T. 3/17/06, p.m.

15   R.T. 3/21/06

16   R.T. 3/22/06

17   R.T. 3/24/06, a.m.

18   R.T. 3/24/06, p.m.

19   R.T. 3/28/06, a.m.

20   R.T. 3/28/06, p.m.

21   R.T. 3/29/06

22   R.T. 3/30/06

23   R.T. 3/31/06, a.m.

24   R.T. 3/31/06, p.m.

25   R.T. 4/4/06

26   R.T. 4/11/06, p.m.

27   R.T. 4/12/06, p.m.

28

1   R.T. 4/18/06, p.m.

2   R.T. 4/19/06, p.m.

3   R.T. 5/2/06

4   R.T. 5/30/06

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28