# EXHIBIT A

# ROA-ITEM 90



**BARTON & STORTS, P.C.**
271 N. Stone Avenue
Tucson, Arizona 85701
(520) 882-2802
(520) 882-5785 (Fax)



Brick P. Storts, III
Pima County Computer No. 55508
Arizona State Bar No. 004507

Attorney for Defendant, BRADLEY A.  SCHWARTZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>                    Plaintiff,<br><br>vs.<br><br><br>BRADLEY A.  SCHWARTZ,<br><br>                    Defendants. | Case No. CR2004-3995<br><br>Hon.  Nanette M.  Warner<br>Div.  20<br><br><br><br>**MOTION TO REMAND** |

COMES NOW the Defendant, BRADLEY A.  SCHWARTZ, by and through counsel undersigned, and, pursuant to Rule 12.9 of the Arizona Rules of Criminal Procedure, respectfully urges this court to enter an order remanding this case for a redetermination of probable cause.   Reasons and authority for this motion are set forth more fully in the attached memorandum which is, by reference, hereby incorporated and made part of this motion.

1

RESPECTFULLY SUBMITTED this ___ day of April, 2005.

BARTON & STORTS, P.C.

Brick P. Storts, III
Attorney for Defendant SCHWARTZ

2

## MEMORANDUM

On October 25, 2004, this case was presented to the Grand Jury. Both Defendants were indicted on two separate felony counts. Count 1 alleges First Degree Murder and Count 2 alleges Conspiracy to Commit First Degree Murder. The State alleges that on or about October 5, 2004, these two Defendants conspired with one another with an intent to murder Dr. David Stidham. The State further alleges that Defendant Schwartz paid Defendant Biggers to murder Dr. Stidham. Both Defendants have adamantly denied conspiring with one another to bring about Dr. Stidham's death. Both have denied participating, in any manner whatsoever, in the murder of Dr. Stidham. There is no physical evidence linking either Defendant to Dr. Stidham's murder. Nevertheless, in a Grand Jury proceeding which denied both Defendants substantial procedural rights, they were indicted.

Rule 12.9 of the Arizona Rules of Criminal Procedure provides, in part, as follows:

> The Grand Jury proceedings may be challenged only by motion for a new finding of probable cause alleging that the defendant was denied a substantial procedural right
>
> ....

At the very beginning of the Grand Jury presentation, the witness testified as follows:

> Dr. Stidham's wife was interviewed and told detectives that the only person she knew of who disliked her husband was his ex-partner identified as Dr. Bradley Schwartz.

(G.J. p.5, l. 25-p. 6, l. 2)

3

The witness then described the medical practice relationship between Dr. Stidham and Dr. Schwartz which was incorrect. This testimony was unnecessary, incomplete and misleading.

## DAPHNE STIDHAM

The testimony that Ms. Stidham knew of only one person who disliked her husband was unnecessary and untrue. Indeed, she told Sheriff deputies that there were at least a couple of people who had problems with Dr. Stidham. Moreover, if the State intended to present this testimony, it had an affirmative obligation to point out to the Grand Jury that at least initially Daphne Stidham was a potential suspect in her husband's murder. Suggesting that Ms. Stidham was and/or is a potential suspect in Dr. Stidham's murder is not an original thought on the part of this Defendant. Rather, the deputies who originally had contact with Ms. Stidham for notification purposes, carefully documented some rather bizarre behaviors by Ms. Stidham and circumstances surrounding their contact.

Ms. Stidham was in bed and, presumably, asleep when deputies first entered her residence for notification and check welfare purposes. For some reason, known only to her, she had left the doors to the home unlocked, which was how the deputies gained entry to the home. Almost immediately when she sat up in bed, Ms. Stidham asked whether her husband had been shot. One deputy noted that she did not even look to the side of the bed where he would have been sleeping before she got out of bed and dressed herself in a more appropriate fashion.

Several deputies noted that there was a legal document, a Last Will and Testament, laying on a couch next to Ms. Stidham's bed. One deputy questioned Ms. Stidham about why she would ask if her husband had been shot since no one

had told her what had actually happened. (Reports Deputies Ledesma, Moreno, Stevens and Othic attached hereto respectively as **Exhibits 1, 2, 3 and 4)**

Even in the absence of offering testimony about what Ms. Stidham may have thought concerning other potential suspects, the State should have advised this Grand Jury concerning the circumstances surrounding the Sheriff Department's contacts with Ms. Stidham on October 6, 2004. Clearly, Ms. Stidham was initially considered a potential suspect. That the Sheriff's Department may have abandoned its investigation concerning Ms. Stidham in order to focus upon these two Defendants does not lessen the State's obligation to fairly present the evidence during this Grand Jury proceeding. The State had an even greater obligation to present this testimony once it informed the Grand Jury about who Ms. Stidham may have suspected was responsible for her husband's murder.

In *Trebus v. Davis*, 189 Ariz. 621, 944 P.2d 1235 (1997), the court pointed out that a prosecutor is obliged to present clearly exculpatory evidence to the grand jury. In *Herrell v. Sargenant*, 189 Ariz. 627, 944 P.2d 1241 (1997), the court said:

> Clearly exculpatory evidence is evidence of such weight that it would deter the grand jury from finding the existence of probable cause.

Given the lack of any physical evidence connecting either Defendant to the murder of Dr. Stidham, the fact that there were no eyewitnesses and both Defendants have adamantly denied being involved in Dr. Stidham's murder, the fact that Ms. Stidham had his last will and testament on the couch next to her bed, immediately asked whether he had been shot and behaved in what can fairly be

5

described as a rather bizarre manner when contacted, is evidence that clearly could have deterred this Grand Jury from finding the existence of probable cause. This testimony should have been presented. It was not. Both Defendants were denied a substantial procedural right.

## MEDICAL PRACTICE RELATIONSHIP
## BETWEEN DR. STIDHAM AND DR. SCHWARTZ

The witness before the Grand Jury described, at least to some extent, the medical practice relationship between Dr. Stidham and Dr. Schwartz and stating they were partners. They were not. This explanation was incorrect, misleading and false. The witness told the Grand Jury that Dr. Schwartz and Dr. Stidham had been in practice together during 2001 and 2002 as Pediatric Opthomologists. The witness further explained to the Grand Jury that sometime during that period of time Dr. Schwartz was unable to work.   The witness then told the Grand Jury that Dr. Stidham ultimately left and opened his own practice having to do with Pediatric Opthomology. (G.J. p. 6, l. 3-9)

Later, during the same Grand Jury presentation, the witness summarized the testimony of several witnesses who suggested that Dr. Schwartz was extremely unhappy with Dr. Stidham about their medical practice relationship, thought that Dr. Stidham was stealing patients and was angry about the circumstances of their separation. The Grand Jury witness testified that several persons had given statements that Dr. Schwartz was so unhappy with Dr. Stidham that he was attempting to hire a hit man to bring about his death.

The testimony before the Grand Jury created an unfair impression that Dr. Schwartz and Dr. Stidham were partners, that Dr. Schwartz was angry about the breakup of their partnership and, perhaps, because he believed that

6

Dr. Stidham was stealing patients, thought that his only recourse was to cause Dr. Stidham's death.

Prior to the Grand Jury presentation in this case, the prosecutor was informed by the attorney then representing Dr. Schwartz about the need to fairly present the nature of the working relationship between Dr. Stidham and Dr. Schwartz and the circumstances surrounding the termination of this working relationship. The prosecutor simply ignored this letter. In addition, the State was informed, as was the police, that the relationship between the two doctors was one of employee, employer. Dr. Schwartz had hired Dr. Stidham to take over the Pediatric Opthomology practice, the very practice the State implied Dr. Schwartz felt Dr. Stidham was stealing from him.

## LETTER FROM MICHAEL PICCARRETA

On October 21, 2004, Michael Piccarreta, then representing Dr. Bradley Schwartz, wrote a letter to Baird Greene of the Pima County Attorney's Office concerning the anticipated Grand Jury presentation. (Copy of letter attached hereto as **Exhibit 5**)

In this letter, counsel advised the prosecutor that the Grand Jury should be told that there had been no business or personal dealings or encounters between Dr. Schwartz and Dr. Stidham for quite some time. The working relationship between Dr. Stidham and Dr. Schwartz was terminated almost three years previously. Counsel also asked that the prosecutor tell the Grand Jury that there had been no litigation over the breakup nor any attempt to enforce a "covenant not to compete" that was part of the working relationship between Dr. Schwartz and Dr. Stidham. Counsel asked that the Grand Jury be told that Dr. Schwartz had turned over the care of his pediatric patients to Dr. Stidham so that Dr. Schwartz

7

could focus his primary attention on adult patients. The prosecutor ignored these requests. Instead, the prosecutor presented the case in such a manner as to suggest that Dr. Schwartz was upset with Dr. Stidham because Dr. Stidham was "stealing" his patients and treating him unfairly.

Obviously, if the Grand Jury had been presented with the requested testimony, it may well have deterred a finding of probable cause. The State's evidence against Dr. Schwartz is primarily based upon comments made by Dr. Schwartz to other people about his unhappiness with Dr. Stidham and a professed desire to see him dead. However inappropriate these thoughts or words might be, they do not, in and of themselves, constitute criminal activity. A full and fair presentation of the evidence concerning the working relationship between Dr. Stidham and Dr. Schwartz should have been provided. It was not. The Defendants were denied a substantial procedural right.

