# EXHIBIT B



# ORIGINAL

FILED
ARIZONA COURT OF
APPEALS DIV. TWO

07 APR -6  PM 1: 53

JEFFREY P. HANDLER
CLERK

## IN THE COURT OF APPEALS
### STATE OF ARIZONA
### DIVISION TWO

**STATE OF ARIZONA,**

      **Appellee/Plaintiff,**

v.

**BRADLEY ALAN SCHWARTZ,**

      **Appellant/Defendant.**

**Court of Appeals**
**No.  2CA-CR 2006-0213**

**(Pima County**
**Superior Court Cause**
**No.  CR2004-3995)**

## OPENING BRIEF

**BARTON & STORTS, P.C.**
**Brick P.  Storts, III**
**271 North Stone Avenue**
**Tucson, Arizona 85701**
**Telephone:  882-2802**
**Pima County Computer No.  55508**
**Arizona State Bar No.  004507**
**Attorney for Appellant**
**Bradley Alan Schwartz**

FILED
ARIZONA COURT OF
APPEALS DIV. TWO

07 APR -6 PM 1:53

JEFFREY P. HANDLER
CLERK

# IN THE COURT OF APPEALS
## STATE OF ARIZONA
### DIVISION TWO

STATE OF ARIZONA,

            Appellee/Plaintiff,

v.

BRADLEY ALAN SCHWARTZ,

            Appellant/Defendant.

Court of Appeals
No. 2CA-CR 2006-0213

(Pima County
Superior Court Cause
No. CR2004-3995)

## OPENING BRIEF

BARTON & STORTS, P.C.
Brick P. Storts, III
271 North Stone Avenue
Tucson, Arizona 85701
Telephone: 882-2802
Pima County Computer No. 55508
Arizona State Bar No. 004507
Attorney for Appellant
Bradley Alan Schwartz

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

LAW AND ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

i

# TABLE OF AUTHORITIES

**Page**

## UNITED STATES CONSTITUTION

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **41**

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . .   **41, 45**

## RULES

Rule 9.3(b), Arizona Rules of Criminal Procedure . . . . . . . . . .   **46**

Rule 10.3, Arizona Rules of Criminal Procedure . . . . . . . . . . .   **50**

Rule 15.2(b), Arizona Rules of Criminal Procedure . . . . . . . . .   **42**

Rule 16.1(b), Arizona Rules of Criminal Procedure . . . . . . . . .   **37**

Rule 16.1( c), Arizona Rules of Criminal Procedure . . . . . . . . .   **37**

Rule 20, Arizona Rules of Criminal Procedure . . . . . . . . . . . . .   **14, 15, 53, 54, 55**

Rule 401, Arizona Rules of Evidence . . . . . . . . . . . . . . . . . . . .   **18, 44**

Rule 402, Arizona Rules of Evidence. . . . . . . . . . . . . . . . . . . .   **18**

Rule 403, Arizona Rules of Evidence. . . . . . . . . . . . . . . . . . . .   **18, 25**

Rule 404, Arizona Rules of Evidence. . . . . . . . . . . . . . . . . . . .   **25,**

Rule 404(a), Arizona Rules of Evidence . . . . . . . . . . . . . . . . . .   **25**

Rule 404(b), Arizona Rules of Evidence . . . . . . . . . . . . . . . . . .   **18, 25**

Rule 608, Arizona Rules of Evidence . . . . . . . . . . . . . . . . . . . .   **38**

Rule 608(b), Arizona Rules of Evidence . . . . . . . . . . . . . . . . . .   **37**

**Page**

Rule 801( c), Arizona Rules of Evidence . . . . . . . . . . . . . . . . . . .   34

Rule 801(d)(1)( c), Arizona Rules of Evidence . . . . . . . . . . . . . .   35

Rule 801(d)(1)(L), Arizona Rules of Evidence . . . . . . . . . . . . . .   35

## UNITED STATES SUPREME COURT CASES

*Ake v. Oklahoma,*
        407 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) . . . . . .   45

*Apprendi v. New Jersey,*
        530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) . . .   55

*Blakely v. Washington,*
        124 S.Ct. 2531 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

*Chambers v. Mississippi, State ex. Rel.* 410 U.S. 284,
        93 S.Ct. 1038 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Delaware v. Van Arsdall,*
        475 U.S. 673, 681, 196 S.Ct. 1431,
        89 L.ED.2d 74 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

*Donnelly v. DeChristoforo,*
        416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) . .   20

*Douglas v. Alabama,*
        380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) . . . . . .   41

*Lilly v. Virginia,*
        527 U.S. 116, 136-37, 199 S.Ct. 1887,
        144 L.Ed.2d 117 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*Ring v. Arizona,*
        536 U.S. 584, 122 S.Ct. 2428 (2002) . . . . . . . . . . . . . . . . .   55

**Page**

**STATE CASES**

*Jones v. Sterling,*
    210 Ariz. 308, 110 P.3d 1271 (2005) · · · · · · · · · · · · · · · ·    45

*Pool v. Superior Court,*
    139 Ariz. 98, 677 P.2d 621 (1984) · · · · · · · · · · · · · · · · · ·    21

*Reader v. General Motors,*
    107 Ariz. 149, 155, 483 P.2d 1388, 1394 (1971) · · · · · · · ·    42

*Romley v. Superior Court,*
    172 Ariz. 233, 836 P.2d 445 (1992) · · · · · · · · · · · · · · · · ·    38

*State v. Atwood,*
    171 Ariz. 576, 611, 832 P.2d 593, 628 (1992) · · · · · · · · · ·   **21, 50, 51**

*State v. Bible,*
    175 Ariz. 549, 858 P.2d 1152 (1993) · · · · · · · · · · · · · · · ·    50

*State v. Blakely,*
    204 Ariz. 429, 65 P.3d 77 (2003) · · · · · · · · · · · · · · · · · ·    50

*State v. Davolt,*
    207 Ariz. 192, 84 P.3d 456 · · · · · · · · · · · · · · · · · · · · · ·    51

*State v. Dunlap,*
    125 Ariz. 104, 603 P.2d 41 (1980) · · · · · · · · · · · · · · · · · ·    42

*State v. Fulminante,*
    198 Ariz. 485, 500, 975 P.2d 75, 90 (1999) · · · · · · · · · · · ·  **18, 36, 44**

*State v. Getzler,*
    126 Ariz. 60, 612 P.2d 1023 (1980) · · · · · · · · · · · · · · · · ·    52

**Page**

*State v. Gibson,*
   202 Ariz. 321, 44 P.3d 1001 (2002) . . . . . . . . . . . . . . . . . . . . . .   17, 40

*State v. Hughes,*
   193 Ariz. 72, 969 P.2d 1184 (1998) . . . . . . . . . . . . . . . . . . . . .   21, 31

*State v. Jones,*
   197 Ariz. 290, 4 P.3d 345 (2000) . . . . . . . . . . . . . . . . . . . . . .   49

*State v. Jorgenson,*
   198 Ariz. 390, 10 P.3d 1177 (2000) . . . . . . . . . . . . . . . . . . . . .   21, 22, 31

*State v. Kennedy,*
   122 Ariz. 22, 592 P.2d 1288 (1978) . . . . . . . . . . . . . . . . . . . . .   44

*State v. Kevil,*
   111 Ariz. 240, 527 P.2d 285 (1974) . . . . . . . . . . . . . . . . . . . . .   35

*State v. Lamar,*
   205 Ariz. 531, 72 P.3d 831 (2003) . . . . . . . . . . . . . . . . . . . . . .   31, 32

*State v. LaGrand,*
   153 Ariz. 21, 734 P.2d 563 (1987) . . . . . . . . . . . . . . . . . . . . . .   51

*State v. McCann,*
   200 Ariz. 27, 21 P.3d 845, 846 (2001) . . . . . . . . . . . . . . . . . . . .   53

*State v. McDaniel,*
   136 Ariz. 188, 665 P.2d 70 (1983) . . . . . . . . . . . . . . . . . . . . . .   38

*State v. Minnett,*
   203 Ariz. 431, 55 P.3d 774 (2002) . . . . . . . . . . . . . . . . . . . . . .   31

*State v. Murray,*
   184 Ariz. 9, 906 P.2d 542 (1995) . . . . . . . . . . . . . . . . . . . . . .   49

**Page**

*State v. Nordstrom,*
   200 Ariz. 229, 25 P.3d 717 (2001) . . . . . . . . . . . . . . . . . . .   **51**

*State v. Nunez,*
   167 Ariz. 272, 806 P.2d 861 (1991) . . . . . . . . . . . . . . . . . .   **55**

*State v. Oliver,*
   169 Ariz. 589, 591, 821 P.2d 250, 252 (App. 1991) . . . . . .   **17**

*State v. Pandeli,*
   200 Ariz. 365, 372, 26 P.2d 1136 (2001) . . . . . . . . . . . . . .   **19**

*State v. Prion,*
   203 Ariz. 157, 52 P.3d 189 (2002) . . . . . . . . . . . . . . . . . . .   **17, 40**

*State v. Romanosky,*
   162 Ariz. 217, 782 P.2d 693 (1989) . . . . . . . . . . . . . . . . . .   **35**

*State v. Roque,*
   213 Ariz. 193, 141 P.3d 368 (2006) . . . . . . . . . . . . . . . . . .   **30**

*State v. Salazar,*
   182 Ariz. 604, 610, 898 P.2d 982, 988 (App. 1995) . . . . .   **36**

*State v. Tankersley,*
   191 Ariz. 359, 369, 956 P.2d 486, 496 (1998) . . . . . . . . . .   **17**

*State v. Taylor,*
   99 Ariz. 151, 407 P.2d 106 (1965) . . . . . . . . . . . . . . . . . .   **35**

*State v. Towery,*
   186 Ariz. 168, 20 P.2d 290 (1996) . . . . . . . . . . . . . . . . . . .   **42**

*State v. Tucker,*
   26 Ariz. App. 376, 448 P.2d 1188 (1976) . . . . . . . . . . . . . .   **54**

**Page**

*State v. Valencia,*
    186 Ariz. 493, 498, 924 P.2d 497, 502 (App. 1996) . . . . . .    34, 43

*State v. Villegas,*
    101 Ariz. 465, 420 P.2d 940 (1966) . . . . . . . . . . . . . . . . . .    54

## OTHER

*Arizona Practice: Law Of Evidence* § 81,
    Udall, Livermore, Escher and McIlvain (3rd Ed. 1991) . .    42

# STATEMENT OF THE CASE

On October 25, 2004, the Defendant was indicted and charged with two separate felony offenses. Count One alleged that on or about October 5, 2004, the Defendant, and his co-defendant, Ronald Bruce Bigger, committed First Degree Murder of Dr. Brian David Stidham. Count Two alleged that on or about October 5, 2004, the Defendant and Ronald Bruce Bigger conspired to murder Dr. Stidham. (RA 2)

Based upon the media attention given to this case, which was both overwhelming and prejudicial, the Defendant filed a motion for change of venue (RA 130) and supplemented that motion throughout the course of the proceedings.(See eg. RA 144, 161, 189, 192, 245, 287, 309, 318, 493 and 506.) All were denied by the court (RA 346) The Defendant also filed a motion to sequester the jury, to remove cameras from the courtroom and close the courtroom to the video media. (RA 331, 415, 419, 610).

Defendant filed a motion for the appointment of an expert to conduct polling in order to gather information which was necessary to properly litigate the motion for change of venue. This motion and a motion for rehearing were both denied. (RA 233 and 346)

Jury selection began on January 25, 2006 (RA 449). On May 2, 2006, the jury found the Defendant guilty of Conspiracy to Commit First Degree Murder, as alleged in Count Two of the Indictment, but was unable to reach a unanimous decision with respect to Count One, which alleged First Degree Murder. (RA 639) That count was dismissed without prejudice. (RA 648)

On May 30, 2006, the Defendant was sentenced to Life, without the possibility of parole for twenty-five years, on the Conspiracy to Commit First

1

Degree Murder Count. (RA 668).  This appeal followed.[1]

# STATEMENT OF FACTS

Christine Roltella testified that she would occasionally work at the medical complex located at 4741 N. First Avenue. (RT, March 7, 2006, p.9, 1. 8-12) Ms. Rotella also testified that she was working at this complex on October 5, 2004. (RT 3/7/06, p. 10, 17-18) She left at approximately 7:00 p.m.( RT 3/7/06, p. 10, 1.23) but returned at approximately 10:30 p.m. (RT 3/7/06, p. 12 1.2) because she had forgotten her engagement ring. (RT, 3/7/06, p.11, 1.15-16)

It was dark when Ms. Rotella entered the complex (RT 3/7/06, p.13, 1.14) but she saw a person laying in the parking lot. (RT 3/7/06 p. 14, 1.2-4) At some point, Ms. Rotella and her fiancee approached the body and Ms. Rotella checked for a pulse. (RT 3/7/06, p.15, 1. 10-11) The person was laying on his back, with his arms out to the sides. (RT 3/7/06 p. 15, 1. 17-18) Sheriff's deputies arrived within 3-5 minutes. (RT 3/7/06, p.15, 22-23) Dr. Stidham had been stabbed multiple times.

