# EXHIBIT B

# IN THE COURT OF APPEALS
## STATE OF ARIZONA
### DIVISION TWO

STATE OF ARIZONA,

        Appellee/Plaintiff,

v.

BRADLEY ALAN SCHWARTZ,

        Appellant/Defendant.

Court of Appeals
No.  2CA-CR 2006-0213

(Pima County
Superior Court Cause
No.  CR2004-3995)

---

## APPELLANT'S REPLY BRIEF

---

BARTON & STORTS, P.C.
Brick P. Storts, III
271 North Stone Avenue
Tucson, Arizona 85701
Telephone:  882-2802
Pima County Computer No.  55508
Arizona State Bar No.  004507
Attorney for Appellant
Bradley Alan Schwartz

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS AS TO
PERTINENT ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

I.  WALSH THIRD-PARTY CULPABILITY DEFENSE. . .   3

II.  PROSECUTORIAL MISCONDUCT . . . . . . . . . . . . . . . .   7
  •  Dr. Jason Lee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
  •  Stephanie Nagel and the Federal Courthouse . . . . .   9
  •  Carmen Fernandez and Other Acts . . . . . . . . . . . . . .   10
  •  Jeff Englander and Exhibit 27  . . . . . . . . . . . . . . . .   11
  •  Lourdes Lopez and Federal Indictments . . . . . . . . . .   12
  •  Dr. Winston's Erroneous Testimony and
     Expanded Rehabilitation . . . . . . . . . . . . . . . . . . . . . . .   13

III.  LORRAINE HEATH AND DNA TESTIMONY . . . . . . . . .   15

IV.  HEARSAY TESTIMONY OF DR. LEE
     AND JENNIFER DAINTY. . . . . . . . . . . . . . . . . . . . . . . .   16

V.  DENIAL OF DEFENDANT SCHWARTZ'S RIGHT
    TO IMPEACH LOURDES LOPEZ . . . . . . . . . . . . . . . . . .   18

VI.  DAPHNE STIDHAM AND THIRD-PARTY
     CULPABILITY DEFENSE . . . . . . . . . . . . . . . . . . . . . . . .   21

VII.  DOCTOR SCHWARTZ'S CHARACTER EVIDENCE . .   23

VIII. THE TRIAL COURT ABUSED ITS DISCRETION
      IN REFUSING FUNDS TO APPOINT A POLLING
      EXPERT TO DETERMINE THE AMOUNT OF
      PREJUDICE PRESENT IN THE COMMUNITY,
      AND TO FURTHER ASSIST THE APPELLANT
      WITH THE MOTION FOR CHANGE OF VENUE . . . . .   24

Page

IX.   THE TRIAL COURT ABUSED ITS DISCRETION
      IN REFUSING TO GRANT APPELLANT'S
      REPEATED MOTIONS FOR A CHANGE OF VENUE . . 25

X.    THE TRIAL COURT ABUSED ITS DISCRETION
      BY FAILING TO SEQUESTER THE JURY . . . . . . . . . . . 27

XI.   CHALLENGE TO RULE 20 . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**Page**

## RULES

**Rule 20,**
       **Arizona Rules of Criminal Procedure** . . . . . . . . . . . . . . .    29
**Rule 404(b),**
       **Arizona Rules of Criminal Procedure** . . . . . . . . . . . . . .    4

## UNITED STATES SUPREME COURT CASES

*Apprendi v. New Jersey,*
       530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29
*Blakely v. Washington,*
       542 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29
*Crawford v. Washington,*
       541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
*Davis v. Washington,*
       126 S.Ct. 226 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
*Ring v. Arizona,*
       536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

## STATE CASES

*Champlin v. Sargeant,*
       192 Ariz. 371, 965 P.2d 763 (1998) . . . . . . . . . . . . . . . .    22
*State v. Atwood,*
       171 Ariz. 576, 832 P.2d 593 (1992). . . . . . . . . . . . . . . . .    26
*State v. Bruni,*
       129 Ariz. 312, 630 P.2d 1044 (1981) . . . . . . . . . . . . . . . .    9
*State v. Gibson,*
       202 Ariz. 321, 44 P.3d 1001 (2002). . . . . . . . . . . . . . . . .    7, 22
*State v. Gretzler,*
       126 Ariz. 60, 612 P.2d 1023 (1980). . . . . . . . . . . . . . . . .    28
*State v. Hill,*
       174 Ariz. 313, 848 P.2d 1375 (1993) . . . . . . . . . . . . . . . .    20

**<u>Page</u>**

*State v. Hughes,*
    193 Ariz. 72, 969 P.2d 1184 (1998). . . . . . . . . . . . . . . . . .    **7**

*State v. McGuire,*
    113 Ariz. 372, 555 P.2d 330 (1976). . . . . . . . . . . . . . . . . .    **20**

*State v. Peeler,*
    126 Ariz. 254, 614 P.2d 335 (App. 1980). . . . . . . . . . . . .    **24**

*State v. Roque,*
    213 Ariz. 193, 141 P.2d 368 (2006). . . . . . . . . . . . . . . . .    **14**

*State v. Smith,*
    123 Ariz. 231, 599 P.2d 187 (1979). . . . . . . . . . . . . . . . .    **24**

*State v. Tankersley,*
    191 Ariz. 359, 956, P.2d 486 (1998) . . . . . . . . . . . . . . . . .    **4**

*Yauch v. Southern Pacific Transportation Company,*
    198 Ariz. 394, 10 P.3d 1181 (App. 2000) . . . . . . . . . . . . .    **24**

## STATEMENT OF FACTS
## AS TO PERTINENT ISSUES

Appellant did not cause the death of Dr. Stidham, either directly or

indirectly. The State relied primarily upon unkind remarks and threats made by

Dr. Schwartz to a number of female witnesses. However, the woman closest to Dr.

