1
2
3
4
5
6            **IN THE UNITED STATES DISTRICT COURT**
7               **FOR THE DISTRICT OF ARIZONA**
8
Bradley Schwartz,                    )
9                                     )    No. CV-09-200-TUC-DCB-DTF
              Petitioner,            )
10                                    )    **REPORT & RECOMMENDATION**
vs.                                   )
11                                    )
Charles L. Ryan, et al.,             )
12                                    )
              Respondents.           )
13                                    )
_____)
14
15          Petitioner Bradley Schwartz has filed a Petition for Writ of Habeas Corpus pursuant

16   to 28 U.S.C. § 2254.  Pursuant to the Rules of Practice of the Court, this matter was referred

17   to Magistrate Judge Ferraro for Report and Recommendation.  Before the Court are the

     Petition (Doc. No. 1), Respondents' Answer (Doc. No. 14), and Petitioner's Reply (Doc. No.
18
     17). Subsequent to the completion of briefing, Petitioner filed a motion to amend, which also
19
     is fully briefed.  (Doc. Nos. 26, 27, 28, 30.)  The Magistrate Judge recommends the District
20
     Court, after its independent review of the record, deny amendment and dismiss the petition.
21
22             **FACTUAL AND PROCEDURAL BACKGROUND**

23          Schwartz was indicted in the Pima County Superior Court for conspiring with Ronald

24   Bigger to murder Brian Stidham and for the murder of Stidham, which occurred on October

25   5, 2004.  The following factual summary of the crime is taken from the Arizona Court of

     Appeals' opinion, in which the court noted that the facts were extensive because they were
26
     primarily circumstantial:
27
                   Both Stidham and Schwartz were pediatric ophthalmologists. From 2001
28          to 2002, Stidham worked for Schwartz, who owned a successful pediatric
            ophthalmology practice in Tucson.  In October 2002, after the State Medical

Board learned Schwartz had been abusing prescription pain medication, it suspended his medical license and required him to seek drug abuse treatment. The Drug Enforcement Agency (DEA) also withdrew Schwartz's license to prescribe controlled substances. In November, while Schwartz was in a residential treatment facility in Tucson, Stidham left Schwartz's practice and opened his own medical office.

In February 2003, Schwartz was released from treatment. His medical license was reinstated in October, and he thereafter reopened his medical office. Although Schwartz's practice grew throughout 2004, it was considerably less successful than it had been before his leave of absence: his income was greatly reduced, the DEA had not reinstated his license to prescribe drugs, and several hospitals and health care organizations had revoked his privileges. Moreover, several of Schwartz's patients and employees had left his practice and followed Stidham to his new office.

Schwartz blamed Stidham for his misfortune and believed Stidham had "left [him] when [he] needed him the most." He became "obsessed with revenge" and wanted to humiliate Stidham and destroy his practice. Schwartz considered planting child pornography or illegal drugs in Stidham's office; he asked a friend to claim Stidham had sexually assaulted her during treatment; and he asked a woman he had met at the treatment center to claim Stidham had fondled her child. He repeatedly told friends that Stidham was "going to die," and he asked several people to "take care of" Stidham or to "poke[ ] out" his eyes, "crush his hands," or "throw acid in his face." In February 2004, he reportedly paid a man $5,000 to kill Stidham, but the plan was foiled when the hired killer was himself murdered in March. Schwartz told his girlfriend that he was going to hire someone to kill Stidham outside Stidham's medical office and that it would look like a carjacking.

On the night of the murder, Stidham conducted an ophthalmology seminar for medical students in his office at 6:00 p.m. The seminar concluded at 7:00, and the attendees had all left by 7:15. At 7:26, the alarm to Stidham's office was activated, indicating the time he left for the evening. At 10:30 p.m., an employee in the complex where Stidham's office was located returned with her fiance to retrieve an item she had left there. They found Stidham's body on the ground in the parking lot and called 911. An autopsy revealed that Stidham had died from several stab wounds to the chest. His wallet, containing his credit cards and some cash, was found inside his pants pocket. His vehicle registration was found on the ground near his body, but his vehicle was gone.

Before the seminar, at approximately 5:45 p.m., several people had seen a man in blue medical "scrubs" sitting on a curb in the parking lot outside Stidham's office. Neither of two men who routinely wore scrubs to work at the complex had been there at that time. At 6:00 p.m., a man wearing blue scrubs, later identified as Ronald Bigger, entered a convenience store near the office complex. He placed several calls from the store phone and left the store at approximately 6:45. About ten minutes later, a man called the store from Schwartz's cell phone, told the store clerk that a man had just called him from that number, and asked whether the caller was still in the store. The clerk informed him the man had left a few minutes earlier. When Bigger left the store, he had been seen walking in the direction of Stidham's office.

Later that evening, Bigger entered a midtown restaurant located about a fifteen-minute drive from Stidham's office. Stidham's vehicle was later found in a parking lot a short walk from the restaurant. At 7:46 p.m., Bigger called Schwartz from a pay phone at the restaurant. Bigger then hailed a taxicab to drive him to another restaurant where Schwartz was having dinner with a companion, Lisa Goldberg. En route, Bigger borrowed the taxi driver's telephone and, at 8:19 p.m., placed another call to Schwartz.

When the taxicab arrived at the restaurant, Schwartz came out and paid the fare. Bigger, who was now wearing casual clothes, joined the two inside for dinner. Goldberg recognized Bigger from Schwartz's office, where she had been introduced to him earlier that day. She noted that he now appeared extremely agitated. Schwartz asked Bigger how the scrubs had "worked out." Significantly, in July, Schwartz had attempted to solicit a prospective "hit man" and said he could provide scrubs to be worn while assaulting Stidham.

After dinner, Schwartz, Goldberg, and Bigger left in Schwartz's car to find a hotel room for Bigger. Several hotels were full, but they eventually secured a room. After Schwartz paid for the room, he and Goldberg left Bigger there and returned to Schwartz's apartment. The next day, Schwartz withdrew $10,000 from his bank account. Bigger was seen that day carrying a large amount of cash in a white envelope. The month before Stidham was murdered, Schwartz had mentioned to Goldberg that he knew a man who was willing to kill someone for $10,000. Upon learning Stidham had been murdered, Goldberg believed Schwartz was responsible. When she asked him about it, he replied that he had not been involved but added that she was "his alibi."

(Doc. 1, Ex. 2 at 2-6.) Schwartz and Bigger were tried separately. Schwartz was convicted on May 2, 2006, of conspiracy to commit first degree murder. The jury could not reach a decision on the first degree murder charge and subsequently it was dismissed. On May 30, 2006, Schwartz was sentenced to life in prison, without the possibility of parole for twenty-five years.

Schwartz filed an appellate brief before the Arizona Court of Appeals, which raised the following arguments: did the trial court err in limiting his third party defense naming Dennis Walsh; was he denied a fair trial in violation of due process by the State's multiple acts of prosecutorial misconduct and the trial court's denial of a mistrial; did the court err in not granting a mistrial based on the testimony of Witness Heath in violation of a court order; did the court err in allowing hearsay testimony by Jennifer Dainty and Jason Lee, which violated his rights under the Confrontation Clause; did the court violate his due process right by precluding impeachment evidence as to Lourdes Lopez's testimony and did the State act

in bad faith in requesting exclusion of this evidence; did the court err in precluding evidence of Daphne Stidham's conduct on the night of the murder and did restriction on cross-examination regarding this conduct violate his Sixth Amendment right; did the court err in precluding his character evidence; did the court violate his right to due process by denying a polling expert; did the court err in denying his requests for change of venue; did the court err in denying his motion to sequester the jury; and did the court err in denying his request for the jury to decide his Rule 20 matter. (Doc. No. 14, Ex. B.) The Court of Appeals affirmed Schwartz's conviction and sentence on March 31, 2008. (Doc. No. 1, Ex. 2.)

Schwartz filed a Petition for Review at the Arizona Supreme Court, seeking review of his claims that: the trial court erred in limiting his third party defense naming Dennis Walsh; he was denied a fair trial in violation of due process by the State's multiple acts of prosecutorial misconduct and the trial court's denial of a mistrial; the court erred in allowing hearsay testimony by Jennifer Dainty and Jason Lee, which violated his rights under the Confrontation Clause; the court violated his due process right by precluding impeachment evidence as to Lourdes Lopez's testimony and the State acted in bad faith in requesting exclusion of this evidence; and the court erred in denying his request for the jury to decide his Rule 20 matter. (Doc. No. 14, Ex. C.) The Arizona Supreme Court denied review on October 28, 2008. (Doc. No. 1, Ex. 3.)

## **DISCUSSION**

Respondents concede that Schwartz's April 9, 2008 petition, which initiated this federal habeas action and alleged six claims, was within the statute of limitations. (Doc. No. 14 at 22.) On April 6, 2010, Schwartz moved to amend to add a seventh claim. Respondents opposed amendment, arguing that the claim is meritless. The Court sua sponte raised the statute of limitations as a possible basis for denying amendment and requested that Schwartz address the issue. The Court first resolves the question of amendment, and then turns to Respondents' arguments that Claims 4 to 6 were not properly exhausted and that Claims 1 to 3 are without merit.

