**BARTON & STORTS, P.C.**
**271 North Stone Avenue**
**Tucson, AZ 85701**
**(520) 882-2802 (tel.)**
**(520) 882-5785 (fax)**
**brickstorts@yahoo.com**
**Brick P. Storts, III**
**Pima County Computer No. 55508**
**Arizona State Bar No. 004507**
**Attorney for Petitioner, BRADLEY SCHWARTZ**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| BRADLEY SCHWARTZ | ) | |
| Petitioner, | ) | No. CV 09-200-TUC-DCB (DTF) |
| | ) | |
| vs. | ) | |
| | ) | (Pima County Superior |
| CHARLES L. RYAN, DIRECTOR, | ) | Court Cause No.CR20043995) |
| ARIZONA DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | OBJECTIONS TO MAGISTRATE'S |
| | ) | REPORT & RECOMMENDATION |
| Respondents. | ) | |
| | ) | |

Petitioner, Bradley Schwartz, by and through counsel undersigned, and

pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), Federal Rules of Civil

Procedure, hereby submits his Objections to the Magistrate's Report and

Recommendation filed April 28, 2010.  Facts and authorities in support of this

pleading are presented in the following Memorandum of Points and Authorities.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

1. <u>**EXHAUSTION**</u>

Petitioner rests upon the argument presented in the habeas reply as to the fair presentation and exhaustion of state remedies as to claim 6 and, without acknowledging claim 6 is procedurally defaulted, addresses only those claims the Magistrate considered on the merits.

2. <u>**OBJECTIONS**</u>

As demonstrated herein, the Magistrates Report & Recommendation relies upon state court findings that constitute an unreasonable application of clearly established federal law and, therefore, has resulted in an erroneous recommendation.

A. <u>**CUMULATIVE EFFECT OF EVIDENTIARY ERRORS VIOLATED DUE PROCESS**</u>

Throughout the Magistrate's Report and Recommendation are conclusions based on state appellate court findings that (1) the trial court's instructed the jury not to consider matters where objections thereto were sustained, and (2) that error was harmless because cumulative evidence of the improperly injected material was otherwise admitted.

As to Petitioner's claims (1) of the prosecutor's use of the term "mug shot" which implied that Biggers had a criminal history, (Magistrate's Report & Recommendation (MRR), p. 18-19), (2) that testimony was elicited that Petitioner

was soliciting to have another doctor "taken care of" (MRR, p. 21-22), (3) that the State elicited testimony from Jeff Englander that the only entry in Petitioner's palm pilot address book that contained an automobile license and model was the entry for Dr. Stidham, (MRR, pp. 22-23), (4) that improper testimony as to the combining of frequency results of DNA analyses determined by Lorraine Heath and Curtis Reinbold was elicited from Lorraine Heath (MRR, pp. 25-27) and, (5) that Dr. Winston, the Pima County forensic pathologist, initially testified falsely as to a critical factor of the crime; the time when he determined livor mortis to set in, which is a standard by which the time of death is determined; the Magistrate found no prejudice because the court of appeals found that objections were sustained, and the jury is presumed to follow instructions to disregard inadmissible evidence inadvertently presented to it.

## B.   CLAIM 1: PROSECUTORIAL MISCONDUCT AND UNFAIR TRIAL

As the Magistrate Judge pointed out, Petitioner is entitled to relief if the adjudication of the case by the State Court resulted in a decision "that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an **unreasonable determination of the facts in light of the evidence presented in the State court proceeding"** See, AEDPA. (emphasis added)

3

It would be an "unreasonable application if a state court "refuses to extend that principle (a governing legal rule announced by the Supreme Court) to a new context where it should apply" See, *Williams v. Taylor*, 529 U.S. 362 at 407 (2000), or renders an otherwise "objectively unreasonable" decision. *Schriro v. Landrigan*, 550 U.S. 465 at 473 (2007). Moreover, Petitioner is entitled to relief if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). The *Miller* Court also said that a state court decision based on factual grounds will be overturned if it is "objectively unreasonable in light of the evidence presented in the state-court proceeding". Id at 340.

