# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Bradley Schwartz,

    Petitioner,

v.

Charles L. Ryan, et al.,

    Respondents.

CV 09-200-TUC-DCB

**ORDER**

After an independent review of the record, the Court adopts as its own the conclusions of law and findings of fact in the Report and Recommendation (R&R). The Court denies the Motion to Amend the Petition and the Petition.

## BACKGROUND

Petitioner, Bradley Schwartz, and the victim, Brian Stidham, were pediatric ophthalmologists. Stidham worked for Schwartz, who owned a successful pediatric ophthalmology practice in Tucson. In October 2002, the State Medical Board suspended Schwartz' medical license and required him to seek drug abuse treatment. The Drug Enforcement Agency (DEA) withdrew his license to prescribe controlled substances.

In November, Stidham left Schwartz' practice and opened his own medical office, taking some patients from the Schwartz practice.

Eventually, after being released from treatment, Schwartz' medical license was reinstated, and he reopened his office. The DEA had not reinstated his license to prescribe drugs, and several hospitals and health care organizations had revoked his privileges. Overall, Schwartz' practice grew throughout 2004, but it was considerably less successful than it had been before his leave of absence, and his income was greatly reduced.

The circumstantial evidence presented at trial against Schwartz was summarized by the Arizona Court of Appeals as follows:

> Schwartz blamed Stidham for his misfortune and believed Stidham had "left [him] when [he] needed him the most." He became "obsessed with revenge" and wanted to humiliate Stidham and destroy his practice. Schwartz considered planting child pornography or illegal drugs in Stidham's office; he asked a friend to claim Stidham had sexually assaulted her during treatment; and he asked a woman he had met at the treatment center to claim Stidham had fondled her child. He repeatedly told friends that Stidham was "going to die," and he asked several people to "take care of" Stidham or to "poke[ ] out" his eyes, "crush his hands," or "throw acid in his face." In February 2004, he reportedly paid a man $5,000 to kill Stidham, but the plan was foiled when the hired killer was himself murdered in March. Schwartz told his girlfriend that he was going to hire someone to kill Stidham outside Stidham's medical office and that it would look like a carjacking.
>
> On the night of the murder, Stidham conducted an ophthalmology seminar for medical students in his office at 6:00 p.m. The seminar concluded at 7:00, and the attendees had all left by 7:15. At 7:26, the alarm to Stidham's office was activated, indicating the time he left for the evening. At 10:30 p.m., an employee in the complex where Stidham's office was located returned with her fiancé to retrieve an item she had left there. They found Stidham's body on the ground in the parking lot and called 911. An autopsy revealed that Stidham had died from several stab wounds to the chest. His wallet, containing his credit cards and some cash, was found inside his pants pocket. His vehicle registration was found on the ground near his body, but his vehicle was gone.
>
> Before the seminar, at approximately 5:45 p.m., several people had seen a man in blue medical "scrubs" sitting on a curb in the parking lot outside Stidham's office. Neither of two men who routinely wore scrubs to work at the complex had been there at that time. At 6:00 p.m., a man wearing blue scrubs, later identified as Ronald Bigger, entered a convenience store near the office complex. He placed several calls from the store phone and left the store at approximately 6:45. About ten minutes later, a man called the store from Schwartz' cell phone, told the store clerk that a man had just called him from that number, and asked whether the caller was still in the store. The clerk informed him the man had left a few minutes earlier. When Bigger left the store, he had been seen walking in the direction of Stidham's office.
>
> Later that evening, Bigger entered a midtown restaurant located about a fifteen-minute drive from Stidham's office. Stidham's vehicle was later found in a parking lot a short walk from the restaurant. At 7:46 p.m., Bigger called Schwartz from a pay phone at the restaurant. Bigger then hailed a taxicab to drive him to another restaurant where Schwartz was having dinner with a companion, Lisa Goldberg. En route, Bigger borrowed the taxi driver's telephone and, at 8:19 p.m., placed another call to Schwartz. When the taxicab arrived at the restaurant, Schwartz came out and paid the fare. Bigger, who was now wearing casual clothes, joined the two inside for dinner. Goldberg recognized Bigger from Schwartz' office, where she had been introduced to him earlier that day. She noted that he now appeared extremely agitated. Schwartz asked

