**BARTON & STORTS, P.C.**
**271 North Stone Avenue**
**Tucson, Arizona 85701**
 **(520) 882-2802 (tel.)**
**(520) 882-5785 (fax)**
**Brick P. Storts, III**
**brickstorts@yahoo.com**
**AZ Bar No.  004507**
**Attorney for: Petitioner Bradley A. Schwartz**

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| **BRADLEY A. SCHWARTZ,** | No.  CV-09-200-TUC-DCB |
| Petitioner, | |
| vs. | |
| **CHARLES RYAN, Director, Arizona Department of Corrections** | **PETITION FOR CERTIFICATE OF APPEALABILITY** |
| Respondent, | |
| **TERRY GODDARD, Attorney General of the State of Arizona,** | |
| Respondent. | |

COMES NOW the Petitioner, by and through counsel undersigned, and, pursuant to 28 U.S.C. § 2253(c), hereby moves this court for a Certificate of Appealability based on the following:

1.	On April 9, 2008, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

1

  2. On August 13, 2010, this Court ruled that the Petition for Writ of Habeas Corpus should be denied and judgment was entered dismissing Petitioner's case.

  3. This Court found that Petitioner had filed a timely Petition for Habeas Corpus (Order, p. 3, l. 15), had exhausted the claims raised in issues 1 through 4, but that the Claims raised in issues 5 and 6, though technically exhausted were procedurally defaulted. (Order p. 3, l. 24---p. 4, l.2)

  4. Petitioner respectfully submits that he is entitled to relief on appeal because he has made a substantial showing of the denial of a constitutional right with respect to issues 1 through 4 and, contrary to the Court's Order, as to issue 6 since that issue has been exhausted and is not procedurally barred.

### STANDARD

  In *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595 (2000), the Court said that in order to obtain a COA "a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot,* includes showing that reasonable jurists could debate whether" the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Id.* at 484 See also, 28 U.S.C. 2253.

  Under subsection 2 of section 2254 (d) habeas relief is available if the State court decision is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Miller-El v. Dretke*, 545 U.S. 231, 240.

## INTRODUCTION

Petitioner was denied his right to a fair trial based on the many instances of prosecutorial misconduct, was prevented from fairly and completely presenting his defense and was denied his right to confront and cross examine the witnesses against him.

The state court unreasonably determined the facts in light of the evidence presented by suggesting what "could have been intended" by the prosecutor (MD, p. 4); what the prosecutor "could have been referring to" (*Id*. p. 4); what the trial court "implicitly" concluded concerning prejudice to Petitioner (*Id*. pp. 5, 8); by not properly reviewing the trial court's acceptance of the unreasonable explanations and excuses offered by the prosecutors for their misconduct by saying it would "defer to the trial court's judgment on such matters" (*Id.* p. 6); by consistently taking the position that it was okay that inadmissible and prejudicial testimony was admitted by the prosecutors because, after all, each and every time it happened, the jury was instructed to disregard that which should not have come before the jury in the first place (e.*g. Id*. pp. 6, 7); by deferring to what the trial court "apparently found" (*Id*. p. 7); by suggesting that it was "not foreseeable" that a witness (Heath) would answer a question in a particular manner, when the evidence was to the contrary (*Id*. p. 8); by offering up what the trial court "could have reasonably concluded" (*Id*. p. 9) and, finally and incredibly, by suggesting that it could think of no reason for how Petitioner could have been prejudiced by the presentation of false sworn testimony. (*Id*. p. 9)

**Prosecutorial Misconduct Which Resulted in Petitioner's Trial Being Anything But Fair**

To prevail on his due process claim, Schwartz must prove that the prosecutor's remarks were not only improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)

This court said as follows:

> The Court agrees with the Magistrate Judge's finding that the state appellate court's decisions were objectively reasonable in respect to its findings that any prejudice created by prosecutorial misconduct was **generally** offset by admissible evidence and addressed by the **corrective instructions** given by the trial court. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (it is presumed the jury will follow instructions to disregard inadmissible evidence inadvertently presented to it). (Order p. 17) (emphasis added)

With all due respect, there were simply too many instances of misconduct to find that a general off set of admissible evidence or that corrective instructions transformed an unfair trial into one which comports with due process. The pattern of misconduct permeated the entire trial and you can only ask a jury to disregard things they hear and see so many times before even the most optimistic among us will conclude that corrective instructions are simply not enough.