The Grand Jury should also have been told that Dr. Schwartz, through his attorney, offered to provide the Sheriff's Department with a statement concerning what actually happened as to all these events. (See, letter dated October 12, 2004, attached hereto as **Exhibit 6**) The State failed to do so.

It appears that the State failed to present much of this information in order to ensure that both Defendants were indicted. By failing to present this exculpatory information, the prosecutor abdicated his responsibilities and took advantage of his *ex parte* role before the Grand Jury. In *Maretick v. Jarrett*, 204 Ariz. 194, 62 P.3d 120 (2003) the court said as follows:

> The prosecutor's role before the Grand Jury is unique in our system. The prosecutor acts not simply as an advocate, but as a "minister of justice", who assists the jurors in their inquiry. *See, Arizona Rule Supreme*

8

> *Court, 42 ER3.8cnp.* Prosecutors bear a "particularly
> weighty duty not to influence the jury because the
> defendant has no representative to watch out for his
> interests" before the Grand Jury. (citations omitted) The
> prosecutor therefore "must not take advantage of his or
> her role as the ex parte representative of the State before
> the Grand Jury to unduly or unfairly influence it.

The State in this case did exactly what *Maretick* prohibits. The prosecutor

presented the case as an advocate, not as a "minister of justice" and took

advantage of his *ex parte* role to unduly and unfairly prejudice the Grand Jury and

influence the outcome. The significance of the prosecutor's role in Grand Jury

presentations has been emphasized in numerous cases. In *State v. Emery*, 131

Ariz. 493, 645 P.2d 838 (1982) the court said:

> If the State chooses to use the Grand Jury as a
> mechanism for obtaining an indictment, it must honor
> and protect the due process rights of the accused.

There was clearly exculpatory evidence that was not presented. Instead, the

State presented its case in a slanted and biased fashion that all but ensured that

both Defendants would be indicted. Winning can hardly be seen as an acceptable

substitute for obtaining a just result.

In *Nelson v. Royston*, 137 Ariz. 272, 669 P.2d 1349 (1983), the court

granted relief to the defendant because, though he could not challenge the

sufficiency of the evidence, he clearly was entitled to the challenge the limitation

of the evidence presented to the Grand Jury.

The Grand Jury was not given all the information to properly find that

probable cause existed for the charges which were rendered against the defendant.

*United States v. Samango*, 607 F.2d 877 (9th Cir. 1979)  Due process is violated

when a defendant has to stand trial on an indictment which the government knows is based on false or misleading testimony, which is material, and when jeopardy has not attached. *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974). Also, the witness ignored statements implicating Ms. Stidham, as contained in the police reports.

The State must furnish an unbiased Grand Jury and present evidence to that Grand Jury in a fair and impartial manner. *Corbin v. Broadman*, 6 Ariz. App. 436, 433 P.2d 289 (1967). The purpose of the Grand Jury is to stand between the government and the accused to protect the accused against nasty, oppressive and ill-conceived prosecutions. *Branzberg v. Hayes*, 408 U.S. 665, 33 L.3d.2d 626 (1972).

In the instant case, the Grand Jury was misinformed and biased against the Defendant. In essence, the Grand Jury merely acted as a rubber stamp for the prosecution and a remand must be ordered.

## VIOLATION OF ATTORNEY-CLIENT PRIVILEGE

Detective Murphy testified about her conversations with Lourdes Lopez. The Grand Jury was told that Ms. Lopez dated Dr. Schwartz for some period of time. The Grand Jury was also told that during this relationship Dr. Schwartz made comments to Ms. Lopez about his dislike for Dr. Stidham and his desire to see him killed. The Grand Jury was not told that in addition to the personal relationship that existed between Ms. Lopez and Dr. Schwartz, she was acting as his attorney on various matters. The presentation of testimony concerning comments made to Ms. Lopez by Dr. Schwartz violated this attorney-client relationship. The Defendant was denied a substantial procedural right by virtue of the disclosure of these confidential communications.

10

Ms. Lopez has admitted, in writing, that she handled several matters for Dr. Schwartz as his attorney. This attorney-client relationship between Ms. Lopez and Dr. Schwartz continued through March 3, 2005. (See letters, both dated March 4, 2005, attached hereto as **Exhibits 7 and 8.**)

Also, the Grand Jury was not told that Ms. Lopez, in her capacity as an attorney, was doing accounting work for Dr. Schwartz as recently as one month before the homicide in this case. In short, there was an attorney-client relationship which existed between Ms. Lopez and Dr. Schwartz. *See, generally, Foulke v. Knuck*, 162 Ariz. 517, 784 P.2d 723 (App. 1989)  This relationship was breached. The Defendant was denied a substantial procedural right when confidential communications between he and his attorney, Lourdes Lopez, were shared with the Grand Jury in this case.

A.R.S. §13-4062 provides that no person shall be examined as a witness under the following circumstances:

> 2.   An attorney, without consent of the attorney's client, as to any communication made by the client to the attorney ....

The Defendant did not and will not consent to his attorney testifying about any communications between the two of them. Ms. Lopez should not have revealed the confidential communications between she and Dr. Schwartz. The State should not have relied upon and presented to the Grand Jury the substance of these confidential communications.

The State may argue that Ms. Lopez was not only authorized but obliged to report the substance of the communications between she and Dr. Schwartz since these conversations related directly to the client's intention to commit a future

11

crime that was likely to result in death or substantial bodily harm. However, this position is simply not well taken. ER1.6 provides, in part, as follows:

> A lawyers shall reveal such information to the extent a lawyer reasonably believes necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm.

It is important to note that Ms. Lopez did not, for whatever her reasons, communicate to the authorities about her conversations with Dr. Schwartz until after Dr. Stidham's murder. Had Ms. Lopez communicated the nature of these conversations to the authorities prior to Dr. Stidham's death, perhaps the disclosure would have been authorized pursuant to ER1.6. However, by the time Ms. Lopez got around to talking to the Sheriff's Department, Dr. Stidham was already dead. The breach of the attorney-client relationship and the disclosure of various confidential communications between she and Dr. Schwartz cannot possibly be seen as authorized pursuant to ER1.6.

Ms. Lopez was, apparently, simply feeling guilty and decided to share conversations that she had with Dr. Schwartz that were covered by the attorney-client relationship and privileged. The State also should have known about the attorney-client relationship between Ms. Lopez and Dr. Schwartz, thus, the Defendant was denied a substantial procedural right.

It should also be noted that Dr. Schwartz called Ms. Lopez in her capacity as his attorney from the Sheriff's Office, when he was arrested. For whatever reason, that conversation was improperly recorded by the Sheriff's Office and most certainly not disclosed to the Grand Jury. **(Exhibit 9)**

Quite simply, privileged communications between attorney and client were shared with Grand Jurors in violation of both statutory and case law.  The only remedy is remand with directions not to rely upon or present any testimony from Ms.  Lopez concerning her conversations with Dr.  Schwartz.

Based upon the foregoing, the Defendant respectfully urges this court to enter an order remanding this case for a redetermination of probable cause. Moreover, since the investigation in this case is ongoing, the Defendant specifically reserves the right to supplement this motion as necessary and appropriate.  Also, the Defendant reserves the right to join in any motion to remand filed by his co-defendant, Ronald Biggers.

RESPECTFULLY SUBMITTED this __4__ day of April, 2005.

BARTON & STORTS, P.C.

Brick P. Storts, III
Attorney for Defendant SCHWARTZ

Copy of the foregoing mailed/delivered
this __4__ day of April, 2005, to:

Sylvia Lafferty
Pinal County Attorney's Office
P.O. Box 887
Florence, AZ 85232

Richard L.  Lougee, Jr.
P.O. Box 43505
Tucson, AZ 85733-3505
Attorney for co-Defendant Bigger

13

# EXHIBIT 1

# DEPUTY J.G. LEDESMA

```
10/20/04              Pima County Sheriff's Department              1044
16:16                    Detail Incident Report            Page:     25
```

Incident #: 041005401


SUPPLEMENTAL NARRATIVE:
-----------------------

Supplement Dictated by J. G. Ledesma #1063 on 10/06/04 at 0345 hrs.
Total Dictation Time = 10:13 mins.
Total Narrative Dictation Time = 9:00 mins.

On 10/06/04, at approximately 0024 hours, I arrived at 5:          1
V           .. Deputy A. E. Stevens #1177, at that address, requested
my assistance. He was there with Deputy J. R. Hamilton #816 reference
a welfare check. Deputy Stevens advised attempted to make contact the
residence, however nobody answered the door. This was in reference
follow up investigation from an earlier homicide at 4741 North First
Avenue. Deputies had opened an unsecured garage door at the
residence. Entry was made into the residence from the garage area,
made contact with a female subject in a bedroom at the residence. I
opened the door to the bedroom, Sheriff's Department was announced to
her. The female was in bed lying on her back. When contact was made
with her, she replied, "Is my husband okay." I asked her who else was
in the residence. She said she had two kids in the residence. This
female subject later became known to me as Daphne Stidham (DOB
10/01/68).