Rudy Gonzalez testified that she worked for Dr. Brain Stidham (RT 3/7/96, p.22, 1. 14-16) and that his office number was 4727. (RT 3/7/06, p. 24, 1.23) on October 5, 2004, Ms. Gonzalez went to Dr. Stidham's car at approximately 5:00-5:20 p.m. to retrieve his wallet (RT 3/7/06, p. 25, 1. 3-7) and left at approximately 5;30 p.m. (RT 3/7/06, p. 25, 1. 22) Dr. Stidham was still in his office when Ms. Gonzalez left. (RT 3/7/06, p.25, 1. 25) When she left, she did not see anyone in the parking lot wearing scrubs. (RT 3/7/06, p. 26, 1. 14)

---

[1] RA is the designation for the record on appeal, followed by the item or document number.  RT refers to the reporter's transcript, followed by the date and page number.

2

Lead Detective Murphy testified that it is her practice to call the Medical Examiner's Office **after** she has finished collecting evidence. (*Id.* at p. 24, l. 14-15) Detective Murphy also testified that Dr. Stidham's Lexus, which had been parked nearby his office, was located at approximately 9:45 p.m. on October 6, 2004. (*Id.* at p. 25, l. 19-24) It was found at an apartment complex located at 3710 E. Bellevue, Tucson Arizona. (*Id.* at p. 26, l. 1-3) This is near the intersection of Speedway and Dodge. (*Id.* at p. 26, l. 6-7) Officer Martinez of the Tucson Police Department testified that he actually located the Lexus on October 7, 2004. (*Id.* at p. 95, l. 21 through p. 96, l. 1)

Gregory Bergquist testified that he owned Crescent Security Systems. (RT 3/7/06, l. 17) and was on-site when the alarm system was installed in Dr. Stidham's office. (RT 3/7/06, p. 40, l. 1). Mr. Berquist identified documents which established that the alarm in Dr. Stidham's office was de-activated when the office was opened at 7:21 and 37 seconds, a.m. and activated when the last person, Dr. Stidham, left the office at 7:26 and 37 seconds p.m. on October 5, 2004. (RT 3/7/06, p. 42, l. 13-15)

Lisa Goldberg testified she dated Dr. Schwartz during September of 2004. (RT 3/15/06 p. 8, l. 13-14) On October 5, 2004, Ms. Goldberg drove to Tucson and went directly to Dr. Schwartz's office. (*Id.* at p. 9, l. 20-25) While there she met a man that she saw again later that evening. (*Id.* at p. 11, l. 5-11) Ms. Goldberg left Dr. Schwartz's office for a short period of time and returned between 5:00-5:30 p.m. (*Id.* at p. 12, l. 6-15) Soon thereafter, Ms. Goldberg followed Dr. Schwartz to his apartment. He then left to attend a rehabilitation meeting. Ms. Goldberg waited at Dr. Schwartz's apartment. (*Id.* at p. 12, l. 23, p. 13, l. 3) Dr. Schwartz returned from his meeting at approximately 7:00 p.m. (*Id.* at p. 13, l. 14) Somewhere between 7:30 and 8:00 p.m., the two left to go to dinner.

3

(*Id.* at p. 13, l. 20) During dinner, Dr. Schwartz received several phone calls. At some point, Dr. Schwartz told Ms. Goldberg that a friend was going to join them. (*Id.* at p. 14, l. 16–p. 15, l. 3) The person who joined them for dinner was the same man Ms. Goldberg had seen earlier in the day at Dr. Schwartz's office. (*Id.* at p.16, l. 9-12) Ms. Goldberg did not notice any signs of injuries, nor did she notice any blood on this person's hands or clothing. (*Id.* at p. 12 ( p.m. session) l. 11-15) Ms. Goldberg believes Mr. Bigger, the man who joined them, arrived at the restaurant between 8:30 and 8:45 p.m. (*Id.* at p. 11(p.m. session) l. 23–p. 12, l. 1)

After dinner they went back to Dr. Schwartz's office to retrieve Mr. Bigger's bicycle, (*Id.* at p. 18, l. 24-25), stopped at an ATM (*Id.* at p. 19, l. 21) although Dr. Schwartz said there was only a $20 balance in his account and then went to two hotels looking for a room for Mr. Bigger. Both of these hotels were booked. (*Id.* at p. 20, l. 18-23) Ultimately, they went to the Residence Inn where Dr. Schwartz was able to get a room for Mr. Bigger. Mr. Bigger and Dr. Schwartz both went into the lobby of the Residence Inn. (*Id.* at p. 21, l.14-15) After dropping Mr. Bigger off at the Residence Inn, Ms. Goldberg and Dr. Schwartz returned to his apartment. Ms. Goldberg stayed at Dr. Schwartz's apartment overnight. (*Id.* at p. 22, l. 18-22) Ms. Goldberg believes they left dinner looking for a room for Mr. Bigger after 9:00 p.m. (*Id.* at p. 13 (p.m. session) l. 23) and returned to Dr. Schwartz's apartment somewhere between 10:30 and 11:00 p.m. (*Id.* at p. 14 (p.m. session) l. 11-13)

Dr. Joel Heerboth confirmed that on October 5, 2004, Dr. Schwartz had attended a regularly scheduled therapy session, arriving at approximately 5:30 p.m. and leaving at approximately 6:45 p.m. (RT 3/31/06 p. 109, l. 19–p. 110, l. 6)

Thomas Boager testified that on October 5, 2004, he was a self-employed cab driver for Allstate Cab Company. Sometime during the evening hours of

4

October 5, 2004, Mr. Boager picked up a fare (Ronald Bigger) near the Bunny Ranch which was located on E. Speedway. (RT 3/14/06 p. 89, l. 11-17) He took this person to a restaurant located near Campbell and Grant. (Where Ms. Goldberg and Dr. Schwartz were having dinner.) (*Id.* at p. 90, l. 17-19) When they arrived, the man got out of the cab and another man came out paid the fare. (*Id.* at p. 91, l. 21–p. 92, l. 9) Mr. Boager did not see any injuries or blood an the man he took to Campbell and Grant. (*Id.* at p. 94, l. 11-16)

The State called a number of other female witnesses who testified that Dr. Schwartz did not like Dr. Stidham, said some very unkind things about him and either talked about hurting Dr. Stidham or threatened to do so. Lilliana Bibb testified that she had met Dr. Schwartz on Match.com, a dating site, during the week before July 4, 2004. (RT 3/15/06 p. 26, l. 18-20) Ms. Bibb dated Dr. Schwartz for approximately one month. (*Id.* at p. 28, l. 18) Ms. Bibb testified that Dr. Schwartz said that he wanted Dr. Stidham "gone, he wanted him hurt". He said that he wanted to have his eyes poked out or his fingers broken so that he could not do surgery. He also said that he would be happy if Dr. Stidham was six feet under. (*Id.* at p. 32, l. 17-25)

Aisha Henry testified that she met Dr. Schwartz while both were at the Cottonwood Rehabilitation Center in September and October of 2002. (RT 3/16/06 p. 18. l. 3-5) Dr. Schwartz told Ms. Henry about his dislike for Dr. Stidham. (*Id.* at p. 20, l. 19-23) They continued to have contact with one another after both were released from Cottonwood. (*Id.* at 23, l. 20–p. 24, l. 4) According to Ms. Henry, at some point Dr. Schwartz asked Ms. Henry to take her son to see Dr. Stidham and then claim that Dr. Stidham had attempted to molest him. (*Id.* at p. 25, l. 3-13) Then, after she refused, Dr. Schwartz supposedly asked her to make an accusation that Dr. Stidham had fondled her during an office visit. (*Id.* at p. 26,

5

l. 20-24)

Finally, Ms. Henry testified that Dr. Schwartz asked whether Ms. Henry's husband would be willing to hurt Dr. Stidham if Dr. Schwartz paid him a certain amount of money. (*Id.* at p. 30, l. 13-18)  Ms. Henry said that Dr. Schwartz agreed to pay her husband $1,500 up front and another $1,500-$2,000 after Dr. Stidham had been hurt. (*Id.* at p. 31, l. 12-22)  On direct examination, Ms. Henry said she did not go to the police because she was scared. (*Id.* at p. 38, l. 16-22)  However, on cross-examination, Ms. Henry had to admit that when she talked to the police, she said she did not report these conversations to the police because she never took Dr. Schwartz seriously. (*Id.* at p.41, l. 16–p. 42, l. 5)

Lourdes Lopez, a Tucson attorney, testified that she became acquainted with Dr. Schwartz in December, 2000  (RT 3/21/06, p. 161, l. 17)  when her step-daughter was referred to Dr. Schwartz for eye surgery. (*Id.* at p. 161, l. 10-15)  Thereafter, she developed a personal relationship with Dr. Schwartz which resulted in their becoming engaged in January of 2004. (*Id.* at p. 162, l. 20)  Their relationship terminated in May of 2004. (*Id.* at p. 163, l. 3)  She also testified that there came a time during October of 2002, when Dr. Schwartz was unable to practice medicine. (*Id.* at p. 164, l. 10-16)  Ms. Lopez testified that Dr. Schwartz had been "court ordered" into the Cottonwood Rehabilitation Center. (*Id.* at p. 165, l. 3).  The court had previously ordered that the State could not present evidence concerning the defendant's indictment in Federal Court, thus Ms. Lopez was asked if she meant that the Medical Board had required in-patient treatment based upon his abuse of prescription medication. (*Id.* at p.165, l. 9-12)

Ms. Lopez also testified that Dr. Stidham had come to work for Dr. Schwartz sometime during 2001, and had worked for Dr. Schwartz  for approximately one year. (*Id.* at p. 165, l. 13-19) When Dr. Schwartz entered into

6

treatment, Dr. Stidham left Dr. Schwartz and started his own practice. According to Ms. Lopez, the break-up occurred sometime around October of 2002. (*Id.* at p. 165, l. 24-25) and was not very pleasant. (*Id.* at p. 166, l. 1-4)

Ms. Lopez also testified that in September of 2001, she was interviewed by agents from the DEA about prescription medication being used by Dr. Schwartz. She admitted that she lied to the DEA so that "Brad (Dr. Schwartz) was not going to get into any kind of trouble". (*Id.* at p. 186, l. 1-25) Ms. Lopez then said that she and her attorney later contacted the "United States Attorney" in order to correct her false statements. (*Id.* at p. 187, l. 15-16)

Ms. Lopez testified that Dr. Schwartz began talking about the horrible things he would like to see happen to Dr. Stidham. (*Id.* at p. 14, l. 13-17) Ms. Lopez testified that for a variety of reasons, she never took Dr. Schwartz's threats seriously. (*Id.* at p. 16, l. 7-24) She also testified that most of her conversations with Dr. Schwartz about Dr. Stidham would take place when she and Dr. Schwartz were watching the Sopranos. (*Id.* at p. 62, l. 21-22) Ms. Lopez also admitted that Dr. Schwartz was a "blowhard" who would talk big in order to make himself appear important. (*Id* at p. 100, l. 8-24) Ms. Lopez was asked whether she had ever said anything to anyone about Dr. Schwartz's threats prior to October 8, 2004. Ms. Lopez said that she had told Paul Skitzki about the threats prior to the murder of Dr. Stidham. (*Id.* at p. 105, l. 18-24) When counsel asked whether Ms. Lopez was aware that Mr. Skizki, who was then a deputy county attorney, had denied, under oath, that Ms. Lopez had ever told him about Dr. Schwartz's threats prior to the murder of Dr. Stidham, the State objected which was sustained by the court (RT 3/22/06, p. 106, l. 19-23)

The State called Jeff Englander as a witness. Mr. Englander testified that he had reviewed Dr. Schwartz's computer hard drive and his palm pilot in search of

7

information that might be pertinent. The State then offered Exhibit 27, and explained that this was relevant because the only entry that had anything to do with addresses or personal information was an entry identifying Dr. Stidham's vehicle type and license plate number. (RT 3/17/06, p. 124, l. 19-22) The exhibit was admitted over defense objections, based on disclosure violations. (*Id.* at p. 132, l. 15-25)

Dr. Winston from the Medical Examiner's Office was not called to the scene until approximately 2:55 a.m. on October 5, 2004 and did not arrive at the scene until approximately 3:50 a.m. He did not view Dr. Stidham's body until somewhere between 4:00-4:15 a.m. (*Id.* at p. 57, l. 3-12)

Dr. Winston testified that he performed the autopsy on Dr. Stidham on October 6, 2004. (RT 3/14/06 p. 114, l. 11-13) Dr. Winston told the jury that Dr. Stidham died as the result of multiple stab wounds. (*Id.* at p. 180, l. 11) He also testified that Dr. Stidham had a skull fracture. (*Id.* at p. 120, l. 8-11) that was likely caused by a fall. (*Id.* at p. 122, l. 21-25)

Dr. Winston described rigor mortis as the stiffening of the body after death. Dr. Winston agreed that rigor mortis would be completely fixed at approximately 12 hours after death. (*Id.* at p. 155, l. 16) Based upon his observation of rigor mortis at the scene, the time of death was probably less than twelve hours. (*Id.* at p. 158, l. 9-12) And, Dr. Winston also testified that he had examined Dr. Stidham's body at the scene at approximately 4:00-4:15 a.m. on October 6, 2004. (*Id.* at p. 183, l. 5-111)

Dr. Winston described livor mortis as the settling of blood after death. (*Id.* at p. 159, l. 5-6) He also said that you no longer see "blanchable" livor mortis after about 12 hours. (*Id.* at p. 161, l 21-22) Finally, Dr. Winston testified that he observed blanchable livor mortis over the posterior surfaces of Dr. Stidham's body.