Schwartz, Lourdes Lopez, said that she never took Dr. Schwartz's remarks and

threats seriously because they were usually made while they were watching the

Sopranos (R.T. 3/21/06, p. 62, l. 21-22) and because Dr. Schwartz was a

"blowhard" who would talk big in order to make himself appear important. (*Id.* at

p. 100, l. 8-24)

Not a single witness called by the State to establish the threats being made

by appellant took anything Dr. Schwartz was saying seriously enough to report his

remarks to law enforcement officials **prior** to the murder of Dr. Stidham.

At approximately 7:46 p.m. on October 5, 2004, Dr. Schwartz's cell phone

received a phone call from the Denny's located on East Speedway, some distance

from Dr. Stidham's office. (Detective Lopez, R.T. 3/24/96, p. 112, l. 4-16)

Although she could not specifically recall the date, Ms. Sullivan testified

that she had contact with a man she identified as Mr. Bigger while she was

working at this Denny's. Mr. Bigger was in Denny's for between half an hour to

1

an hour before he asked for phone numbers for cab companies. (Sullivan, R.T. 3/30/06, p. 19, l. 3-4). She provided him with the number for Allstate Cab Company. (*Id.* at p. 19, l. 12-20). After having been provided with this number, Mr. Bigger made a call from the pay phone in the lobby. (*Id.* at p. 19, l. 21-25). (Even taking the lower estimate of the amount of time Mr. Bigger was at the Denny's before calling Dr. Schwartz's cell phone, this would place Mr. Bigger at the Denny's sometime around 7:15 p.m., which is before Dr. Stidham even left his office. Moreover, Ms. Sullivan said that Mr. Bigger seemed normal, in terms of his behavior, and that she did not notice any blood on his person or clothing. (R.T. *Id.* at p. 23, l. 3-14)

Dr. Winston, the State's pathologist, testified that you no longer see "blanchable" livor mortis after approximately 12 hours. (R.T. 3/14/06, p. 161, l. 121-122). He also testified that he performed the autopsy on Dr. Stidaham at 8:30 a.m. on October 6, 2004). After being impeached so badly about his earlier testimony that even the prosecutor said that he "now looks like a boob and one who is perhaps not candid with the court" (R.T. 4/11/06, p. 124) he finally agreed that his autopsy notes indicated that at the time of the autopsy livor mortis was not fixed. In other words, livor mortis was still "blanchable at 8:30 a.m. on October 6, 2004. (R.T. 4/11/06, p. 98, l. 12).

Additionally, Dr. Keen, the Chief Medical Examiner for Maricopa County, was called as a witness by the defense in this case and testified that it was his opinion that the time of death should be in the range of 4-7 hours prior to the time of observation, which was between 4:00-4:15 a.m. on October 6, 2004 (Dr. Winston, R.T. 3/14/06, p. 183, l. 5-11) and that he would be surprised if death occurred before 9:00 p.m. on October 5, 2004. (R.T. 4/11/06, p.m., p. 43, l. 9-15).

The only physical evidence the State had to rely upon was DNA evidence taken from Dr. Stidham's recovered Lexus. The State called three different experts to testify about the DNA collected from the radio knob of Dr. Stidham's vehicle. Curtis Reinbold testified that he had performed an STR analysis on the DNA taken from the radio knob. (R.T. 3/28/06, p. 42, l. 14-15)  He also offered his opinion concerning the random statistical probability of a match.

Dr. Budelow, another DNA expert called by the State, disagreed with Reinbold's calculations. (R.T. 4/20/06, p. 18) Brian Wraxall, the DNA expert called by the defense, was also critical of Reinbold's work.

## I.

## WALSH THIRD-PARTY CULPABILITY DEFENSE

Even the State finally acknowledged at trial that it would be error for the court to preclude Dr. Schwartz from presenting a third party culpability defense

with respect to Dennis Walsh. (R.T. 3/7/06, p. 68, l. 6-10). After that, the only remaining question became whether the court would so severely limit the defense that it would not be tactically sound to present it. In other words, unless Dr. Schwartz was allowed to present the defense in a full, complete and fair manner, it would be useless. In fact, the court almost immediately set about looking for distinctions that would allow it to keep out as much of the defense as possible but still be able to maintain that Dr. Schwartz was not deprived of his opportunity to have the jury consider this evidence. The limitations imposed resulted in effectively precluding the defense.