1        **AMENDMENT**

2            Schwartz moves to amend to add a claim that the trial court's denial of his requests

3    for change of venue violated his right to a fair and impartial jury.  (Doc. Nos. 26, 27.)

4    Amendment in a habeas corpus action is governed by Rule 15 of the Federal Rules of Civil

5    Procedure.  *See James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001); 28 U.S.C. § 2242; Rule

6    11, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Although leave to amend "shall

7    be freely given when justice so requires," denial is within the Court's discretion for reasons

8    such as undue delay, bad faith or dilatory motive, futility of amendment, or undue prejudice

9    to the opposing party.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

10           Because Schwartz sought to add this claim a year after the original petition, the Court

11   requested briefing on whether the new claim would be barred by the statute of limitations,

12   rendering amendment futile.  Under the Antiterrorism and Effective Death Penalty Act of

13   1996 (AEDPA), 28 U.S.C. § 2254, a one-year statute of limitations applies to petitions for

14   writ of habeas corpus by state prisoners.  28 U.S.C. § 2244(d)(1).  The primary limitations

15   period runs one year from "the date on which the judgment became final by the conclusion

16   of direct review or the expiration of the time for seeking such review."  28 U.S.C.

17   § 2244(d)(1)(A).

18           In applying (d)(1)(A), the Court must assess when direct review of Petitioner's

19   conviction and sentence became final.  The Arizona Supreme Court denied review on

20   Petitioner's direct appeal on October 29, 2008 (Doc. No. 1, Ex. 3), and his time to petition

21   for a writ of certiorari from the United States Supreme Court expired ninety days later, on

22   January 27, 2009, Sup. Ct. R. 13.  Thus, the judgment against Petitioner became final on that

23   date.  *See Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999) (holding that "direct review"

24   includes the period during which a petitioner can petition for writ of certiorari, regardless of

25   whether the petitioner seeks such review); *see also Jimenez v. Quarterman*, 129 S. Ct. 681,

26   685 (2009) (finding direct review to include the time up to the expiration of the period to

27   seek review by the Supreme Court).

28

The statute of limitations expired in January 2010, prior to Schwartz proposing to add Claim 7. If a new claim in a proposed amended petition is filed after the one-year limitations period has run and the claim does not relate back to a claim in the original petition, amendment is properly denied. *See Hebner v. McGrath*, 543 F.3d 1133, 1134-35 (9th Cir. 2008). When given an opportunity to address the statute of limitations, Schwartz did not contest the Court's preliminary finding that the new claim was outside the statute of limitations and would be untimely unless it relates back to the original petition. (Doc. No. 30 at 2, 3-4.)

Federal Rule of Civil Procedure 15 provides, in relevant part, that an amended pleading "relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). Claims arise out of the same "conduct, transaction, or occurrence" when they are based on "a common 'core of operative facts'"; they do not relate back if they arise out of "events separate in 'both time and type' from the originally raised episodes." *Mayle v. Felix*, 545 U.S. 644, 657, 659 (2005).

First, Schwartz argues that proposed Claim 7 relates back to his original petition because Claim 7 and all of the claims in the original petition arise out of the unfairness of his trial. This argument, that an unfair trial can satisfy the common core of operative facts requirement, has been squarely rejected by the Supreme Court. In *Mayle*, the Court held that the requirement of the same "conduct, transaction, or occurrence," is not satisfied by a claim that merely relates to the same trial or conviction as a timely raised claim. 545 U.S. at 660-64 (allowing claims after the one-year limitations period solely because they relate to the same trial would render almost meaningless the statute of limitations).

Second, with no accompanying argument or explanation, Schwartz cites the section of his petition captioned Procedural Facts Supporting Petition, which included the following language: "Based upon the media attention given to this case, which was both overwhelming

and prejudicial, the Petitioner filed a motion for change of venue (RA 130) and supplemented that motion throughout the course of the proceedings." (Doc. No. 1 at 4.) This brief statement was included in a section of background information and was not relied upon as a basis for any claim in Schwartz's petition. Further, this single sentence does not contain the core operative facts for his proposed claim that his jury was not impartial.

A review of the original petition in entirety reveals that none of the claims therein share a common core of operative facts with the proposed claim. Proposed Claim 7 alleges the pretrial publicity was so extensive and inaccurate, and it recounted inadmissible evidence, that the jury was presumed prejudiced against Schwartz, rendering his trial unfair. (Doc. No. 27 at 3-10.) This claim focuses on media publicity occurring up to and during trial and its impact on the jury. This is a discreet occurrence from the claims in the petition, which allege prosecutorial misconduct during trial and the erroneous admission or preclusion of evidence at trial. Because the proposed claim is separate in type and time from the claims alleged in the petition, it does not relate back.

This conclusion is supported by a review of the proposed claims at issue in *Mayle* and *Hebner*, which were found to not share a common core of operative facts with any timely claims. In *Mayle*, the Court found that a claim challenging a defendant's pretrial statements as inadmissible because they were coerced in violation of the privilege against self-incrimination did not relate back to a claim that the defendant's rights under the Confrontation Clause were violated by the admission of a witness's videotaped testimony. 545 U.S. at 650, 660-61. In *Hebner*, the Ninth Circuit found that a claim challenging the admission of prior bad act evidence at trial was separate in type and time from a claim challenging the standard of proof in a jury instruction. 543 F.3d at 1139. In Hebner's original petition he pled that admitting evidence of another alleged sexual assault denied him due process, and in support he asserted that the trial court only required the prior offense to be proven by a preponderance of the evidence and the jury might have convicted him only to punish him for the prior offense. *Id.* at 1136. The proposed claim alleged that his due

process right was violated because the court instructed the jury that it could find he committed the prior offense by a preponderance of the evidence and, if it so found, it could infer he committed the offense charged. *Id.* at 1135, 1136. The Ninth Circuit found the claims were not sufficiently related because one challenged the admission of evidence at trial while the other was based on the jury instructions. *Id.* at 1138. The facts underlying the proposed claim in *Hebner* were much more closely related to facts pled in the timely petition, than are the facts in Schwartz's proposed claim related to his original petition. Because relation back was not found in the *Hebner* case it is clear that Schwartz's proposed claim does not relate back to the petition. Because Schwartz's proposed Claim 7 does not relate back, it is untimely and amendment is properly denied as futile. *See id.* at 1139; *Bonin*, 59 F.3d at 845 (leave to amend may be denied based upon futility alone).

As an additional matter, the proposed claim regarding pretrial publicity was raised on direct appeal in state court, at which time Schwartz was represented by the same counsel. Schwartz was required by the Rules Governing § 2254 Cases to include in his petition "all grounds for relief available to petitioner." Rule 2(c), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. In the motion to amend, Schwartz provided no explanation why this claim was not included in the original petition. Because the claim and the facts underlying it were known to Schwartz and his counsel prior to the filing of the original petition, his failure to include it earlier constitutes undue delay. *See Chodos v. West Publ'g Co., Inc.*, 292 F.3d 992, 1003 (9th Cir. 2002).

Schwartz's motion to amend is properly denied based on futility and undue delay.

**PROCEDURAL DEFAULT**

With respect to Claims 4 and 5, Respondents argue that, although Schwartz fairly presented them to the Arizona Court of Appeals, they were not properly exhausted because Schwartz did not include them in his petition for review to the Arizona Supreme Court. With respect to Claims 5 and 6, Respondents argue that Schwartz failed to fairly present them as

ones based on federal law in state court and that they are defaulted because Schwartz would now be barred from raising these claims in state court.

**Principles of Exhaustion and Procedural Default**

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion."). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc); *cf. Fields v. Washington*, 401 F.3d 1018, 1022 (9th Cir. 2005) (mere citation to a state case that conducts both a state and federal law analysis does not, by itself, satisfy exhaustion).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). However, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

## Presentation to the Arizona Supreme Court as to Claims 4 and 5

In *Swoopes v. Sublett*, the Ninth Circuit held that, in cases not carrying a life sentence or the death penalty, "claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." 196 F.3d 1008, 1010 (9th Cir. 1999). Respondents submit that because Schwartz was sentenced to life in prison he was required to raise his claims to the Arizona Supreme Court and, further, *Swoopes* was incorrectly decided and all defendants regardless of their sentence are required to raise their claims before the Arizona Supreme Court.

The Court first addresses Respondents' argument that *Swoopes* was decided erroneously. This argument arises from the statutory requirement that a petitioner exhaust "the remedies **available** in the courts of the State," 28 U.S.C. § 2254(b)(1)(A) & (c), which requires giving state courts a "fair opportunity to act" upon the claims, *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). In support of their argument, Respondents cite *Baldwin v. Reese*, 541 U.S. 27 (2004), and *O'Sullivan v. Boerckel*. In *Baldwin*, a case appealed from the Ninth Circuit, the Supreme Court addressed the question of what constitutes notice of the federal nature of a claim sufficient to satisfy the fair presentment requirement of exhaustion. In laying the groundwork for its decision, the Supreme Court stated that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." 541 U.S. at 29 (citations omitted).