Petitioner must show not only that the prosecutor's remarks (and/or conduct) were improper but that they also "so infected the trial with unfairness as to make the resulting conviction a denial of due process". *Johnson v. Sublett*, 63 F3d 926, 930 (9th Cir. 1995). In *Smith v. Phillips*, 455 U.S. 209, 219 (1982) the Court said that the "touchstone of due process analysis in a case of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor".

Petitioner's trial was anything but fair. The prosecutors' intentional and/or reckless improper remarks and conduct, the continuous need for the court to instruct the jury to disregard testimony they had already heard, and should not have, and exhibits they had already seen and/or been told about, when they should not have, the

4

prosecutors' repeated improper questioning, their attempts to back door court rulings and their attempts to make false testimony appear to be true so infected the proceedings that Petitioner did not and could not have received a fair trial. Petitioner's trial was a travesty and a total miscarriage of justice. Much was ignored, excused and explained away by the Arizona courts because, with all due respect, the trial court did not want to mistry this high profile murder case and the appellate court did not want to reverse.

The Arizona courts suggested that all was well because the jury was told to disregard the improperly received evidence and testimony, over and over again, and because the evidence and/or testimony could not have influenced the verdict. The Arizona courts were all too willing to assume the jury was capable of following the court's admonition to disregard, even though they were asked to do so repeatedly, on the one hand, but not willing to recognize that the jury was capable of understanding the innuendo and unfair inferences created by the prosecution when it came to damaging and prejudicial testimony which was improperly admitted, on the other.

There are some situations where "the risk that the jury will not ... follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. U.S.,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627 (1968). This is such a case. The state

court decision in this case "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" See, AEDPA. *Miller-El v. Dretke*, supra.

### 1.    The "Mug Shot"

The prosecutor asked Dr. Lee if the photo he had seen was or was not a "mug shot." (This all ignores that Dr. Lee said that the person he saw did not resemble either Petitioner or his alleged co-conspirator Mr. Bigger). There was an objection. A motion for mistrial was denied. The Arizona Court said that Petitioner's claim that the questioned implied that Bigger had a criminal history and was prejudicial was not well taken because "we cannot say that the prosecutor **"necessarily"** intended to imply that Bigger had a criminal history, **"could"** have been intended to merely differentiate between a photograph of the entire body and a photograph of a person's face the jury was **"likely"** aware that Bigger had been arrested so that they might have thought the prosecutor **"could have"** referring to the booking photograph taken in this case. In order to avoid a reasonable application of federal law, the Arizona court was willing to engage in speculation about what "could have been" and whether the prosecutor "necessarily" intended the improper implication.

If the prosecutor merely intended to differentiate between a facial photo, on the one hand, and a full body photo, on the other, he certainly could have asked without including "mug shot" in his question. The Arizona court also said that there was no prejudice because "we presume" the jury followed the court's earlier admonition to disregard "such statements". The Magistrate Judge's Report simply accepts as not "objectively unreasonable" the opinion of the Arizona court.  It is.

2.    **Federal Charges**

Stephanie Nagel testified that she was at the federal courthouse as part of her pretrial conditions of release in order to "drop" a urine sample. She was asked and agreed that this was required because she had some "legal problems". The prosecutor then asked if Petitioner had told her that he was also there to "drop" urine. Certainly, if the jury is seen as capable of understanding and following the admonition to disregard, they were also capable of figuring out that Petitioner was also there because of "legal problems". This is precisely what the State had been told to avoid. There were any number of ways the questions could have been asked without raising this improper inference that was in direct violation of the trial court's previous order.

The Arizona court made the observation that Petitioner did not object during Nagel's testimony.  First, this is simply untrue. In fact, at the very beginning, when the prosecutor asked why Ms. Nagel had been at the federal courthouse, Petitioner

said "Judge—". There was an immediate bench conference. If this does not constitute an objection, Petitioner is unsure what would. Moreover, trial attorneys recognize that continuing objections can create an unfavorable inference. Certainly, if the prosecutor had intended to have Ms. Nagel testify concerning statements made to her by Petitioner, he could have done so without even making reference to the federal courthouse. Instead, the prosecutor established that Ms. Nagel was at the court house to drop urine because she had legal problems and immediately asked whether Petitioner had told her that he too was there to drop urine. The improper testimony created an undeniable inference of wrongdoing in direct violation of the court's prior ruling.