> Bigger how the scrubs had "worked out." Significantly, in July, Schwartz had attempted to solicit a prospective "hit man" and said he could provide scrubs to be worn while assaulting Stidham.
>
> After dinner, Schwartz, Goldberg, and Bigger left in Schwartz' car to find a hotel room for Bigger. Several hotels were full, but they eventually secured a room. After Schwartz paid for the room, he and Goldberg left Bigger there and returned to Schwartz' apartment. The next day, Schwartz withdrew $10,000 from his bank account. Bigger was seen that day carrying a large amount of cash in a white envelope. The month before Stidham was murdered, Schwartz had mentioned to Goldberg that he knew a man who was willing to kill someone for $10,000. Upon learning Stidham had been murdered, Goldberg believed Schwartz was responsible. When she asked him about it, he replied that he had not been involved but added that she was "his alibi."

(R&R at 1-3); (Petition (Doc. 1), Ex. 2: Arizona App. Decision at 2-6). Schwartz and Bigger were tried separately. Schwartz was convicted of conspiracy to commit first degree murder. The jury could not reach a decision on the first degree murder charge, and it was dismissed. Schwartz was sentenced to life in prison, without the possibility of parole for twenty-five years.

Schwartz' conviction was upheld on direct appeal on March 31, 2008. The Arizona Supreme Court denied review on October 28, 2008. Schwartz filed a timely federal habeas Petition on April 9, 2008.

On April 20, 2009, the Petition was referred to Magistrate Judge D. Thomas Ferraro for a Report and Recommendation (R&R) in accordance with 28 U.S.C. § 636(b)(1) and LRCiv. 72, Rules of Practice of the United States District Court for the District of Arizona.

On April 28, 2010, Judge Ferraro issued the R&R. Based on the one year statute of limitations period applicable under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Magistrate Judge recommended denying Petitioner leave to amend the Petition to add a seventh claim. Additionally, he recommended that this Court find Claims 1 through 4 have been exhausted, but Claims 5 and 6 were not fairly presented in state court and, if Petitioner returned to state court to exhaust them they would be untimely.

Consequently, Claims 5 and 6 are technically exhausted, but procedurally defaulted. The Magistrate Judge recommended dismissing Claims 5 and 6.[1]

The R&R considered the merits of Claims 1 through 4, and the Magistrate Judge recommended they be dismissed and the Petition by denied.

The Petitioner filed a written objection to the R&R, pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ.P.72(b). The State filed a Response. The matter is ready for final disposition by this Court.

## STANDARD OF REVIEW:

### A. Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)

The duties of the district court in connection with a R&R by a Magistrate Judge are set forth in Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed.R.Civ.P. 72(b), 28 U.S.C. § 636(b)(1). Where the parties object to a R&R, a district court judge "shall make a *de novo* determination of those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 149-50 (1985). When no objections are filed, the district court need not review the R&R *de novo*. *Wang v. Masaitis,* 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna-Tapia,* 328 F.3d 1114, 1121-22 (9th Cir.2003) (en banc).

---

[1]As to Claim 6, Petitioner's objection referred the Court to his arguments presented in his Reply to the Petition. This is not an objection to the Magistrate Judge's R&R, which considered the arguments presented in the Reply. The Petitioner does not provide an objection to the Magistrate Judge's conclusion that his citation to *State v. Gibson*, 44 P.3d 1001 (2002), a case which relied on state law but in-turn cited *Winfield v. United States*, 676 A.2d 1 (D.C. 1996), which relied on constitutional law was "once removed" from the requirement that he fairly present his constitutional claims to the state court, and therefore Claim 6 should be dismissed. (R&R at 14-15.) Claim 6 is waived by Petitioner's failure to object to the recommendation in the R&R for its dismissal. To the extent Petitioner addresses Claim 6 in the Supplement to Petition (Doc. 34), the Court will not consider the merits of Claim 6 in respect to *State v. Machado*, 2010 WL 1713952 (App. Div. 2 (April 29, 2010) because Claim 6 is procedurally defaulted and waived.

This Court's ruling is a *de novo* determination as to those portions of the R&R to which there are objections. 28 U.S.C. § 636(b)(1)(C). To the extent that no objection has been made, arguments to the contrary have been waived. *See* 28 U.S.C. § 636(b)(1)(A) (objections are waived if they are not filed within ten days of service of the R&R), *see also McCall v. Andrus*, 628 F.2d 1185, 1187 (9th Cir. 1980) (failure to object to magistrate's report waives right to do so on appeal); Advisory Committee Notes to Fed. R. Civ. P. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974) (when no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation). Neither party presents any argument in respect to the Magistrate Judge's rulings regarding procedural default. The Petitioner "addresses only those claims the Magistrate considered on the merits." (P's Objection at 2.)