In *Alvarez v. Boyd*, 225 F.3d 820 (7th Cir. 2000), the court said that trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law. *See also, U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) In *U.S. v. Francis*, 170 F.3d 546 (6th Cir. 1999), the court said that the determination of whether a prosecutor's behavior constituted prejudicial error must be made in the

context of the whole trial. The court then reminded us all of the prosecutor's role by quoting from *United Sates v. Berger*, 295 U.S. 78, 88 (1935), and pointing out that although prosecutors may strike hard blows, they are not allowed to strike foul blows.

## Mug Shot

On day nine of the trial, the State called Dr. Lee as a witness to testify about a conversation he had with a man wearing scrubs in the parking lot of the medical complex where Dr. Stidham was found stabbed to death. (RT 3/10/06, p. 28, l. 23-25)  The State brought out that this man had told Dr. Lee that pizza had been delivered to Dr. Stidham's office. (RT *Id.* P. 31, l. 5-6) However, Dr. Lee admitted on cross examination, that he had seen pictures of Mr. Bigger, and that Mr. Bigger he did not resemble the man he spoke to in the parking lot.  (RT *Id.* at p. 38, l. 22-p. 39, l. 15)  Then, for some inexplicable reason, one of the two very experienced prosecutors in this case asked Dr. Lee whether the photographs he had seen were "mug shots". (RT *Id.* at 43, l. 11) The clear inference from this question was that Mr. Bigger must have had a prior criminal history.

The Court of Appeals dismissed this issue saying:

> First, we cannot say the prosecutor necessarily intended to imply that Bigger had a criminal history.  When the prosecutor's question is viewed in context, it **could have been  intended** to merely differentiate between a photograph of the entire body and a photograph of a person's face. Moreover, **the jury was likely aware that Bigger had been arrested, given that there had been widespread media coverage** of the case. Therefore, the prosecutor **could have been referring** to Bigger's booking photo. (MD, p. 4) (emphasis added)

5

If the prosecutor had intended to "merely differentiate" between a photo of the entire body and one of a face only, he simply could have asked Dr. Lee whether the photos he saw were full body photos or ones of the face only. The trial court and the Court of Appeals both accepted this unreasonable explanation for why the prosecutor asked about mug shots. Certainly, reasonable jurists could debate whether the state court made an unreasonable determination of the facts in accepting the explanation of the prosecutor.

### Federal Charges

Stephanie Nagel testified that she met Petitioner at the federal courthouse while she was there dropping urine as part of her pretrial release conditions because she had "some legal problems". The prosecutor then asked Ms. Nagel whether Petitioner had told her that he was also there dropping urine samples. She replied yes. The Court of Appeals acknowledged that the trial court had prohibited the State from introducing any evidence of "the federal investigation, indictment, or plea agreement." (*Id*. at p. 4) and that the prosecutors had used innuendo to allude to the federal charges in violation of the court's order. However, the court also said that they could not conclude that the trial court erred in "implicitly" finding that any prejudice was insufficient to warrant a mistrial. It is an unreasonable determination of the facts to rely upon what an appellate court might think a trial court "implicitly found. At the very least, reasonable jurists could debate whether this is true.

## Harm to the Second Doctor

During the testimony of Carmen Fernandez, the following questions were asked and answers given:

> Q. And during these conversations you were having with Dr. Schwartz did he ever tell you who he want (sic) to be taken care of?
> A. Yes.
> Q. Who did he tell you?
> A. Dr. Stidham.
> Q. He also tell you about another doctor that he wanted to be taken care of.
> A. Yes.
> Q. Do you know the name of that doctor?
> A. I cannot recall the name.

(RT, 3/17/06 p. 12, l. 9-19)

The prosecutor attempted to justify these questions by suggesting that it was okay because he was going to point out that although Petitioner wanted to kill one doctor, he only wanted to harm another. Had the prosecutor not asked this question, he would not have had to "differentiate" between Petitioner's homicidal tendencies on the one hand versus what the prosecutor must have believed to be his less serious desire to harm one or more doctors on the other. The Court of Appeals dismissed this issue/misconduct by saying that the evidence that Petitioner was attempting to find someone to harm Stidham was so overwhelming that "the fact that Schwartz may also have wished to harm another doctor would have had no effect on the jury's verdict." (*Id*. at p. 6)

Bringing out that he may have wanted to "harm" one or more other doctors made him look like a homicidal maniac who was poised to wipe out half of the physician population in our community.  This sort of evidence is not looked upon with favor because the guilt or innocence of a defendant

should be decided based on evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing. See, *U.S. v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) To say that this evidence did not or would not effect the jury's verdict ignores reality.  It is and was objectively unreasonable accept as true the explanation/excuse the prosecutor offered up for asking these questions. The State was concerned that Petitioner might be acquitted and because of that concern, the prosecutors resorted to striking "foul Blows" in order to secure their conviction.