When she got out of bed, she walked towards myself and Deputy
Stevens. She asked, "Was he shot." When she asked that, Deputy
Stevens walked away from the area. I said to Ms. Stidham, Why would
you ask me that. She replied, "Because he's missing. He didn't come
home." I asked Ms. Stidham for identification. She retrieved her
Arizona driver's license from her purse that was in the kitchen dining
room area of the residence. The driver's license #D01805563.

Detective M. E. Othic #1420 was also on scene and told Ms. Stidham of
her husband's death. She asked if she could phone her mother and
returned to her bedroom to get her cell phone. She then attempted to
call her mother, however she was unable to get through. She then
called her mother-in-law and advised her mother-in-law about the
incident.

Ms. Stidham was crying and visibly upset, shaking.

While she was speaking to her mother-in-law on the phone, I observed a
telephone unplugged on the floor on the left side of the bed. Also,
on the left side of the bed was a couch. On the couch was an estate
planning document with her and her husband's name showing, living
will.

After Ms. Stidham was finished speaking with her mother-in-law, she
attempted to call her mother again, however nobody was answering the
phone. She kept attempting to make contact. She then said, as she
was dialing the phone again, "I don't know why the cruel things happen
to the nicest people."

Deputies had Ms. Stidham attempt to make her phone call from the
family room area, it would be more comfortable for her as she was

FIRST DISCLOSURE
Nov 4, 2004

10/20/04
16:16

Pima County Sheriff's Department
Detail Incident Report

1044
Page:    26

Incident #: 041005401

sitting on the floor in the bedroom attempting to make her phone
calls.

Detective Othic was speaking with her.  I went outside of the
residence until other detectives arrived on scene, at which time I
cleared the scene.

NFI            Transcribed by #4486 at 08:00:04 10/06/2004

FIRST DISCLOSURE
Nov 4, 2004

# EXHIBIT 2
# DEPUTY R. B. MORENO

10/20/04
16:16

Pima County Sheriff's Department
Detail Incident Report

1044
Page:   23

Incident #: 041005401


SUPPLEMENTAL NARRATIVE:
-----------------------

Supplement Dictated by R. B. Moreno #4688 on 10/06/04 at 0350 hrs.
Total Dictation Time = 9:13 mins.

On 10/06/04 at 0008 hours, I responded as a backup unit for Deputy
A. E. Stevens #1177 to 5335 North Ventana Vista.  Other units involved
were Deputy J. R. Hamilton #816 and Deputy J. G. Ledesma #1063.

Upon arrival, we made forced entry into the residence.  As I went to
the rear of the residence and covered the back, other deputies made
entry through the front of the residence.  As deputies cleared the
residence, I made contact with a female subject.  I later made my way
inside the residence from the rear.  It appeared that the female was
very upset due to circumstances given to her at the time.  Another
deputy also involved and on scene was Detective M. E. Othic #1420.
The female inside the residence then asked if she could use the phone
inside her bedroom.  She ran into the bedroom and I followed behind
her.  She sat on the floor, picked up her cellphone and began to call
family and friends.  I stayed with her inside the master bedroom,
along with other deputies.

As I looked around, I noticed that there was a legal document, a Will
and Last Testament, sitting on the couch next to the bed of the master
bedroom.  I advised Deputy Othic of the document.  The female then
made a comment to one of the deputies stating, "He was probably just
tired" after she was given an emergency message that her husband was
deceased.  She then attempted to call her mother-in-law by the name of
Joyce in Texas.  She made contact with her and advised her of her
son's passing.  She then asked, "Are there any detectives with my huz
Bryan?"  She asked, "Was he just shot or had a heart attack?"  She
then began to speak on the phone with other family and friends and
another female subject by the name of Vivian.  She contacted her at
0057 hours.  She stated, "I was asking police if he was just shot or
something, but they don't know."  She also stated, "I feel so guilty.
I just wanted to tell him that I loved him, but I didn't want to
bother him at the time, earlier today."  She then asked if it was a
murder.  She stated that she knew a couple of people who were against
him, meaning her husband.

The female then spoke about her husband's ex-partner, Bryan Schwartz
(ph), who was involved with drugs and had contact with DEA because of
this involvement.  The female was no longer upset as she had been
earlier.  She began asking us if we wanted anything to drink or if we
wanted to sit down in the living room.  I stood by while detectives
conducted an investigation.  I then cleared the residence when other
detectives arrived there to continue their investigation.

I then contacted Communications and asked if they could contact the
police department in Longview, Texas or Mesquite, Texas which is a
suburb out of Dallas, Texas for an emergency message delivery for the
female's mother, Junja, at 120 Blue Heron Lane.  Communications called
me back and advised that address was non-existent.  I was advised of

FIRST DISCLOSURE

, 2004

```
10/20/04              Pima County Sheriff's Department           1044
16:16                    Detail Incident Report        Page:      24
```

Incident #: 041005401

this after I had left the residence at 0130 hours.

I then contacted Deputy Stevens who was still at the residence to advise the female that we were unable to make contact.

That concludes my involvement in this case.

NFI              Transcribed by #4764 at 07:42:09 10/06/2004

Copy Forwarded to Sergeant B. S. Foust #873, Homicide

FIRST DISCLOSURE
Nov 4, 2004

# EXHIBIT 3
# DEPUTY A.  E.  STEVENS

10/20/04
16:16

Pima County Sheriff's Department
Detail Incident Report

Page:

1044
30

Incident #: 041005401


SUPPLEMENTAL NARRATIVE:
- - - - - - - - - - - - - - - - - - - - - - -

Supplement Dictated by A. E. Stevens #1177 on 10/06/04 at 0807 hrs.
Total Dictation Time = 9:39 mins.

On 10/05/04 at approximately 2350 hours, Communications contacted me
by telephone and requested I make telephonic contact with Detective
M. E. Othic #1420 of the Pima County Sheriff's Department Criminal
Investigations Division.  I made contact with Detective Othic, who
requested I meet with him in reference to a homicide the Sheriff's
Department was working at 4741 North First Avenue.

I met with Detective Othic, along with Deputy J. R. Hamilton #816, at
the grocery store parking lot at Swan and Sunrise.  Detective Othic
briefed us that we were going to be responding to 5355 North Ventana
Vista Drive to conduct a check welfare.  It was related to me by
Detective Othic that there was a victim of a homicide who was believed
to be David Stidham and his vehicle was not at the homicide scene.  He
was instructed to respond to his home address to conduct a check
welfare.

Detective Othic, Deputy Hamilton and I arrived at the residence at
5355 North Ventana Vista Drive at 0001 hours.  The three of us went to
the front door.  There were no vehicles parked in front of the house
or in the driveway.  It was also related to us that the victim's
vehicle was a Lexus passenger car.  I was not able to see anything
through the windows and did not hear anything inside the residence.  I
rang the doorbell on two occasions but got no response.  I knocked
loudly on the front door and again got no response.  I checked the
front door and noticed it was unlocked.  I pushed it open and it
opened about an inch to an inch and a half and was stopped by a
security latch in the upper portion of the door.  I yelled inside the
opening, identifying myself as a deputy with the Pima County Sheriff's
Department on several occasions.  Again, I got no response.

We began checking the residence.  Deputy Hamilton was able to open the
garage door, which was unsecured.  There was a Lexus parked inside the
garage.  We ran the license plate.  It was registered to the victim of
the homicide as well as his wife, Daphne Stidham; however, it was not
the same vehicle the victim had driven to work.  Detective Othic
informed us his supervisors requested we enter the residence to
conduct a check welfare.  Deputy R. B. Moreno #4688 arrived and
secured the rear of the residence.  Deputy J. G. Ledesma #1063 arrived
and went with Deputy Hamilton and me through the garage to check the
garage door that entered the residence.  Detective Othic stood by the
front door to maintain security at the front of the residence.

Deputy Hamilton checked the door entering the residence and it was
also unsecured.  Deputy Hamilton, Deputy Ledesma and I then entered
the residence.  Deputy Hamilton went through the laundry room area,
which came off of the garage, and went toward the living room area.
Deputy Ledesma and I went to the right, which led to a double door.
Upon opening the door, it was discovered to be the master bedroom of

1ST FIRST DISCLOSURE
Nov 4, 2004

10/20/04                   Pima County Sheriff's Department                      1044
16:16                         Detail Incident Report              Page:      31

Incident #: 041005401

the house.  Deputy Ledesma and I observed a female lying in the bed
who appeared to be asleep.  I illuminated her with my flashlight and
yelled at her, identifying myself as a deputy Sheriff with the Pima
County Sheriff's Department.  She immediately opened her eyes, looked
at me, sat up in the bed, then asked, "Is my husband okay?"

The female got out of the bed and asked if she could put some pants
on, which she did.  She did not look to her left, which would be the
open space of the bed to see if her husband was there, she just
immediately got out of the bed and walked to her dresser, where she
obtained a pair of pajama pants.  She then stated, "Was he shot?"
Deputy Ledesma and I had made no statements to her in reference to her
husband or his physical being.  She put the pajama bottoms on and we
escorted her to the dining room and kitchen portion of the residence.
Deputy Hamilton stated he found the two children asleep in their
respective bedrooms.  The three of us then escorted her into the
dining room/kitchen area and Deputy Moreno entered the rear of the
residence through an unsecured door.  Detective Othic also came in the
front door of the residence after I unlocked the security latch.