8

(*Id.* at p. 164, l. 4-6)

On cross-examination, Dr. Winston testified that at the scene, Dr. Stidham's body was warm to the touch. (*Id.* at p. 185, l. 123, p. 186, l. 2) Dr. Winston testified that he performed the autopsy at 8:30 a.m. on October 6, 2004. (*Id* at p. 188, l. 5-8)  When asked about a notation on his autopsy notes which indicated that livor mortis was still not fixed at 8:30 a.m. on October 6, 2004, the time of the autopsy, Dr. Winston said this note was simply intended to remind him about his scene observations made at approximately 4:00-4:15 a.m. (*Id.* at p. 188, l. 11-25)

Dr. Phillip Keen was called as a witness by the Appellant.  Dr. Keen is the Chief Medical Examiner for Maricopa and Yavapai counties.  (*Id.* at p. 5, l. 1-5) Dr. Keen testified that he had reviewed the autopsy reports and notes prepared by Dr. Winston, some police reports and various scene photos.  (*Id* at p. 21, l. 12-16) He also testified that the notes should be prepared base upon observations made at the time of the autopsy.  (*Id.* at p. 23, l. 10-11)

Importantly, Dr. Keen testified that based upon his review of the available information, it was his opinion that the time of death should be in the range of 4-7 hours prior to the time of observation, which was 4:00-4:15 a.m. (*Id.* at p. 20, l. 18–p. 21, l. 3)  This would place the time of death between 9 p.m. and midnight on October 5, 2004.  Dr. Keen was shown a copy of Dr. Winston's autopsy notes and said that with no additional information, he would have to conclude that at the time of the autopsy on October 6, 2004, at approximately 8:30 a.m., Dr. Winston was reporting an observation that livor mortis was not fixed.(*Id.* at p. 24, l. 3-21) It was only after Dr. Keen's testimony that Dr. Winston corrected his own mistake. Finally, Dr. Keen testified that he would be surprised if the death in this case occurred prior to 9 p.m. on October 5, 2004. (*Id.* at p. 43, l. 9-15)

9

During the defense case, Dr. Winston was recalled as a witness. When asked about his earlier testimony that the livor mortis notation was simply a reminder to him about observations he made at the scene, Dr. Winston admitted that he had made an "error". (RT 4/11/06 p. 96, l. 15-19) He said that after he testified he realized he had made a mistake and thought that he would address the mistake when he was recalled. (*Id.* at p. 97, l. 8-12) He also said that although the livor mortis was still blanchable at 8:30 a.m. on October 6, 2004, his opinion concerning time of death had not changed. (*Id.* at p. 98, l. 12) When the prosecutor questioned Dr. Winston, she specifically asked whether he had had any recent experience with lividity that had not become fixed. As if on cue, Dr. Winston testified that he had seen cases where even after 24-30 hours, lividity had not become fixed. (*Id.* at p. 105, l. 22–p. 106, l. 1) Obviously, Dr. Winston wanted to avoid the implications of his earlier testimony and did so by talking about some of his more recent experiences notwithstanding the opinion he had offered previously that livor mortis would become fixed in about 12 hours. Ultimately, the court struck Dr. Winston's testimony about his two most recent experiences with lividity. (ROA 617)

Erin Sullivan testified that from October 1 through October 7, 2004, she was working at the Denny's located on East Speedway. (RT 3/30/06 p. 14, l. 17-20) Ms. Sullivan was shown a picture of man she recognized. He had been in Denny's, however, she could not be sure of the date. (*Id.* at p.16, l. 14-20) (this man was Ronald Bigger) Ms. Sullivan testified that she had a conversation with this man as he sat at the counter. (*Id.* at p. 17, l.23-24) Ms. Sullivan also testified that she had seen this same man at the Denny's once or twice before. (*Id.* at p. 18, l. 9) Although she was not positive, she believed the man was inside the Denny's for half an hour and hour". (*Id.* at p. 19, l. 3-4) The man was asking for phone

10

numbers for a cab so Ms. Sullivan gave him the number for Allstate Cab.(*Id.* at p. 19, l. 12-20) The man then went to the Denny's pay phone. (*Id.* at p. 19, l. 21-25) The man was normal, in terms of his behavior, and Ms. Sullivan did not notice any blood on his person or clothing. (*Id.* at p. 23, l. 3-14) Detective Lopez testified that on October 5, 2004, at approximately 7:46 p.m., the pay phone in the Denny's lobby had also called Dr. Schwartz's cell phone. (RT 3/24/06 at p. 112, l. 4-16)

Detective Hogan testified that he assisted Detective Murphy in processing the interior of Dr. Stidham's Lexus. Specifically, Detective Hogan testified that he took swabs from the radio knobs of the Lexus (*Id.* at p. 97, l. 21-24) Detective Hogan also testified that there was no written or unwritten policy at the Sheriff's Department about when to call OME. It was up to the individual detective. (*Id.* at p. 112, l. 9-18)

The State relied heavily upon the only physical evidence that linked either Dr. Schwartz or Ronald Bigger to the murder of Dr. Stidham, the DNA evidence obtained from the radio knobs, swabbed by Detective Hogan, in Dr. Stidham's recovered Lexus. First, the State called Curtis Reinbold from the DPS crime lab in Tucson. Mr. Reinbold testified that he performed a DNA analysis on the DNA collected from the radio knobs of Dr. Stidham's Lexus. The type of DNA analysis conducted by Mr. Reinbold was called "short tandem repeats". **(STR)** (RT 3/28/06, p. 42, l. 14-15) Mr. Reinbold also said that crime labs use a threshold for determining where to look for comparative DNA. (*Id.* at p. 67, l. 18–p. 68, l. 18) Mr. Reinbold testified that his lab had been using a threshold of 150 RFUs (*Id.* at p. 69, 5-6) but changed to 100 RFUs during the year preceding trial in this case. (*Id.* at p. 70, l. 6) Mr. Reinbold also testified that after the actual DNA analysis is completed, they also do a random statistical probability analysis. (*Id.* at

11

p. 8 (p.m. session) l. 20-25) Mr. Reinbold said that they use a program called Pop Stats to calculate how rare a profile might be in the population. (*Id.* at p.10, l. 2-12)

Mr. Reinbold told the jury that the DNA from the radio knobs appeared to be a mixture of at least two people. (*Id.* at p. 11, l. 6-7) There was a major component and a minor component. (*Id.* at p. 11, l. 11-13) Mr. Reinbold identified the major component as Dr. Stidham. (*Id.* at p. 13, l. 2-4) Dr. Stidham's DNA matched all 14 loci or locations which were being looked at. (*Id.* at p. 13, l. 8-9) Mr. Reinbold also testified that using the threshold of 150, the other person's DNA was found at three loci. (*Id.* at p. 13, l. 15-17) Using a threshold of 100, Mr. Reinbold said that he was able to find the DNA at four locations. (*Id.* at p. 14, l. 2-5) As to the other 11 areas of comparison, using the threshold of 150, Mr. Reinbold said that he could not exclude Mr. Bigger as a possible donor. (*Id.* at p. 14, l. 6-13) Using the threshold of 100, Mr. Reinbold said there was nothing at the other 10 areas or locations that would cause him to exclude Mr. Bigger. (*Id.* at p. 14, l. 14-25) However, Mr. Reinbold admitted that he was not able to say, to a reasonable degree of scientific certainty, that the minor component was the DNA of Ronald Bigger. (*Id.* at p. 15, l. 1-5) He could only say that he could not exclude Mr. Bigger as a possible donor. (*Id.* at p. 15, l. 8-9)

Ms. Lorraine Heath was called as a witness and testified that she had been called as an expert once in Pima County and twice in Maricopa County and that none of these appearances had anything to do with a Y-STR analysis. (RT 3/28/06 at p. 96, l. 5-12) She also said that Y-STR testing is fairly new (*Id.* at p. 99, l. 18) and looks only at the DNA of the Y chromosomes, which are unique to the male population. (*Id.* at p. 100, l. 7-13). Ms. Heath testified that with Y-STR testing, there are 16 loci being looked at. (*Id.* at p. 104, l. 20-22) Moreover, she said that she found Mr. Bigger's profile at 9 of these loci. (*Id.* at p. 105, l. 16-17)

Ms. Heath also admitted that she could not say, to a reasonable degree of scientific certainty, that the DNA at these 9 loci actually belonged to Ronald Bigger. (*Id* at p. 106, l. 6-9)

Brian Wraxall was called as a defense expert regarding DNA analysis. Mr. Wraxall testified that he had reviewed the work and conclusions of Curtis Reinbold and Lorraine Heath, the State's first two DNA experts. (RT 4/4/06 p. 126, l. 3-9) Mr. Wraxall testified that a DNA analysis is much more difficult when dealing with mixtures. (*Id*. at p. 129, l. 24–p. 130, l. 1) Mr. Wraxall also said that when you consider LX39, the DNA from the radio knobs of Dr. Stidham's vehicle, and look at the location D8, if you assume that there are only two donors, which is an assumption that Mr. Reinbold made, you would have to exclude Mr. Bigger since there is an 11 at this location. (*Id*. at p. 158, l. 20 and p. 161, l. 10-17) Mr. Wraxall also took exception to Mr. Reinbold's testimony that there was a 16-16 at D8. Mr. Wraxall pointed out that you cannot be sure that the minor donor was not a 13-16 as opposed to a 16-16. (*Id*. at p. 164, l. 2-20) Mr. Wraxall was also critical of Mr. Reinbold's testimony that the minor donor at the TPOX location was a 10-10. Mr. Wraxall said that it was a question of interpretation and that you simply could not be sure whether the minor donor at TPOX was an 8-10, a 10-10 or a 10-11. (*Id*. at p. 170, l. 19–p. 171, l. 15)

Mr. Wraxall also criticized the manner in which Mr. Reinbold arrived at his random statistical probabilities. He pointed out that in order to arrive at the 1 in 20 million that Mr. Reinbold reported,  you would have to assume that the "minor donor is a 9.3 at THO1, that he is a 10-10 at TPOX, and that he is a 16-16 at D8" which is something you simply cannot do." (*Id*. at p. 177, l. 20–p. 178, l. 2) Mr. Wraxall then said that if the calculations are done properly, the random statistical probability is closer to 1 in 1,632, as to the minor donor. (*Id*. at p. 180,

13

1. 9-19)

At the close of the State's evidence, the Court denied the Defendant's motion for directed verdict and the defendant's motion challenging the constitutionality of Rule 20 of the Arizona Rules of Criminal Procedure. (RA 604)

Additional facts will be set forth, as necessary, in support of the legal arguments on the various issues raised herein.

## ISSUES PRESENTED

I.    Did the Trial Court err in severely limiting Appellant's Third Party Defense naming Dennis Walsh?

II.   Did the State commit multiple acts of Prosecutorial Misconduct and the Trial Court err in failing to grant Appellant's repeated motions for a mistrial?

III.  Did the Trial Court error by not granting a mistrial when Ms. Heath and the State completely disregarded the Trial Court's order and had Ms. Heath testify in direct violation to the order?

IV.   Did the Trial Court error by allowing into evidence the hearsay testimony of Jennifer Dainty and Dr. Jason Lee?

V.    Did the Trial Court error in precluding Appellant from impeaching Lourdes Lopez with the Paul Skitzki and Dave Wickey's testimony?

     A.    Did the State file the motion to preclude the impeachment testimony in bad faith?

VI.   Did the Trial Court error in precluding evidence of Daphne Stidham's conduct on the night of the homicide?

     A.    The Trial Court's restrictions on cross examining police officers regarding Ms. Stidham's conduct, deprived Appellant of his Sixth Amendment right to cross-examine witnesses.

14

VII.   Did the Trial Court error in precluding Appellant's character evidence as not being relevant.

VIII.  Did the Trial Court error in refusing to appoint a polling expert to assist Appellant with properly evaluating the media coverage of his case?

IX.    The Trial Court abused its discretion and erred in denying the Appellant's repeated motions to change venue.

    A.   The media coverage was so pervasive and unrelenting that prejudice should have been presumed and the trial court should have granted a change of venue.