At trial and on appeal, the State argues that since there were dissimilarities in the various offenses committed by Walsh, preclusion of all but those which matched the nature of the offense in this case was appropriate. While evidence of "other acts" may be inadmissible to prove identity if the acts are not sufficiently similar, Rule 404 (b), Arizona Rules of Criminal Procedure and *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998), there was no question in this case concerning whether Walsh had committed each of the acts Dr. Schwartz sought to introduce into evidence. He admitted and plead guilty to each of those acts sought to be admitted. And, these acts all took place at/and or around the time of the offense in this case and/or nearby where the body of Dr. Stidham was found.

4

The State makes the assertion that without "some evidence tending to connect Walsh to the crime scene, evidence of Walsh's convenience store robberies bear no relation to Stidham's murder" (State's Responsive Brief (SRB), p. 36). First, there is no requirement that Walsh be connected to the crime "scene" with physical evidence. Neither was Dr. Schwartz. Except for testimony that Mr. Bigger could not be excluded from the DNA taken from the radio knob of Dr. Stidham's Lexus, no physical evidence connected Mr. Bigger to the crime scene.

It is enough if Walsh can be connected to the offense. Even the State agrees that Dr. Schwartz had evidence to establish that Walsh had confessed to the murder of Dr. Stidham (R.O.A., Item 489, Exhibit A) and at least two other witnesses had information that Walsh had been involved in the car-jacking. (*Id.*) (SRB, p. 36).

Under these circumstances, the court erred in limiting Dr. Schwartz's third-party culpability defense as to Dennis Walsh to the two carjackings that took place on October 15, 2004, on the southside of Tucson, robbery number 5, and the one that occurred on October 28, 2004, at a feed store, robbery number 15.

What was destroyed by the ruling of the court was the pattern that would have been evidenced in the crimes committed by Walsh from October 3, 2004,

through December 26, 2004.  As previously noted in the Appellant's opening brief, twelve of the seventeen armed robberies took place in the area of Dr. Stidham's office.  However, what was more dispositive regarding the armed robberies, to which Walsh pled guilty, was the pattern of Walsh's robberies that were committed on almost a regular basis of two or three per week.  The only gap of time in those robberies, was October 5, 2004, the date Dr. Stidham was found murdered.

The Appellant filed extensive exhibits with the trial court showing this pattern, and argued to the court this was critical as it established the fact that Walsh performed these robberies in a crime pattern by showing that Walsh committed robberies on October 3, 2004, and it was then that one full week passed until the next robbery on October 10, 2004.  Thereafter robberies took place from then until the end of October, with a robbery once or twice per week. This would have been extremely compelling evidence for the Jury to have considered.  The court, by confining Defendant to the two carjackings, lost the opportunity to have presented Walsh's crime pattern. (R.O.A., Exhibits 3 and 4, to the motion)

The error was further compounded when the court would not, at the very least, allow the Appellant to present the knife attack and at least four other

6

robberies that took place in the vicinity of Dr. Stidham's office immediately before and after the death of Dr. Stidham. These robberies would have presented to the Jury a robbery with a knife on October 10, 2004, blocks from Dr. Stidham's office, and a robbery that took place between that date and October 20, 2004, all within blocks of Dr. Stidham's office.

In *State v. Gibson*, 202 Ariz. 321, 44 P.3d 1001 (2002) the court made it clear that third party culpability evidence is admissible if it would tend to create a reasonable doubt about the defendant's guilt. Any suggestion that this evidence should have been precluded based on considerations of "prejudice or confusion" is ridiculous. Had the court allowed the defense to present each of the offense to which Walsh entered pleas of guilty, Dr. Schwartz would then have been able to call the witnesses who connected Walsh to Dr. Stidham's murder. Without being able to show all of the offenses committed by Walsh, Dr. Schwartz was placed at a significant tactical disadvantage, and the limitations imposed by the court effectively denied appellant the opportunity to present a third-party culpability defense.

## II.

### PROSECUTORIAL MISCONDUCT

In *State v. Hughes*, 193 Ariz. 72, 969 P.2d 1184 (1998), the court said:

7

> To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process" (citation omitted) "Reversal on the basis of prosecutorial misconduct requires that the conduct be "so pronounced and persistent that it permeates the entire atmosphere of the trial. (citation omitted) To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct.

The court went on to say that a prosecutor has a duty to see that defendants receive a fair trial. *Id.* at 80, 1192. The prosecutors in this case failed in that duty, and exhibited a reckless indifference to the danger of mistrial and reversal.

**Dr. Jason Lee**

Dr. Lee was asked, by a prosecutor with considerable experience, whether the photo of Mr. Bigger was "not just a mug shot". The State now argues that there was no error, nor any misconduct, because the prosecutor was simply trying to draw a distinction between a "photograph of a person's entire body" as opposed to a "tight shot of person's face, like a "mug shot". (SRB p. 38) This is ludicrous. If the prosecutor had wanted to draw such a distinction that could easily have been done, without any reference to a "mug shot".  Making the jury believe that Mr. Bigger had a prior criminal history, was quite helpful to the State.