*Swoopes* was decided on remand to the Ninth Circuit for consideration in light of the Supreme Court's decision in the *O'Sullivan* case. In *Swoopes*, the Ninth Circuit, just like the *Baldwin* court, began by reiterating the general rule stated in *O'Sullivan* that, "in order to satisfy the exhaustion requirement for federal habeas relief, state prisoners must file for discretionary review in a state supreme court when that review is part of ordinary appellate review." *Swoopes*, 196 F.3d at 1009 (citing *O'Sullivan*, 526 U.S. at 843-48). Further, the

fact that a state employs a discretionary review system does not, in itself, make state supreme court review "unavailable." *Id.* (citing *O'Sullivan*, 526 U.S. at 848.) The court recognized, however, that the Supreme Court had "acknowledged an exception to the exhaustion requirement," when a State provides that a specific remedy is unavailable. *Id.* (quoting *O'Sullivan*, 526 U.S. at 847).

The Ninth Circuit proceeded to assess Arizona's discretionary review system. The court cited two Arizona cases, *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), and *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989), which made it clear that, "in cases not carrying a life sentence or the death penalty, review need not be sought before the Arizona Supreme Court in order to exhaust state remedies." *Swoopes*, 196 F.3d at 1010. Thus, the court concluded, "post-conviction review before the Arizona Supreme Court is a remedy that is 'unavailable' within the meaning of *O'Sullivan*," and unnecessary to exhaust state remedies. *Id.* There is nothing in *Baldwin* that suggests, implicitly or explicitly, that this analysis is flawed or that the holding has been overruled.

Also strongly suggestive of the continued vitality of *Swoopes* is that the Ninth Circuit continues to cite the case for the very proposition Respondents suggest was overruled. In *Castillo v. McFadden*, 399 F.3d 993, 998 n.3 (9th Cir. 2005) (quoting *Swoopes*, 196 F.3d at 1010), the court stated that "[i]n cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" At least one other circuit also has cited *Swoopes* for this proposition without questioning its continuing validity. *See Lambert v. Blackwell,* 387 F.3d 210, 233 (3rd Cir. 2004). In sum, Respondents' argument that the reliability of the holding in *Swoopes* is questionable fails.

Next, the Court turns to Respondents contention that, even if *Swoopes* is controlling law, that case required defendants sentenced to life imprisonment, such as Schwartz, to present their claims to the Arizona Supreme Court. This issue was thoroughly examined by a district judge of this Court, who concluded that, in cases carrying life sentences, review by

the Arizona Supreme Court is not part of the standard review process and is not required for exhaustion. *See Crowell v. Knowles*, 483 F. Supp.2d 925 (D. Ariz. 2007); *see also Paige v. Schriro*, 648 F. Supp.2d 1151, 1168-69 (D. Ariz. 2009) (agreeing with *Crowell*). The court in *Crowell* explained that the language from *Swoopes* regarding defendants sentenced to life imprisonment was dictum, as the defendant in that case had not been sentenced to life in prison. 483 F. Supp.2d at 929. That dictum has been repeated as dictum in many subsequent cases. *See id.* at 930-31. As explained in *Crowell*, the dictum in *Swoopes* and subsequent cases was premised on an outdated version of an Arizona statute, A.R.S. §12-120.21(A)(1). *Id.* at 928-29. Under §12.120.21(A)(1), prior to 1989, original appellate jurisdiction over cases carrying a life sentence belonged to the Arizona Supreme Court. However, after April 1989, the Arizona Court of Appeals has jurisdiction over cases in which a life sentence was imposed and there is no distinction for exhaustion purposes between cases involving a life sentence and those involving other non-capital sentences. 483 F. Supp.2d at 928-29. In sum, Arizona Supreme Court "discretionary review in non-capital cases is 'unavailable' for purposes of federal habeas exhaustion." *Id.* at 933. Therefore, Schwartz's fair presentation of Claims 1 to 4 to the Arizona Court of Appeals was sufficient for exhaustion.

### **Fair Presentation of Claims 5 and 6 as Based on Federal Law**

Claim 5

Claim 5 alleges that the trial court erred in precluding Schwartz from presenting character evidence. First, Schwartz's claim as asserted before this Court is not federal in nature and alleges only that the trial court's ruling was an abuse of discretion. Relief in this Court is available for a person convicted in state court only if the person is in custody in violation of the federal constitution or a law of the United States. 28 U.S.C. § 2241(c)(3). Schwartz alleges no such violation as to Claim 5, therefore, habeas corpus relief is not available. Second, in state court Schwartz alleged the factual basis of this claim only in connection with state-law based arguments supported by state caselaw. (Doc. No. 14, Ex. B at 42-44.) Nowhere in his appellate brief did Schwartz alert the court of appeals that he

was asserting any federal claims. (*Id.*) Further, the state cases cited in that brief do not plainly analyze a relevant federal constitutional issue (*id.*). *See Peterson*, 319 F.3d at 1158; *Fields*, 401 F.3d at 1022. Finally, Schwartz appears to concede that he did not properly exhaust Claim 5. (Doc. No. 17 at 3 n.1.) Schwartz failed to fairly present this claim in state court as one asserting a federal constitutional issue.

Claim 6

Claim 6 alleges the trial court erred in limiting Schwartz's third party defense regarding Dennis Walsh. This claim is, at best, marginally stated as a federal claim in this Court. Regardless, the Court assesses whether it was properly exhausted in state court. Schwartz argues that he presented the federal basis of this claim by citing state law analyzing a federal issue. Fair presentation for purposes of exhaustion can be satisfied by "citation to a state case analyzing [the] federal constitutional issue." *Peterson*, 319 F.3d at 1158. As Schwartz contends, in state court he cited *State v. Gibson*, 202 Ariz. 321, 44 P.3d 1001 (2002) (Doc. No. 14, Ex. B at 15-19), which relied upon *Winfield v. United States*, 676 A.2d 1 (D.C. 1996), and *Winfield* was based upon a defendant's constitutional right to present a complete defense. The court in *Gibson* analyzed only the admissibility of third-party culpability evidence under state rules and did not engage in any analysis based on federal law. 202 Ariz. 321, 44 P.3d 1001. Thus, Schwartz's contention is one step too far removed – citing a case that cites a case employing a federal constitutional analysis is insufficient for fair presentation. *Cf. Fields*, 401 F.3d at 1022 (finding that without labeling a claim as federal it is insufficient to merely cite a state case that conducts both a state and federal analysis). Similarly, in ruling on this claim, the Arizona Court of Appeals cited *Gibson* and other state cases strictly for state law. (Doc. No. 1, Ex. 2 at 6-9.) In sum, Schwartz failed to fairly present this claim on appeal as one asserting a federal constitutional issue.

Procedural Default of Claims 5 and 6

If Schwartz were to return to state court now to litigate Claims 5 and 6, they would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of

Criminal Procedure because they do not fall within an exception to preclusion. Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, these claims are technically exhausted but procedurally defaulted. Schwartz has not alleged cause and prejudice or that a fundamental miscarriage of justice will result if these issues are not reviewed on the merits. Claims 5 and 6 are procedurally defaulted.

**MERITS**

**Legal Standard for Relief Under the AEDPA**

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

- 15 -

the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable," the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 550 U.S. at 473; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v.*

*Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240.

**Claim 1**

Schwartz alleges seven instances of prosecutorial misconduct and that each instance individually and all of them cumulatively violated his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments. As set forth herein, the Court finds that Schwartz's individual claims of prosecutorial misconduct fail. The Court also concludes that, considered cumulatively, the totality of the misconduct allegations do not establish entitlement to habeas relief.

Legal Standard

Clearly established federal law provides that the appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Therefore, in order to succeed on this claim, Schwartz must prove not only that the prosecutor's remarks were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). "[T]he touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In determining if Schwartz's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make this assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, and "the weight of the evidence against the petitioner." 477 U.S. at 181-82. Moreover, the Supreme Court has clearly indicated that the state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly,* 416 U.S. at 645.

Subclaim A

The prosecution called Dr. Jason Lee as a witness regarding his attendance at a lecture at Stidham's office at 6:00 p.m. on the evening that Stidham was murdered. (RT 3/10/06 A.M. at 26-27.) He testified that after he parked his car a person in the parking lot wearing blue scrubs initiated a conversation with him. (*Id.* at 28.) On cross-examination, Lee testified that he had seen pictures in the media of Schwartz and Bruce Bigger and, when interviewed on December 6, 2004, he informed Detective Anderson that neither of them were the man he saw in scrubs in the parking lot of Stidham's office. (*Id.* at 38-39.) On re-direct, the prosecutor asked if the photographs Lee saw in the media were of the entire person or a certain portion of the person, to which Lee responded that they showed most of the body and face. (*Id.* at 43.) The prosecutor then asked, "As to Mr. Bigger, was it not just a mug shot –." (*Id.*) The court sustained the defense attorney's objection to the prosecutor's reference

to a mug shot. (*Id.*) The prosecutor restated the question, asking if the picture of Mr. Bigger was just a "face shot." (*Id.* at 43-44.)