The Arizona appellate court did agree that the prosecutor "used innuendo in questioning Nagel to indirectly allude to the federal charges against Schwartz, in violation of the trial court's order."  But, the court concluded that since there was other evidence that Schwartz's medical license had been suspended and since Petitioner had not objected (which he had), reversal was not required. Even though this testimony had been elicited in direct violation of the trial court's order. The Magistrate Judge simply agreed with the Arizona court and found that Petitioner's prejudice argument was "weak" since he did not object and that it was unlikely this evidence affected the jury's verdict.

With all due respect, there is a huge difference between the jury being told that Petitioner's medical license had been suspended, on the one hand, and being informed, improperly and in violation of a court order, that he had federal charges pending against him, on the other.

### 3.    Harm to Second Doctor

The prosecutor asked Carmen Fernandez whether Petitioner had told her that he wanted Dr. Stidham taken care of. Through her testimony and the testimony of other witnesses, the State was attempting to establish that Petitioner wanted horrible things, including death, to befall Dr. Stidham. The experienced prosecutor then asked whether there was another doctor that Petitioner wanted taken care of. (Magistrate's Report, p. 21).

Since the prosecutors questions established that "taken care of" meant killed and he asked his question about the second doctor using the same terminology, the jury was clearly lead to believe that Petitioner wanted to kill another doctor. The state had not made proper disclosure of evidence to support the presentation of this "other acts" evidence. And, their explanation for asking this question was, being kind, absurd, unbelievable and mind boggling.

The prosecutor said that she had asked the question in order to "elicit a difference in what Schwartz wanted done between the two doctors. One he wanted

killed, one he wanted harmed".  How in the world this explanation could be accepted as true is beyond counsel. The prosecutor raised the inference that Petitioner wanted to kill another doctor and their only explanation was that she did so in order to show that he wanted to kill Stidham but only wanted to harm the second doctor. This is ridiculous.

The Arizona court concluded that this testimony did not affect the jury's verdict because the state called four witnesses to say that Petitioner wanted to find someone to injure Stidham and three others to say that Petitioner told them he intended to find someone to injure Stidham. The Arizona court said that since there was overwhelming evidence that Petitioner had been looking for someone to harm Stidham, the "fact that Schwartz may also have wished to harm another doctor would have had no effect on the jury's verdict". Finally, the Arizona court pointed out that there  could be no prejudice because the jury was admonished to disregard. It is difficult to imagine evidence that would have had a greater effect on the jury's verdict than the evidence that was improperly admitted that Petitioner wanted to kill or harm yet another doctor.

With all due respect, the Magistrate Judge simply accepted the Arizona court's determination that there was no prejudice since other witnesses testified about Petitioner's intent to have someone kill Dr. Stidham. When the testimony about the

second doctor was elicited, Petitioner was made to look like a homicidal maniac who was hell bent on killing one or more doctors. How can anyone honestly say this testimony did not affect the jury's verdict?

### 4.    Palm Pilot

Petitioner submits this issue on the pleadings filed heretofore except to point out that the Arizona court found the failure to properly disclose was, at least, the result of negligence or mistake and that there was no prejudice because the jury was admonished to disregard.

### 5.    Reference to the Indictment

Lourdes Lopez, who was never instructed by the prosecutors not to mention the fact that Petitioner had been indicted in federal court, testified about her problems with Petitioner and said that she resigned because she learned that she was about to be indicted in federal court. Incredibly, the Arizona court found that Ms. Lopez's testimony did not violate an earlier ruling prohibiting the state form eliciting testimony that Petitioner had been indicted in federal court because she said that she "believed that *she*, not would be indicted". So, according to the Arizona courts, a jury that was given credit for being able to follow the admonition to disregard, repeatedly, was now unable to draw the all too clear inference that Schwartz had also been indicted in federal court. The Arizona court also accepted as true the prosecutors'

explanation that they had not admonished Ms. Lopez not to mention the federal indictment because her attorney had not allowed them to have contact with Ms. Lopez prior to the day of her testimony. Finally, the Arizona court said "We fail to see how her testimony **necessarily** implied that Schwartz had been indicted" Of course, the prosecutors were never asked to explain why they could not have sent a letter or explained to Ms. Lopez's attorney the need to avoid mention of the federal indictment. The acceptance of this explanation and the finding that the court order not to mention the federal indictment was not violated because M. Lopez said that "she" not Petitioner, had been indicted, ignores reality and constitutes an objectively unreasonable application of federal law.