### B. <u>28 U.S.C. § 2254</u>

Habeas petitions are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), see *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), which established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reduc[ing] delays in the execution of state and federal criminal sentences.' " *Schriro v. Landrigan*, 550 U.S. 465, 473, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' ... demands that state-court decisions be given the benefit of the doubt ." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*) (quoting *Lindh*, 521 U.S. at 333 n. 7).

A petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the threshold question is "whether [the Petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). The Court must first identify the clearly established Federal law, if any, that governs the claims. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 409; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

Under subsection 1 of section 2254(d), a state court decision is "contrary to" the Supreme Court's clearly established precedents if it applies a rule that contradicts the governing law set out in those precedents and reaches a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*).

In short, "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court cases] to the facts of the prisoner's case [will] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974. The petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively" unreasonable. *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under subsection 2 of section 2254(d), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). State court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C.§ 2254(e)(1); *Landrigan*, 550 U.S. at 473-474; *Miller-El II*, 545 U.S. at 240. However, it is only the state

court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

### C. Due Process Right to a Fair Trial: Prosecutorial Misconduct, Right to Present a Defense and to Confront Witnesses

As the Magistrate Judge correctly noted, clearly established federal law provides that the appropriate standard for federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). To prevail on his due process claim, Schwartz must prove that the prosecutor's remarks were not only improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181. "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" (R&R at 17-18 (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

Accordingly, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make this assessment, it is necessary to place the prosecutor's remarks in context considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, and "the weight of the evidence against the petitioner." *Id.* at 18 (citations omitted). The state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Id.* (citing *Donnelly,* 416 U.S. at 645).

Due process also requires that the defendant be afforded a fair opportunity to present a complete defense, including calling witnesses on his own behalf. (R&R at 36) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)). In considering the evidentiary rulings by the trial court, it is not this Court's role to review state law decisions on state law issues,

therefore, this Court is precluded from inquiring into the correctness of a state court evidentiary ruling. *Id.* (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). The state trial court's admission of evidence will only form the basis for federal habeas relief where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation of the petitioner's due process rights. *Mammal v. Van de Camp,* 926 F.2d 918, 919 (9th Cir. 1991). Petitioner argued he was precluded from presenting witnesses necessary to impeach State witnesses, and he was precluded in his cross-examination of witnesses in violation of the Confrontation Clause.

## **PETITIONER'S OBJECTIONS:**

The Petitioner alleged his due process rights under the Constitution were violated when evidence, either singularly or cumulatively, reached the jury because of prosecutorial misconduct or because of erroneous evidentiary rulings that prevented him from presenting a full defense and confronting witnesses against him.

Petitioner argued, as follows:

> Defendant's trial was anything but fair. The prosecutors' intentional and/or reckless improper remarks and conduct, the continuous need for the court to instruct the jury to disregard testimony they had already heard, and should not have, and exhibits they had already seen and/or been told about, when they should not have, the prosecutors' repeated improper questioning, their attempts to back door court rulings and their attempts to make false testimony appear to be true so infected the proceedings that Petitioner did not and could not have received a fair trial. Petitioner's trial was a travesty and a total miscarriage of justice. . . . There are some situations where 'the risk that the jury will not . . . follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' *Bruton v. United States*, 391 U.S. 123, 135 (1968). This is such a case.

(Petitioner's Objection (D's Objection) at 4-5.)

### **A. Alleged Prosecutorial Misconduct**

### **1. The mug-shot**

The Magistrate Judge considered the propriety of the Prosecutor's questioning of Dr. Lee, who saw a person wearing blue scrubs in the parking lot at Dr. Stidham's office on the evening of the murder. On cross-examination, Dr. Lee testified that he had seen pictures of Schwartz and co-defendant Bigger in the media, and that when he was interviewed on

- 8 -

December 6, 2004, he informed Detective Anderson that neither of them were the man he saw in scrubs in the parking lot. On re-direct, the Prosecutor asked, "As to Mr. Bigger, was it not just a mug shot – ." The defense's objection was sustained, and the Prosecutor rephrased the question to ask if the picture of Mr. Bigger was just a "face shot." (R&R at 18-19.)