Deferring to the trial court's acceptance of untrue and incredible explanations or excuses for misconduct is itself "objectively unreasonable". This misconduct alone warrants reversal. Together with the other instances of misconduct, it demands reversal.

### Schwartz's Palm Pilot

The Arizona Court of Appeals dismissed this issue by saying the "totality of the circumstances **suggests**, as the trial court **apparently** found in denying a mistrial, that the prosecutor's actions were the result of negligence or mistake rather than intentional conduct, and we defer to its determination". (*Id*. at p. 7) (emphasis added). The Court of Appeals also said that since the jury was instructed to disregard the testimony, it must have done so. (*Id*.)

Two questions leap out and beg to be answered. First, just how many times is the prosecutor allowed to say "oops" and be forgiven? And, equally important, how many times should we believe a jury can be told to disregard something significant and actually do so?

8

Petitioner respectfully submits that reasonable jurists could debate whether this issue, standing alone or in combination with the other instances of misconduct, warrants a finding that Petitioner was denied his right to a fair trial. Petitioner urges this court to issue a COA.

## Reference to Indictment

Lourdes Lopez testified that she had a relationship with Petitioner and that during that relationship she helped Petitioner unlawfully obtain prescription drugs. Everyone, including the prosecutors in this case, knew that Ms. Lopez left her employment with the Pima County Attorney's Office because she was about to be indicted based upon the things she and Petitioner had done.  Nevertheless, the prosecutor asked Ms. Lopez if there was a reason why she left the County Attorneys Office.  Her response was, predictably, "Because I knew I was going to be indicted".  After Ms. Lopez finished her testimony, she told the court that the prosecutors had not informed her that she was not to mention the federal proceedings. (This was the second witness who had not been properly informed concerning the court's rulings having to do with the federal proceedings. See, Affidavit of Leo Duffner that Ms. Nagel also said she had not been warned about the court's rulings)

The Court of Appeals dismissed this issue/misconduct by saying:

> Whether the omission was an oversight or something more, we note that the prosecutor informed the court that Lopez's counsel had not permitted him to contact Lopez before that day.
>
> \*      \*      \*
>
> ...and we cannot say the trial court erred in not finding the prosecutor's failure to inform Lopez to be more than negligence or mistake. Her testimony did not violate the

9

> court's order; she testified that she believed *she*, not Schwartz, would be indicted. We fail to see how her testimony necessarily implied that Schwartz had been indicted, and we defer to the trial court's observation that "the response of Ms. Lopez was not one that the State sought to elicit, but was the result of non-leading questions. (Id at p. 7)

One has to keep in mind that the prosecutors also elicited testimony form Ms. Nagel that she met Petitioner at the federal courthouse where she was dropping urine as part of her release conditions because she had legal problems **and** that Petitioner was also there dropping urine. Reasonable jurists could debate whether this issue should result in a new trial and whether the State court made an unreasonable determination of the facts by, once again, blindly accepting the prosecutors' excuses for one problem/issue after another which all deprived Petitioner of his right to a fair trial.

## DNA Testimony

Importantly, the only physical evidence which even remotely tied Bigger or Petitioner to the crime scene and the murder of Dr. Stidham was DNA evidence found on the radio knob of Dr. Stidham's stolen Lexis. The witness Heath testified consistently with an e-mail she had sent which read as follows:

> In addition, the new calculations (the calculations which were the result of the combined efforts of Ms. Heath and Mr. Reinbold) would allow me to strengthen my statements made during the interview (the first defense interview) and I would now say that I thought there was very strong evidence that Mr. Bigger's DNA was on this item.(the radio knobs).

10

At trial Heath said:

> Having looked at both my data and Mr. Reinbold's data, I feel there is very strong evidence that...(RT 3/28/06 (pm session) p. 119, l. 23-25)(emphasis added)

The Court of Appeals said that based on the prosecutor's question, "it was not foreseeable that Heath would answer as she did". (*Id*. at p. 8). With all due respect, the answer was not only foreseeable, it was calculated and predictable. Once again, the prosecutors violated both the letter and spirit of the trial court's ruling in order to insure a conviction. Certainly, reasonable jurists could debate whether Petitioner is correct.