Once Mrs. Stidham was inside the dining room/kitchen portion,
Detective Othic began asking her questions in reference to her
husband's work, the type of vehicle he drove, things of that nature.
He then informed Mrs. Stidham that her husband had been found
deceased.  She asked if she could make some phone calls.  She appeared
to be upset.  We walked her to the bedroom to get a phone.  She stated
her home phone was not working and she wanted to get her cell phone.
As she was attempting to make phone calls, she made the statement,
"Why do the most horrible things happen to the nicest people?"  She
looked up at Deputy Ledesma and me, then smiled.  She attempted to
make several phone calls and repeated the exact statement, "Why do the
most horrible things happen to the nicest people?"  A short time
later, she made the statement, "I don't know why the cruelest things
happen to the nicest people."

Later on during my involvement with Mrs. Stidham, she made the
statement, "Can I talk to someone with my husband to see if he was
shot?"  At no time did anybody in her residence tell her that her
husband had been shot.  I informed her we were not at the scene where
her husband was found and we had no information as to what caused his
death.  She then made a statement, "If he was murdered, I know of a
couple of people," at that point, she began to fade off in her
statement and I could not understand what she said.  She then made the
statement, "I need to know if he was shot or if he just died."  I
again informed her I did not have that information.  A little bit
later, she asked, "Did someone hear a shot, or something?"

I stood by with Mrs. Stidham as she got a hold of some family members
and informed them of her husband's death.  A short time later,
Homicide detectives arrived at the scene.

It should be noted while Mrs. Stidham was in her bedroom getting her
cell phone and making a couple of phone calls, there was paperwork on
a couch or love seat type furniture piece on the left side of the bed,
facing the bed.  It was in plain view, sitting on top of a couple of

Pima County Sheriff's Department                1044
Detail Incident Report                  Page:   32

Incident #: 041005401

magazines.  It appeared to me to be a will or living trust of some
kind with her name and her husband's name on it.  Detective Othic and
Deputy Ledesma also observed that.  We then had her exit the bedroom
and that was when we took her into the dining room/kitchen portion to
make the remainder of her phone calls.

Upon the arrival of Homicide investigators, Deputy Ledesma, Deputy
Moreno and Deputy Hamilton departed the scene.  Detective Othic left a
short time later and I stood by as uniformed presence for Homicide
detectives while they conducted their portion of the investigation.  I
stood by while they conducted a taped statement with Mrs. Stidham.  At
the conclusion of that interview, I met with Victim Witness, who had
been waiting out in front of the residence, and escorted them inside.
They stayed with Mrs. Stidham until she could make contact with a
family member or friend to be with her.

During the majority of my interaction with Mrs. Stidham, she appeared
to be rather calm and did not cry from what I saw.  The only time she
appeared upset was upon the initial notification that her husband was
deceased.  The remainder of the time, she appeared to be calm and very
lucid.

After Homicide detectives completed their interview, I departed the
residence.

NFI              Transcribed by #5257 at 08:55:39 10/06/2004

FIRST DISCLOSURE
Nov 4, 2004

# EXHIBIT 4
# DEPUTY M. E. OTHIC

Incident #: 041005401


SUPPLEMENTAL NARRATIVE:
- - - - - - - - - - - - - - - - - - - - - -

Supplement Dictated by M. E. Othic #1420 on 10/06/04 at 1459 hrs.
Total Dictation Time = 8:19 mins.

On 10/05/04, at approximately 2250 hours, I was advised by Sergeant
W. L. Leonetti #391 of the Night Detective Squad to respond to 4741
North 1st Avenue reference a possible homicide.  I arrived at the 1st
Avenue address at approximately 2311 hours.

Upon arrival, Sergeant Leonetti, Detective S. J. Marsh #1417 and I met
with deputies on scene at which time were were briefed that there was
a male subject lying in front of the medical office with a defect to
his chest.  The area was taped off with yellow Sheriff's tape around
the entire complex.

A few moments later, I was advised that there was a stolen truck found
behind the medical office in the same complex that the victim was in.

At that time, Sergeant Leonetti advised me to respond to
                     to make contact and do a check welfare on the
residence due to the fact that this was the address that the
registration that was found next to the victim came back to.  I was
also advised that the victim's wife, Daphne Stidham, should be there.

At that time, Deputy A. E. Stevens #1177, Deputy J. R. Hamilton #816
and I met at the Safeway at Sunrise and Swan and I briefed both
deputies on the call and what we were going to do at the residence.

We then proceeded to the V          sta address where Deputy Stevens
rang the doorbell several times with no contact.  There was also no
noise or movement inside the house.  Deputy Stevens then began
knocking on the door very loudly and there was still no contact.
Deputy Stevens then tried to open the front door which was unlocked.
He was able to open the front door approximately an inch wide and it
then caught on a latch that latched from the inside.  Deputy Stevens
announced several times Sheriff's Department, come to the door with
negative response.

At that time, I contacted Sergeant Leonetti, briefed him of the
situation and advised him that there was one vehicle inside the garage
which appeared to be a white Lexus SUV and Sergeant Leonetti stated to
make forced entry into the residence.

Deputy Hamilton tried the single garage door which was unlocked and he
was able to push it open.  Deputy Stevens, Deputy Hamilton and Deputy
J. G. Ledesma #1063 then made entry into the house and I covered the
front area of the residence.  A few moments later, Deputy Stevens came
to the front door, unlocked it, let me in and stated that they had
made contact with Ms. Stidham.

I then walked in and Ms. Stidham was walking to the kitchen to
retrieve identification.  As I walked in, Ms. Stidham was sitting on

FIRST DISCLOSURE
Nov 4, 2004

Pima County Sheriff's Department
                    Detail Incident Report                Page:   1044
                                                                    36

Incident #: 041005401

the kitchen floor going through her purse getting her identification.
She then presented the ID card to me and I positively identified her.
I then had Ms. Stidham sit in a dining room chair and I asked her her
husband's name.  She stated that her husband's name was David Stidham.
I asked her what he did for a profession.  She stated that he was a
medical doctor.  I asked her if he had an office or where he worked.
She stated that he had an office on 1st Avenue.  I asked her what kind
of vehicle he drove.  She said a 1991 Lexus sports car.  At that time,
Ms. Stidham asked me if her husband was shot.  I stated that I was not
sure and I then stated that I had some bad news, that her husband was
found deceased.  At no time prior to Ms. Stidham's comment did I state
that Mr. Stidham was found deceased until after she made the comment.

Ms. Stidham then got up and ran to the master bedroom and Deputy
Moreno R. B. Moreno #4688 followed and I followed Deputy Moreno.  She
then sat on the floor and, using a cell phone, dialed her father and
got no answer.  While Ms. Stidham was trying to make phone calls, I
was signaled over by Deputy Moreno to look on the couch next to the
bed.  As I did, I noticed a will in Ms. Stidham and Mr. Stidham's name
sitting in plain view.  At that time, I also noticed, on the floor of
the bedroom, a house phone that was unplugged.  I then asked
Ms. Stidham if she would like to go into the living room where it
would be more comfortable for her to make phone calls and we then
walked out and shut the doors to the master bedroom.

I then had Deputy Stevens and Deputy Moreno stand by with Ms. Stidham
while I made an advisory to Sergeant Leonetti that we had made contact
with her and had broken the news to her.  At that time, Sergeant
Leonetti stated that he would have Homicide respond to interview
Ms. Stidham.

As I went back inside, Ms. Stidham was on the telephone with
Mr. Stidham's mother, Joyce.  At this time, I noted that it was
approximately 0104 hours and one of the comments Ms. Stidham made to
Joyce was I know that this is hard for you and I am sorry.  After she
hung up, Ms. Stidham stated that she wished she could pay us for being
there with her.  She then asked if we needed anything to drink and as
she was sitting in a chair waiting for detectives to arrive, she kept
asking how her husband died, if he died of a heart attack or if he was
shot.  I stated that I was not sure, that the detectives en route
would advise her of that.

I then cleared the scene at approximately 0145 hours with no further
involvement once Detective Lopez (no badge number given) and Detective
P. A. Montano #847 of the Homicide Unit arrived.

NFI   Transcribed by #3706 at 16:15:00 10/06/2004

FIRST DISCLOSURE
Nov 4, 2004

# ROA-
# ITEM 247

SEP - 2 2005

FILED
PATRICIA A. NOLAND
CLERK, SUPERIOR COURT

05 SEP -2  AM 8: 36

ARIZONA SUPERIOR COURT, PIMA COUNTY

JUDGE: HON. NANETTE WARNER   BY: R. ST. GERMAINE, DEPUTY   CASE NO.   **CR20043995**

DATE:   August 31, 2005

STATE OF ARIZONA

VS.

BRADLEY A. SCHWARTZ
RONALD BRUCE BIGGER

---

## RULING

IN CHAMBERS RULING on Defendant Schwartz' Motion for Additional Discovery.

The Court has read Defendant Schwartz' Motion for Additional Discovery as it pertains to Daphne Stidham, Daphne Stidham's Response and Defendant Schwartz' Reply. No oral argument has been requested. The Court has also considered the law.

THE COURT FINDS that there are no grounds for granting Defendant Schwartz' Motion for Additional Discovery. Daphne Stidham, the widow of Brian Stidham, is the victim and is not required to submit to the discovery requested by Defendant Schwartz.