X.     The Trial Court abused its discretion and erred in denying the Appellant's motion to sequester the jury.

XI.    The Trial Court erred in denying Appellant's request to have the jury decide the Appellant's Rule 20 matter.

# LAW AND ARGUMENT

## I.   Did The Trial Court Err In Severely Limiting Appellant's Third Party Defense Naming Dennis Walsh?

The court erred in precluding the majority of the third-party defense raised by Appellant, as to third-party Defendant, Dennis Walsh. Seldom will a defendant have a more compelling and factually similar third-party defense to present to jury, as in the instant case. The Appellant noticed the court on March 9, 2005, of his intent to introduce a third-party defense, accusing Dennis Walsh, of murdering Dr. Brian Stidham. (RA 78)

The State belatedly recognized, during oral argument, that it would be error for the court to totally preclude the Appellant from relying upon a third-party culpability defense with respect to Mr. Walsh. (RT 3/7/06, p. 68, l. 6-10)  The State

15

then suggested to the court, that only certain evidence should be admissible. The court, as a result, ruled that the Appellant could present a third-party culpability defense with respect to Mr. Walsh, however, severely limited the Appellant to evidence dealing only with two carjackings and not some (17) other armed robberies. This effectively denied the defense to the Appellant.

Both the Appellant and the State conducted extensive investigations into the third-party defense. Numerous witnesses were brought forth as the result of contacts that Appellant made with various inmates at the Pima County Jail that supported that defense. (RA 485, Exhibit 1) The State also had witnesses to counter the proffered third-party defense by Appellant. However, taken as a whole, the Appellant would have been in a position to present compelling evidence as to the criminal conduct of Mr. Walsh, in and around the time and at the location near where the death of Dr. Brian Stidham occurred.

It was not until February 10, 2006, two weeks before commencement of Defendant's trial, that the State filed their motion to preclude the third-party defense of Dennis Walsh. (RA 489) The Appellant responded to that motion on February 21, 2006. (RA 485) The court precluded all other evidence of robberies and related attacks committed by Walsh in and around the scene where Dr. Stidham was murdered, including dates before and after the death of Dr. Stidham. (RA 517) The armed robberies by Walsh took place from October 2, 2004 to December 29, 2004, 12 of 17 armed robberies took place in the area of Dr. Stidham's medical complex.

During trial, Appellant filed a motion for rehearing on the third-party defense. (RA 520) The motion limited Walsh's criminal conduct presented to the Jury, restricting the presentation to five criminal acts. The Appellant requested he be allowed to offer the evidence of the robberies that occurred with a knife and that

16

took place in and around the location where Dr. Stidham was assaulted and for dates before and after the death of Dr. Stidham. The court denied the motion for rehearing on March 28, 2006. (RA 545)

## STANDARD OF REVIEW

The admissibility of third-party culpability evidence is reviewed under an abuse of discretion standard. *State v. Tankersley,* 191 Ariz. 359, 369, 956 P.2d 486, 496 ¶ 37 (1998). It is permissible for a defendant to attempt to show that another person committed the crime for which he is charged, *Tankersley,* 191Ariz. at 369, 956 P.2d at 496, but it remains in the trial court's discretion to exclude the evidence if it offers only a possible ground of suspicion against another. *State v. Oliver,* 169 Ariz. 589, 591, 821 P.2d 250, 252 (App. 1991)

## LAW

The Defendant meets the foundational requisites discussed in *State v. Gibson,* 202 Ariz. 321, 44 P.3d 1001 (2002) and *State v. Prion,* 203 Ariz. 157, 52 P.3d 189 (2002) The admissions of guilt made by Mr. Walsh should have been admissible as he had admitted guilt to (19) separate armed robberies and carjackings. The State argued, however, that the evidence concerning Mr. Walsh's criminal offenses be precluded, as the evidence would result in a "catalyst for confusion, misleading, delay and waste" for the Jury.

The trial court erred in precluding Appellant's third-party defense in its entirety. Furthermore, Appellant should not have been limited by the court, and should have allowed that defense, in total, and not the diminished one that was approved by the court. The court's ruling was not well taken, factually or legally. In *State v. Prion, supra,* the court said as to that issue:

> In a recent opinion in <u>State v. Gibson</u> (citation omitted) we
> clarified the rule, holding that a special, higher standard of

17

admissibility for third party culpability evidence was not the intention of Fulminante. The proper standard regarding third-party culpability evidence is found in Rules 401, 402, and 403 of the Arizona Rules of Evidence. Any such evidence must simply be relevant and then subjected to the normal 403 weighing analysis between relevance, on the one hand, and prejudice or confusion on the other. *Id.* at 161.

The *Prion* court went on to say:

To be relevant, the evidence need only tend to create a reasonable doubt about the Defendant's guilt.

The court, in the order, made the observation that the Appellant had failed to suggest a basis for admissibility concerning the other offenses committed by Mr. Walsh. The court's ruling precluded the Appellant from putting on a third-party culpability defense with respect to Mr. Walsh. The court's limitations made it impossible to effectively present the evidence in a manner that was critical for the jury to have been able to evaluate Mr. Walsh's conduct. Rule 404(b) of the Arizona Rules of Evidence was misinterpreted by the court.

The court was incorrect in finding the only purpose the Appellant had for introducing evidence of the various crimes committed by Mr. Walsh was to demonstrate that he was a person of bad character, and likely to engage in criminal activity. The facts did not support that conclusion. Mr. Walsh committed a series of armed robberies, many of which occurred near the area where Dr. Stidham's body was found, some of the crimes within blocks of Dr. Stidham's his office, and he used knives. Mr. Walsh's crime spree occurred during the same period of time, October 5, 2004, as this case. (See, Diagrams filed with the Defendant's response, Exhibits 3 and 4.)(RA 485, unnumbered pp. 17 and 19)

18

The Appellant, as previously stated, requested the court reconsider its' initial ruling and allow him to tell the Jury about the armed robberies in the <u>immediate</u> vicinity of Dr. Stidham's office.  This evidence consisted of (5) armed robberies.  (RA 520)  The court denied his request, on March 28, 2006.  Thus, the court erred in its initial ruling and in the scaled-down request for third-party liability in the Defendant's motion for re-hearing.  (RA 545)

For an error to be reversible, as here, it must be clearly prejudicial and "sufficient to create a reasonable doubt about whether the verdict might have been different had the error not been committed." *State v. Pandeli*, 200 Ariz. 365, 372, 26 P.3d 1136, 1143 ¶ 18 (2001) (citation omitted).  Given the strength of the Walsh evidence, the result of Appellant's trial would not have been the same if the Walsh evidence had been admitted, thus, the trial court's error necessitates a new trial.

**II.   <u>Did The State Commit Multiple Acts Of Prosecutorial Misconduct And The trial Court Erred In Failing To Grant Appellant's Repeated Motions For A Mistrial</u>?**

There were numerous instances of prosecutorial misconduct in this case.  In fact, Appellant made ten requests for mistrial.  (ROA 534; 563; 560; 559; 558, p.5; 557 p.2; 605, p.3; 603; 618; 621) The conduct that caused the request for mistrial permeated the proceedings, thus, Appellant was denied his right to a fair trial.  The prosecutorial misconduct consisted of both reckless indifference <u>and</u> intentional and knowing acts during trial.

Dr. Keen, the Chief Medical Examiner for Maricopa County, testified that the time of death was after 8:30-9:00 p.m. on October 5, 2004.  This was critical evidence because if the time of death was around 8:30, Mr. Bigger could not have committed the murder.  Mr. Bigger's whereabouts, as demonstrated by the testimony of Thomas Boager and two calls he made to appellant's cell phone,

19

could be accounted for and proved that he could not have committed the murder at any time after approximately 7:40p.m.

The only physical evidence connecting Mr. Bigger to the murder of Dr. Stidham was DNA found on the radio knobs in Dr. Stidham's recovered Lexus. The State was aware that appellant would be calling Brian Wraxall as an expert witness to testify that the State's DNA analysis was flawed because Mr. Reinbold made numerous assumptions he should not have. Mr. Reinbold made numerous assumptions he should never have made and that the random statistical probability evidence was inflated based upon these improper assumptions. Ultimately, another witness called by the State, Dr. Budowle, agreed with Mr. Wraxall. (RT 4/20/06, p. 70, l. 23-p. 2, l. 4)  Moreover, the State was aware that Mr. Wraxall would testify that if you did make the assumptions made by Mr. Reinbold, Mr. Bigger would be eliminated as a donor of the DNA found on the radio knobs.

During trial it became apparent that the State's primary DNA expert would be impeached and discredited not only by the defense expert, but also by another DNA expert the State initially believed would corroborate the testimony of Mr. Reinbold, the State's first and primary expert. Dr. Budowle agreed with Mr. Wraxall and criticized the work of Mr. Reinbold.

The State's pathologist was recalled by the defense, his testimony was so bad that the prosecutor said, on the record, that he looked like a "boob and one who is perhaps not candid with the court". (RT 4/11/0, p. 123, l. 11-12)

A consideration of the various instances of misconduct is required.

## STANDARD OF REVIEW

To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v.*

20

*DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Atwood*, 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992)

## ARGUMENT

The standard having to do with prosecutorial misconduct was set forth in *State v. Hughes*, 193 Ariz 72, 969 P.2d 1184 ( 1998) wherein the court said:

> To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the **cumulative** effect of the misconduct. *Id.* at 79. (emphasis added)

Moreover, the court in *State v. Jorgenson*, 198 Ariz. 390, 10 P3d 1177 (2000), relied upon *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 621 ((1984), (intentional misconduct was not required.) In talking about when jeopardy would bar a retrial, the court said as follows:

> Double jeopardy prevents retrial when the prosecutor's deliberate, intentional, and knowing conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is **indifferent to the danger of resulting mistrial or reversal.** When this occurs, it is clear that the burden of a second trial is not attributable to the defendant's preference for a new trial over completing the trial infected by error. Rather, it results from the State's readiness, though perhaps not calculated intent, to force the defendant to such a choice. Id. at 391, 1178.

Reversal is required if the misconduct is so pronounced and persistent that it permeates the entire atmosphere of the trial. When determining whether the conduct permeated the trial, the court looks to the cumulative effect of the misconduct.

The allegations of misconduct which follow, if viewed as isolated mistakes or oversights, might not warrant reversal. However, when this Court examines each in relationship to the others, the conclusion is inescapable that the atmosphere of this trial was so infected by prosecutorial misconduct that appellant was denied his right to a fair trial. As the court said in *State v. Jorgenson, supra,* the defendant was convicted not based upon the evidence, rather he was convicted because of the prosecutor's misconduct.

## DR. LEE AND MUG SHOTS

On day nine of the trial, the State called Dr. Lee as a witness to testify about a conversation he had with a man wearing scrubs in the parking lot of the medical complex where Dr. Stidham was found stabbed to death. (RT 3/10/06, p. 28, l. 23-25) The State brought out that this man had told Dr. Lee that pizza had been delivered to Dr. Stidham's office. (RT *Id.* P. 31, l. 5-6)

However, Dr. Lee admitted on cross examination, that he had seen pictures of Mr. Bigger, and that Mr. Bigger he did not resemble the man he spoke to in the parking lot. (RT *Id.* at p. 38, l. 22-p. 39, l. 15) Then, for some inexplicable reason, one of the two very experienced prosecutors in this case asked Dr. Lee whether the photographs he had seen were "mug shots". (RT *Id.* at 43, l. 11) The clear inference from this question was that Mr. Bigger must have had a prior criminal history. Obviously, that inference was helpful to the State. The State's theory is obviously bolstered and the jury believed Mr. Bigger a criminal with a history. The defense objected and the court instructed the State to rephrase it's question in a more appropriate and acceptable fashion. While this question, standing alone, might not warrant a reversal, it was simply an indication of things to come.

## STEPHANIE NAGEL - FEDERAL COURTHOUSE

Prior to trial the court ruled the State would not be allowed to elicit any

22

testimony that appellant had been indicted or charged with one or more federal offenses. The State called Stephanie Nagel as a witness to testify about conversations she had with appellant wherein appellant had indicated his dislike for Dr. Stidham and his desire to find someone to cause harm to Dr. Stidham. During her testimony, Ms. Nagel was asked where she had met appellant. She testified that she met him in the federal courthouse building. (RT 3/16/06, p. 67)

When the prosecutor asked what she, Ms. Nagel, was doing at the federal building, there was an objection. The court called counsel to the bench and said as follows:

> THE COURT:   ...I was getting a little nervous. Has she been counseled not to get into the facts? (*Id.* at p. 67, l. 20-21)

In response, the prosecutor said she could lead the witness through the problem area. The prosecutor never answered the court's question about whether Ms. Nagel had been counseled not to go into the facts. (RT *Id.* at p. 67)

Ms. Nagel later signed an affidavit, which was filed in court, that the prosecutors in this case had never talked with her about the court's ruling and had never instructed her not to mention that appellant had been indicted on federal charges or was at the federal building as the result of federal charges.