The reference to "mug shot" was both unnecessary and prejudicial. As the

8

State concedes, evidence of "mug shots" or the mention of the fact that police have

photos of the defendant (or, as here, the co-defendant) taken some time prior to the

crime charged can be error. *State v. Bruni*, 129 Ariz. 312, 630 P.2d 1044 (App.

1981)

**Stephanie Nagel and the Federal Courthouse**

The trial court had made it clear that there should be no reference to Federal

charges against Dr. Schwartz. Nevertheless, Ms. Nagel testified that she met Dr.

Schwartz while at the Federal courthouse because they were both required to

"drop urine". (R.T. 3/16/06, p. 67). The State now argues that it was not error, nor

misconduct, for the prosecutor to elicit this testimony because appellant did not

object until this testimony had been elicited on more than one occasion and

because Ms. Nagel never said directly that Dr. Schwartz was facing federal

charges and never testified directly concerning why it was that Dr. Schwartz was

required to "drop urine" at the federal courthouse. (SRB p. 39)

The likelihood that the jury was unable to figure out that Dr. Schwartz was

facing or had been convicted of federal charges and that was the reason he was

being required to "drop urine" at the federal courthouse is slim and none. This is

particularly true when one considers the testimony of Ms. Nagel, together with

Ms. Lopez's testimony that she resigned from the County Attorney's Office

because she knew she was about to be indicted. (R.T. 3/21/06, p. 191, l. 5-6).

It also appears that the State is now arguing that misconduct becomes acceptable if the defense does not object quickly or often enough. That is not and cannot be the law. Misconduct remains misconduct, regardless of how quickly it is noticed or brought to the court's attention.

### Carmen Fernandez and Other Acts

The day after Ms. Nagel's testimony, one of the two experienced prosecutors assigned to this case asked Carmen Fernandez whether Dr. Schwartz had also spoken with her about another doctor he wanted to be "taken care of". (R.T. 3/17/06, p. 12, l. 9-19). The State now defends this question by suggesting that the prosecutor simply wanted to explain the difference between the threats to the two doctors by demonstrating that Dr. Schwartz wanted to kill one (Dr. Stidham) but only wanted to harm the other or others. (SRB, p. 40)

Of course, the jury had no idea about any threats to any other doctor until this question was asked and there was, therefore, no distinction or difference to explain. The prosecutor's explanation was and is disingenous at best and most probably an untruthful response designed to cover up or explain away his obvious and intentional misconduct. Moreover, there was never any disclosure of other acts evidence which would have given the defense the opportunity to attack the

10

admissibility of this clearly prejudicial testimony.

This testimony was inadmissible pursuant to Rules 403 and 404 of the Arizona Rules of Evidence, highly prejudicial and designed to paint Dr. Schwartz as a person of bad character who killed or caused to be killed at least one doctor and was interested in doing the same with one or more other doctors. To say that this question constituted misconduct would be an understatement.

**Jeff Englander and Exhibit 27**

Englander testified that he had searched Dr. Schwartz's palm pilot and that the only entry that had a car model and license plate number was an entry having to do with Dr. Stidham. The State wanted to rely upon this testimony to show that Dr. Schwartz was planning to hire someone to harm or kill Dr. Stidham and that this information was or would be communicated to the person he hired.

The State argues that it was not misconduct for the prosecutors to elicit this testimony and, even if it was, there is no harm since the information was available through another witness. (SRB p. 41-42) Of course, the other witness was Carmen Fernandez who was impeached and arguably unreliable as a witness. Having the information on his palm pilot was far more damaging than having a witness testify that the information was provided by Dr. Schwartz.

Importantly, the defense had sent correspondence to the State seeking to

11

have the State identify exactly what it was the State would rely upon that was

taken from Dr. Schwartz's computer. The State had responded saying that it would

not rely upon anything taken from Appellant's palm pilot and would only use a

single memorandum taken from Dr. Schwartz's computer.

The court reviewed the correspondence and then struck the testimony and

the exhibit. However, once again, this was too little, too late. And, the court

expressed a deep concern about the prosecutors eliciting this testimony given the

nature of the correspondence.

**Lourdes Lopez and Federal Indictments**

Ms. Lopez indicated that she resigned from the County Attorney's Office

because she thought that she was about to be indicted in Federal Court. (*Id.*) In

context, the jury knew that her fears about being indicted had to do with her

helping Dr. Schwartz to obtain drugs in an unlawful manner. One would not have

to be the smartest or most astute juror in the world to figure out that if Ms. Lopez

had done something unlawful and was about to be indicted, so too was Dr.

Schwartz.