Schwartz alleges that the prosecutor's use of the term "mug shot" was prejudicial because it implied that Bigger had a criminal history. The Arizona Court of Appeals rejected this claim finding that the prosecutor was not necessarily implying that Bigger had a criminal history. (Doc. No. 1, Ex. 2 at 10.) The court found that the prosecutor merely could have been differentiating between a photograph of a person's full body and one of his face, or he could have been referring to Bigger's booking photo from the instant case of which the jury was likely aware given the media coverage. (*Id.* at 10-11.) Finally, the court stated that the jurors were obligated to follow the court's instructions to disregard any statements as to which an objection was sustained, as happened in this instance. (*Id.* at 11.)

The court of appeals' denial of this claim was not objectively unreasonable. As found by that court, and when the prosecutor's question is viewed in context, there is no clear prejudice to Schwartz. The prosecutor's use of the term "mug shot" was directed at how much of the person the photograph revealed not whether the photo was taken in connection with a criminal case. Further, the detective interviewed Lee two months after the murder, when Bigger had been arrested. Therefore, any mug shot reference would reasonably relate to the case at hand. Finally, the objection was sustained and the jury was required to follow the court's instruction not to consider that question (RT 4/25/06 at 14 ("If the court sustained an objection to a question, you must disregard it and any answer given.")). *See Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (it is presumed the jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it). The prosecutor's question, to which an objection was sustained, did not render Schwartz's trial unfair. Schwartz has not established prosecutorial misconduct with respect to Subclaim A.

Subclaim B

Prior to trial, the court precluded the State from introducing any evidence that Schwartz had been the subject of a federal investigation, indictment or plea regarding

prescription drug fraud. (Doc. No. 1, Ex. 1, ROA 449 at 2.) The State's witness Stephanie Nagel was asked on direct where she had met Schwartz, to which she responded that she met him at the federal courthouse. (RT 3/16/06 at 66-67.) Pursuant to an objection to the prosecutor's question regarding why she was at the federal courthouse, the court called counsel to the bench for a conference. (*Id.* at 67.) The prosecutor stated that she would lead the witness through the questions to avoid the precluded issues. (*Id.* at 67-68.) Nagel testified that she was at the federal building to drop a urine sample as a condition of her pretrial release and that Schwartz told her he was also there for a urine drop for drug testing. (*Id.* at 68.) The prosecutor later asked if Nagel was dropping urine samples for her pretrial release for pending felony charges for possession of stolen mail, to which she responded affirmatively. (*Id.* at 73.) There were several further references to the fact that Nagel had a pending federal indictment and that she and Schwartz had interacted at the federal building. (*Id.* at 74, 77-78, 79, 82.) At the end of the direct examination, Schwartz's counsel moved for a mistrial. (*Id.* at 87.) The court denied the motion because the objection was not made until after the entirety of Nagel's direct testimony. (*Id.* at 90-91.)

The court of appeals agreed with Schwartz that the prosecutor indirectly alluded to the federal charges against him, which was improper in light of the court's ruling on the prior motion in limine. (Doc. No. 1, Ex. 2 at 14.) However, the court found that the references were "highly unlikely to affect the jury's verdict," because properly admitted evidence revealed that Schwartz's medical license had been suspended and he had lost his license to prescribe controlled substances. (*Id.* at 14-15.)

Schwartz's argument that he was prejudiced is weak in light of counsel not objecting as soon as Nagel stated that Schwartz was also at the federal building for a urine drop. Further, Nagel made no reference to a federal charge against Schwartz, and other testimony was properly admitted regarding Schwartz's obligation to drop urine pursuant to his suspension by the medical board. Schwartz has not established actual prejudice or that the

admission of this testimony rendered his trial fundamentally unfair. The state court's denial of this claim was not objectively unreasonable.

Subclaim C

State's witness Carmen Fernandez testified that Schwartz asked her about finding someone who could "take care of a person for him." (RT 3/17/06 A.M. at 11.) Then the following exchange occurred:

> Q    And during these conversations you were having with Dr. Schwartz did he ever tell you who he want [sic] to be taken care of?
>
> A    Yes.
>
> Q    Who did he tell you?
>
> A    Dr. Stidham.
>
> Q    He also tell you about another doctor that he wanted to be taken care of?
>
> A    Yes.
>
> Q    Do you know the name of that doctor?
>
> A    I cannot recall the name.
>
> Ms. Davila:    Objections, relevance, Your Honor.
>
> The Court:    Sustained.

(*Id.* at 12.) Defense counsel moved for a mistrial. (*Id.* at 13.) The court denied the mistrial but directed the jury to disregard the answer to the last question stating, "[i]t is not evidence in the case." (*Id.*)

The court of appeals denied this claim finding "beyond a reasonable doubt that Fernandez's testimony did not affect the jury's verdict." (Doc. No. 1, Ex. 2 at 15-16.) This finding was based on the fact that four witnesses testified that Schwartz had asked them to find someone to injure Stidham and three witnesses testified that Schwartz told them he intended to find someone to injure Stidham. (*Id.* at 16.) "In light of this overwhelming and uncontested evidence that Schwartz had been looking for someone he could hire to harm Stidham, the fact that Schwartz may also have wished to harm another doctor would have

had no effect on the jury's verdict." (*Id.*) Additionally, the court noted that the jury had been instructed to disregard the statement. (*Id.*) Schwartz contends the eliciting of this information was improper because the jury's decision should have been based solely on the evidence regarding the death of Stidham and the court of appeals finding, that the evidence did not effect the verdict, was "ludicruous." (Doc. No. 17 at 12.)

The judge immediately informed the jury that they should disregard the statement, which diminishes the possibility that Schwartz was prejudiced. *See Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate.") (quoting *United States v. Berry*, 627 F.2d 193, 198 (9th Cir. 1980)). Additionally, the jury instructions reiterated that the jurors were required to disregard a question and answer if the court sustained an objection to it (RT 4/25/06 at 14). *See Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (it is presumed the jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it). More important, as found by the appellate court, the statement was not significantly prejudicial in light of the evidence that Schwartz informed numerous individuals about his intent to have someone kill Stidham. The statement by Fernandez, which was immediately precluded from the jury's consideration, did not render Schwartz's trial fundamentally unfair.

Subclaim D

During the testimony of Jeff Englander, the State introduced as an exhibit a printed version of Schwartz's palm pilot address book. (RT 3/17/06 P.M. at 123.) Schwartz objected because it contained extraneous information that might be prejudicial and the defense had not reviewed it. (*Id.* at 124.) The State informed Schwartz and the court that they were seeking to admit it to show that the only person's entry that had automobile license and model information was the entry for Stidham. (*Id.*) The court admitted the exhibit solely for the purpose expressed by the prosecution. (*Id.* at 125.) Englander then testified to the fact that the only place in Schwartz's address book that a license number and car model

appeared was under the entry for Stidham. (*Id.* at 126.) Pursuant to a written motion, the court later struck the admission of Exhibit 27 and instructed the jury not to consider the exhibit or related testimony of Englander. (Doc. No. 1, Ex. 8, ROA 556 at 2; RT 3/24/06 P.M. at 3.)

The court of appeals denied this claim finding, first, that the prosecutor's actions were not intentional but the result of negligence or mistake. (Doc. No. 1, Ex. 2 at 18.) Further, the court noted that the jury had been instructed to disregard the exhibit and testimony. (*Id.*) Finally, and most importantly, the appellate court found that the admission of this evidence did not affect the verdict and "was harmless because the jurors later learned that Schwartz had known Stidham's vehicle model and license plate number when another witness testified to that fact without objection." (*Id.*)

Although Schwartz contends the admission of Exhibit 27 was clearly prejudicial, he does not contest the appellate court's finding that almost identical evidence was later admitted through the testimony of Fernandez without objection. (RT 3/24/06 P.M. at 7.) In light of this fact, the admission of Exhibit 27 and Englander's related testimony, which the jury was told to disregard (RT 3/24/06 P.M. at 3; RT 4/25/06 at 14), did not render Schwartz's trial fundamentally unfair.