### 6.    DNA Testimony

The trial court entered an order precluding the State form eliciting testimony about the combined results and random statistical probabilities of the DNA findings, based on the work of Reinbold and Heath.

Ms. Heath was called as a witness and ultimately testified that although she could not say, to a reasonable degree of scientific certainty, that Mr. Bigger's DNA was on the radio knobs of Dr. Stidham's recovered Lexus, she could say:

> Having looked at both my data and Mr. Reinbold's data,
> I feel **there is very strong evidence that**...(RT 3/28/06 p. 119,
> l. 23-25)

Before she was able to finish her answer, there was an objection.  Once again, the defense moved for a mistrial since Ms. Heath's opinion that "there is very strong evidence" was clearly based upon the combined results of her work and that of Mr. Reinbold.

Prior to trial, Ms Heath sent one of the two prosecutors in this case an e-mail which read, in part, as follows:

> In addition, the new calculations would allow me to strengthen my statements made during the interview (the first defense interview) and I would now say that I thought **there was very strong evidence that** Mr. Bigger's DNA was on this item.(the radio knobs).  (See, ROA 563 and attachments) (emphasis added)

This e-mail makes it clear that Ms. Heath's opinion that **there was very strong evidence that** Mr. Bigger's DNA was on the radio knobs of Dr. Stidham's recovered Lexus was based upon the combined calculations that had been precluded.

The Arizona courts concluded that the answer was not foreseeable and that there was no prejudice because of the admonition to disregard.  Clearly, the prosecutors had explained to Ms. Heath that she should not give a combined random statistical probability. The e-mail makes it clear that the prosecutors tried to find a way to be clever and avoid the court's order of preclusion. They did so by having Ms. Heath testify about the combined results, bolstering the strength of her opinions,

while avoiding the testimony about the numbers. The Arizona court, once again, concluded that Petitioner was not entitled to relief because the jury was instructed to disregard at various points during the trial. The acceptance of the prosecutors' explanation, given the evidence presented during the state court proceedings, was objectively unreasonable. The DNA evidence was the only physical evidence linking Bigger to the murder scene. And, if Bigger did not commit the murder, then Petitioner would be entitled to an acquittal. This evidence was critical. There was prejudice. Petitioner was deprived of his right to a fair trial. The Magistrate Judge, once again, simply deferred to the Arizona courts' findings which were and are objectively unreasonable.

### 7.    Winston's Testimony

The time of death in this case was critical. Dr. Winston testified during the State's case in chief. To say that he was more of an advocate than he was an objective expert witness would be something of an understatement.

Once it became apparent that Petitioner would call Dr. Keen and recall Dr. Winston to expose his falsified testimony concerning critical autopsy observations, Dr. Winston decided he would correct his "mistake" during his recall testimony. The prosecutors admitted that they spoke with him about correcting his "mistake", although they said this conversation took place minutes before he was recalled. The

prosecutors also explained that they thought the defense was aware that he would change his testimony because, after all, he was now a defense witness. These assertions are disingenuous, at best.

Even more disturbing is that the prosecutors, when told about the anticipated change of testimony, actually came up with a way to make an untruth appear to be true. Once Winston "corrected his mistake", he offered testimony about two recent cases in order to remain sure concerning the time of death. The Arizona courts seemed to believe that since the testimony was corrected, there couldn't be any prejudice. Obviously, the prosecutors had enough time to confer with Dr. Winston and come up with a way to rehabilitate his testimony and make his falsehood appear to be true.