The state appellate court determined that under the circumstances the "mug shot" question did not necessarily imply that Bigger had a criminal history because the jury knew Bigger had been arrested in the case before them, and may have logically concluded the mug shot referred to by the Prosecutor was the one taken in the case. The Prosecutor may have been innocently trying to distinguish between a full body shot and a head shot. The trial court gave a curative instruction that the jury not consider the question. This cured any prejudice, and there was no prosecutorial misconduct.

**2.     Federal Charges**

In violation of the trial court's order precluding the State from introducing evidence that Schwartz had been the subject of a federal investigation, indictment or plea regarding prescription drug fraud, the Prosecutor asked witness Nagel on direct examination where she had met Schwartz, and she responded that she met him at the federal courthouse. Schwartz objected. After a side-bar conference, the Prosecutor said she would guide the witness through the questions to avoid the precluded issues. Nagel was allowed to testify that she was at the federal building to drop a urine sample as a condition of her pretrial release, and Schwartz told her he was also there for a urine drop for drug testing. There were several references to the fact that Nagel had a pending federal indictment and that she and Schwartz had interacted at the federal building. At the end of the direct examination, Defense counsel moved for a mistrial. It was denied because it was not made until the end of Nagel's direct testimony.

The state court of appeals found the Prosecutor improperly alluded to the federal charges against Schwartz, but that defendant's argument of prejudice was weak because there was other testimony properly admitted regarding the suspension of Schwartz' medical

1 license and that he had lost his license to prescribe controlled substances, and had an
2 obligation to drop urine pursuant to his suspension by the medical board. Additionally,
3 Defense counsel did not object to the response by Nagel about the urine drop or other
4 interactions between herself and Schwartz until the end of her direct testimony.

**3.    Harm to Second Doctor**

The Prosecutor questioned witness Fernandez about whether Schwartz had told her he wanted Stidham taken care of, and through her testimony and the testimony of other witnesses, the State showed that Schwartz wanted horrible things, including death, to befall Stidham. Then, the Prosecutor asked Fernandez whether there was another doctor that Schwartz wanted taken care of, which left the impression that Schwartz wanted to kill another doctor. The State had failed to make proper disclosure of evidence to support the presentation of "other acts" evidence. The State, however, argued that the evidence was not other acts evidence because she asked the question to show the difference between what Schwartz wanted done between the two doctors.

The state appellate court found the Prosecutor improperly implied there was another doctor Schwartz wanted to kill, but the question did not prejudice defendant's case because there was overwhelming evidence from four other witnesses that Schwartz wanted to injure Stidham and three witnesses who testified that he wanted to find someone to injure Stidham. Given this overwhelming evidence, the jury would not be prejudiced by evidence that he also wished to harm another doctor, and the trial court admonished the jury to disregard the evidence.

**4.    Palm Pilot**

The State introduced an exhibit of a printed version of Schwartz' palm pilot address book. Schwartz objected that it contained extraneous information that might be prejudicial and the defense had not reviewed it. The trial court allowed the exhibit and witness testimony from Jeff Englander that the only place in Schwartz' address book that a license number and car model appeared was under the entry for Stidham. Later, pursuant to a written motion, the evidence was stricken and the jury was told to disregard it.

The appellate court found the failure to properly disclose this evidence was the result of negligence or mistake and there was no prejudice because the jury was admonished to disregard it. Most importantly, the court found the admission was harmless because jurors later learned through admissible evidence that Schwartz knew Stidham's vehicle model and license plate number.

## 5. Reference to the Indictment

The Prosecutor failed to instruct witness Lourdes Lopez, Schwartz' ex-fiancé, that she was not to mention the fact that Schwartz had been indicted on federal drug charges or the subject of a Drug Enforcement Agency (DEA) investigation. During her testimony, she said she resigned from her employment with the Pima County Attorney's Office because she learned she was about to be indicted in federal court. Petitioner argued that the jury must necessarily have concluded that Schwartz had also been indicted in federal court.

The trial court and the state court of appeals both found that Lopez' response did not violate the court order because it did not necessarily imply Schwartz was indicted too. Even in combination with Nagel's testimony that she saw Schwartz at the federal court house, Lopez' testimony did not necessarily imply he was under federal indictment. Any error was harmless because there was properly admitted evidence which reflected he was addicted to prescription drugs and as a result he had lost his license to practice medicine. Lopez testified without objection that she had helped him unlawfully obtain prescription drugs.