### Winston's Testimony

In *Killian v. Poole*, 282 F3d 1204 (9th Cir. 2002), the court said that a "conviction based in part on false evidence, **even false evidence presented in good faith**, hardly comports with fundamental fairness". (emphasis added). In *U.S. v. LaPage,* 231 F3d 488 (9th Cir. 2000), the court said that a lie is a lie, no matter what its subject and the use of known lies deprives a defendant of his constitutional right to due process of law.

In *Hayes v. Brown*, 399 F3d 972 (9th Cir. 2005), the court said:

> "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is **"virtually automatic"** (citations omitted) In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears.

The grand daddy of all the instances of misconduct reared its ugly head when Dr. Winston was called by the State to testify. The time of death

11

in this case was critical. If the murder occurred after 7:45 p.m., then Bigger could not have been responsible and Petitioner would have been entitled to an acquittal. Dr. Winston knew this. According to Winston's "autopsy notes", livor mortis was still not fixed at the time of the autopsy. Since the autopsy in this case was performed at 8:30 a.m. on October 6, 2004, the time of death would have to be after 8:30 p.m. on October 5, 2004, since, according to Winston, livor mortis would become fixed in approximately twelve (12) hours. This would mean that Mr. Bigger could not have committed the murder.

Dr. Winston lied and said that his autopsy notes were simply a reminder about what he observed at the scene. The defense was forced to call Dr. Keene as a witness to prove that Dr. Winston was being untruthful. Only then did Dr. Winston admit that the autopsy notes were notes of what he observed during the autopsy itself. Dr. Winston told the prosecutor that he was about to change his testimony, because he had no other choice. The prosecutor did not immediately inform the defense of this anticipated "correction". The prosecutors did, however, attempt to rehabilitate Dr. Winston in order to make the lie appear to be the truth during their examination of Dr. Winston.

In order to avoid a mistrial, the State argued that he (Winston) "**now looks like a boob and one who is perhaps not candid with the court**" (RT 4/11/06, p. 123-124) (emphasis added).

The Arizona Court of Appeals said they agreed that "the prosecutor should have immediately informed defense counsel of Winston's error". (*Id.* at p. 9). Incredibly, the Court of Appeals also said:

> When the trial court asked Schwartz how he had been prejudiced, he was unable to offer an answer. Schwartz

> continues to offer no plausible theory of how he was
> prejudiced, and **we can think of none.** Accordingly,
> even if prosecutorial misconduct had occurred, it would
> not require reversal. (Id at p. 9) (Emphasis added)

Is it not prejudice enough to warrant a new trial if the prosecutors rely on what they know or reasonably should know to be false evidence. And, the prosecutor's comments above clearly demonstrate that they knew Dr. Winston had falsified his testimony on a critical issue. As the Court said in *U.S. v. Vozzella*, 124 F3d 389 (2d Cir. 1997),

> The fundamental unfairness of a conviction obtained
> through the use of false evidence has long been
> recognized by the Supreme Court. (Citations omitted)
> As *Agurs* noted, this conduct not only violates
> constitutionally mandated disclosure obligation, but
> "involves prosecutorial misconduct" and a "corruption
> the truth seeking function of the trial process. 427 U.S.
> at 104. The Supreme Court has therefore imposed
> "a strict standard of materiality" where the prosecution
> uses evidence it knew or should have known was false.
> In such a case, the conviction "must be set aside if
> there is any reasonable likelihood that the false testimony
> could have affected the judgment of the jury."

Here, because the false testimony was admitted on perhaps the single most critical issue in the case, reversal is required. Certainly, reasonable jurists could debate whether or not this is so. Petitioner respectfully urges this court to grant him a COA.

**Precluding Petitioner from Impeaching Lourdes Lopez**

Ms. Lopez testified on direct examination that the Petitioner told her that Dr. Stidham was going to die, that the Petitioner would not do it himself, and that it would be accomplished like a robbery or a car jacking

13

(RT 3-22-06, p. 14, ll. 13) but she never took the Petitioner serious.  (RT 3-22-06, p. 16, ll. 7-10).

The trial court precluded Petitioner from impeaching Ms. Lopez when she said she had told Paul Skitzki about the "threats" made by Petitioner. The information to impeach Ms. Lopez was, also, of a significant nature, as it applied directly to what the jury might believe about the truth of what she had testified regarding.  She had stated she did not take the threats by Appellant seriously but she did, in fact, take him seriously enough to have allegedly reported them to a Deputy County Attorney. Mr. Skitzki denied that took place and so stated under oath, at a previous hearing.