The case of *State v. Superior Court*, 172 Ariz. 232, 836 P.2d 445 (App. 1992), cited by Schwartz, presents a very different situation. In that case, the court ordered disclosure of the victim's medical records. These records were related directly to a defense of self-defense. The defendant in *State v. Superior Court* alleged that her husband, the victim, had multiple personality disorder and that she was defending against one of his violent personalities at the time of the alleged incident. The court undertook an *in camera* examination of medical records and ordered records disclosed only as it related to multiple personality disorder. The court rejected any wholesale review or disclosure of medical records. The trial court's ruling was upheld on appeal.

Sandi Simpson
Judicial Administrative Assistant

*8-31-05*

# RULING

Page:  2                           Date:  August 31, 2005              Case No:  **CR20043995**

Defendant Schwartz, in this case, sets forth no specific defense which has any cognizible basis for examination of Daphne Stidham or to require her to provide the requested information.  The request for discovery appears to be nothing more than a fishing expedition.

IT IS THEREFORE ORDERED denying the Defendant Schwartz' Motion for Additional Discovery.

cc:     Hon. Nanette Warner
        County Attorney - Sylvia Lafferty/Richard Platt
        Brick Storts III, Esq.
        Jill Thorpe, Esq.
        Philip Hall, Esq.
        Dan Cooper, Esq.

Sandi Simpson
Judicial Administrative Assistant

*8-31-05*

# ROA-
# ITEM 364

FILED
PATRICIA A. NOLAND
CLERK, SUPERIOR COURT

05 DEC -5 AM 8: 00

DEC 0 5 2005

ARIZONA SUPERIOR COURT, PIMA COUNTY

JUDGE: HON. NANETTE WARNER BY: R. ST. GERMAINE, DEPUTY CASE NO.   **CR20043995**

DATE:        December 2, 2005

STATE OF ARIZONA

VS.

BRADLEY A. SCHWARTZ
RONALD BRUCE BIGGER

---

## R U L I N G

---

UNDER ADVISEMENT RULING on admission of alleged prior bad acts.

In connection with this issue, the Court has reviewed the documents set forth in the under advisement ruling dated September 26, 2005. on defendant Schwartz' Motion to Preclude.  In addition, the Court has reviewed the following documents: (1) Supplement to Defendant's Reply to State's Response Re: Motion to Preclude Evidence of Federal Proceedings; (2) Defendant Schwartz' Trial Memorandum; (3) State's Offer of Proof Re: Defendant's Motive to Kill Dr. David Brian Stidham dated October 28, 2005; (4) Defendant Schwartz' Response to State's Offer of Proof Re: Defendant's Motive to Kill Dr. Brian Stidham dated November 4, 2005; (5) Defendant Schwartz' Supplemental Exhibit to Defendant's Motion to Preclude dated November 14, 2005; (6) Schwartz' Time Line; (7) State's Response to Schwartz' Time Line and Its Amendments Thereto dated November 14, 2005; Arizona Medical Board Order Vacating Interim Consent Agreement Order dated February 12, 2003 filed by Schwartz pursuant to Notice of Disclosure.

The Court has also considered testimony and evidence presented in connection with these issues, the offer of proof by defendant Schwartz at the November 7, 2005 hearing and arguments of counsel.

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

RULING

Page: 2                     Date: December 2, 2005                     Case No: **CR20043995**

The Court rules as follows:

## ISSUES

1.    Under Rules of Evidence 404(b), for the purpose of showing motive, should the Court admit evidence that defendant Schwartz was indicted on federal drug charges and was subject to orders by the Arizona Medical Board for treatment of his prescription drug abuse, including suspension of his medical license, participation in drug rehabilitation and drug monitoring through testing of urine samples?

2.    Under Rule 403, is the probative value of this evidence substantially outweighed by the danger of unfair prejudice?

## FACTUAL BACKGROUND

The facts pertinent to this issue are as follows:

On October 5, 2004, Dr. David Brian Stidham was murdered outside of his office. The State alleges that defendant Bradley Schwartz conspired with and hired defendant Ronald Bruce Bigger to kill Dr. Stidham.

At the time of the murder, Dr. Schwartz and Dr. Stidham were both medical doctors, specializing in pediatric ophthalmology. Prior to Dr. Stidham moving to Tucson, Dr. Schwartz maintained a private practice as a sole practitioner in Tucson, Arizona. On April 30, 2001, Dr. Stidham and his wife came to Tucson to interview with Dr. Schwartz regarding employment with him. Shortly thereafter, the Drug Enforcement Administration (DEA) began to investigate the purchases of controlled substances for prescriptions written by Dr. Schwartz to his then girlfriend, Lourdes Lopez, and his office manager, Laurie Espinoza, and her family. On August 1, 2001, Dr. Stidham again came to Tucson regarding a potential move to Tucson. On September 21, 2001, Dr. Stidham entered into an employment agreement with Dr. Schwartz with the effective date of October 1, 2001. Dr. Stidham commenced his work with Dr. Schwartz on November 1, 2001.

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

RULING

Page: 3                     Date:  December 2, 2005                     Case No:  **CR20043995**

On December 31, 2001, the DEA served a search warrant at Dr. Schwartz' office at 5190 E. Farness Drive. Dr. Stidham and Laurie Espinoza were present during the search. Laurie Espinoza and Dr. Stidham gave interviews with the DEA. Dr. Stidham denied any knowledge of improper use of drugs or drug abuse by Dr. Schwartz. In late 2001 and in 2002, Lourdes Lopez spoke with the DEA. Additionally, Laurie Espinoza spoke with the DEA.

On September 25, 2002, Dr. Schwartz, Lourdes Lopez and Laurie Espinoza were indicted on 77 counts of prescription drug fraud. On October 8, 2002, the federal indictment is reported to the Arizona Medical Board. Pursuant to an Interim Order of the Medical Board of October 9, 2002, on October 12, 2002, defendant Schwartz entered Cottonwood, a substance abuse treatment facility and ceased seeing patients. Dr. Stidham continued to see patients of the practice.

On October 31, 2002, Dr. Schwartz telephoned the office from Cottonwood and spoke with Laurie Espinoza. Dr. Schwartz was angry with Dr. Stidham and concerned that he was leaving the practice and taking patients with him. Dr. Schwartz used course language regarding Dr. Stidham in his conversation with Ms. Espinoza expressing that he felt betrayed by him and noted that he had "given him everything." Dr. Schwartz asked Ms. Espinoza to fire Dr. Stidham. She declined to personally fire him and put Dr. Stidham on the phone with Dr. Schwartz. It was Ms. Espinoza's understanding that Dr. Schwartz terminated Dr. Stidham. In his conversation with Laurie Espinoza, Dr. Schwartz, ranting and while in a tirade, stated that he was blaming Stidham for "everything." Laurie Espinoza mentioned the DEA and Schwartz responded "everything." In that conversation, Dr. Schwartz was "totally out of control" as described by Laurie Espinoza. Dr. Stidham was formally terminated by defendant Schwartz' mother, Lois Schwartz, on November 7, 2002.

On November 7, 2002, Dr. Schwartz was discharged from Cottonwood Hospital to go to Rush Behavioral Health Impaired Physicians Program in Chicago ordered by the Medical Board. Dr. Schwartz was discharged from Rush on February 14, 2003. On February 12, 2003, the Arizona Medical Board and

Sandi Simpson
Judicial Administrative Assistant

# RULING

Page: 4                     Date:  December 2, 2005                     Case No:  **CR20043995**

Dr. Schwartz entered into an interim consent agreement.  In these interim orders, Dr. Schwartz was prohibited from the practice of "clinical medicine or any medicine involving direct patient care, and [was] prohibited from prescribing any form of treatment including prescription medications, until respondent applies to the Board and receives affirmative approval to return to practice."  On August 14, 2003, the Medical Board entered an order vacating the Interim Consent Agreement from Practice Restriction of February 12, 2003.  On October 10, 2003, the Medical Board entered a Decree of Censure and Probation against Dr. Schwartz and issued Findings of Fact and Conclusions of Law and Order.  Pursuant to that Order, Dr. Schwartz was required to submit to a medical, substance abuse and mental health care and treatment ordered by the Board or recommended by the Monitoring Aftercare Program (MAP).  He was placed in the MAP program for five (5) years, restricted on prescribing certain controlled substances, required to participate in therapy and 12-step groups and required to submit to drug testing, among other requirements.  On December 23, 2003, defendant Schwartz entered into a plea agreement in the federal case and received a diversion sentence.  Judgment of conviction was not entered at that time, but postponed for a 12-month consideration period during which he was required to be supervised by federal pretrial services, to comply "strictly with all conditions imposed by the Arizona Medical Board" and to surrender his DEA registration to dispense controlled substances.  The Agreement provides that at the end of the 12-month consideration period, if he complied with all the conditions of the plea, Dr. Schwartz would be able to withdraw from his plea and the indictment would be dismissed with prejudice.

In late 2003, Dr. Schwartz contacted former patient Rosalie Humo regarding employment.  In her interview, Ms. Humo testified that in January 2004, when she met with Dr. Schwartz regarding employment, he asked her to kill Dr. Stidham or find someone to kill him.  In the course of his conversation with Ms. Humo, Dr. Schwartz allegedly told her that "Dr. Stidham had everything to do with him being publicized and embarrassed by the, by the public, and that it was all his fault, and that he was nothing but a thief.  He was nothing but a -he stole his patients, he stole everything." (Interview of Rosalie Humo, p.33, line 12-17).