Under the cumulative circumstances of this case, the failure to properly advise Ms. Nagel of the court's earlier rulings constituted a reckless indifference to the resulting danger of mistrial or reversal. Moreover, when the court asked the prosecutor directly whether Ms. Nagel had been counseled, the prosecutor was obliged to answer the question honestly. She failed to do so. Instead, she avoided the question and promised the court that she would lead the witness so that there would not be any other problems. (RT *Id.* at p. 67)

The prosecutor, then, inexplicably asked questions and received answers that made it clear that the Appellant was at the Federal Building. (*Id.* at p.68, l. 8-20)

The jury clearly understood that Appellant, like Ms. Nagel, was at the federal building to drop urine samples because he, like Ms. Nagel, had "some legal problems". (*Id.* at p. 73, l. 5-8)

At the conclusion of the prosecutor's direct examination, the defense had no other choice but to move the court to declare a mistrial.(*Id.* at p. 86, l. 23) Although the court expressed concern about the impression that was created, Appellant had been indicted on federal charges, the court denied the defendant's motion for mistrial. (*Id.* at p. 90, l. 17-25) Apparently, the court accepted the State's argument that Appellant should have objected more often.  (*Id.* at p. 91, l. 1-3)  The defense was concerned that more objections would cause the jury to believe that the defense was trying to hide something.

## CARMEN FERNANDEZ–OTHER ACTS

The day after Ms. Nagel's testimony, the prosecutors in this case were at it again. The State called Carmen Fernandez to testify about conversations she had with appellant prior to the murder of Dr. Stidham. During her testimony, the following questions were asked and answers given:

Q. And during these conversations you were having with Dr. Schwartz did he ever tell you who he want(sic) to be taken care of?

A. Yes.

Q. Who did he tell you?

A. Dr. Stidham.

Q. He also tell you about another doctor that he wanted to be taken care of.

A. Yes.

24

Q.    Do you know the name of that doctor?

A.    I cannot recall the name. (RT 3/17/06 p. 12, l. 9-19)

There was an objection, which was sustained, and a motion for mistrial. (*Id.* at p. 12, l. 20–p. 13, l. 3) The prosecutor explained the reason for his question as follows:

> MR. PLATT:    Your Honor, I was going to elicit there was a difference in what he wanted done between the two doctors. One he wanted killed, one he wanted harmed. (*Id.* at p. 13, l. 11-14)

This experienced prosecutor had to have realized his question was improper because it elicited other acts testimony in violation of Rule 404(a) and (b) of the *Arizona Rules of Evidence*, attempted to justify his question by suggesting that it was okay because he was going to point out that although Appellant wanted to kill one doctor, he only wanted to harm another. The State's excuse was absurd. The State had now presented improper and prejudicial testimony that the alleged hit man had a criminal history, that appellant had been charged with one or more federal offenses and wanted to kill or harm another doctor or doctors, in addition to Dr. Stidham. Even though this testimony violated the provisions of Rule 404, and was far more prejudicial than probative pursuant to Rule 403, the court denied appellant's motion for mistrial. (Id. at p. 13, l. 16) The court did order the answer stricken and admonished the jury to disregard the answer. However, the harm could not be undone.

## JEFF ENGLANDER AND EXHIBIT 27

One of the most egregious acts of prosecutorial misconduct was the testimony of Jeff Englander and introduction of Exhibit 27. Appellant and the State discussed the computer and palm pilot several times prior to trial. The State

<u>never</u> disclosed its intent to use the data from the palm pilot, and, in fact, alternatively stated it only intended (hereafter Picarretta memo) to use a memo from Appellant's Federal attorney. *Id.* Based upon the correspondence with the State, the State alternatively stated the only evidence from Appellant's computer would be the Picarretta memo.

During the testimony of Jeff Englander, the State offered Exhibit 27 into evidence and over defense objections, it was admitted. (RT 3/17/06, p. 125, l. 21) The State explained that Exhibit 27 contained information taken from appellant's palm pilot. The significance, according to the State, was that the only entry that had anything to do with addresses or personal information was an entry identifying Dr. Stidham's vehicle type and license plate number. Clearly, this evidence was prejudicial to appellant's position.

However, even though the defense had asked directly, the State had never disclosed this evidence. It's introduction came as a complete surprise to the defense. After the court had the opportunity to review correspondence from the defense, it found that the evidence had not been properly disclosed and ordered that Exhibit 27 be stricken.(RA 556) Of course, the jury had already heard this damaging and undisclosed testimony and evidence. The prosecutors knew that this evidence had not been properly disclosed, however, used it anyway thus they simply did not care. The win "at all costs" attitude pervaded the entire trial, as the State was willing to risk a mistrial or reversal rather than run the risk of an acquittal.

## LOURDES LOPEZ AND FEDERAL INDICTMENTS

Ms. Lopez testified that she had developed a personal relationship with appellant which ultimately led to their engagement in January of 2004. She admitted helping appellant obtain prescription drugs in an unlawful manner, during

the relationship. When asked why she resigned from the Pima County Attorney's Office, Ms. Lopez said that she resigned because she knew she was about to be indicted. (RT 3/21/06 p. 191, l. 5-6)  Ms. Lopez as a result, raised an almost irrefutable inference that appellant, like Ms. Lopez, was indicted in federal court.

This is precisely the type of evidence that had been precluded. Outside the jury's presence, Ms. Lopez told the court that the prosecutors had never told her that she was not to mention the federal indictments. She also said that she had specifically asked the prosecutors whether there were any areas she was supposed to avoid. The only thing she was told was that she could not testify that her ex-husband, Danny Lopez had been murdered. (RT *Id.* at p. 199, l. 1-22)  The State, again, inexplicably failed to notify its witness what evidence was inadmissible and should be avoided.

## LORRAINE HEATH AND DNA TESTIMONY

The State called Curtis Reinbold as an expert witness. Mr. Reinbold testified that he had conducted an YSTR- DNA analysis on the DNA found on the radio knobs of Dr. Stidham'a recovered Lexus. Lorraine Heath was also called as DNA expert.  She testified that she had conducted a YSTR analysis on the same DNA.  The State intended to have Ms. Heath testify that based upon the combined results of her work and Mr. Reinbold's, the random statistical probability was some astronomical number which could only be arrived at as the result of their combined efforts.

After a *Frye* hearing, the court ruled that this method was not commonly accepted in the scientific community and that the State would be precluded from offering any testimony about the combined results. (RA 554) Ms. Heath was called as a witness and ultimately testified that although she could not say, to a reasonable degree of scientific certainty, that Mr. Bigger's DNA was on the radio

27

knobs of Dr. Stidham's recovered Lexus, she could say:

> Having looked at both my data and Mr. Reinbold's data,
> I feel **there is very strong evidence that**...(RT 3/28/06 p. 119,
> l. 23-25)

Before she was able to finish her answer, there was an objection.  Once again, the defense moved for a mistrial since Ms. Heath's opinion that "there is very strong evidence" was clearly based upon the combined results of her work and that of Mr. Reinbold.

Ms. Heath testified, out of the jury's presence, that although she had been told not to mention the combined statistics, she had not been told not to offer any opinions based upon the combined results of her work and Mr. Reinbold's. (*Id.* at p. 125, l. 17-25)  The State had effectively and improperly "back doored" the court's ruling.  Since neither Mr. Reinbold nor Ms. Heath could offer an opinion to a reasonable degree of scientific certainty that Mr. Bigger's DNA was on the radio knobs of Dr. Stidham's recovered Lexus and the State was not being allowed to bring out the mathematical statistical probability, the State did the next best thing.  It elicited an opinion that there was very strong evidence that it was Mr. Bigger's DNA on the radio knobs.

Ms Heath sent one of the two prosecutors in this case an e-mail which read, in part, as follows:

> In addition, the new calculations would allow
> me to strengthen my statements made during
> the interview (the first defense interview) and
> I would now say that I thought **there was very
> strong evidence that** Mr. Bigger's DNA was
> on this item.(the radio knobs).  (See, ROA 563
> and attachments) (emphasis added)

28

This e-mail makes it clear that Ms. Heath's opinion that **there was very strong evidence that** Mr. Bigger's DNA was on the radio knobs of Dr. Stidham's recovered Lexus was based upon the combined calculations that had been precluded.

Once again, appellant was prejudiced by the prosecutor's misconduct, which violated a prior court ruling.

## DR. WINSTON'S 'ERRONEOUS TESTIMONY' AND EXPANDED REHABILITATION

Dr. Winston testified, when first called as a witness by the State, that livor mortis would become fixed in approximately twelve (12) hours. Dr. Winston also testified that based upon his observations of rigor mortis at the scene, the time of death was probably less than 12 hours. He would not or could not be any more precise. The autopsy in this case was done at 8:30 a.m. on October 6, 2004. When asked about his autopsy notes which indicated that livor mortis was still not fixed at the time of the autopsy, Dr. Winston said that the autopsy notes were simply a reminder to him about his scene observations. (RT 3/8/06, p. 188, l. 11-25) Apparently, Dr. Winston realized that if he agreed that livor was not fixed at 8:30 a.m. on October 6, 2004, the time of death would have to be after 8:30 p.m. on October 5, 2004, which would mean that Mr. Bigger could not have been responsible.

The defense called Dr. Keen, the Chief Medical Examiner for Maricopa County, to establish that autopsy notes are intended to reflect the pathologist's observations at the time of autopsy and, if there were no other notations, which there were not, any reasonably competent pathologist would interpret the notes as evidence of autopsy observations. (RT 4/11/06, p. 24, l. 3-21)

Dr. Keen was called and testified that the time of death was between 4-7 hours prior to the time of observation which was between 4:00-4:15 a.m. He also testified that he would read Dr. Winston's autopsy note as reflecting observations made at the time of autopsy.

Dr. Winston was then recalled by the defense. When asked about his earlier testimony concerning his autopsy notes, Dr. Winston admitted that he had been in "error".

On redirect examination, Dr. Winston was asked whether he had told anyone about his "mistake" prior to taking the stand. Before he could answer, the court summoned counsel to the bench. (RT 4/11/06, p. 112, l.22 - p. 113, l. 5) During this bench conference, the prosecutor admitted that Dr. Winston had told her about his "mistake" during the recess which had taken place immediately prior to his recall. She also admitted that she had not informed defense counsel that Dr. Winston was going to admit and correct the mistake he made during his earlier testimony. (RT 4/11/06, p. 119, l. 22-25) She defended her failure to disclose by asserting that she had learned about Dr. Winston's intent to correct his mistake only minutes before he was recalled and arguing that since Dr. Winston was being recalled as a defense witness, she just assumed that the defense was aware of what was about to happen.  This argument was disingenuous at best and outright dishonest at worst.

In *State v. Roque*, 213 Ariz. 193, 141 P.3d 368 (2006) the court said that it was misconduct for a prosecutor to expand the scope of an experts testimony without making appropriate disclosure.

## THE CUMULATIVE EFFECT

Appellant has provided the court with some of the more serious instances of prosecutorial misconduct, however, all are listed the Record of Appeal. A mistrial

should have been granted on at least seven different occasions, if not based upon each instance of misconduct then surely as the result of the combined effect of the continuing series of prosecutorial misdeeds. The conduct was not merely the result of legal error, negligence, mistake, or insignificant impropriety. Taken as a whole, the conduct amounted to intentional conduct which the prosecutors knew to be improper and prejudicial. *See State v. Hughes.*

Appellant respectfully urges this court to reverse his conviction and remand the matter with directions that the case against him be dismissed with prejudice. Retrial is barred by the double jeopardy provisions of both the State and Federal Constitutions. In the alternative, Appellant respectfully urges this court to order that he be awarded a new trial and remand the matter with directions that the trial court determine whether retrial is barred. *State v. Hughes, State v. Jorgenson* and *State v. Minnett*, 203 Ariz. 431, 55 P.3d 724 (2002)

### III.    Did The Trial Court Err By Not Granting a Mistrial When Ms. Heath And The State Completely Disregarded The Trial Court's Order And Had Ms. Heath Testify In Direct Violation To The Order?

The Trial Court ruled the State was precluded from soliciting testimony based upon the combined results of Ms. Heath and Mr. Reinbold. Despite that ruling, the State elicited testimony from Ms. Heath that "there was very strong evidence that Mr. Bigger's DNA was on the radio knobs of the Lexus." (RT 3/28/06, p. 119, l. 23-25)

The defense objected immediately, and moved the court to declare a mistrial. This motion was denied. The facts surrounding Ms. Heath's improper testimony have been set forth in the Statement of Facts and as part of appellant's argument concerning prosecutorial misconduct.

31

In *State v. Lamar*, 205 Ariz. 431, 72 P.3d 831 (2003) (*cert. den.*) 541 U.S. 940 (2004) (opinion supplemented as to sentencing issues) 210 Ariz. 571, 115 P.3d 611 (2005). The declaration of a mistrial, although the most dramatic remedy for trial error, is necessary when "justice will be thwarted if the current jury is allowed to consider the case." The court went on to say:

> The trial court must consider two factors in determining whether to grant a motion for mistrial based on a witness's testimony: (1) whether the testimony called to the jurors' attention matters that they would not be justified in considering in reaching their verdict and (2) the probability under the circumstances of the case that the testimony influenced the jurors. *Id*. at 839, 439.

Both prongs of the test in *Lamar* are met. Ms. Heath's testimony called to the juror's attention matters they were not justified in considering. There was a court ruling that the combined methodology being utilized by Ms. Heath was not commonly accepted in the scientific community and was, therefore, inadmissible.