The State defends against this claim by making reference to the trial court's

remarks that it's prior ruling did not preclude mention that Ms. Lopez had been or

was about to be indicted and that there really was no error because she did not say

12

for sure that she or Dr. Schwartz had actually been indicted or what the outcome
of an indictment might have been. (SRB, p. 43)

There is no question that the trial court forgave the prosecutors for allowing
this testimony to come into evidence because, according to the court, Ms. Lopez's
response was not one the State sought to elicit but was the "result of non-leading
questions". (R.O.A. item 541)  However, the response could have been avoided
had the prosecutors properly prepared Ms. Lopez by covering with her the trial
court's previous rulings and what she was not allowed to say during her testimony.
In fact, Ms. Lopez testified that even though she asked the prosecutors whether
there were areas she was to avoid, she was not told not to mention federal
indictments. (R.T., p. 199, l. 1-22)

**Dr. Winston's Erroneous Testimony and Expanded Rehabilitation**

Dr. Winston, the State's pathologist, stopped being an expert witness and
became an overzealous advocate when he attempted to suggest that his autopsy
notes were intended to be reminders about his scene observations. It was only
because the defense had retained the services of Dr. Keen, the Chief Medical
Examiner for Maricopa County, that Dr. Winston "corrected" his false sworn
testimony when he was recalled.

The State now defends the prosecutors' failure to disclose the fact that Dr.

13

Winston intended to "correct" his earlier testimony when recalled on the basis of the State's belief that the defense was recalling Dr. Winston for precisely that purpose and because the prosecutors only learned of Dr. Winston's intended correction 20 minutes before he was recalled. (SRB, p. 46-47) First, the defense had no idea that Dr. Winston intended to correct his earlier testimony. Instead, the defense intended to confront Dr. Winston with the opinions and testimony of Dr. Keen. The State knew this and recognized that once Dr. Winston was impeached, he would not likely be believed on the critical question concerning the time of death. Whether the prosecutors learned of the intended correction days, hours or even minutes before Dr. Winston's recall, it should have been disclosed and was not.

Knowing the importance of Dr. Winston's advocacy concerning the time of death, the prosecutors consciously decided not to disclose the intended correction. Instead, they worked out with Dr. Winston how best to accomplish his rehabilitation on the initial "erroneous" testimony by expanding the scope his disclosed testimony in violation of *State v. Roque*, 213 Ariz. 193, 141 P.2d 368 (2006).

14

## III.

## LORRAINE HEATH AND DNA TESTIMONY

Finally, it appears that the prosecutors actually talked with one of their witnesses about court rulings and how these rulings might affect their testimony. Unfortunately, it appears clear that the discussions between the witness and the prosecutor were actually designed to circumvent the court's ruling, rather than adhere to it.

Ms. Heath was planning to offer testimony that when she combined the results of her work with the results of Mr. Reinbold's work, specifically the math having to do with the random statistical probabilities of a match, the number would become astronomical. She was precluded from doing so. When she testified, however, she said that having looked at her data and Mr. Reinbold's data, she felt **"there is very strong evidence that..."**( R.T. 3/28/06, p. 119, l. 23-25). There was an immediate objection and Ms. Heath did not have a chance to finish her answer.

Interestingly enough, Ms. Heath had sent one of the prosecutors in this case an email which read, in part, as follows:

> In addition, the new calculations would allow me to strengthen my statements made during the interview (the first defense interview) and I would now say that I thought

15

> there was very strong evidence that Mr. Bigger's DNA
> was on this item. (the radio knob) (*See*, R.O.A. 563 and
> attachments) (parentheticals added)

One of two things seems clear. Either the prosecutors did not explain to Ms. Heath that she was not allowed to offer testimony that her opinions were stronger because of the math calculations which were the result of the combined results of her work and Mr. Reinbold's, or, in the alternative, the prosecutors encouraged her to testify the way she did in order to "back door" the court's ruling. Both possibilities were and are improper.

If one compares the email to Ms. Heath's sworn trial testimony, it cannot be any more clear that her "strengthened" opinion was based upon that which had been precluded. This is true even though she never said what the combined random statistical probabilities number was. Knowing the importance of the DNA evidence, the prosecutors in this case found an indirect way to skirt the court's ruling. This was totally improper and a review of Ms. Heath's testimony supports a conclusion that this was done intentionally in a deliberate attempt to avoid the inevitable acquittal.

## IV.

## HEARSAY TESTIMONY OF DR. LEE and JENNIFER DAINTY

The State was not able to produce a single witness to testify that Mr. Bigger

16

was the man seen wearing scrubs in the parking lot of Dr. Stidham's complex prior

to the murder in this case. To make up for this short coming, the State introduced

hearsay "pizza" testimony from Dr. Jason Lee and Jennifer Dainty. Ms. Dainty

testified that a man in scrubs came into her store at approximately 6:00 p.m. This

convenience market was located nearby Dr. Stidham's medical complex. The court

allowed Ms. Dainty to testify that the man, identified as Mr. Bigger, said that

he was at a meeting where pizza was being served and since he didn't like pizza,

he was looking for something else to eat. (R.T. 3/14/06, p. 40, l. 5-8)

　　Then, the court allowed the State to elicit testimony from Dr. Lee that he

had seen a man wearing scrubs in the parking lot and that this man directed him to

Dr. Stidham's office and said that pizza had been recently delivered. (R.T.