Subclaim E

In a pretrial order, the court precluded the State from introducing any evidence that Schwartz was the subject of a Drug Enforcement Agency (DEA) investigation or was indicted on federal charges. (Doc. No. 14, Ex. A, ROA 364.) Witness Lourdes Salomon-Lopez, Schwartz's one-time fiancé, testified that she was contacted by the DEA about her and Schwartz and some prescriptions. (RT 3/21/06 at 186.) Several questions later, the prosecutor asked her if there was a reason she left her employment with the Pima County Attorney's Office in 2002. (*Id.* at 191.) She responded affirmatively and that it was "[b]ecause I knew that I was going to be indicted." (*Id.*) Schwartz objected based on the pretrial order and requested a mistrial. (*Id.*) The court denied the request finding that the

question and answer did not implicate that Schwartz was indicted. (*Id.* at 191-93.) Outside the presence of the jury, Lopez testified that the prosecutor had not told her she could not discuss Schwartz's federal indictment or charges. (*Id.* at 197-99.) Schwartz again moved for a mistrial. (*Id.* at 198.) After taking it under advisement, the court denied the request for a mistrial finding that the court's pretrial order had not been violated:

> No evidence has been introduced that she or the defendant were indicted nor has there been any evidence presented to the jury concerning the outcome of the federal case.
>
> Further, the response of Ms. Lopez was not one that the State sought to elicit, but was the result of non-leading questions.
>
> THE COURT THEREFORE FINDS that there is no misconduct on behalf of the State in its questioning of Ms. Lopez.
>
> . . . .
>
> IT IS FURTHER ORDERED that the State and defendant are forthwith precluded from introducing evidence that Ms. Lopez . . . was the subject of a federal indictment or the outcome of any federal criminal charges.

(Doc. No. 14, Ex. A, ROA 541 at 2.)

The court of appeals denied the claim because the testimony did not violate the court order. (Doc. No. 1, Ex. 2 at 19.) Specifically, Lopez's testimony had not "necessarily implied that Schwartz had been indicted." (*Id.*)

The Court disagrees with Schwartz's assessment of the evidence that this testimony, in combination with that of Nagel, made clear to the jury that Schwartz had been indicted. With respect to the DEA investigation and the indictment, Lopez spoke only about herself. Further, this instance does not rise to the level of actual prejudice. As summarized by Schwartz, Lopez testified without objection to the fact that during her relationship with him, "she helped Petitioner unlawfully obtain prescription drugs." (Doc. No. 17 at 14.) Schwartz's addiction to prescription drugs and the consequences that addiction had on his ability to practice medicine were all properly admitted. An indirect implication that Schwartz may have been indicted for unlawful activity of which the jury was aware did not render his trial fundamentally unfair in violation of due process.

<u>Subclaim F</u>

During trial, the court held a hearing regarding the admissibility of certain testimony

regarding DNA testing conducted on swabs taken from the radio knobs in Stidham's car.

The court set forth the factual background as follows:

> The State will be offering the testimony of Curtis Reinbold that he performed autosomal short tandem repeat (STR) testing on the samples. The State will further present evidence that Lorraine Heath performed Y-STR testing on the available samples. Mr. Reinbold will testify that at least one of the unknown samples he tested was a mixture of two males with a major contributor matching the DNA of David Brian Stidham. With respect to the minor contributor, Mr. Reinbold will testify that markers at four loci matched those of Bigger.
>
> Y-STR testing only looks for the presence of markers on the male specific regions of the chromosome. It has been found to be useful in testing where there is a mixed sample of male and female DNA or a sample indicating the presence of at least one male where a small quantity of DNA is available. Ms. Heath will testify that there were two contributors to the DNA with Y-STR testing and that the major contributor matched that of David Brian Stidham. With respect to the minor contributor, Ms. Heath identified nine loci which match loci also found on the DNA of Bigger. Thus, Mr. Reinbold and Ms. Heath will both testify that based on the tests they performed, they could not exclude Ronald Bruce Bigger as the minor contributor. Both witnesses are expected to offer testimony as to the frequency of the profile of the minor contributor on the STR and Y-STR appearing randomly in the general population.
>
> Additionally, the State seeks to admit testimony by Lorraine Heath combining the frequency results of the STR and Y-STR analysis for the purpose of computing the random statistical probability of the results of the STR found by Mr. Reinbold and the Y-STR results from Ms. Heath's analysis appearing in the general population.

(Doc. No. 14, Ex. A, ROA 554 at 1-2.) It was the proposed testimony of Heath regarding the

combined statistical probabilities of the results of the autosomal STR and Y-STR analysis

to which Schwartz objected, and the court granted the motion precluding it. (*Id.* at 2, 5.)

Heath testified at trial regarding the Y-STR testing she conducted and the frequency

with which the profile she identified would appear randomly in the population. (RT 3/28/06

P.M. at 100-19.) The prosecutor then asked, "So what opinion can you give about the

likelihood that the DNA, the nine locus DNA profile that you saw, belonged to Ronald

Bigger?" (*Id.* at 119.) To which she responded, "Having looked at both my own data and

Mr. Reinbold's data, I feel that there is very strong evidence that –" (*Id.*) Schwartz objected

and the court sustained the objection. (*Id.* at 120.) Schwartz then moved for a mistrial. (*Id.*) Upon questioning outside the presence of the jury, Heath stated that she knew she was not to discuss combined statistics and she was complying with that ruling. (*Id.* at 128.) The court then inquired what her answer was based upon if not combined statistics, to which she responded:

> It's still based on the rarity of the profile that occurred, Mr. Reinbold generated, which the statistics are the one and twenty million. And – approximately twenty million. I don't know the exact number. It still – when I do an analysis such as this, I always look at the earlier analysis and I ensure that I agree with that analysis, shall we say. I re-analyze it. I don't re-report it, but I look at it, for my own purposes, and then I combine that with what I see in my head.

(*Id.* at 128-29.)

After reviewing a written motion for mistrial and hearing argument (RT 3/29/06 A.M. at 2-23), the trial court found that Heath's intended testimony was not in violation of the Court's ruling precluding the combined statistical analysis. (*Id.* at 23-26.) In particular, the court found the defense had been given adequate notice that Heath's confidence in her opinion was based on using her experience, not just statistics, to assess both her results and the results of Reinbold. (*Id.*) Over objection, the court allowed Heath to answer the following question posed by the State:

> due to the rarity of the STR profiles that Mr. Reinbold discovered, and the fact that Mr. Reinbold could not exclude Mr. Bigger, based on the rarity of the YSTR profile that you obtained, and the fact that you could not exclude Mr. Bigger, has your confidence increased that Mr. Bigger is the donor of the minor component of DNA on item LX-39?

(RT 3/29/06 P.M. at 8-10.)

The Arizona Court of Appeals found no misconduct by the prosecutor. (Doc. No. 1, Ex. 2 at 21-22.) The court found that the record did not indicate the prosecutor was attempting to ask about combined results nor did Heath testify about a combined statistical probability. (*Id.* at 21.) The court went on to find that Schwartz was not prejudiced and the court sustained the objection, thus, the jurors knew to disregard the statement. (*Id.* at 22.)

The Court disagrees with Schwartz's conclusion that Heath's response, which gave an opinion based on both her results and Reinbold's results, was foreseeable. The prosecutor's question asking for Heath's opinion was limited to how likely it was that the DNA profile she found through **her testing** belonged to Bigger. Further, the objection to that question was sustained, therefore, the jury was required to disregard it (RT 4/25/06 at 14 ("If the court sustained an objection to a question, you must disregard it and any answer given.")). *See Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (it is presumed the jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it). Most importantly, after considering Schwartz's position, the court allowed Heath to testify about her confidence level that the DNA belonged to Bigger based on the rarity of the profile found by both her and Reinbold. Thus, Schwartz was not prejudiced by Heath's initial statement discussing the strength of her opinion in light of both her and Reinbold's results.

Schwartz has not established that the prosecutor acted improperly. Nor has he established that he suffered actual prejudice by the admission of this evidence. The state court's denial of this claim was not objectively unreasonable because this evidentiary issue did not deny Schwartz a fair trial.

<u>Subclaim G</u>

Dr. Winston, a Pima County forensic pathologist, testified that he examined Stidham's body at the scene beginning around 4:15 a.m. (RT 3/14/06 at 185.) Dr. Winston testified that livor mortis, which is the settling of blood after death, appears several hours after death and remains blanchable for about twelve hours, after which time it remains fixed. (*Id.* at 159-62.) He stated the twelve-hour estimate was plus or minus a couple hours, and Stidham's loss of blood could have slowed the development of livor mortis. (*Id.* at 162-63.) Dr. Winston testified that when he examined Stidham's body at the scene, he had blanchable livor mortis over the posterior surfaces of his body, which meant the time of death was less then twelve hours prior. (*Id.* at 164.) On cross-examination, Schwartz's counsel asked Dr. Winton about his note on his autopsy report that livor mortis was not fixed. (*Id.* at 188.) The

doctor testified that the note related to his livor mortis finding at the scene not the state of livor mortis at the autopsy, which was begun at 8:30 a.m. that same morning. (*Id.*) Dr. Winston testified that he could not narrow the time of death beyond his assessment that it happened in the twelve hours prior to 4:15 a.m. (*Id.* at 158, 164, 199.)

Schwartz called Dr. Philip Keene who testified that, after reviewing Dr. Winston's autopsy report, he concluded the livor mortis finding on the report reflected the condition of Stidham's body at 8:30 a.m. when the autopsy was begun. (RT 4/11/06 P.M. at 24.) Dr. Keene acknowledged that some of the literature gives the range of time for livor mortis to fix as up to twelve hours but in his opinion, based on the most recent publications, it will fix within six to eight hours. (*Id.* at 20-23, 36-37.) Dr. Keene estimated Stidham's time of death to have been between 9 p.m. and the time his body was discovered around 10:30 p.m. (*Id.* at 21-22.)