The Magistrate Judge's Report indicates that "Schwartz has no evidence that the prosecutor knew or should have known that any of Dr. Winston's testimony was false". (Report, p. 30, l. 8). To the contrary, after Dr. Winston was impeached about his earlier testimony, the prosecutor said that he "**now looks like a boob and one who is perhaps not candid with the court**" (RT 4/11/06, p. 123-124) (emphasis added). There is no better evidence than this that the prosecutors' knew Dr. Winston was being less than candid. However, they sought to make the falsehood appear to be true because they realized that if the jury believed that Winston was testifying falsely

and that his opinion concerning the time of death was wrong, Petitioner would be acquitted.

All of this demonstrates that the state courts unreasonably applied existing federal law in order to avoid a reversal and that the state court decision is objectively unreasonable.

### C.   CUMULATIVE EFFECT

In *Alvarez v. Boyd*, 225 F3d 820 (7th Cir. 2000), the court said that trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law. See also, *U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990). In *U.S. v. Francis*, 170 F.3d 546 (6th Cir. 1999), the court said that the determination of whether a prosecutor's behavior constituted prejudicial error must be made in the context of the whole trial. The court then reminded us all of the prosecutor's role by quoting from *United Sates v. Berger*, 295 U.S. 78, 88, as follows:

> The United States is the representative not only of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor, indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every

legitimate means to bring about a just one.

Here, the prosecutors struck foul blows designed and calculated to bring about a conviction, regardless of the cost. They used improper methods and were more concerned about winning than they were about justice.

**D.    EVIDENTIARY ERRORS**

1)    Preclusion of Testimony of Paul Skitzki

Not only did prejudicial information repeatedly find its way into the jury box, but evidentiary rulings similarly deprived the Petitioner of a fair trial when it prevented the Petitioner from presenting evidence a reasonable person would rely upon to evaluate the truth of a matter.  Lourdes Lopez testified that the Petitioner had made repeated threats against Dr. Stidham, that she did not take the threats seriously, but did occasion to tell then prosecutor Paul Skitzki.  The Petitioner had previously disclosed Mr. Skitzki as a potential witness, and he sought to present Mr. Skitzki's testimony to establish  Ms. Lopez to be less than truthful.

The Magistrate adopted the court of appeals holdings by finding that the exclusion of the testimony of former prosecutor Paul Skitzki, who would have testified that Ms. Lopez did not tell him about threats made by the Petitioner to Ms. Lopez, did not render the Petitioner's trial fundamentally unfair because it was *not relevant to the ultimate issue of his guilt or innocence but related solely to a*

17

*collateral matter,* (MRR, p. 38) and that Ms. Lopez did not testify why she told Mr. Skitzki about the threats, thus ensuring that this testimony did not contradict her testimony that she did not believe the Petitioner's threats and, therefore, it did not undermine the defense theory that these were indeed empty threats. (Id., at 38-39)

It is a fact that the Petitioner knew Ms. Lopez would testify that she told Mr. Skitzki about the threats, and that testimony was brought out on cross-examination. Apparently, Ms. Lopez had said that she told Paul Skitzki about the treats in order to validate her statements about the threats. The State did not elicit this information from Ms. Lopez because her testimony would be impeached, however, due process demands, so the jury could properly weigh Ms. Lopez' testimony, that the Petitioner be permitted to establish that Ms. Lopez had lied about telling Mr. Skitzki about the threats in order to validate what she was saying. The inessentiality of whether she told Mr. Skitzki about the threats became essential when she made that statement to bolster her own credibility prior to trial. Rule 608, Arizona Rules of Evidence cannot be used to disallow such vital evidence of veracity. Moreover, it is worthy to note that the State did not object pursuant to Rule 608 when counsel asked Ms. Lopez if she told Mr. Skitzki about the threats; because it supported its case that she had enough concern over the matter to repeat it. The State cannot fail to object to that testimony and then holler foul when the Petitioner seeks to disprove it. Nevertheless,

even if the State had objected, whether Ms. Lopez lied in order to be believed about the Petitioner having made threats against Dr. Stidham goes directly to the truthfulness of her testimony on a critical issue in this case and the Petitioner's rights to due process and cross-examination mandate that he be permitted to present this crucial information to the jury; the threats Ms. Lopez claimed Petitioner to have made, if believed, or if believed to be more than just blowing off steam by the Petitioner, went directly to the Petitioner's motive to conspire with Biggers to murder Dr. Stidham.