## 6. DNA Testing

The Prosecutor asked witness Lorraine Heath what her opinion was on the likelihood that the DNA taken from Dr. Stidham's car belonged to Mr. Bigger. She testified, "Having looked at both my own data and Mr. Reinbold's data, I feel there is very strong evidence that-" before being interrupted by the Defense's objection, which the court sustained. Petitioner argued that this testimony violated the trial court's order precluding Heath's opinion based on combined statistical probabilities of Reinbold's autosomal STR and her Y-STR test results. He also argued that the question by the Prosecutor was merely a clever way to get in testimony precluded by the court.

The trial court found that the testimony was not in violation of the court's preclusion order. The court found that the defense had been given proper notice that Heath's confidence in her opinion was based on using her experience, not merely statistics, to assess both Reinhold's results and her own results. She was not testifying about any sort of combined statistical probability; rather, her confidence level was based on the rarity of the profiles found by both Reinbold and herself. Therefore, Schwartz was not prejudiced by Heath's initial testimony regarding her opinion in light of both her and Reinbold's data.

The state court of appeals found no misconduct by the Prosecutor. It found that there was nothing in the record to indicate that the Prosecutor was asking about combined results and that Ms. Heath's testimony was not about combined statistical probability. Also, Heath's response was not foreseeable, as she was only asked how likely it was that the DNA profile she found in *her* testing was Bigger's. There was no prejudice because the objection was sustained before any objectionable testimony was admitted.

### 7. Forensic Pathologist Winston's Testimony

Dr. Winston testified that he examined Stidham's body at the scene beginning around 4:15 a.m. He also testified that liver mortis, the settling of blood after death, appears several hours after death and remains blanchable for about twelve hours before becoming fixed. Dr. Winston testified that when he examined the body at the scene, it had blanchable live mortis over the posterior surfaces of the body, meaning the time of death was less than twelve hours prior. This turned out to be a mistake. When called for reexamination by the defense, Dr. Winston testified that the notation in his autopsy report stating that liver mortis was not fixed was based on his review of the body at 8:30 a.m. when he began the autopsy, not when he examined the body at the scene. He also testified that this realization did not change his opinion about Stidham's time of death, citing two recent cases in which bodies that had been refrigerated, as Stidham's was, did not show signs of fixed liver mortis for twenty-four and thirty hours after death. The Prosecutor stated that she learned of Dr. Winston's error and intention to correct it just before he took the stand, which was corroborated by Dr. Winston. She also said that she did not disclose this information to defense counsel because she

believed this was the reason he recalled Dr. Winston. Petitioner argued that the Prosecutor knew Dr. Winston was being "less than candid," and that he sought to make the mistake seem inconsequential by "rehabilitat[ing] his testimony."

The trial court found that the Prosecutor should have immediately informed the defense of Dr. Winston's disclosure, even if it was only twenty minutes before he took the stand. However, the court denied a mistrial because it believed the Prosecutor was being truthful, and it found no prejudice to Schwartz. The court of appeals and the Magistrate Judge also found that Schwartz had not suffered any prejudice because the defendant had a chance to show the jury that Dr. Winston's prior testimony was inaccurate, and Dr. Winston did not change his opinion as to the time of death, that testimony cannot be said to be false. An attempt to rehabilitate testimony in no way suggests the Prosecutor knowingly put on false testimony, and Dr. Winston's false testimony could not have affected the jury's verdict because it was shown to be false prior to deliberations.

### B. Alleged Evidentiary Rulings:
### Violations of the Right to Present a Complete Defense and Confrontation Clause

**1. Preclusion of Skitzki Testimony**

Lourdes Lopez testified that Schwartz told her that Stidham was going to die, that he would not do it himself, and that it would be like a robbery or a car jacking. She also testified that she did not take him seriously. Furthermore, she testified that she had told Paul Skitzki about these conversations. The State moved to preclude defendant from impeaching Lopez with testimony by Skitzki. The State expected Skitzki to testify that Lopez had not told him about these discussions and that the Defense would use this to demonstrate that Lopez was untruthful. The trial court granted the State's motion. Petitioner argued that preclusion was inappropriate because whether or not Ms. Lopez lied was relevant to the truthfulness of her testimony on a critical issue in this case, i.e., defendant's motive to conspire with Bigger to murder Dr. Stidham.