The trial court also precluded Petitioner from impeaching Ms. Lopez through the testimony of DEA Agent Wickey, who would have testified that Ms. Lopez had made numerous false statements to the Jury regarding her reason for both leaving the Pima County Attorney's and her knowledge of the DEA investigation and when she had obtained that knowledge.  17), but she never took the Petitioner serious.  (RT 3-22-06, p. 16, ll. 7-10).

In *U.S. v. Osazuwa,* 564 F.3d 1169, 1175-1176 the court said that otherwise inadmissible evidence may be introduced when the witness "opens the door" by introducing potentially misleading testimony. Petitioner was entitled to impeach Ms. Lopez with the testimony of Paul Skitzki to establish the falsity of her testimony; of which the State was clearly aware. (RA 242, ¶ 7). *U.S. v. Kincaid-Chauncey,* 556 F.3d 923, 932 (9th Cir. 2009) (impeachment by contradiction as an exception to the collateral fact rule embodied in *Rule 608(b), Federal Rules of Evidence (Fed.R.Evid.),* permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence, *citing United States v. Castillo,* 181 F.3d 1129, 1132 (9th Cir.1999))In *U.S. v. Abel,* 469 U.S. 45, 105 S.Ct. 465 (1984)

the Supreme Court held that extrinsic evidence of the witness' untruthfulness is permissible to establish a potential bias, and the fact that said evidence would also tend to prove the witness' testimony to be false is of no moment. *U.S. v. Abel,* 469 U.S. 45, 105 S.Ct. 465 (1984)(It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar) (Id. 469 U.S. at 55-56, 105 S.Ct. at 470-471).

**Hearsay Testimony of Jennifer Dainty and Dr. Jason Lee**

On the night of his murder, pizza was, in fact, delivered to Dr. Stidham's office. The State relied upon hearsay statements made to two separate witnesses, Jennifer Dainty and Dr. Lee, to establish that Mr. Bigger was in the Stidham parking lot some time soon before the murder. If the statements to Dr. Lee and Ms. Dainty were not true, then this testimony would have been irrelevant and, therefore, inadmissible. On the other hand, if the statements were offered for their truth, they would be classic hearsay and the admission of these statements would have violated Petitioner's right to confront and cross examine his accusers.

On day nine of the trial, the State called Dr. Lee as a witness to testify about a conversation he had with a man wearing scrubs in the parking lot of the medical complex where Dr. Stidham was found stabbed to death. (RT 3/10/06, p. 28, l. 23-25)  The State brought out that this man had told Dr. Lee that pizza had been delivered to Dr. Stidham's office. (RT *Id.* P. 31, l. 5-6)

The State did not produce a single witness to testify that Ronald Bigger was present at the medical complex where Dr. Stidham's body was

found on October 5, 2004. It was the State's theory Mr. Bigger was wearing scrubs at the time of the murder. The Court, in error, overruled the defense objection and allowed Dr. Lee to testify that the man directed him to Dr. Stidham's office (*Id.* at p. 30, l. 25) and said pizza had recently been delivered to that office. (*Id.* at p. 31, l.5)

The Court of Appeals held that these statements were not hearsay because they were not offered for their truth. (MD at p. 10). The Court of Appeals went on to say that since the statements were not hearsay, the Confrontation Clause was not implicated.

In *U.S. v. Summers*, 414 F.3d 1287 (10th Cir. 2005), the court said that a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime.

Reasonable jurists could debate whether the introduction of this hearsay evidence violated Petitioner's right to confront and cross examine his accusers, particularly because this evidence was the only evidence that even remotely established that Mr. Bigger was at or near the scene of the crime.

**Restrictions on Cross Examination of Daphne Stidham**

The evidence Petitioner intended to elicit from police testimony may not have directly inculpated Mrs. Stidham. However, the evidence would *tend* to create a reasonable doubt about the defendant's guilt. *State v. Gibson,* 44 P3d 1001 (2002).

There is no question but that the Petitioner had the right to present a defense, and as a corollary to that right, to confront and fully cross-examine witnesses against him, and to elicit testimony indicating third party

16

culpability of a non-testifying party. The trial court's limiting of the Petitioner's right to such cross-examination violated the Petitioner's right to present a defense.