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

# R U L I N G

Page: 5                    Date:  December 2, 2005              Case No:  **CR20043995**

In its offer of proof, the State details a number of other witnesses who will testify that Dr. Schwartz had intense hatred for Dr. Stidham, blaming him for losing his patients, from losing privileges at hospitals, for the problems he was having with the Arizona Medical Board and the restrictions he was having imposed on him by the Arizona Medical Board, including having to be tested and treated for drugs. The State proposes to call witnesses who will testify that the defendant Schwartz contacted several people, including people at the Labcore, where he provided urine samples, regarding the identity of people he could hire to kill or otherwise harm or frame Dr. Stidham. Additionally, a record purporting to be from Dr. Schwartz' computer itemizes some of his hostility towards Dr. Stidham wherein he stated, "My former business associate, (Brian Stidham) started his own practice while I was hospitalized and took four of my full time employees with him. He has badmouthed me to the physician community while he openly advertised the grand opening of his practice and placed his business cards and announcements while I was in Chicago at Rush. Dr. Stidham plotted with Laurie Espinoza to get him credentialed on all health care plans behind my back while I was hospitalized."

## LEGAL ANALYSIS

Arizona Rules of Evidence Rule 404(b) provides that: "[E]vidence of other crimes, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Arizona courts have admitted other act evidence where it is relevant to motive. *State v. Martinez*, 196 Ariz. 451, 459-460, 999 P.2d 795 (2000); *State v. Beasley*, 205 Ariz. 334, 337, 70 P.3d 463 (App.2003). Furthermore, Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . ."

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

# RULING

Page: 6                    Date:   December 2, 2005              Case No:  **CR20043995**

The State seeks to admit evidence that defendant Schwartz was indicted on federal drug charges resulting in a guilty plea and that he had restrictions placed upon him by the Arizona Medical Board requiring him to undergo drug treatment and testing, suspension of his medical practice, and thereafter, restriction of his medical practice.  The State contends that these acts and information are relevant to show that Dr. Schwartz had a motive to kill or conspire to have Dr. Stidham killed.  The State alleges that  it will be able to demonstrate that Dr. Schwartz believed that Dr. Stidham was responsible, at least in part,  for the federal indictment, his problems with the Arizona Medical Board, including the consequential loss of patients, restriction of his medical practice and financial problems due to his inability to practice medicine. Defendant Schwartz contends that while the State can argue that Dr. Schwartz was angry at Dr. Stidham because Dr. Stidham left the practice and took his patients which had, in turn, financial consequences to Dr. Schwartz,  Rules of Evidence 404(b) and 403 prelude admission of evidence of the federal indictment, restrictions on his medical license, and participation in drug treatment and monitoring.

There is no dispute that Dr. Schwartz was indicted in federal court on prescription drug fraud charges, entered into a plea agreement as a result of those charges, entered into drug and substance abuse treatment, had his practice suspended by the Medical Board and underwent substance abuse monitoring. The issue before the Court is whether there is evidence that any of these situations presents a motive for Dr. Schwartz to harm Dr. Stidham.

## Federal Indictment

The only evidence that the State has produced that defendant Schwartz in any way held Dr. Stidham responsible for the federal charges was the statement of Laurie Espinoza that Dr. Schwartz blamed Dr. Stidham for "everything."  The DEA was suggested by Ms. Espinoza.

With the plethora of witness that the State has garnered who will testify regarding Dr. Schwartz' ill-will towards Dr. Stidham, Ms. Espinoza is the only one who directly implicates Dr. Schwartz as blaming Dr. Stidham for the DEA investigation and federal charges.  Although Laurie Espinoza was a co-defendant

                                        Sandi Simpson
                                        Judicial Administrative Assistant

*12-1-05*

RULING

| | | |
|---|---|---|
| Page: 7 | Date: December 2, 2005 | Case No: **CR20043995** |

in the federal case, it is fair to say that there is ill-blood between Ms. Espinoza and Dr. Schwartz. There was a subsequent lawsuit brought by Ms. Espinoza against Dr. Schwartz which resulted in a counterclaim by Dr. Schwartz against Ms. Espinoza and a settlement wherein Ms. Espinoza paid Dr. Schwartz money.

THE COURT FINDS that the State has not proved that Dr. Schwartz in any way blamed Dr. Stidham for the DEA investigation and subsequent federal charges. Furthermore, under Rule 403, any relevance of DEA investigation the federal charges and the plea agreement are substantially outweighed by the danger of unfair prejudice. As outlined below, the Court is permitting admission of other evidence the State contends is proof of motive.

### Actions by Arizona Medical Board including License Restriction and Drug Monitoring

The State has proved that Dr. Schwartz blamed Dr. Stidham, at least in part, for his problems with the Medical Board which resulted in license suspension, entry into drug treatment, substance abuse monitoring and restriction of his medical practice. Furthermore, admission of evidence regarding requirements and restrictions by the Arizona Medical Board is relevant to demonstrate the reasons Dr. Stidham left the practice with Dr. Schwartz, started his own practice and the reasons patients left Dr. Schwartz to be treated by Dr. Stidham. Furthermore, evidence of the drug monitoring is relevant to explain the circumstances under which defendant Schwartz alleged contact with persons at the laboratory facilities where he allegedly inquired regarding persons who would be willing to do harm to Dr. Stidham.

Without such evidence the basis for Dr. Schwartz alleged anger at Dr. Stidham would be out of context and confusing.

While the Court acknowledges that this evidence is prejudicial,

THE COURT FINDS that under Rules of Evidence 403, the relevancy is not substantially outweighed by the danger by unfair prejudice.

THE COURT THEREFORE FINDS that the State may introduce evidence regarding the actions of the Medical Board suspending and restricting the defendant's medical license and requiring him to enter into

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

# R U L I N G

Page: 8                   Date:  December 2, 2005              Case No:  **CR20043995**

---

drug treatment and drug monitoring as with the resulting loss of patients and income.

## ORDERS

IT IS THEREFORE ORDERED that the State is precluded from introducing evidence that defendant Schwartz was the subject of a DEA investigation, was indicted on federal charges and entered into a plea agreement.

IT IS FURTHER ORDERED that the State may introduce evidence that the actions of the Arizona Medical Board regarding the restrictions of Dr. Schwartz' practice, the requirement that he enter into drug treatment and undergo drug monitoring and date that these events occurred.

The Court will entertain a jury instruction limiting the extent to which the jury may consider this evidence.

HON. NANETTE WARNER

cc:     Hon. Nanette Warner
        Syliva Lafferty, Esq./Richard Platt, Esq.
        Brick Storts, Esq.
        Jill Thorpe, Esq.
        Harold Higgins, Esq.
        Clerk of Court - Under Advisement Clerk

Sandi Simpson
Judicial Administrative Assistant

*12-1-05*

# ROA-
# ITEM 429

**BARTON & STORTS, P.C.**
271 N. Stone Avenue
Tucson, Arizona 85701
(520) 882-2802
(520) 882-5785 (Fax)

FILED
PATRICIA A. NOLAND
CLERK, SUPERIOR COURT

06 JAN 25  PM 4: 39

V. ARMY. DEPUTY

Brick P. Storts, III
Pima County Computer No. 55508
Arizona State Bar No. 004507
Attorney for Defendant, BRADLEY A. SCHWARTZ

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA**

| | |
|---|---|
| STATE OF ARIZONA,<br><br>           Plaintiff,<br><br>vs.<br><br>BRADLEY A. SCHWARTZ,<br><br>           Defendants. | Case No. CR2004-3995<br><br>Hon.  Nanette M.  Warner<br>Div.  20<br><br>**NOTICE OF TRIAL<br>WITNESSES PURSUANT<br>TO RULE 15.2(b)** |

COMES NOW, the Defendant, BRADLEY A.  SCHWARTZ, by and through his counsel undersigned, and hereby notices the following witnesses pursuant to Rule 15.2(b), that will be called to testify as to the Defendant's character and overall capabilities as a medical doctor.

1.   Jodie Adkins, 30006 Amber Sunrise, Marana, Arizona 85613, tel.  616-6180;

2.   Julie Youtsey, 2424 South Cottonwood Lane, #186, Tucson, Arizona 85713;

3.   Edward Motzkin, 2784 West Calle de Dalias, Tucson, Arizona 85745;

4.   Mark Crum, 115 East 16th Street, Tucson, Arizona 85701, tel.  629-0896;

5.     Cliff Housen and Tammy Allison, 3200 East Irvington, Tucson, Arizona 85714, work tel. 889-6000;

6.     Linda Bescript, 1607 North Desert Place, Tucson, Arizona 85712;

7.     Robert and Claudia Huerta, Benson, Arizona, tel. (520) 586-4677;

8.     Sally Davis, 6181 East Miramar Dr., Tucson, Arizona 85715;

9.     Suzanne Reeves, Pima County Adult Probation;

10.    Ms. Gallardo, address will be provided when known.

These witnesses will be testifying regarding the contact they had with the Defendant in his capacity as a medical doctor. This testimony will be used, in part, as character evidence, however, will principally be offered to refute the theory of the State that the Defendant caused the murder. of the victim, Dr. Brian Stidham, as the result of his inability to acquire patients and have an on-going successful medical practice, for which he blamed Dr. Stidham. These witnesses will testify that the Defendant was an excellent doctor and the fact that he materially affected their lives and their children's predicated on his excellent medical services. This will be the thrust of the testimony of these witnesses.