Given the time line, the DNA evidence was crucial. The State recognized this and elicited the combined results testimony from Ms. Heath. Ms. Heath's testimony, given in violation of the court's prior ruling, had to influence this jury since it was the only physical evidence connecting Mr. Bigger to the murder of Dr. Stidham. The motion for mistrial should have been granted. Justice was thwarted and reversal is required.

**IV.** **Did The Trial Court Err By Allowing Into Evidence The Hearsay Testimony of Jennifer Dainty And Dr. Jason Lee?**

The State did not produce a single witness to testify that Ronald Bigger was present at the medical complex where Dr. Stidham's body was found on October 5,

2004.  It was the State's theory Mr. Bigger was wearing scrubs at the time of the murder.  To support their theory, several witnesses were called and testified they saw a man wearing scrubs in the parking lot area of the complex during the early evening hours of October 5, 2004. The description of this man or men varied from witness to witness.

Becky Carr, who worked at the complex, testified that late in the day a man walked into her office.  She described him as of either Mexican or Hispanic descent, light olive colored skin (RT 3/9/06 p. 12, l. 24-25), 5'6" to 5' 7', black hair, short and wearing black or dark blue scrubs. (RT *Id.* at p. 21, l. 12-14)

Danielle Garner testified she saw a man in the parking lot in the late afternoon or early evening hours of October 5, 2004. She described this man as tall and skinny with black busy hair. (RT 3/10/06 p. 17, l. 1-2)  She also testified she had seen Mr. Bigger on TV and the man she saw did not look like Mr. Bigger. (*Id.* at p. 17, l. 23–p. 18, l. 11)

In an effort to persuade the jury that Mr. Bigger was the man in scrubs in the parking lot, the State used hearsay statements made to Dr. Jason Lee and Ms. Jennifer Dainty. Dr. Lee testified that he was at the complex during the evening hours of October 5, 2004, attending a lecture by Dr. Stidham.(RT 3/10/06 p. 27 l. 1) He arrived at approximately 5:50 p.m. and saw a person in the parking lot. (*Id.* at p. 28, l. 5-12) The man was sitting on a curb and wearing aqua blue scrubs. (*Id.* at p. 28. l. 23) The defense objected to the introduction of any hearsay statements made by this man to Dr. Lee. The State argued that the statements were being offered to prove identification. (*Id.* at p. 30, l. 6)  The Court, in error, overruled the defense objection and allowed Dr. Lee to testify that the man directed him to Dr. Stidham's office (*Id.* at p. 30, l. 25) and said pizza had recently been delivered to that office. (*Id.* at p. 31, l.5)

33

Dr. Lee admitted that he had told the police this man may have had facial hair. (*Id.* at p. 37, l. 6) He also testified that he had told the police that he had seen pictures of both Dr. Schwartz and Mr. Bigger and that neither one resembled the man. (*Id.* at p. 37, l. 23)

Jennifer Dainty testified that on October 5, 2004, she was working as a clerk at a QuickSmart located at First and River. (RT 3/14/06 p. 29, l. 10-14) This market was nearby the complex where Dr. Stidham's body was found. At approximately 6:00 p.m., a man came into the store wearing blue scrubs. (*Id.* at p. 33, l. 18-23) Ms. Dainty described this man as average height and weight, brown hair and darker skin tone. (*Id.* at p. 34, l. 23-25)

Given the court denied Appellant's motion to preclude Ms. Dainty's hearsay statements. She testified as follows: (RA 516)

> A.    Yeah. He had said he was at a meeting, and they
>       were serving pizza, and he didn't like pizza, so
>       he was in my store to look for something else
>       to eat. (*Id.* at p. 40, l. 5-8)

Ms. Dainty also said she allowed the man to use the phone. (*Id.* at p. 44, l. 8-10) Two days after the murder, Ms. Dainty identified Mr. Bigger's photo from a line-up she was shown by the police as the man in her store. (*Id.* at p. 5-11)

## STANDARD OF REVIEW

A court's ruling on the admissibility of hearsay evidence is reviewed for an abuse of discretion. *State v. Valencia*, 186 Ariz. 493, 498, 924 P.2d 497, 502 (App. 1996). Confrontation clause violations are, however, reviewed *de novo*. *Lilly v. Virginia*, 527 U.S. 116, 136-37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) Courts have held in deciding if hearsay evidence violates the Confrontation Clause, a court should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of that clause.

34

## ARGUMENT

Hearsay is a statement, other than the one made by the Declarant, while testifying at trial, that is offered to prove the truth of the matter asserted. Rule 801(c) Arizona Rules of Evidence  However, a statement is not hearsay if the Declarant testifies at trial, and the statement is "one of identification of a person made after perceiving the person." Rule 801(d)(1)( c) Arizona Rules of Evidence.

The State relied on Rule 801(d)(1)(L) to admit Dr. Lee's testimony about his conversation of the man in scrubs. However, this rule does not apply and the trial court erred.

If Mr. Bigger is seen as the declarant to Ms. Dainty, he did not testify and was not subject to cross examination. If, on the other hand, Ms. Dainty is the declarant, the statements made to her by Mr. Bigger and her testimony about those comments, cannot fairly be characterized as ones of "identification of a person made after perceiving the person". The trial court, in denying the Appellant's motion to preclude, also fell back on the time worn hearsay exception, "Not offered the truth of the matter", which was error by the trial court. The court commented, the statements were not being offered to prove pizza was served. In this instance, that logic by the court was flawed.

In *State v. Kevil*, 111 Ariz. 240, 527 P2d 285 (1974), the court relying upon *State v. Taylor*, 99 Ariz. 151, 407 P2d 106 (1965), stated since an identification made prior to trial is more significant than one made in the courtroom, the testimony of one who has observed such an incident is admissible.

In *State v. Romanosky*, 162 Ariz. 217, 782 P2d 693 (1989), the defendant was charged with first degree murder, and the victim's wife, who was present when her husband was shot and killed, could only provide a very sketchy description of the assailant. However, on the same day as the murder, there was

35

also an armed robbery that the police believed the defendant had committed. Based upon the sketchy description provided by the homicide victim's wife and descriptions of witnesses to the armed robbery, an officer testified about a "composite" identification. This composite identification provided a very specific and detailed description of the male and female perpetrators.

In this case, the State created a "composite" conversation about pizza and relied upon independent comments made to Ms. Dainty and Dr. Lee to make it appear the same person made each of the comments, in order to prove that Mr. Bigger was in and around the complex parking lot at or near the time of the murder. The State's only justification for the introduction of this testimony was that it was being offered to prove identity. However, the rule having to do with the introduction of identification testimony clearly does not apply. The testimony of both Dr. Lee and Ms. Dainty was hearsay and should have been precluded.

This court has commented that a violation of the confrontation clause may be harmless error. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 196 S.Ct. 1431, 89 L.ED.2d 74 (1986); *State v. Salazar*, 182 Ariz. 604, 610, 898 P.2d 982, 988 (App. 1995) (quoting *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431). Evidence admitted is harmless in a criminal case only when the reviewing court is satisfied beyond a reasonable doubt that the error did not impact the verdict. *State v. Fulminante*, 198 Ariz. 485, 500, ¶ 49, 975 P.2d 75, 90 (1999)

It cannot be said that the introduction of this hearsay testimony was harmless error, as no other witnesses could place Mr. Bigger at the complex shortly before the murder of Dr. Stidham, or that the jury ignored the improperly admitted hearsay evidence regarding the pizza conversations in arriving at a verdict, thus, reversal is required.

36

## V.   Did The Trial Court Err In Precluding Appellant From Impeaching Lourdes Lopez With Paul Skitzki and Dave Wickey's Testimony?

The State sought and received a ruling from this court that the testimony of Paul Skitzki would be precluded.  (RA 617) In addition, the State also received a ruling that DEA Agent Dave Wickey could not be called by the Appellant as a surrebuttal witness to impeach the testimony of the State's witness Lopez.  The State filed this motion, after allowing Appellant to elicit an answer from  Ms. Lopez on cross-examination that the State knew would be asked, so the State could take advantage of that answer, thus, allowing the Jury to have heard evidence that the State knew should be construed as deceptive, misleading and/or outright false. (RT 3/22/06, p. 105, l. 18-p. 106, l. 22)

The Appellant also filed a notice of disclosure of DEA Agent Dave Wickey on April 11, 2006.  That disclosure made it very clear that Agent Wickey would be testifying that Ms. Lopez had made numerous false statements to the Jury regarding her reason for both leaving the Pima County Attorney's and her knowledge of the DEA investigation and when she had obtained that knowledge. This was the subject of an offer of proof relative to the DEA reports that were prepared on October 30, 2001 and July 19, 2002, by Agent Wickey.

The issue as to Mr. Skitzki was also extensively litigated and that the State made the argument that Mr. Skitzki and Agent Wickey should be precluded pursuant to Rule 608(b).

Rule 608(b) should not, however, have provided the remedy sought by the State.  Further, misuse of Rule 608(b) may arguably be in bad faith on the part of the State, as the State's motion was untimely as to Mr. Skitzki.  The State's motion violated Rule 16.1(b) and ( c), of the Arizona Rules of Criminal Procedure, and violated the procedural due process rights of the Defendant.  The State knew for

37

months the Appellant had intended to call Mr. Skitzki as a witness to impeach Ms. Lopez.

## A. The Motion filed by the State was in bad Faith.

This court should have concluded it was bad faith by the State to move to preclude Mr. Skitzki, after knowing full-well of the Appellant's announced intention. The untimely motion subverted the truth-seeking function and violated the substantive due process rights of Appellant to present a defense, pursuant to the Sixth and Fourteenth Amendments of the Constitution. *See, Chambers v. Mississippi, State ex. Rel.* 410 U.S. 284, 93 S.Ct. 1038 (1973), *Romley v. Superior Court,* 172 Ariz. 233, 836 P.2d 445 (1992).

Rule 608, also, cannot be used under any circumstance to assert preclusion of a witness. Credibility was the only issue raised, thus the testimony goes to weight, not the admissibility of Ms. Lopez, as her credibility was for the jury to determine. *State v. McDaniel*, 136 Ariz. 188, 665 P.2d 70 (1983).

The court should have viewed the State's motion as a two-fold issue, dealing with the <u>prove-up</u> of prior inconsistent statements and/or non-statements, not offered for the truth of the matter but for the fact that the witness made <u>prior</u> inconsistent statements.

The information to impeach Ms. Lopez was, also, of a significant nature, as it applied directly to what the jury might believe about the truth of what she had testified regarding. She had stated she did not take the threats by Appellant seriously but she did, in fact, take him serious enough to have allegedly reported them to a Deputy County Attorney. Mr. Skitzki denied that took place and so stated under oath, at a previous hearing.

The very basis of the defense raised by Appellant was that he made comments to various women including Ms. Lopez, however, no one took the

comments seriously. The implication from the questioning of Ms. Lopez was that she did in fact take them seriously because she allegedly reported them to Mr. Skitzki. This makes the impeachment significant in nature.

The defense had an obligation to raise these two inconsistent positions taken by two separate witnesses as to Ms. Lopez's testimony. It was clearly impeachment testimony, with prove-up witness being offered to attack the credibility of not only Ms. Lopez but, more importantly, the motive and importance she placed upon the statements made by Appellant, and her false reasons for hiding the DEA investigation. (RT 4/12/06, p. 15-18)

The court was told that defense counsel was ethically obligated to bring this inconsistent testimony to the Jury's attention. One, also, should argue that the State had that same obligation to present that same evidence and leave it up to a jury to determine who, in fact, is being truthful, Ms. Lopez or Mr. Skitzki. In that ethical duty, the State failed and the court should reverse the Appellant's conviction on this issue standing alone, as this was not harmless error. (RA 502)

## VI. Did The Trial Court Err In Precluding Evidence Of Daphne Stidham's conduct On The Night Of The Homicide?

The Appellant did not notice a third-party defense as to Ms. Daphne Stidham. The State, however, filed a motion to preclude a non-existing third-party defense, and preclude the Appellant from presenting any evidence regarding the incriminating conduct of Ms. Stidham the night of her husband's murder. The State requested that Appellant not make any statements, eliciting any testimony, presenting any evidence or make any argument to the Jury that would suggest Ms. Stidham, not Appellant had the ability, opportunity or motive to have committed the murder. (RA 448)

39

The Appellant responded by arguing that evidence of Ms. Stidham's conduct, her statements and a Will found at the home of Dr. and Mrs. Stidham, when the Sheriff's Department entered that home on the night of the homicide, was highly suspect and was evidence that should have been presented to the Jury. (RA 458)  The court erred in granting the State's motion to preclude that testimony. The lead detective, Jill Murphy, agreed that Ms. Stidham was a possible suspect at commencement of this investigation. Further, that there was clear evidence found at the scene by the Deputy Sheriff who entered the home, indicating very suspicious behavior by Ms. Stidham. (RT 90, See Motion to Remand, Exhibit 1-4 reports of Deputies Ledesma, Moreno, Stevens and Othick)

The State argued Ms. Stidham had nothing to do with the death of her husband and, therefore, no evidence and/or testimony was appropriate relative to her bizarre and strange conduct which indicated inculpating conduct on her part. The trial court's ruling precluding that evidence was flawed for at least two reasons.