3/10/06, p. 31, l. 5)

　　The State argues that this testimony was not hearsay because the pizza

statements were not offered to prove the truth of the matter asserted, presumably

that pizza was being served at Dr. Stidham's office and that the man  the

convenience store didn't like pizza. Instead, the State asserts that this testimony

was offered in order to prove that the man in the parking lot who spoke to Dr. Lee

was the same man in Ms. Dainty's store, that is, Mr. Bigger. The State also argues

that this testimony did not violate the confrontation clause because it was not

17

offered to prove the truth of the statements made.

Of course, the State would have this court forget that Dr. Lee specifically testified that Mr. Bigger was not the man he saw in the parking lot wearing scrubs and making remarks about pizza. (R.T. 3/10/06, p. 37 and p. 39)  And, unless the jury believed the remarks about pizza were actually made, there would be no purpose for their introduction into evidence. These statements were offered for the truth of the matter asserted, were hearsay and extremely prejudicial. They were "a weaker substitute for live testimony" and, therefore, inadmissible. *See, Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 126 S. Ct. 2266 (2006)

This was the only evidence connecting Mr. Bigger to the crime scene and the statements  were allowed into evidence even though Dr. Lee said that the man he saw was not Mr. Bigger. The error is reversible.

## V.

## DENIAL OF DEFENDANT SCHWARTZ'S RIGHT TO IMPEACH LOURDES LOPEZ

Prior to trial the defense disclosed Paul Skitzki, a former Deputy Pima County Attorney and friend of Lourdes Lope, as a witness. Contrary to the assertions made in the State's Responsive Brief (SRB, p. 55), it was clear to the

18

State that the defense intended to use Mr. Skitzki to impeach the testimony of

Lourdes Lopez that she had told Mr. Skitzki about the threats being made by Dr.

Schwartz **prior** to the murder.

Knowing full well that the defense intended to call Mr. Skitzki to impeach

Ms. Lopez's anticipated testimony about when it was that she actually told Mr.

Skitzki about the threats, and knowing that the defense would be required to ask

the "warning question" of Ms. Lopez prior to calling Mr. Skitzki, the State waited

until after the question of Ms. Lopez had been asked to file it's motion to preclude

Mr. Skitzki's testimony. Unless this court is willing to say that prosecutors are

allowed to engage in "clever lawyering" in order to keep the truth from a jury, the

timing of the prosecutors' motion constitutes yet another example of misconduct.

The State knew what the defense intended to do. If the State believed that the

impeachment of Ms. Lopez by calling Mr. Skitzki was improper they could have

filed their motion before Ms. Lopez was asked whether she had told anyone about

threats being made by Dr. Schwartz. Instead, they waited until Ms. Lopez had

given the answer the State wanted the jury to hear and then filed the motion to

preclude. In other words, they consciously allowed testimony to be heard by the

jury knowing that this sworn testimony was false, at least according to Mr. Skitzki.

This constitutes misconduct.

In any event, the court erred in precluding the defense from calling Mr. Skitzki. The State argues that the impeachment would have been on a collateral matter and was, therefore, properly precluded. (SRB, p. 54-55) In *State v. Hill*, 174 Ariz. 313, 848 P.2d 1375 (1993), the court said that evidence is collateral if it could not properly be offered for any purpose independent of the contradiction. *See also, State v. McGuire*, 113 Ariz. 372, 555 P.2d 330 (1976). Here, the evidence was also being offered to prove that Ms. Lopez did not take the threats being made by Dr. Schwartz seriously enough to report to anyone. Until Ms. Lopez was actually called as a witness no one could know for sure what she might say, even though her prior statements suggested that she would testify as she did. Even then, had the defense been allowed to call Mr. Skitzki, the jury would have been allowed to decide who was telling the truth. If it was Mr. Skitzki, the defense would have established the important point that the threats being made were not serious in nature.

Mr. Skitzki's testimony was not collateral because it was also being offered for a purpose independent of the contradiction. The court erred in precluding the defense from calling Mr. Skitzki as a witness and the error is reversible.

20

# VI.

## DAPHNE STIDHAM AND THIRD-PARTY CULPABILITY DEFENSE

Prior to trial, the defense made it clear that it wished to investigate and, possibly, pursue a third party culpability defense with respect to Dr. Stidham's widow, Daphne Stidham. The defense asked that court order that Ms. Stidham make herself available for a pre trial interview or deposition. When that request was denied, the defense asked that she be required to answer various written interrogatories. That request was also denied. Now, the State argues that it was not error for the court to deny Dr. Schwartz's discovery requests. Nor was it error, according to the State, for the court to deny Dr. Schwartz the right to present third party culpability evidence with respect to Daphne Stidham. The State also asserts that the court was correct in saying that Dr. Schwartz's discovery requests amounted to little more than a fishing expedition since there really was no evidence suggesting that Ms. Stidham may have been responsible for causing the death of her husband, either directly or indirectly.