That same day, Schwartz re-called Dr. Winston and during questioning he stated that his prior testimony was in error and that the notation in the autopsy report that livor mortis was not fixed was based on his review of the body at 8:30 a.m. when he began the autopsy; it was not based on the body at the scene. (*Id.* at 96.) He stated that he realized his error after he testified and he thought he would correct it when called back by the defense. (*Id.* at 97.) Dr. Winston stated that his mistake had not caused him to change his opinion about Stidham's time of death and that it could have occurred any time after he left his office at 7:30 p.m. (*Id.* at 97-98, 102, 112.) He reiterated that the twelve-hour estimate for livor mortis fixing is plus or minus some time, is not definitive, and that refrigeration of a body as occurred with Stidham could extend the time period. (*Id.* at 97-98, 103-05.) On cross-examination by the State, Dr. Winston testified that in two recent cases, in which bodies had been refrigerated, livor mortis had not fixed twenty-four and thirty hours after death. (*Id.* at 105-07.)

At a bench conference, the prosecutor stated that she learned of Dr. Winston's error and intention to correct it just before he took the stand, which was confirmed by Dr. Winston,

and she thought the defense already knew about Dr. Winston's mistake and that was the purpose of recalling him. (*Id.* at 113-14, 122, 129-30.) The court found that the prosecutor should have immediately informed defense counsel of Dr. Winston's disclosure. (*Id.* at 132.) However, it denied a mistrial because it believed the prosecutor was being truthful and it found no prejudice to Schwartz. (*Id.*) The following day, the court instructed the jury that the testimony by Dr. Winston, regarding the two recent cases in which livor mortis had not become fixed after more than twenty-four hours, was stricken from the record and they were to disregard it. (RT 4/12/06 P.M. at 29-30.)

The court of appeals denied this claim finding that Schwartz had not suffered any prejudice. This Court agrees. Schwartz appears to be arguing that because the time of death was critical he was prejudiced. However, he was able to call into question Dr. Winston's reliability on the time of death and the erroneous testimony was corrected prior to the jury's deliberation. As Schwartz's counsel stated, he recalled Dr. Winston because he thought his original answer about the livor mortis note on his autopsy report was untruthful. (RT 4/11/06 P.M. at 131.) Schwartz was able to show the jury that Dr. Winston's prior testimony was inaccurate, just as he intended to do.

Schwartz makes no clear claim of prejudice under *Darden*, rather, he argues under a new legal theory that he was prejudiced because his conviction was premised on testimony that the prosecutor knew or should have known was false.[1] In *Napue v. Illinois*, the Supreme Court held that the knowing use of false evidence by the state, or the failure to correct false evidence, violates due process. 360 U.S. 264, 269 (1959). To prevail on a *Napue* claim, the petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was

---

[1] Although Respondents did not raise exhaustion, this is an entirely new claim that was not raised or exhausted in state court. (Doc. No. 14, Ex. B at 29-30.) It is governed by a different legal standard, as discussed above, and as set forth in Schwartz's petition and reply brief. Regardless, the Court will review the claim because it is meritless. *See* 28 U.S.C. § 2254(b)(2).

material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). For the purpose of *Napue* claims, materiality is determined by "whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury,'" in which case "the conviction must be set aside." *Id.* (citations omitted). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (internal quotation omitted).

Schwartz has no evidence that the prosecutor knew or should have known that any of Dr. Winston's testimony was false. His arguments to this effect are wholly conclusory. First, to the extent Schwartz is suggesting that Dr. Winston testified falsely about the time of death, there is no evidence to substantiate that argument. His testimony regarding the time of death was called into question by other testimony and his changed testimony on livor mortis, but he never altered his opinion on the time of death and there is no basis to conclude it was "false."

Second, Schwartz contends the prosecutor knew or should have known that Dr. Winston testified falsely about the timing of blanchable livor mortis. In support of this argument, Schwartz relies upon the prosecutor's questions on cross-examination that indicated she and Dr. Winston had discussed his recent experiences with livor mortis prior to him taking the stand, in an effort to rehabilitate him. The prosecutor acknowledged at trial that she discussed Dr. Winston's erroneous testimony and his intention to change it immediately prior to him testifying that day. This is no way indicates the prosecutor knew or should have known the original testimony was false at the time she presented it. Similarly, the fact that she discussed additional testimony that might help rehabilitate or support his opinion regarding the time frame for blanchable livor mortis, in no way suggests she knowingly put on false testimony. Finally, the trial judge credited the prosecutor as being truthful regarding when Dr. Winston informed her about his change in opinion.

1    Schwartz has not established that Dr. Winston's testimony regarding the time of death

2    was false or that the prosecutor knew or should have known she was presenting any false

3    testimony.  Most significant to this analysis is the fact that Dr. Winston's false testimony

4    could not have affected the jury's verdict because it was shown to be false prior to

5    deliberations.  Thus, the verdict is not in question.

6                     Cumulative Analysis and Conclusion

7            Petitioner focuses extensively on the knowledge and experience of the prosecutor in

8    arguing misconduct, as well as his characterization of the alleged misconduct as intentional

9    in nature.  The focus of a due process assessment for claims of prosecutorial misconduct is

10   whether Schwartz's trial was fair not the culpability of the prosecutor.  *Phillips*, 455 U.S. at

11   219.  The instances of alleged prosecutorial misconduct did not, individually or cumulatively,

12   "so infect[] the trial with unfairness as to make the resulting conviction a denial of due

13   process."  *Darden*, 477 U.S. at 181.  This finding is bolstered by the fact that the jury was

14   instructed to disregard inadmissable evidence, both near in time to its admission and again

15   in the final jury instructions.  *See Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (it is

16   presumed the jury will follow an instruction to disregard inadmissible evidence inadvertently

17   presented to it).

18           The Court rejects Schwartz's claim that he is entitled to habeas relief based upon

19   prosecutorial misconduct.  The determination of the Arizona Supreme Court that Schwartz

20   was not deprived of his right to a fair trial was neither contrary to nor an unreasonable

21   application of clearly established federal law.  Particularly when evaluated in the light of the

22   substantial evidence of Schwartz's guilt, the conduct engaged in by the prosecution,

23   considered individually or in the aggregate, did not constitute a due process violation.

24   *Darden*, 477 U.S. at 182; *see Cook v. Schriro*, 538 F.3d 1000, 1021 (9th Cir. 2008)

25   (petitioner not entitled to relief where it was clear that the jury would have returned a guilty

26   verdict notwithstanding the prosecutor's comments).  Therefore, Schwartz is not entitled to

27   relief on Claim 1.

28

## Claim 2

Schwartz alleges that the admission of hearsay testimony by witnesses Jennifer Dainty and Dr. Jason Lee violated his right under the Confrontation Clause.

As discussed in Claim 1(A), Lee testified about his attendance at a lecture given by Stidham at his office on the night he was murdered. (RT 3/10/06 A.M. at 26-27.) He testified that he arrived around 5:50 p.m. and encountered a person in the parking lot wearing blue scrubs. (*Id.* at 28.) The prosecutor then asked Lee:

> Q    And what drew your attention to him other than the fact he may have been sitting on the curb?
>
> A    Well, he initiated the conversation, because he saw that I was looking for something, and he –
>
> Mr. Storts:    Objection, hearsay.
>
> The Courts:    I am going to overrule that.
>
> . . . .
>
> A    He asked me if I was looking for something –
>
> The Court:    Okay, that's hearsay.
>
> Mr. Platt:    May we approach?
>
> . . . .
>
> The Court:    I guess you are not offering it for the purpose of what?
>
> Mr. Platt:    And the Court has already ruled that he can talk about this. I am not offering it for the proof –
>
> Mr. Storts:    There's never been a – Not this man. This is hearsay.
>
> The Court:    So I guess the issue is – Okay?
>
> Mr. Platt:    It's not being offered for the truth that's being asserted. It again goes to identify. And this was the object of the motion that you allow us to get into with Dr. Lee.
>
> The Court:    Let me hear from you, Mr. Storts, please.
>
> Mr. Storts:    That's fine. I have nothing further.
>
> The Court:    Okay. I will overrule the objection. Thank you.
>
> . . . .

| | | |
|---|---|---|
| 1 | Q | Did you have a brief conversation with this man? |
| 2 | A | Yes. |
| 3 | Q | And you previously testified that he asked you a question? |
| 4 | A | He helped direct me to, you know, the office that I was looking for. |
| 5 | Q | That would have been Dr. Stidham's office? |
| 6 | A | Correct. |
| 7 | Q | And did he mention to you anything about pizza? |
| 8 | A | Yes. He mentioned to me that he thought that pizza had recently been delivered to Dr. Stidham's office. |

(*Id.* at 29-31.)