2)      <u>Testimony of Dr. Jason Lee and Jennifer Dainty</u>

The State's theory was that Biggers was wearing scrubs when he murdered Dr. Stidham, however, no one could place Biggers at the medical complex where Dr. Stidham's body was found.  The testimony of Dr. Lee and Ms. Dainty was used by the State to call into question Dr. Lee's testimony that the person in scrubs in the parking lot outside of Dr. Stidham's office was <u>not</u> Biggers.

Over objection of the Petitioner, the testimony of Dr. Lee and Ms. Dainty was permitted to prove identity.  Ms. Dainty had identified the person in the store as Biggers, who had mentioned that pizza was being served at a meeting.  The State hoped to establish that because the person in the parking lot had mentioned something to Dr. Lee about pizza being delivered, that person was also Ronald Biggers.

Essentially, the State advanced a position it knew to be false in order to prove in the minds of jurors that Biggers was present in the parking lot before the murder and was therefore, Dr. Stidham's killer.  It was later determined on appeal, and by the Magistrate, that the testimony about the pizza was not hearsay as touted by the Petitioner, and that it was not permitted to establish identity as argued by the State, however, this irrelevant testimony as to identity was presented to the jury to confuse the issue of a positive identification of the person in the medical complex parking lot as not being Ronald Biggers, and create an unreasonable doubt in the minds of jurors as to the identity of the person in the parking lot; depriving the Petitioner of a fair presentation of the facts and to his due process right to a fair trial.

3)   Evidence of Dr. Stidham's Wife's Reaction to Discovery of Police in Her Home

The Magistrate found the court of appeals' was correct in its determination that the Petitioner was not denied his Sixth Amendment right to cross-examination of the police officers at Daphne Stidham's home the night of the murder because the Petitioner conceded he did not intend to raise a third-party defense as to Daphne Stidham, which the court found amounted to an implicit acknowledgment that evidence of her reaction on the night of the murder would not have created a reasonable doubt about the Petitioner's guilt, that said testimony would not have been relevant, and that it was not objectively unreasonable for the court to find as much.

20

(MRR, p. 40-42)

The Petitioner's decision not to pursue a third-party defense may speak to whether that evidence <u>by itself</u> would create a reasonable doubt as to his guilt, however, the Petitioner submits that evidence of Ms. Stidham's reaction, taken with all the other evidence, may have weighed toward creating a reasonable doubt as to the Petitioner's guilt and was entirely relevant in this case.  Petitioner's threats against Dr. Stidham seemed to be almost common knowledge, and given that, it would not unfathomable for Petitioner to argue that his big mouth could have resulted in Ms. Stidham having something to do with her husband's death, knowing it would be blamed on the Petitioner; although evidence of this was not sufficient for Petitioner to adopt a specific third party strategy.

The conclusion in *Parle v. Runnels,* supra., sums up the situation here:

> Because all of the trial court's errors pertained to evidence relevant to the only issue before the jury-Parle's state of mind at the time of the crime-and <u>all of the improperly admitted evidence bolstered the State's case, while all of the erroneously excluded evidence rendered Parle's defense far less persuasive than it might have been, it was objectively unreasonable for the California Court of Appeal to conclude that the combined effect of these errors did not violate Parle's due process rights.</u> That the evidence in question may have been partially cumulative of other properly admitted evidence does not render the errors necessarily harmless because the State's case establishing Parle's premeditation was less than overwhelming, and the jury's verdict is therefore more likely to have been affected by the trial court's errors.

*Parle v. Runnels,* supra., at 934

Based on the foregoing, the Petitioner submits that the Magistrate's Report and Recommendation is incorrect and the Petitioner should be granted habeas relief.

RESPECTFULLY SUBMITTED this  11th  day of May 2010.

BARTON & STORTS, P.C.


 s/Brick P. Storts, III
Brick P. Storts III
Attorney for Petitioner

The foregoing was efiled with the
Court this  11th  day of May 2010,
and a copy of the foregoing was
hand-delivered this date to:

Joseph Parkhurst
Assistant Arizona Attorney General
400 West Congress, #S-315
Tucson, Arizona 85701