The appellate court found that this evidence was properly excluded under Arizona Rule of Evidence 608(b) which states that a party cannot introduce extrinsic evidence to impeach a witness regarding an inconsistent fact that is collateral to the trial issues, but is

- 13 -

1 "bound by the witness' answer." It found that the exclusion of Skitzki's testimony did not
2 render defendant's trial fundamentally unfair because it was not relevant to the ultimate
3 issue of his guilt or innocense but related solely to a collateral matter, which was whether
4 Lopez believed Schwartz' threats were genuine. It was the defense theory that the
5 Schwartz' threats were empty. Moreover, because she did not explain why she told Skitzki
6 about the threats, this testimony did not contradict her prior testimony that she did not
7 believe the threats were genuine.

**2.      Admission of Lee and Dainty Pizza Testimony**

Dr. Jason Lee testified that he attended a lecture given by Stidham at his office on the night he was murdered. He testified that when he arrived at around 5:50 p.m., he encountered a person in the parking lot wearing blue scrubs. He testified that the man was sitting on the curb and helped him to find Dr. Stidham's office. The man told him he thought pizza had recently been delivered to Dr. Stidham's office. Jennifer Dainty testified that a man in blue scrubs came into her store and told her he was looking for something to eat because the meeting he was at had served pizza, and he didn't like pizza. The defendant moved to preclude this testimony as hearsay, arguing the State offered the statements to prove the truth of the matter - that pizza was delivered to Stidham's office on the night of the murder. Schwartz argued that the statements attributed to Bigger were testimonial because he would be able to foresee that anything he said to others at that time might be used in a criminal investigation or prosecution. He alleged the State advanced a position it knew to be false in order to confuse jurors regarding Dr. Lee's prior testimony that Bigger was not the man he saw in the parking lot. *See supra* § A(1) (discussing Lee's cross-examination question regarding mug shot).

In a pretrial ruling, the court denied a motion in limine to preclude this testimony. It found that the testimony was not hearsay as it was not used to show that pizza was or wasn't being served or that the man liked or disliked pizza; rather, it was used to show that the person who made the statement at the convenience store was the same person as the man who spoke to Mr. Lee at the medical complex. The appellate court affirmed the trial court's

- 14 -

ruling, and found that Schwartz would not have benefitted from cross-examining the man in blue scrubs about his statements. It also found that the Confrontation Clause was not violated because the statements were neither testimonial nor hearsay.

**3.      Preclusion of Stidham's Wife's Reaction**

On the night of the murder, several Pima County Sheriff's deputies went to check on Mrs. Stidham. When the deputies woke her, Mrs. Stidham immediately asked if her husband was okay. She then asked if he had been shot. The deputies had not mentioned that her husband had been harmed, so they asked her why she would ask those questions. She responded that he hadn't come home yet. At a pretrial hearing, the Defense conceded that it did not intend to raise a third-party defense as to Mrs. Stidham. The trial court found this to be an implicit acknowledgment that evidence of Mrs. Stidham's reaction would not have created a reasonable doubt as to defendant's guilt. It therefore precluded evidence regarding Mrs. Stidham's reaction. Petitioner argued that this preclusion violates the Confrontation Clause of the Sixth Amendment because he could not cross-examine the deputies.[2] He contends that Mrs. Stidham's reaction, taken with all the other evidence, may have weighed toward creating a reasonable doubt concerning defendant's guilt. For example, he could have argued that Mrs. Stidham was involved with the murder because she knew blame would be cast on Schwartz because of his "big mouth."

The appellate court found that the trial court's preclusion was reasonable because any relevancy of the evidence was outweighed by possible confusion. It also found that the Sixth Amendment's Confrontation Clause was not violated because evidence of Mrs. Stidham's

---

[2]Petitioner now claims that *State v. Machado*, 242 Ariz. 343 (App.2010) supports his argument that preclusion was improper. (Doc. 34). *Machado* states that out-of-court statements may be offered to establish the <u>knowledge or state of mind of the person who heard them</u>, regardless of their truth, and that such statements do not fall within the proscription of Rule 802. *Machado* at ¶ 58 (emphasis added). In this case, deputies heard Mrs. Stidham's statements. Petitioner does not explain how establishing the knowledge or state of mind of the deputies would be in any way relevant to the proceedings. *Machado* does not support Petitioner's argument for preclusion.