The Sixth Amendment guarantees all criminal defendants the right to confront adverse witnesses through cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed..2d 934 (1965). This is a fundamental right which is applicable to State proceedings through the *Fourteenth Amendment*.

Again, reasonable jurists could debate whether the restrictions placed on Petitioner's right to cross examine police officers who had contact with Ms. Stidham immediately after the body of Dr. Stidham was found and the restrictions placed on Petitioner's ability to present this third party culpability evidence violated Petitioner's constitutional rights to fairly and completely present his defense, to cross examine his accusers and his right to a fair trial.

**Restrictions Paced on Petitioner's Right to Present a Third Party Culpability Defense with respect to Dennis Walsh**

Due process requires that the defendant be afforded a fair opportunity to present a complete defense, including calling witnesses on his own behalf. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Additionally, Petitioner has a Constitution right to a meaningful opportunity to introduce relevant evidence on his behalf. *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). The evidence the Petitioner sought to present to establish a reasonable probability that Dennis Walsh killed Dr. Stidham consisted of a confession that he had taken a car from somebody wearing scrubs and that he had stabbed this person; a statement from Brandon Kelly that he was acquainted with Mr. Walsh and in early October

17

2004, Mr. Kelly had seen Mr. Walsh in possession of a Lexus vehicle which he was attempting to get rid of.  Mr. Kelly stated that Mr. Walsh also showed him two knives that he was carrying in some blue-collared hospital scrubs with the letters UMC that he was wearing.  Mr. Walsh had committed two carjackings, one occurring October 15, 2004 and the other on October 28, 2004 (RA 517)   Mr. Walsh also committed 16 robberies from October 3, 2004 to December 29, 2004, four of which were committed in December, and twelve in October.  There is no indication Mr. Walsh committed any robberies in November.  Of the offenses committed in October, five were committed on the north side of Tucson a short distance from the location of Dr. Stidham's murder.  Dr. Stidham's vehicle was located in the immediate area where Mr. Walsh hung out and sold the cars he had stolen.  (RA 485 and attached exhibits). Without all of the evidence of Mr. Walsh's criminal activity, the Petitioner was forced to withdraw presentation of the defense in order to avoid the appearance of desperation.   (RA 617)

This court found that this issue had been exhausted but then found that it was procedurally defaulted and waived by Petitioner's failure to make specific objections to the R&R's conclusion that Petitioner's citation to *State v. Gibson,* 202 Ariz. 321, 44 P3d 1001 (2002) which in turn, relied on *Winfield v. U.S.,* 676 A.2d 1 (1996), was not sufficient to preserve the federal issue. However, it is well established that a Petitioner may fairly present his federally based claim by citing case law that would alert the state court to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 33, 124 S.Ct. 1347, 1351 (2004). By objecting to the findings of the R&R, Petitioner effectively objected to its conclusion that the issue was barred.

In *Winfield v. U.S*., Id, the court said that "a substantial proffer that a third person committed the offense implicates the defendant's constitutional

18

right to a 'meaningful opportunity to present a complete defense". *Id*. at 7. The court also said that unduly restricting the admission of third party perpetrator evidence would raise concerns of unequal treatment.

Petitioner respectfully submits that his citation to *Gibson* would have alerted the state court to the federal nature of his claim. Further, his objections to the R&R preserved the issue for federal appellate review. As indicated previously, reasonable jurists could debate whether Petitioner's position is well taken with respect to the finding that he is procedurally defaulted and the merits of his argument.

## CONCLUSION

Based on the foregoing, Petitioner respectfully submits that he has presented important and substantial questions of Constitutional law which are deserving of appellate consideration. Therefore, Petitioner respectfully urges this court to issue a Certificate of Appealability with respect to Claims 1 through 4 and claim no. 6.

RESPECTFULLY SUBMITTED this   24th   day of August 2010.

BARTON & STORTS, P.C

*s/Brick P. Storts, III*
Attorney for Petitioner

## CERTIFICATE OF SERVICE

I, Brick Storts, hereby certify that I caused an original of the foregoing Petition for Certificate of Appealability to be electronically filed to the Clerk, United States District Court, and one copy delivered to EZ Messenger Service this  24th  day of August 2010, to be delivered and served on the following:

> Joseph Parkhurst
> Arizona Attorney General's Office
> 400 West Congress, #S315
> Tucson, AZ  85701

>  *s/Brick P. Storts, III*
> Brick P. Storts, III