Counsel for Defendant will arrange for interviews of all of these witnesses, at the convenience of the State.

RESPECTFULLY SUBMITTED this _____21____ day of January 2006.

BARTON & STORTS, P.C.

Brick P. Storts, III
Attorney for Defendant SCHWARTZ

2

# ROA-
# ITEM 444

ROBERT CARTER OLSON
PINAL COUNTY ATTORNEY (00003800)
Richard T. Platt (87188) Chief Deputy
Sylvia R. Lafferty (87183) Deputy
P. O. Box 887
Florence, AZ 85232
(520) 866-5558
Attorneys for the State



FILED
06 FEB -2 PM 3: 27
PATRICK K. HOLAND
CLERK SUPERIOR COURT
BY _____
DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PIMA

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | NO. CR-2004-3995 |
| | ) | |
| Plaintiff, | ) | STATE'S MOTION IN LIMINE |
| | ) | TO PRECLUDE THIRD PARTY |
| v. | ) | DEFENSE |
| | ) | |
| BRADLEY SCHWARTZ and | ) | |
| RONALD BIGGER, | ) | |
| | ) | |
| Defendants. | ) | (Judge Warner) |
| | ) | |

The State of Arizona, by and through its deputy undersigned, and moves this Court
to preclude the defendants from offering evidence and/or argument concerning a "third-party
culpability defense." Specifically, the State seeks an order precluding defendants from
making statements, eliciting testimony, presenting evidence, or making arguments to the jury
suggesting that Daphne Stidham, not the defendants, had the ability, opportunity, and/or
motive to commit or may have committed the crimes charged in this case, as more fully set
forth herein.

\ \ \

\ \ \

## FACTS

As early as December 14, 2004, Defendant Schwartz informed the State (through correspondence from Mr. Storts) that Daphne Stidham was a viable suspect in the murder of her husband:

> I would also point out, and I am sure you are very aware of this, that Dr. Stidham's widow's behavior was bizarre, to say the least. Several deputies documented her behavior when they went to notify her about her husband's death.  Without having been provided any information, Ms. Stidham immediately began asking whether or not Dr. Stidham had been shot.  Why she would not have asked whether he was involved in an accident, remains a mystery.  This evidence, when considered together with the fact that a Will and related documents were lying in her bedroom certainly causes pause.  This is particularly true if my information is correct that Dr. Stidham's insurance was changed, in an upward direction, shortly prior to his death.  This evidence certainly would support a **third-party culpability defense** [emphasis added].

On April 4, 2005, Defendant Schwartz filed a Motion to Remand.  Defendant argued that certain testimony concerning Daphne Stidham should have been presented to the Grand Jury:

> ...it [the State] had an affirmative obligation to point out to the Grand Jury that at least initially Daphne Stidham was and/or is a potential suspect in her husband's murder.  Suggesting that Ms. Stidham was and/or is a potential suspect in Dr. Stidham's murder is not an original thought on the part of this Defendant.  Rather, the deputies who originally had contact with Ms. Stidham for notification purposes, carefully documented some rather bizarre behaviors by Ms. Stidham and circumstances surrounding their contact.
>
> Ms. Stidham was in bed and, presumably, asleep when deputies first entered her residence for notification and check welfare purposes. For some reason, known only to her, she had left the doors to the home unlocked, which was how the deputies gained entry to the home. Almost immediately when she sat up in bed, Ms. Stidham asked whether her husband had been shot.  One deputy noted that she did

2

not even look to the side of the bed where he would have been sleeping before she got out of bed and dressed herself in a more appropriate fashion.

Several deputies noted that there was a legal document, a Last Will and Testament, laying on a couch next to Ms. Stidham's bed.  One deputy questioned Ms. Stidham about why she would ask if her husband had been shot since no one had told her what had actually happened. [cite omitted].

...the State should have advised this Grand Jury concerning the circumstances surrounding the Sheriff Department's contacts with Ms. Stidham on October 6, 2004.  Clearly, Ms. Stidham was initially considered a potential suspect.  That the Sheriff's Department may have abandoned its investigation concerning Ms. Stidham in order to focus upon these two Defendants does not lessen the State's obligation to fairly present the evidence during this Grand Jury proceeding...[cite omitted].

Given the lack of any physical evidence connecting either Defendant to the murder of Dr. Stidham, the fact that there were no eyewitnesses a and both Defendants have adamantly denied being involved in Dr. Stidham's murder, the fact that Ms. Stidham had his last will and testament on the couch next to her bed, immediately asked whether he had been shot and behaved in what can fairly be described as a rather bizarre manner when contacted, is evidence that clearly could have deterred this Grand Jury from finding the existence of probable cause.

In the meantime, on April 2, 2005, Defendant Schwartz sent the State a letter requesting certain information from Ms. Stidham. [See Exhibit A].  The State forwarded this letter to Ms. Stidham's attorney.  Several months later, having received no disclosure, Defendant Schwartz again sent the April 2 letter to the State, which the State again forwarded to Ms. Stidham's attorney.  The same letter was appended to Defendant's Motion for Additional Disclosure, submitted July 25, 2005.

In that Motion for Additional Disclosure, Defendant wrote:

The Defendant has a right to investigate and explore whether or not other persons may have been interested in causing Dr. Stidham's death....Counsel's

3

obligation to the Defendant requires that he seek information, necessary to **establish or disprove that Ms. Stidham may or may not have been involved in Dr. Stidham's death** [emphasis added].

Defendant went on to request the items listed in Exhibit A.  In his Reply to Daphne Stidham's Response, Defendant made his purpose even clearer:

> The Defendant has previously pointed out the need to gain additional information from Daphne Stidham in order to be able to properly investigate and, perhaps, **pursue a third-part [sic] culpability defense**....

> Depending upon the information provided pursuant to the Defendant's request, the Defendant may well be in a position of being able to **present a legitimate third-party culpability defense**. [Emphasis added].

The Court denied Defendant Schwartz' Motion for Additional Discovery on August 31, 2005, finding, "Defendant Schwartz, in this case, sets forth no specific defense which has any cognizable basis for examination of Daphne Stidham, or to require her to provide the requested information.  The request for discovery appears to be nothing more than a fishing expedition."

The State now asks this Court to issue an order precluding the defense from referring to or presenting any testimony about this proffered defense on either direct examination or cross-examination, because such testimony is not relevant and is substantially more prejudicial than probative.  The State also asks this Court to order the defense to refrain from arguing this third-party defense to the jury.

## MEMORANDUM OF POINTS AND AUTHORITIES

A defendant cannot present a "third-party defense" unless the defendant shows **both** that the evidence is relevant to **his own** culpability **and** that the risk of prejudice, confusion, or waste of time does not substantially outweigh its probative value.  Third-party evidence

4

is not relevant unless it somehow connects the third person to the crime. It is not enough simply to show vague suspicions or to show that a third party had motive, ability, or opportunity to commit the crime.

In *State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988), *affirmed*, 449 U.S. 279 (1991), citing *State v. Williams*, 133 Ariz. 220, 231, 6540 P.2d 1202, 1213 (1982), the Arizona Supreme Court held that before a defendant may introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an "inherent tendency" to connect such other person with the actual commission of the crime. Vague grounds of suspicion are not sufficient. In that case, the defendant did not offer any evidence that connected the third party to the victim's murder—he merely offered evidence that established that the third party might have had the ability to commit the crime. Since the evidence failed to connect the third party to the murder, the trial court properly excluded the evidence. *Fulminante*, 161 Ariz. at 252, 778 P.2d at 617. Also see *State v. Wooten*, 193 Ariz. 357, 972 P.2d 993 (App. 1998).

In *State v. Gibson*, 202 Ariz. 321, 323, 44 P.3d 1001, 1003 (2002), the Arizona Supreme Court explained that the "inherent tendency" language of *Fulminante* did not establish any "special standard or test of admissibility." Instead, the appropriate analysis is found in the relevancy standards of Rule 401, 402, and 403, Arizona Rules of Evidence. The *Gibson* Court stated:

> Initially, the court must determine if the proffered evidence is relevant. 'Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401. 'All relevant evidence is admissible....Evidence

5

> which is not relevant is not admissible.' Rule 402. Once the evidence
> is determined relevant, it is admissible unless 'its probative value is
> substantially outweighed by the danger of unfair prejudice, confusion
> of the issues, or misleading the jury, or by considerations of undue delay,
> waste of time, or needless presentation of cumulative evidence.' Rule 403.
> [cite omitted].

The Court recognized that the defendant did not have to prove that another person "really" committed the crime or was "largely" connected to it, citing Judge Gerber's dissent from *Fulminante, supra.* The Court further explained that the relevancy determination is not based on the trial court's assessment of the third party's guilt or innocence. Rather, the relevancy analysis depends on the court's assessment as to whether the proffered evidence shows anything about the **defendant's own** culpability:

> The proper focus in determining relevancy is the effect the evidence
> has upon the *defendant's* culpability. To be relevant, the evidence
> need only *tend* to create a reasonable doubt as to the defendant's guilt.
> [cite omitted].