First, the State obviously had an interest in denying that any other person, besides Appellant might be responsible.  Clearly, any evidence that a third person may have been responsible would tend to exonerate both the Appellant and his co-defendant, Ronald Bigger.

Second, the State took advantage of prior trial court rulings which prevented Appellant from acquiring information which would substantiate a third-party claim with respect to Ms. Stidham. (RA 207, 299, 294 and 334 )  The Appellant was not allowed to interview Ms. Stidham.  The defense has been denied access to information from Ms. Stidham which would have supported or contradicted a third-party culpability defense.  The State suggested that Appellant could not meet a threshold burden of establishing relevancy, and under the above circumstances,

40

that argument was unjust and prejudicial.

Importantly, and as previously discussed, the *Prion* court made it clear that there was no "special higher standard of admissibility" for third-party culpability evidence.  Moreover, in *Gibson*, when the court stated: "To be relevant, the evidence need only <u>tend</u> to create a reasonable doubt as to the defendant's guilt", was speaking of the very type of evidence that was precluded in the Appellant's case.

Clearly, any evidence which suggests that Ms. Stidham, or any other third person for that matter, might have been responsible for the death of Dr. Stidham, "tends" to create a reasonable doubt as to the Appellant's guilt.

The relevance of this evidence has been established by demonstrating that if Ms. Stidham were responsible, this certainly, and at the very least, <u>tends</u> to create a reasonable doubt about the Defendant's own guilt.

In addition, by excluding this evidence, the Appellant's right to cross examine the State's witness was infringed upon.

A.  <u>**THE TRIAL COURT'S RESTRICTIONS ON EXAMINING POLICE OFFICERS REGARDING MS. STIDHAM"S CONDUCT, DEPRIVED APPELLANT OF HIS SIXTH AMENDMENT RIGHT OF CROSS-EXAMINATION**</u>

The Sixth Amendment guarantees all criminal defendants the right to confront adverse witnesses through cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed..2d 934 (1965). This is a fundamental right which is applicable to State proceedings through the *Fourteenth Amendment*.

As a consequence of the trial court's decision not to allow evidence of the conduct of Ms. Stidham, this precluded the Appellant from eliciting any testimony relating to that issue was error and denied Appellant the opportunity for a full and complete cross-examination of officers who were first to arrive at the Stidham

41

home.

The State argued that because the trial court precluded the non third party defense as to Ms. Stidham, any evidence as to her conduct at the home, was irrelevant.

Evidence need not be sufficient to prove a finding of an ultimate fact to be relevant, it need only render an inference more probable. *Arizona Practice: Law of Evidence* § 81, Udall, Livermore, Escher, and McIlvain (3rd. Ed. 1991) See also, *Reader v. General Motors Corp.* 107 Ariz. 149, 155, 483 P.2d 1388, 1394 (1971) ("It is not necessary that such evidence be sufficient to support a finding of an ultimate fact; it is enough if the evidence, if admitted, would render the desired inference more probable.")

Because the holding of the trial court improperly reduced the State's burden on an element of the offense, allowing the evidence to focus only on one potential theory as to the victim's death, preclusion of Appellant from cross-examining detectives as to Ms. Stidham's conduct, unreasonably limited her cross-examination. *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980). Testimony as to an element of the offense, i.e. the cause of death, was entirely relevant and preclusion of testimony on that issue is reversible error. *State v. Towery* 186 Ariz. 168, 20 P.2d 290 (1996).

The trial court erred in precluding this cross-examination and deprived Appellant of his right to cross-examine witnesses.

## VII. Did The Trial Court Err In Precluding Appellant's Character Evidence, As Not Being Relevant?

The State filed a motion captioned, Motion To Preclude Evidence of Character. (RA 478) The Appellant responded by stating the proposed testimony was not character evidence but instead related to the Appellant's practice and the

42

State's theory of the case. (RA 487) The motion to preclude character evidence was granted. (RA 487)

The Appellant's Rule 15.2 (b) disclosure, put the State on notice of the purpose of the "character" evidence to be offered at trial.

> "This testimony will be used, in part, as character evidence, however, will principally be offered to refute the theory of the State that the Defendant caused the murder of the victim, Dr. Brian Stidham, as the result of his inability to acquire patients and have an on-going successful medical practice, for which he blamed Dr. Stidham." (RA 431)

The State argued that the Appellant's competency as a medical doctor was not in question, nor an element of crimes for which he had been charged. The State agreed that the Appellant was a competent medical doctor who possessed the necessary skills to practice in his area of medical expertise and had the ability to attract and sustain a medical practice. The State argued that, whether the Appellant was a competent physician or not, was not an issue that needed to be determined by the jury. The evidence as to whether the Appellant performed competent medical skills upon his former patients was not relevant, thus, his "character" as a competent medical practitioner was not a material issue.

The Appellant argued that this question should not be limited to the degree of success the practice was enjoying at the time of Dr. Stidham's murder, but also involved a related but significantly important consideration of the anticipated future success and viability of the Appellant's practice. The Appellant, for that reason, should not have been precluded from presenting this important character and competency evidence, as same was relevant and refuted at basic theory of the State's case.

43

## STANDARD OF REVIEW

A court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Valencia*, 186 Ariz. 493, 498, 924 P.2d 497, 502 (App. 1996)

## ARGUMENT

The State's theory of the case was that Appellant's practice was losing money and not doing well.  The State took the position that the Appellant was angry at Dr. Stidham because Dr. Stidham was stealing his pediatric eye patients. The State, in an attempt to prove motive, presented evidence which called into question, both the competency of Dr. Schwartz as a physician and the viability of his medical practice.  The State also presented evidence that Appellant was addicted to prescription drugs and was, therefore, less effective as a physician.  The Appellant attempted to offer evidence of his character, conduct and competency to counter these allegations.

Relevant evidence means evidence having any tendency to make the existence of <u>any</u> <u>fact</u> that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  *See*, Rule 401, Arizona Rules of Evidence.  Evidence is "relevant if it has any basis and reason to prove a material fact and issue." *State v. Kennedy*, 122 Ariz. 22, 592 P.2d 1288 (1978) *See*, also *State v. Fulminante*, 193 Ariz. 485, 975 P.2d 75 (1999).

This evidence of character and competency would not have been confusing to the jury, nor would they have been unable to comprehend its significance.  The court's order precluding evidence that was favorable to the Appellant effectively denied the Appellant his opportunity to present a defense.  This ruling was in error by the trial court, and requires reversal.

## VIII. <u>Did The Trial Court Err In Refusing To Appoint A Polling Expert To Assist Appellant With Properly Evaluating The Media Coverage Of His Case?</u>

44

Appellant requested funds to hire a polling expert, O'Neil Associates, Inc., to poll the potential jury pool in Pima County and assist both the Appellant and the trial court. (RA 200). Appellant filed a supplement to the request.( RA 204).  The polling data would have measured the extent of pretrial publicity and its impact upon the Appellant's potential jury pool. ( RA 200), *Exhibit 2.*  Without question the polling data compiled by O'Neil Associates would have assisted the trial court in determining if Appellant could have received a fair trial in Pima County.

The trial court denied the request for funds to hire O'Neil Associates. (RA 231). In denying the request, the trial court listed three reasons it felt the polling data was not useful and the proposed survey would be irrelevant. *Id.*  In response to the denial, Appellant filed a motion to reconsider and attached a letter from O'Neil Associates. (RA 292).  The letter specifically addressed each and every concern expressed by the trial court. *Id.*  In fact, the letter expressed "concern" because the ruling was based on "several seriously flawed factual assumptions." *Id.*  Despite Appellant's expert refuting each and every one of the trial court's reasons for denying the request for a polling expert, the trial court denied the motion for rehearing and affirmed its denial of Appellant's request for a polling expert. (RA 346).

A defendant is entitled to the appointment of an expert for pretrial matters. *Jones v. Sterling,* 210 Ariz. 308, 110 P.3d 1271 (2005).  The denial of a request for the appointment of an expert can violate the Due Process Clause of the Fourteenth Amendment. *Id. citing Ake v. Oklahoma,* 407 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).  A polling expert would have been a great assistance to the trial court in deciding Appellant's motion to change venue.  The trial court erred in denying the Appellant's request to appoint one.

45

Had the trial court granted Appellant's request for a polling expert, it would have had the benefit of an unbiased survey conducted by an expert. The trial court then would have known, without any guess work, how many people heard of Appellant's case and if each person surveyed held any biases about the case.

This error is even more egregious considering the expert could have assisted the court in ruling on Appellant's several motions to change venue and whether or not Appellant met the "presumed prejudice" prong of the test.

## IX.  Did The Trial Court Abuse Its Discretion And Erred In Denying the Appellant's Repeated Motions To Change Venue?

The Appellant moved for a change of venue on several different occasions, starting during pretrial litigation and a renewed motion at the beginning of trial. The trial court denied Appellant's motion for change of venue on all occasions. The trial court consistently took the position the Appellant could, would, and did receive a fair trial in Pima County. The Appellant did not receive a fair trial in Pima County. The media coverage of Appellant's case was relentless, often inaccurate, and involved issues inadmissible at trial. The articles and news reports often covered Appellant's personal life, his federal charge, his problems with prior employers, and his problems with the Medical Board. Most, if not all, of this information was inadmissible at trial, painted Appellant in a less than favorable light, and tainted the potential jury pool in Pima County.

The media coverage was brash and unrelenting and often referred to inadmissible evidence and allowed a potential jury pool to read or hear stories about Appellant. For instance, several articles referred to the Appellant in a less than favorable light and referenced inadmissible evidence. (RA 134). One of the articles attached centers solely around Appellant's medical license. It states other doctors referred to Appellant as a "loose cannon" and question why he still had his

46

medical license. *Id.* Another article in the same supplement, stated "Schwartz, his character is such that the medical community suspected him from the very beginning." *Id. Tucson citizen 10/16/04.* Another article did not focus on the criminal charges, but rather centered solely on Appellant's personal and professional problems. *Id. Tucson Citizen 10/19/04.* Another article again focused primarily on Appellant's personal problems and a lawsuit filed against him by his former employer. *Id. Tucson Citizen 10/22/04.* Many of the articles in the supplement also centered around Appellant's federal charges, laying out in detail the charges and plea agreement. *Id.* All of the above information was inadmissible at trial.

The coverage continued and the number of stories continued to be astounding. (RA 161). In the months of May 2005 through June 2005, 166 television stories aired. In essentially the same time period, 23 stories were run in the Tucson Citizen, Arizona Daily Star, and the Tucson Weekly. *Id.* Stories continued to run that showed Appellant in the jail jumpsuit and focused on his custody status and bond amount. The media coverage continued unabated and the Appellant continued to make the trial court aware of it. (RA 192) (RA 287), (RA 288),( RA 309).

On December 1, 2005, the trial court denied the Appellant's motion to change venue. ( RA 346). The trial court found that 84.3% of the media coverage was "factual in nature" and that although the publicity and coverage was steady and voluminous, it did not rise to the level of presumed prejudice. *Id.*

Compounding the prejudice was the media coverage of Appellant's trial. The Appellant filed motions to not only keep the cameras from the courtroom, but to bar the media completely from his trial pursuant to Rule 9.3(b) of the *Arizona Rules of Criminal Procedure.* (RA 293) The trial court likewise denied these

motions. The atmosphere that was created in the courtroom became a media spectacle and the carnival atmosphere permeated all the proceedings from the indictment through the trial and verdict. As an example, the television channels provided a "live-break in" for coverage of the verdict and held a post-verdict, impromptu news conference with the jurors.

To prevent this prejudicial media coverage, Appellant filed a renewed motion to change venue on the eve of trial, February 21, 2006. (RA 493). The articles addressed inadmissible and prejudicial information. For instance, one article portrayed life as an inmate behind "Dupnik's 'Graybar Hotel'" and referred to Appellant as one of its most high-profile guests since his arrest. *Id. Arizona Daily Star, 2/13/06.* Another article put the media's spin on one of Appellant's defenses. It stated that an amateurish hit man killed the victim and the alleged carjacking was staged. *Id. Arizona Daily Star, 2/12/06.* Another article, perhaps the most prejudicial of the three, read "The man accused of stabbing Dr. David Brian Stidham to death last year showed up in court with a black eye Monday afternoon, and his attorney wondered if his co-defendant, Dr. Bradley Schwartz, was behind it." *Id. Arizona Daily Star, 12/6/05.* The article went on to quote the co-defendant's attorney saying she is concerned Appellant did it and that Appellant has already attempted to "set someone else up for the murder." *Id.* The media also continued to report and write about Appellant's prior drug charge, even though it was held to be inadmissible at trial.