To suggest that there was no basis for believing that Ms. Stidham may have been responsible when even the case detective considered her a possible suspect at some point in the investigation and deputies detailed what can fairly be described as bizarre behavior on her part when she was told of her husband's death, is

21

ridiculous. (R.O.A. 90, Motion to Remand and Exhibits)

The State argues that the defense simply did not present sufficient evidence to warrant being allowed to cross examine the deputies about Daphne Stidham's bizarre and inculpatory behavior and/or present a third party culpability defense with respect to Daphne Stidham. The defense was not allowed to investigate this defense and the State took advantage of various court rulings denying Dr. Schwartz this opportunity. (R.O.A. 207, 299, 294 and 334)

In *State v. Gibson, supra*, the court made it clear that third party culpability evidence is admissible if it would tend to create a reasonable doubt about the defendant's guilt. Obviously, if a defendant has a right to present a third party culpability defense he or she should also have the corresponding right to fully investigate whether such a defense is viable. Here, the defense was denied both the right to investigate and the right to present such a defense.

In *Champlin v. Sargeant*, 192 Ariz. 371, 965 P.2d 763 (1998), the court said that there is nothing in the Victim's Bill of Rights or the statute which "supports the argument that victims have a blanket right to be shielded from all contact with defendants or their attorneys until the time of trial". Id. at 767, 375. This case presents a classic example of when the shield should be lifted and contact should be allowed.

22

## VII.

## DOCTOR SCHWARTZ'S CHARACTER EVIDENCE

The State's motion to preclude Appellant's character evidence was granted. (ROA 487). The state takes the position that this evidence was irrelevant and that at least some evidence of Dr. Schwartz's skill as a physician and his ability to attract and maintain a patient base came in through other witnesses. The fact that one or more witnesses may have given answers that indirectly addressed these important issues does not cure the error committed by the court in precluding the defense.

The State's theory was that Dr. Schwartz was angry at Dr. Stidham because Dr. Stidham had stolen Dr. Schwartz's patients and that Dr. Schwartz's practice was not what it had once been. The defense wanted to call witnesses to talk about Dr. Schwartz as a person and as a physician. These witnesses would also have established **directly** that Dr. Schwartz's practice was well on its way to becoming even more lucrative than it had been when Dr. Schwartz and Dr. Stidham had been practicing together.

Any evidence that relates to a consequential fact and has a tendency to make that fact more or less probable than it would be without the evidence is relevant and admissible. *Yauch v. Southern Pacific Transportation Company*, 198 Ariz.

23

394, 10 P.3d 1181 (App. 2000). Moreover, the standard for relevancy for Rule 401 purposes is not particularly high. The character evidence sought to be admitted by Dr. Schwartz and precluded by the court related directly to the absence of motive and the absurdity that Dr. Schwartz was still so angry at Dr. Stidham that he would actually seek to bring about his death.

## VIII.

### THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING FUNDS TO APPOINT A POLLING EXPERT TO DETERMINE THE AMOUNT OF PREJUDICE PRESENT IN THE COMMUNITY, AND TO FURTHER ASSIST THE APPELLANT WITH THE MOTION FOR CHANGE OF VENUE.

The State claims the trial court did not abuse its discretion in refusing to appoint a polling expert. Further, the State argues that Appellant has not clearly established substantial prejudice, and therefore, his claim should fail. *State v. Peeler*, 126 Ariz. 254, 614 P.2d 335 (App. 1980). In support of its argument, the State claims the Appellant could not establish why he could not "make the investigation himself, or why the accepted jury selection process in this case failed to identify biased jurors." (Answering Brief, p.64) The State also claims that *State v. Smith*, 123 Ariz. 231, 599 P.2d 187 (1979) is dispositive of the issue that the Appellant is not entitled to a polling expert. However, given the gravity and nature of the Appellant's case, *Smith* is not dispositive of whether Appellant was

entitled to a polling expert. Furthermore, Appellant's case was arguably the most covered and publicized case in the history of Pima County.

The State has failed to address any of the Appellant's arguments other than to say that the substantial voir dire conducted in the case was sufficient and the trial court did not abuse its discretion in its refusal to appoint a polling expert. The State fails to recognize or argue against specific reasons Appellant sought the polling expert. Although the State does cite the trial court's reasoning for denying Appellant's motion and Motion for Reconsideration, the State fails to argue or refute the Appellant's position in his Motion for Reconsideration. Most importantly, Appellant submitted a letter from a representative of O'Neill and Associates which specifically addressed the concerns expressed by the trial court in its denial of his original motion for a polling expert. Each of the court's assumptions were addressed by O'Neill and Associates, and it was explained why those assumptions were flawed. (ROA 292) The State simply hides behind the shroud of an abuse of discretion standard, rather than addressing these arguments.

### IX.

### THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO GRANT APPELLANT'S REPEATED MOTIONS FOR A CHANGE OF VENUE.

The State contends the trial court did not abuse it's discretion in denying the

25

Appellant's repeated Motions for Change of Venue. The State relies upon the fact that Appellant has not shown he was prejudiced by the failure to move the case from Pima County, and also that there was no need for the change of venue. As was previously argued, the Appellant's case was the most widely covered by the media in Pima County's history. The statistics that were brought forth in Appellant's first motion to change venue clearly show the media coverage was ongoing, pervasive and oftentimes factually inaccurate, or dealt with issues that were not admissible at trial.