Jennifer Dainty, an employee at a convenience store near Stidham's office testified that around 6:00 p.m. on the night of the murder a man in blue scrubs entered the store. (RT 3/14/06 at 33.) The prosecutor asked her:

| | | |
|---|---|---|
| | Q | All right. When the man in scrubs came into your store, ma'am, did you have a conversation about pizza, or did he say something to you about pizza? |
| | A | Yeah. He had said he was at a meeting, and they were serving pizza, and he didn't like pizza, so he was in to my store to look for something else to eat. |

(*Id.* at 40.) Upon reviewing a photo lineup, Dainty identified the man in scrubs from the store as Bigger. (*Id.* at 49-52.)

In a pretrial ruling, the court denied a motion in limine to preclude this testimony:

> The Court agrees with the State that the statement is not being offered to prove that pizza was being served or that the declarant did not like pizza, but to show that the person who made the statement at the convenience store was the same person who spoke with Dr. Lee at the medical complex.
>
> IT IS THEREFORE ORDERED that the statements allegedly made to the convenience store clerk and Dr. Lee regarding pizza are not hearsay and are admissible.

(Doc. No. 14, Ex. A, ROA 516.)

The Arizona Court of Appeals affirmed the trial court's ruling, finding:

> the trial court correctly concluded the out-of-court statements were not hearsay because they were not offered to prove their truth. Whether pizza had in fact

> been delivered to Stidham's medical office and whether Bigger actually disliked pizza were irrelevant to any issue at trial, and Schwartz would not have benefitted from cross-examining the man in blue scrubs about his statements.

(Doc. No. 1, Ex. 2 at 27.)  The court went on to conclude that because the statements were neither testimonial nor hearsay, the Confrontation Clause was not implicated.  (*Id.* at 29.)

Schwartz spends a significant portion of his petition discussing whether the testimony was hearsay and, therefore, improperly admitted under the state rules of evidence.  (Doc. No. 1 at 38-41.)  It is not this Court's role to review state law decisions on state law issues.  *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (precluding inquiry into the correctness of a state-court evidentiary ruling).  Additionally, because the Court finds the statements were not hearsay there was no violation of the state evidentiary rules.  Below, the Court examines the claim strictly as a constitutional issue.

Schwartz had a right under the Confrontation Clause of the Sixth Amendment and the Due Process Clause to cross-examine the witnesses against him.  *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *Pointer v. Texas*, 380 U.S. 400, 403-04 (1965).  The Confrontation Clause precludes admission of testimonial out-of-court statements if the party against whom they are offered has not had an opportunity to confront that witness.  *Crawford v. Washington*, 541 U.S. 36, 69 (2004).  However, statements that are not hearsay or are non-testimonial do not implicate the Confrontation Clause.  *Id.* at 59 n.9, 68 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).  Respondents contend that the statements were neither hearsay nor testimonial.  The Court examines both those arguments below.

Under Arizona Rule of Evidence 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Schwartz contends the statements by Lee and Dainty were hearsay because the State offered them to prove the truth of the matter – that pizza was delivered to

Stidham's office on the night of the murder.[2]  He argues that only if the statements were true does that help establish that Bigger was in the parking lot on the evening of the murder.  The Court disagrees.  As found by the trial court and the Arizona Court of Appeals, the statements were offered to establish that the person who commented on pizza delivery to the convenience store clerk, who identified that person as Bigger, was the same person who spoke to Lee in Stidham's office parking lot.  This correlation arises from the similarity of the statements, not from the fact that pizza was in fact delivered to Stidham's office.  *See Anderson v. United States*, 417 U.S. 211, 220 & n.8 (1974) ("evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement.").

If Schwartz doubted that Dainty or Lee accurately recounted the statement by the man in the scrubs, he was free to cross-examine them on that point.  *See Street*, 471 U.S. at 414. Schwartz's right to cross-examination in this instance was satisfied by Dainty's and Lee's presence on the stand.  *Id.*  The Court concludes that this testimony was not hearsay and did not implicate the Confrontation Clause.

Although the Supreme Court did not completely define the parameters of testimonial statements in *Crawford*, it identified the core of such statements as those "made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," such as ex parte in-court testimony, affidavits, custodial examinations and police interrogations, prior testimony not subject to cross-examination by the defendant, and confessions.  541 U.S. at 51-52.  Schwartz contends that the statements attributed to Bigger prior to his commission of a murder were testimonial because "even he would be able to foresee that whatever he said to other persons [at that

---

[2]  Petitioner argues that to admit these statements the State erroneously relied on Arizona Rule of Evidence 801(d)(1)(c), which excepts from hearsay statements of identification "made after perceiving the person," if the declarant testifies at trial regarding the statement.  The Court agrees that this exception does not apply.  Regardless, the Arizona Court of Appeals did not rely on an identity exception for testimony that it found would otherwise qualify as hearsay.  Rather, it concluded the statements were not hearsay.

time] might be used in a criminal investigation or prosecution."  (Doc. No. 17 at 26.)
Schwartz's singular argument characterizing the statements as testimonial, made for the first
time in his reply brief, is without foundation.  To the contrary, these "off-hand" remarks by
the man in blue scrubs, made prior to a crime being committed, are far outside the boundaries
of testimonial statements the Supreme Court classifies as implicating the Confrontation
Clause.  *See Crawford*, 541 U.S. at 51.  The Court finds these statements were not
testimonial.

The Arizona Court of Appeals' opinion denying this claim was not an unreasonable
application of Supreme Court law and Schwartz is not entitled to relief.

**Claim 3**

Schwartz alleges his right to present a complete defense was violated by the State
successfully precluding him from using witnesses Paul Skitzki and Dave Wickey to impeach
the State's witness Lourdes Lopez.

Legal Standard[3]

Due process provides a defendant the right to a fair opportunity to present a defense
to the State's accusations, including calling witnesses on his behalf.  *Chambers v.
Mississippi*, 410 U.S. 284, 294 (1973).  When these rights are restricted in a way that
deprives a defendant of a fair trial in violation of due process, he is entitled to relief.  *Id.* at
302 (trial court excluded "critical evidence").  However, a defendant does not have "an
unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible

---

[3]     The Arizona Court of Appeals held that, under state law, the evidence from Skitzki
and Wickey was properly excluded under state evidentiary rules. (Doc. No. 1, Ex. 2 at 29-
34.) Although Schwartz contests this ruling, and Respondents also focus on the state law
issue, it is not this Court's role to review state law decisions on state law issues. *See Estelle
v. McGuire,* 502 U.S. 62, 67-68 (1991) (precluding inquiry into the correctness of a state-
court evidentiary ruling). Similarly, Schwartz argues the State acted in bad faith but provides
no law suggesting that the State's intent is a factor in the analysis of whether the state court
violated Schwartz's constitutional rights.   The Court addresses solely the federal
constitutional due process claim.

under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). States have the power to "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability," and judges have wide latitude to exclude evidence that is "marginally relevant" or would cause confusion of the issues. *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Chambers*, 410 U.S. at 302).

Skitzki

On direct examination, Lopez testified that in February or March 2003, Schwartz told her that Stidham was going to die, that he would not do it himself and it would be like a robbery or carjacking. (RT 3/22/06 at 14.) She stated she did not take Schwartz seriously. (*Id.* at 16.) On cross-examination, defense counsel asked Lopez if she had mentioned any of the conversations she had with Schwartz about Stidham to anyone else, and she testified that she had told Paul Skitzki of the Pima County Attorney's Office about them prior to the murder. (*Id.* at 106-07.)

On March 27, 2006, the State moved to preclude Schwartz from impeaching Lopez with testimony by Skitzki, who had been noticed as a defense witness. (Doc. No. 14, Ex. A, ROA 562.) Specifically, the State alleged that it anticipated Schwartz was going to ask Skitzki if Lopez revealed Schwartz's threats about Stidham to Skitzki prior to the murder, and Skitzki was expected to respond in the negative. (*Id.* at 2.) Because this contradicted Lopez's testimony, the State anticipated Schwartz would use it to demonstrate that Lopez was untruthful. (*Id.*) The court granted the State's motion to preclude Skitzki from testifying. (Doc. No. 14, Ex. A, ROA 617.)

The Arizona Court of Appeals denied this claim finding that the evidence was properly excluded pursuant to Arizona Rule of Evidence 608. As stated by the appellate court, [u]nder Rule 608(b), a party cannot introduce extrinsic evidence to impeach a witness regarding an inconsistent fact that is collateral to the trial issues, but is 'bound by the witness'[s] answer.'" (Doc. No. 1, Ex. 2 at 30 (citing *State v. Hill*, 174 Ariz. 313, 325, 848

P.2d 1375, 1387 (1993)).  With respect to Schwartz's argument that Lopez's testimony, that she had told Skitzki of the threats, undermined the heart of his defense that no one took his threats seriously, the court found:

> Lopez, however, had testified on direct examination that she had believed Schwartz was a "big blowhard [who] made a lot of big talk" and that she had not taken his threats against Stidham seriously.  Although she testified she had told Skitzki about the threats, she did not say whether she had done so because she had taken them seriously or for some other reason.  Therefore, Lopez's testimony that she had told Skitzki about the threats did not necessarily undermine Schwartz's defense, and Skitzki's testimony would have constituted impeachment evidence on a collateral issue.