- 15 -

conduct was irrelevant in that it did not tend to create a reasonable doubt as to defendant's guilt.

**CONCLUSION**

The Magistrate Judge found that the state appellate court's decisions rejecting, individually, each allegation of error were objectively reasonable. The Court agrees. It is not enough for Petitioner to make arguments such as: no reasonable person could conclude there was not prosecutorial misconduct leading to admission of evidence that Petitioner wanted to have another doctor killed and that this did not affect the trial because it made him look like a "homicidal maniac." (D's Objection at 10-11). Simply asserting prejudice, does not address the reasonability of the state appellate court's finding that any prejudice was addressed by a curative instruction to the jury and offset by other admissible evidence that clearly established defendant's intent to have Dr. Stidham killed. Petitioner's other assertions of prejudice are not nearly as inflammatory as the alleged "homicidal maniac" inference, and curative instructions and other admissible evidence cannot be ignored.

Petitioner argued that, cumulatively, evidence admitted due to prosecutorial error overcame the ability of any curative instruction to address prejudice and ensure the Petitioner received a fair trial. Having found that the state appellate court's decisions were objectively reasonable as to each alleged error, there were only three admissions of evidence due to prosecutorial error, as follows: (1) improper allusion to federal charges against Schwartz, (2) improper implication that there was another doctor Schwartz wanted to kill, and (3) failure to disclose Schwartz' palm pilot as evidence. In each instance, the state appellate court found these errors were offset by admissible evidence and addressed by the corrective jury instructions given by the trial court. There was no prosecutorial error with regard to petitioner's other claims: 1) the use of the phrase "mug shot," 2) improper reference to the indictment, 3) improper reference to precluded combined statistical probability concerning DNA testing, and 4) failure to disclose a change in Dr. Winston's testimony.

The Court agrees with the conclusions and analysis presented by the Magistrate Judge, affirming as objectively reasonable the findings related to prosecutorial conduct. Petitioner focused extensively on the knowledge and experience of the prosecutor in arguing misconduct; however, when conducting a due process assessment for claims of prosecutorial misconduct, the focus is whether or not defendant's trial was fair, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The instances of prosecutorial misconduct alleged here did not, individually or cumulatively, "so infect[] the trial with unfairness as to make the resulting conviction a violation of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

The Court agrees with the Magistrate Judge's finding that the state appellate court's decisions were objectively reasonable in respect to its findings that any prejudice created by prosecutorial misconduct was generally offset by admissible evidence and addressed by the corrective instructions given by the trial court. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (it is presumed the jury will follow instructions to disregard inadmissable evidence inadvertently presented to it).

Additionally, the Court agrees with the Magistrate Judge's conclusion that the state appellate court's decision was objectively reasonable in respect to Petitioner's claim that his right to present a complete defense was violated because the trial court precluded him from calling Paul Skitzki and Dave Wickey to impeach the State's witness Lopez. In both instances, preclusion was based on the trial court's finding that the proposed impeachment testimony was not material and was collateral to the ultimate issue in the case. The state appellate court affirmed this evidentiary ruling by the trial court and so does this Court.

As to the Petitioner's charge that the trial court violated the Confrontation Clause by precluding the cross-examination of police officers, who informed Daphne Stidham of her husband's death, about her reaction to the news, the state appellate court affirmed the trial court's finding that it was not relevant and confusing. This Court agrees with the Magistrate Judge's conclusion that this finding by the state appellate court was objectively reasonable, especially since the defendant conceded he did not intend to present a third-party culpability

defense as to Ms. Stidham. (R&R at 41). Preclusion of this evidence was well within the wide latitude held by a trial court to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, witness' safety or interrogation that is repetitive or marginally relevant. *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

After a *de novo* review of the record, the Court finds the Petitioner's due process right to a fair trial and to present a complete defense were not violated by prosecutorial misconduct or the evidentiary rulings of the trial court.

**Accordingly,**

**IT IS ORDERED,** that after a *de novo* review of the issues in the Petitioner's Objection, the Court adopts the Report and Recommendation (Doc. 31) as the Opinion of the Court.

**IT IS FURTHER ORDERED** that the Motion to Amend the Petition (Doc. 26) is DENIED.

**IT IS FURTHER ORDERED** that the Petition (Doc. 1) is DENIED, and the Clerk of the Court shall enter Judgment accordingly.

DATED this 13th day of August, 2010.

David C. Bury
United States District Judge