The Court further held that this test must be applied to the facts of each case.

In *State v. Prion*, 203 Ariz. 157, 52 P.3d 189 (2002) the court clarified its rulings in *Fulminante* and *Gibson, supra.*

> In our recent decision, *State v. Gibson* [cite omitted], we clarified the rule
> holding that a special higher standard of admissibility for third party
> culpability evidence was not the intention of *Fulminante.* The proper
> standard regarding third party culpability evidence is found in Rules
> 401, 402, and 403 of the Arizona Rules of Evidence. Any such evidence
> must simply be relevant and then subjected to the normal 403 weighing
> analysis between relevance, on the one hand, and prejudice or confusion
> on the other.

Defendant Prion had been convicted of the murder of Diana Vicari. At trial, he was denied the ability to present a third party defense. On appeal, Prion's conviction was

reversed because the court found that, "[T]he proffered Mazure evidence is relevant in

Prion's trial because on its face it may suggest reasonable doubt as to Prion's guilt.  It

supports the notion that Mazure had the opportunity and motive to commit this crime and

that he may have been in contact with Vicari."  The "Mazure evidence" was as follows:

> [h]e was a co-worker of Vicari's...; he was disciplined for sexually harassing
> female co-workers...; he tried to conceal his discipline from police; he
> attempted to rape one of his female co-workers...; he had a violent temper and
> bit a woman's nose during a fight; he rented a new apartment on the day of
> Vicari's disappearance; that new apartment was close to both the New
> Orleans nightclub and the location at which Vicari's car was found; he was
> working at the New Orleans on the night Vicari disappeared; he denied that
> fact when questioned by the police; one of the doormen at the New Orleans
> said Vicari was let in to the bar that night specifically to see him; and finally,
> he appeared at work the next morning so disheveled and disoriented that he
> was fired. He was also considered a suspect early in the investigation, at least
> to the extent that his car was tested by the police for the presence of blood.

In a subsequent case, *State v. Tucker*, 205 Ariz. 157, 68 P.3d 110 (2003) the court

clarified its holdings in *Gibson* and *Prion, supra*.

> The evidence Tucker offers that Kozakiewicz might be the killer is the
> following: He knew all of the victims in this case; he did not like Roscoe; he
> did not like blacks; [footnote omitted] he had spoken derogatorily of Roscoe
> and blacks in general; he had access to guns; he gave Tucker one of his three
> sets of hand-cuffs; and he had pled guilty to another murder that occurred two
> months before the murders in this case....

> *Prion* held that evidence that another person committed the crimes is admis-
> sible if it "supports the notion that [the third party] had the *opportunity and
> motive* to commit this crime."

After describing the third-party evidence in *Prion,* the court said:

> The evidence Tucker offers only minimally indicates that Kozakiewicz had
> motive, albeit the same motive as perhaps dozens of other people who
> were acquainted with the Merchant family.  But unlike in *Prion*, Tucker does
> not point to any evidence showing that Kozakiewicz had the opportunity to
> kill the Merchants.  Without some evidence tending to connect Kozakiewicz

7

to the crime scene, Tucker's speculation that Kozakiewcz might have been the killer is arguably irrelevant, and therefore, would likely have been found inadmissible.

Accordingly, this Court should first require the defense to establish relevancy by an offer of proof.  To be relevant, the evidence must connect the third party to the actual commission of the particular crimes in question, rather than just show that the third party had means, motive, or opportunity to commit the crimes.  If the defendant fails to establish relevancy, the inquiry is over and the evidence must be excluded.

If this Court finds that the proffered evidence is relevant, this Court must then apply the balancing test under Rule 403, Arizona Rules of Evidence, and determine if the factors of prejudice, confusion, and delay substantially outweigh the value of the proffered evidence. The trial court has substantial discretion in making this determination. *State v. Gibson, supra,* 24, 44 P.3d 1001, 1004 (2002; *see also State v. Prion,* 203 Ariz. 157, 161, 52 P.3d 189, 193 (2002).

In this case, if the defense were allowed to question Daphne Stidham, or any other witness who would offer evidence of the proposed third-party defense, the proposed testimony would not be admissible under *Gibson, supra.*

The "Will" to which Defendant referred in his earlier pleadings, was not a "Will," but an estate planning letter from the Stidhams' attorney.  Ms. Stidham's reactions which deputies found peculiar were later explained to the satisfaction of Sheriff's detectives. Any references found in witness statements concerning Dr. Stidham having an affair, or Ms. Stidham being obsessed with money and insurance policies can be traced to having originated with Defendant.  In any event, all such statements would be hearsay.

8

In addition to the paucity of evidence concerning Daphne Stidham, Defendant Schwartz has difficulty in determining a specific third party upon whom to shift the blame; Defendant has also claimed that a different third party, Dennis Walsh, is the "real killer" of Dr. Stidham.

Finally proposed testimony and argument concerning Daphne Stidham's culpability appears to be designed merely to denigrate the victim and his widow.

## CONCLUSION

Vague grounds of suspicion are not sufficient to allow admission of third-party evidence in the absence of any evidence connecting the third party to the crimes in this case. This is insufficient to meet the relevancy test of Rules 401 and 402 of the Arizona Rules of Evidence and *State v. Gibson, supra*.

The defense has proffered no evidence tending to show that Daphne Stidham actually committed the crimes against her husband. Even if this Court were to find that the proffered evidence was marginally relevant, the limited relevance is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, and/or needless presentation of cumulative evidence. The only effect of the proposed testimony would be the character assassination of Dr. And Ms. Stidham.  This proposed third-party defense consists wholly of unsupported speculations and accusations that would unduly prejudice the prosecution by encouraging jury speculation.

WHEREFORE, the State moves this Court to grant the State's Motion in Limine and order that the defense cannot present this third-party claim to the jury by eliciting testimony on direct or cross examination, submission of exhibits, or argument concerning Daphne

9

Stidham being guilty of her husband's murder either acting alone or with another; the existence of a "Will" in Ms. Stidham's bedroom; whether or not Dr. Stidham had an affair; Ms. Stidham's interest in money and life insurance; strange behavior on Ms. Stidham's part.

DATED this 31 day of January, 2006.

ROBERT CARTER OLSON
PINAL COUNTY ATTORNEY

Sylvia R. Lafferty
Deputy County Attorney

Copies of the foregoing mailed/faxed
this 31 day of January, 2006 to:

The Honorable Nanette Warner
Pima County Superior Court
110 W. Congress
Tucson, AZ 85701
520-740-8313

Brick P. Storts, III
271 N. Stone
Tucson, AZ 85701
520-882-5785
Attorney for Defendant Schwartz

Jill E. Thorpe
177 North Church, Ste. 305
Tucson, AZ 85701
520-791-9406
Attorney for Defendant Bigger

10

EXHIBIT A

# BARTON & STOR1ᴜ

BRICK P. STORTS, III *

· A PROFESSIONAL CORPORATION

ARIZONA STATE BAR CERTIFIED
CRIMINAL LAW SPECIALIST

271 NORTH STONE AVENUE
TUCSON, ARIZONA 85701-1526
(520) 882-2802
FAX (520) 882-5785

MICHAEL BARTON

DECEASED

April 2, 2005

Sylvia Lafferty
Pinal County Attorney's Office
P.O. Box 887
Florence, AZ 85232

     RE:   *State v. Bradley Schwartz, et al.*

Dear Sylvia:

     Obviously, I am unable to communicate directly with Ms. Stidham. So, I have no choice but to rely upon you to obtain certain critical information. I do not wish to offend Ms. Stidham or cause her unnecessary anxiety, however, I am obliged to represent Dr. Bradley Schwartz.

     I am specifically requesting that you do whatever is necessary, including talking with Ms. Stidham, in order to provide me with answers to the following questions:

1.    Was Dr. Stidham having an extramarital relationship with any other person at the time of his death? If so, please identify this person and provide me with a last known address and telephone number so that I can communicate directly with them.

2.    Did Ms. Stidham suspect that Dr. Stidham was having an extramarital relationship with some other person at the time of his death? If so, please let me know who Ms. Stidham thought Dr. Stidham was having a relationship with. Also, please provide me with the basis for her belief and the circumstances surrounding her suspicions.

3.    Please provide me with copies of any insurance policies which existed concerning Dr. Stidham. This should include the beneficiary, the amount of the insurance and the date of acquisition.

4.    Please discuss the policies of insurance that were open and in the bedroom of Ms. Stidham when the deputies gained entrance to her bedroom.

Sylvia Lafferty
RE:    *State v. Schwartz*
April 2, 2005

     5.     Please advise concerning whether Dr. Stidham and Ms. Stidham had been
undergoing or seeking to participate in marital counseling concerning their
relationship.

     Again, I do not wish to offend Ms. Stidham, nor do I wish to cause her unnecessary
anxiety. However, given the State's disclosure concerning the Sheriff Department's initial
contact with Ms. Stidham, it would be negligent for me not to pursue this investigation.

     I look forward to hearing from you.

                    Sincerely,

                    BARTON & STORTS, P.C.

                    Brick P. Storts, III

BPS/ch

2