Appellant then supplemented his renewed motion to show the trial court the media coverage was growing, not dissipating. ( R.A. 506). In this supplement alone, the print media had run nine (9) stories in seven days. One of the articles was a preview of the trial. *Id. Exhibit 1, Arizona Daily Star, 2/26/06.* It listed potential witnesses which it called "the cast of characters," a time-line, and finally

a picture of Appellant in handcuffs. *Id.*

On April 18, 2006, Appellant again filed a supplement to the motion to change venue. (RA 607). Appellant cited all the ongoing print media coverage as well as internet coverage for the entire trial. *Id.* The stories covered the trial, including hearings, arguments and rulings that occurred outside the presence of the jury. Some stories covered the trial court's ruling on whether Appellant would have to wear a "shock belt," testimony about previously precluded drug indictment, the motions for mistrials, and stories about Dennis Walsh, the third party Defendant. *Id.*

The media coverage not only did not subside leading up to trial and during trial, it actually increased. The coverage, with the stories previewing the trial and covering inadmissible evidence and arguments of the attorneys, prejudiced the Appellant.

It is fair to say the trial court warned the jury about the media coverage. Unfortunately, that warning was not enough. Even more concerning was during the entire course of the trial not one single juror ever made any acknowledgment that he or she had inadvertently, accidentally or otherwise heard anything about the trial in either print, electronic, or video media. The fact that jurors stated at first they could avoid the media coverage is troubling, and the fact that not one said he or she encountered any media coverage defies belief.

## STANDARD OF REVIEW

Appellate courts will not overturn a trial court's decision to deny a motion for change of venue, absent an abuse of discretion and prejudice to the Appellant. *State v. Murray,* 184 Ariz. 9, 906 P.2d 542 (1995). When reviewing a trial court's decision denying a change of venue, the Appellate Court must evaluate the totality of the circumstances from the entire record to determine if the publicity was so

49

great as to have resulted in an unfair trial. *State v. Jones,* 197 Ariz. 290, 4 P.3d 345 (2000).

## ARGUMENT

The media publicity created an inextricable link between the Appellant and the murder, thus, making the prospective jury pool prejudiced against the Appellant prior to trial. In fact, ninety percent (92 %) of the potential jurors were aware of the case and the facts.

Prejudice may be assumed if the publicity was so "extensive or outrageous that it permeated the proceeding or created a 'carnival-like atmosphere.'" *State v. Blakely,* 204 Ariz. 429, 65 P.3d 77 (2003); *quoting State v. Atwood,* 171 Ariz. 576, 832 P.2d 593 (1992). Motions for a change of venue are governed by Rule 10.3 of the *Arizona Rules of Criminal Procedure:*

The purpose of the rule is to assure a Defendant is tried by a fair and impartial jury. *Blakely, supra.* Actual prejudice can result from pretrial publicity as well as the trial publicity. In Appellant's case, he received an unfair trial due to the ongoing publicity, both pretrial and during the trial.

The party moving for a change of venue must prove the dissemination of the prejudicial material will result in the party being deprived of a fair trial. Prejudice can be proven in two ways: (1) it may be presumed if "pretrial publicity [is] so outrageous that it promises to turn the trial into a mockery of justice or a mere formality" or (2) that the jury was actually influenced by the pretrial or trial publicity. *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993). Both of these standards are very difficult to achieve. In the case of presumed prejudice, courts rarely presume prejudice and it is difficult to show a jury was actually influenced by the publicity because juries are hesitant to come forward and acknowledge trial publicity, especially after a verdict. Simply put, a change of venue was necessary

to assure the Appellant received a fair trial. If a change of venue is not appropriate in Appellant's case, it will never be appropriate in Pima County.

**A.    The media coverage was so pervasive and unrelenting that prejudice should have been presumed and the trial court should have granted a change of venue.**

When the media coverage is so pervasive, extensive and so outrageous that it permeated the proceedings or created a carnival-like atmosphere, the courts presume prejudice "without a particularized examination of the publicity's effect on the jury." *State v. Atwood,* 171 Ariz. 576, 832 P.2d 593 (1992); *citing State v. LaGrand,* 153 Ariz. 21, 734 P.2d 563 (1987). The fact the publicity was voluminous, does not alone deny a Defendant a fair trial. *Id.* Appellate courts have refused to presume prejudice when the publicity was "primarily factual and non-inflammatory or if the publicity did not occur close in time to the trial." *State v. Davolt,* 207 Ariz. 192, 84 P.3d 456; *quoting State v. Nordstrom,* 200 Ariz. 229, 25 P.3d 717 (2001). The media coverage of Appellant's case actually increased leading up to trial and many times contained information or evidence that was not admissible at trial or was not going to be used at trial. The trial court should have found a presumption of the prejudice and granted a change of venue.

The media coverage of Appellant's case was so pervasive and prejudicial, the only way Appellant was going to receive a fair trial was if it was moved from Pima County. The media coverage, including reports, interviews, and witness statements put forth the media's interpretation of the homicide. Most importantly, the media coverage was undeniably slanted to portray the Appellant's guilt and involvement in the homicide. For instance, the television broadcasts referred to the Appellant as the "doctor killer" and the "accused killer who hired a hitman."

The trial court erred in denying Appellant's motion to change venue and a

51

fair trial did not take place.

### X.    The Trial Court Abused Its Discretion And Erred In Denying The Appellant's Motion To Sequester The Jury.

Appellant brought a motion to sequester the jury based upon the pretrial publicity and media coverage. ( RA 331)  Appellant also argued the media coverage would continue and increase during the trial of this matter. *Id.* Despite the fact the publicity and media coverage did in fact increase during the trial, the trial court denied Appellant's motion to sequester the jury.  One only needs to look at the current media coverage for the Appellant's co-defendant's trial which started on March 14, 2007, to see the high level of media coverage.  Appellant respectfully submits the media coverage for his trial was far greater.

The trial court refused to move the trial from Pima County despite the aforementioned prejudice. Appellant continued to attempt to limit the prejudiced influence the media had on the jury. Appellant filed to have the cameras removed from the courtroom (RA  610) objected to the electronic coverage of the trial (RA 415, 419) and objected on the first day of trial to the cameras. (RT  3/7/06, p.4 l. 11 through p. 6, l. 16)

Despite these attempted measures, the media coverage invaded the jury. One of the jurors was actually excused because she had brought a newspaper with coverage of the trial, to the jury room. (RA 603, 604) The news coverage was unavoidable. The only way to assure the jury was not affected by the prejudicial media coverage was to sequester the jury. The media coverage that permeated Pima County and that persisted throughout the entire trial mandated the jury should have been sequestered in this case.

The trial court has broad discretion on whether to sequester the jury. Publicity is a chief factor the trial court should consider when making this

determination. *State v. Getzler,* 126 Ariz. 60, 612 P.2d 1023 (1980).

As the publicity of the case was extensive and continued leading up to the trial and throughout the trial. All Tucson news channels covered the trial daily at all news slots. i.e. morning, lunch, evening, and nightly news. Court TV had live coverage of the trial on the internet. Both newspapers carried daily stories during the trial, recapping and summarizing the testimony during that day. Most alarming, the media, the newspapers and television, summarized the majority of the arguments and rulings that occurred outside of the jury during the trial. Given the media coverage, it can hardly be believed the jurors went home at night and were able to avoid all media coverage of the trial.

The proper way to assure Appellant received a fair trial and the jury did not hear or read the media coverage, was for the trial court to sequester the jury. The Appellant did not receive a fair trial and remand for a new trial is appropriate as a result of the courts error.

## XII.  The Trial Court Erred In Denying Appellant's Request To Have The Jury Decide Appellant's Rule 20 matter.

The State is required to prove a defendant's guilt beyond a reasonable doubt and a criminal defendant is not required to present any evidence or testify in his own behalf.

## STANDARD FOR REVIEW

We review issues regarding the interpretation of federal and Arizona constitutional provisions *de novo. State v. McCann,* 200 Ariz. 27, 28, ¶ 5, 21 P.3d 845, 846 (2001)

## APPELLANT'S MOTION FOR A RULE 20 JURY DECISION

A defendant is entitled, pursuant to *Rule 20* of the *Arizona Rules of Criminal*

53

*Procedure*, to test the sufficiency of the State's case by asking the trial court to make a determination of whether or not the State has presented substantial evidence of guilt. *Rule 20* was drafted in order to preserve the defendant's right to test the sufficiency of the State's case <u>before</u> requiring him to decide whether or not to present his or her own evidence or testify on his or her own behalf.

A defendant is entitled to have a jury, not a trial court, decide this all important question of whether or not the State's proof is adequate.

The comment to *Rule 20* provides, in part, as follows and is dispositive to the jury verdict issue:

> The rule requires that the decision on such motion be made with all possible speed <u>after the state has rested its case</u>. At this point the defendant must decide whether or not to defend himself affirmatively. He should not be forced to make his decision in ignorance of the sufficiency of the state's case. See *State v. Villegas*, 101 Ariz. 465, 420 P.2d 940 (1966). (emphasis added).

The comment to *Rule 20* makes several important observations. First, the Defendant is entitled to test the sufficiency of the State's evidence as soon as the "State has rested its case". Second, this decision should be made expeditiously since the Defendant is now in a position of having to decide whether or not to present evidence or testify on his own behalf. Finally, the comment points out that a defendant should not be forced to make this decision in ignorance of the sufficiency of the State's case. The reasoning is sound. However, the jury, not a trial court, should make the critical decision of whether or not the State's evidence is sufficient to warrant a conviction.

The problem with Rule 20 of the Arizona Rules of Criminal Procedure is that although well-intended, it allows a judge, rather than a jury, to decide whether the State's evidence, and only the State's evidence, is sufficient to establish the

defendant's guilt beyond a reasonable doubt.  Moreover, the Rule provides that this decision is to be made based upon a standard of "substantial evidence", rather than the constitutionally mandated standard of beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556(2002), *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, 124 S.Ct. 2531 (2004) all make it clear that a jury, rather than a trial judge, has to decide whether there are aggravators or enhancement factors present in a particular case.  And, the proper standard to be applied is beyond a reasonable doubt.

The Appellant requested the court to make that ruling, prior to the trial commencing, for a jury determination of Rule 20.  (RA 154)  That request was denied by the court.  (RA 182)

This request was unusual, given traditional criminal law.  However, was the only way to ensure the Appellant's right to have a jury determine the sufficiency of the State's evidence.  The Appellant re-filed this motion at the conclusion of the State's case, (RA 566), and again the court denied it.

In *State v. Tucker*, 26 Ariz. App. 376, 448 P.2d 1188 (1976), the court pointed out the purpose of *Rule 20* is to avoid forcing a defendant to go forward with his own evidence when the state's case is insufficient, thus, risking convicting himself.

Having the trial court, rather than a jury, make the determination of whether or not the State's evidence is sufficient to warrant conviction, creates yet another problem.  In *State v. Nunez*, 167 Ariz. 272, 806 P.2d 861 (1991), the court said that if a defendant goes forward and presents his own evidence, after a motion for a directed verdict has been denied, he waives any error if his case supplies the evidence missing from the State's case.

# CONCLUSION

Therefore, Appellant respectfully requests this Court vacate his conviction and remand the case back to the Trial Court with an order to either dismiss the case with prejudice or set for a new trial.

## VERIFICATION AND CERTIFICATION

I, Brick P. Storts, III, hereby certify that I am the attorney for the Appellant, and the facts contained in this Opening Brief are known to me as acting in that capacity.

I further avow and verify that the allegations raised in this Opening Brief are factual and true to the best of my knowledge.

Brick P. Storts, III

I, Brick P. Storts, III, hereby further certify that this Opening Brief complies with the proscriptions as set forth by the Arizona Rules of Civil Appellate Procedure by being typed with proportional type of New Time Roman in font size 14, and the Opening Brief falls within the page limit allowed.

This Opening Brief contains the following number of words: __18452__.

Brick P. Storts, III

SUBSCRIBED and SWORN to before me this __6__ day of April 2007 by Brick P. Storts, III.

Notary Public

My commission expires:

__5/28/10__

CARMEN HERNANDEZ
Notary Public - Arizona
PIMA COUNTY
My Comm. Exp. 5-28-10

## CERTIFICATE OF SERVICE

I, Brick P. Storts, III hereby certify that I have delivered copies of this
Opening Brief to Hawkins and E-Z Messenger Legal Support Providers on this _6th
day of April 2007, to be delivered and served upon the following:

Honorable Nanette M. Warner
Pima County Superior Court, Division 20
110 West Congress
Tucson, Arizona 85701

Arizona Attorney General's Office
1275 West Washington
Phoenix, Arizona 85007

Brick P. Storts, III



# ORIGINAL

### IN THE COURT OF APPEALS
### STATE OF ARIZONA
### DIVISION TWO

FILED
ARIZONA COURT OF
APPEALS DIV. TWO

07 NOV 13  PM 1: 35

JEFFREY P. HANDLER
CLERK

STATE OF ARIZONA,

            **Appellee/Plaintiff,**

v.

BRADLEY ALAN SCHWARTZ,

          **Appellant/Defendant.**

Court of Appeals
No.  2CA-CR 2006-0213

(Pima County
Superior Court Cause
No.  CR2004-3995)

---

## APPELLANT'S REPLY BRIEF

---

BARTON & STORTS, P.C.
Brick P. Storts, III
271 North Stone Avenue
Tucson, Arizona 85701
Telephone:  882-2802
Pima County Computer No.  55508
Arizona State Bar No.  004507
Attorney for Appellant
Bradley Alan Schwartz