The State cites that the publicity has to be so much that it turns the trial into a "carnival-like atmosphere." *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992). It is respectfully submitted that is exactly what occurred in Appellant's case. Not only was the coverage of Appellant's pretrial proceedings, arrest and trial continuous, but the court allowed tv cameras in the courtroom, and actually had a section within the courtroom for the media to sit. The coverage was pervasive and the amount of coverage, turned the trial into a spectacle, certainly akin to a carnival.

Part of the court's finding, in (R.O.A. 346), was "there was no way to know how many viewers or readers actually heard or read anything about this criminal case or related issues in the media." (R.O.A. 346) However, had the court allowed

26

the polling expert, potentially it could have heard precisely what it was questioning above. It did not, and therefore the court by its own orders precluded itself from knowledge that it could have had to know whether or not the media coverage prejudiced the Defendant.

The trial court also cited in deciding to deny the motion for change of venue, that the majority of the articles or opinions were derived from disclosure or documents associated with the case. (R.O.A. 346)   However, the issue should not end at that inquiry. The inquiry must be how prejudicial that information was. It is a far different case if the information derived from the court filings and court documents was factual in nature and would have been something admissible at trial. It is far different if that information is not admissible at trial and was filtered out to the public through the media. It simply tainted the jury and gave it information that it was not privy to prior to hearing evidence in the Appellant's case.

## X.

## THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO SEQUESTER THE JURY.

The State claims that the publicity was neither sensational nor inflammatory, and therefore the Appellant's Motion to Sequester the Jury was

properly denied.  As such, the State argues that the trial court did not abuse it's

discretion.   However, the State is wrong on both accounts.

It is undisputed that this case drew the most media coverage of any that has

occurred in Pima County.  Not only was the media coverage extensive at the

inception of the case, but continued to be just as pervasive, inflammatory and in-

depth throughout the trial.  With all due respect to the trial court, it's admonition

to avoid newspapers, tv and any other media that may have covered the trial was a

virtual impossibility.

The State cites *State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980) in

support of its argument that sequestration of the jurors was not necessary.

However, even *Gretzler* admits that when there is an indication the Court's

instruction  or admonition is violated, sequestration might be a possibility.  That is

undoubtedly what occurred in this case.  The jury simply could not avoid the

media coverage and in fact, as was argued in the Opening Brief, Juror 49 brought

forth a newspaper to the jury room. This was certainly an introduction of media

contamination into the jury that was presiding over the case. The jurors may have

taken the admonition from the court seriously, however, jurors could not have

completely avoided the media coverage.  This is clearly exemplified by Juror 49's

conduct, which shows media contamination of the jury, and further proves that Defendant's contention, that the jury should have been sequestered, was correct.

## XI.

### CHALLENGE TO RULE 20

The State takes the position that this issue has no merit because Rule 20 is a procedural rule and because *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002) and *Blakely v. Washington*, 542 U.S. 296 (2004) all applied to sentence enhancement factors an/or aggravators.

The State misses the point entirely. Although this is an issue of first impression, the logic is inescapable.

This determination should be made by the jury, not the court as provided for by Rule 20, and the decision should be made based upon the standard of beyond a reasonable doubt, not substantial evidence as provided for by Rule 20.

### CONCLUSION

Based upon the foregoing and all those arguments and authorities contained in Appellant's Opening Brief, Appellant respectfully urges this court to order that Appellant's conviction and sentence be vacated and set aside and that the matter be remanded for a new trial.

. . .

RESPECTFULLY SUBMITTED this ⟋ʒ day of November 2007.

BARTON & STORTS, P.C.

Brick P. Storts, III
Attorney for Appellant SCHWARTZ

30

## **VERIFICATION AND CERTIFICATION**

I, Brick P. Storts, III, hereby certify that I am the attorney for the Appellant, and the facts contained in this Reply Brief are known to me as acting in that capacity.

I further avow and verify that the allegations raised in this Reply Brief are factual and true to the best of my knowledge.

Brick P. Storts, III

I, Brick P. Storts, III, hereby further certify that this Reply Brief complies with the proscriptions as set forth by the Arizona Rules of Civil Appellate Procedure by being typed with proportional type of New Time Roman in font size 14, and the Reply Brief falls within the page limit allowed.

This Reply Brief contains the following number of words:  7262 .

Brick P. Storts, III

SUBSCRIBED and SWORN to before me this  13  day of November 2007 by Brick P. Storts, III.

My commission expires:

05/28/10

Notary Public



CARMEN HERNANDEZ
Notary Public - Arizona
PIMA COUNTY
My Comm. Exp. 5-28-10

## CERTIFICATE OF SERVICE

I, Brick P. Storts, III hereby certify that I have delivered copies of this Reply

Brief to Hawkins and E-Z Messenger Legal Support Providers on this ⟋3

day of November 2007, to be delivered and served upon the following:

Honorable Nanette M. Warner
Pima County Superior Court, Division 20
110 West Congress
Tucson, Arizona 85701

Arizona Attorney General's Office
1275 West Washington
Phoenix, Arizona 85007


Brick P. Storts, III