(*Id.* at 31.)  The court went on to state that "[g]enerally, 'extrinsic evidence may not be admitted to impeach testimony invited by questions posed during cross-examination.'" (*Id.* (quoting *United States v. Castillo*, 181 F.3d 1129, 1133 (9th Cir. 1999)).  In light of that principle the court discussed the circumstances surrounding the proffered evidence and held:

> Schwartz concedes in his reply brief that defense counsel had known before cross-examining Lopez that she would testify she had told Skitzki about Schwartz's threats.  In light of Lopez's previous testimony that she had not taken Schwartz's threats seriously, which wholly supported Schwartz's defense, it seems that Schwartz hoped to elicit testimony about Skitzki for the sole purpose of later challenging Lopez's general credibility by introducing extrinsic evidence to impeach her on that point.  Extrinsic evidence about collateral facts is not admissible for such purpose, *see* Ariz. R. Evid. 608(b), and we cannot say the court erred by precluding the testimony.  *See Castillo*, 181 F.3d at 1133-34.

(*Id.* at 32.)  Finally, the court noted that although Schwartz identified Skitzki prior to trial as a "potential impeachment witness," "the state could not have known then what Schwartz would ask Lopez on cross-examination or whether Schwartz would in fact call Skitzki as a witness."  (*Id.* at 33 n.8.)

As thoroughly explained by the court of appeals, the exclusion of Skitzki's testimony did not render Schwartz's trial fundamentally unfair because it was not relevant to the ultimate issue of his guilt or innocence but related solely to a collateral matter.  In particular, Lopez had testified explicitly on direct examination that she had not taken Schwartz's threats seriously, which supported his defense that he had merely made empty threats towards Stidham and no one believed him.  This defense theory was not undermined by Lopez's brief

testimony that she told Skitzki about the threats because she did not provide any explanatory information regarding why she told him. Further, contrary to Schwartz's argument, because Lopez provided no basis for why she told Skitzki, the testimony did not contradict her prior statements that she did not believe Schwartz's threats.[4] The court of appeals' decision precluding this evidence was not an objectively unreasonable application of federal law.

Wickey

On direct examination, witness Lopez testified that she was contacted in September 2001, by the DEA about some prescriptions relating to both her and Schwartz. (RT 3/21/06 at 186.) On cross-examination, Lopez testified that when the DEA agent first contacted her, he did not tell her exactly why he wanted to speak with her and she assumed it was about a drug case she was prosecuting. (RT 3/22/06 at 46.) When she met with the DEA, she stated that she was not truthful with them because she did not want Schwartz to get into trouble. (RT 3/21/06 at 186-87.) She later told the United States Attorney, in a meeting with a DEA agent, that she had not been honest in her initial interview. (*Id.* at 188-89.) She also testified that she resigned from the Pima County Attorney's Office because she was going to be indicted. (*Id.* at 191.)

On April 11, 2006, Schwartz filed a notice of disclosure of DEA Agent Dave Wickey as a surrebuttal witness to impeach Lopez's testimony about her knowledge of the DEA investigation. (Doc. No. 14, Ex. A, ROA 590 at 1.) Schwartz averred that the information was known to the State and had been disclosed on March 14, 2005. (*Id.* at 2.) The State made an oral motion to preclude Wickey from testifying, which the court granted on April 12, 2006. (Doc. No. 14, Ex. A, ROA 617.)

---

[4]    In his reply brief, Schwartz argues that it was legitimate to ask Lopez on cross-examination if she had told anyone about Schwartz's threats because if she had answered in the negative that would have supported his defense. The court of appeals stated that Schwartz conceded before that court that he knew that Lopez, if asked, would testify that she had told Skitzki about the threats. (Doc. No. 1, Ex. 2 at 32; *see also* RT 4/12/06 A.M. at 22.) Thus, to the extent this testimony undermined his defense it was of his own doing.

The Arizona Court of Appeals held that the proposed testimony of Wickey "about Lopez's reasons for leaving the Pima County Attorney's Office and about her knowledge of the DEA investigation clearly would not have been relevant or admissible apart from their impeachment purpose. Accordingly, we cannot say the trial court erred by precluding the collateral testimony." (Doc. No. 1, Ex. 2 at 34.)

Schwartz has not attempted to explain how Wickey's proposed impeachment testimony was material and non-collateral or how its exclusion rendered his trial unfair. As found by the court of appeals, this evidence was not relevant to the ultimate issue in the case and its exclusion did not deny Schwartz a fair trial. The state court's decision precluding this evidence was not an objectively unreasonable application of federal law.

Conclusion

The state court's preclusion of Skitzki and Wickey as impeachment witnesses did not violate Schwartz's right to due process. Further, even if the restriction on impeachment witnesses was error, Schwartz has not demonstrated that it had a substantial and injurious effect on the verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). Claim 3 is without merit.

**Claim 4**

Schwartz alleges that the trial court's decision to preclude evidence regarding the conduct of the victim's wife, Daphne Stidham, on the night of the murder violated his Sixth Amendment Confrontation Clause right to a full cross-examination of the police officers present at her home that night.

The Arizona Court of Appeals set forth the following background regarding this issue, which Schwartz does not challenge:

> At midnight on the night of the murder, several Pima County Sheriff's deputies went to the Stidham residence to conduct a welfare check. The deputies let themselves into the home through an unlocked door in the garage after no one responded at the front door. They found Daphne Stidham, the victim's widow, asleep in bed and woke her. Without looking to see if her husband was in bed beside her, she asked: "Is my husband okay?" She then asked: "Was he shot?" Because the deputies had not mentioned that her husband had been harmed, one of them asked her why she would ask that

- 40 -

question. She replied: "Because he's missing. He didn't come home yet." The deputies told Daphne that her husband was dead, and she began to cry. Several of the deputies saw a legal document, lying on a couch in the bedroom. They noted it had both of the Stidham's names on it and believed it to be a will.

Schwartz informed the state before trial that he considered Daphne's behavior on the night of the murder to be "bizarre" and that she was a "potential suspect" in the murder. Although Schwartz did not assert an intention to present a third-party culpability defense accusing Daphne of the murder, the state filed a motion in limine to preclude such a defense. After a hearing, the trial court granted the state's motion, finding that the evidence about Daphne's behavior on the night of the murder would be irrelevant and that any possible relevancy would be outweighed by potential confusion of the issues.

(Doc. No. 1, Ex. 2 at 34-35.)

The court of appeals noted that, at a pretrial hearing, defense counsel conceded he did not intend to raise a third-party defense as to Daphne Stidham, which the court found amounted to an implicit acknowledgment "that evidence of Daphne's reaction on the night of the murder would not have created a reasonable doubt about Schwartz's guilt." (*Id.* at 36.) The court upheld the trial court's decision, agreeing that any relevancy of the evidence was outweighed by possible confusion. (*Id.*) The court further concluded that Schwartz's right to cross-examination was not violated because evidence of Daphne Stidham's conduct on the night of the murder was irrelevant as it did not tend to create reasonable doubt as to Schwartz's guilt. (*Id.*)

Defendants have a right to cross-examination based on the Confrontation Clause of the Sixth Amendment. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). The Supreme Court recognizes that cross-examination is critical to test a witness's story but more importantly serves the goals of impeachment of credibility and exposure of bias. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Schwartz's sparse argument is limited to a general contention that Daphne Stidham's conduct was relevant to the victim's cause of death. (Doc. No. 1 at 46-47.) He provides no discussion as to how the evidence of her conduct on the night of the murder, without more, would tend to create reasonable doubt about his guilt. He states only that it does so. The state court's conclusion to the contrary was not objectively unreasonable and did not violate Schwartz's confrontation rights. In particular, Schwartz's concession in state court that he did not intend to present a third-party culpability defense as to Daphne Stidham was an acknowledgment that the evidence was not relevant. Because the evidence was irrelevant and would be prone to confusing the jury, the trial judge was within constitutional bounds to restrict such cross-examination. *See Van Arsdall*, 475 U.S. at 679; *see also Perry v. Rushen*, 713 F.2d 1447, 1455 (9th Cir. 1983) (finding no constitutional violation because the evidence, which was excluded for "lack of probity and its tendency to confuse the jury" was not central enough to the question of guilt or innocence). Claim 4 is without merit.

## CONCLUSION & RECOMMENDATION

Schwartz's motion to amend should be denied because amendment would be futile and Schwartz unduly delayed raising the proposed claim. Claims 5 and 6 are procedurally defaulted and should be dismissed on that basis. Claims 1 to 4 do not warrant relief under the AEDPA and should be dismissed on the merits. Based on the foregoing, the Magistrate Judge recommends the District Court enter an order DENYING the Motion to Amend (Doc. No. 26) and DISMISSING the Petition for Writ of Habeas Corpus.

DATED this 28th day of April, 2010.

D. Thomas Ferraro
United States Magistrate Judge